## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| **BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEIL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS**<br><br>**Defendants.** | Civil Action No. _____ |

## MEMORANDUM IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

Callan G. Stein (BBO # 670569)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
(617) 204-5100
callan.stein@troutman.com

William H. Hurd (Va. Bar # 16967)
Christopher W. Carlson, Jr. (Va. Bar # 93043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
(804) 697-1490
william.hurd@troutman.com
chris.carlson@troutman.com

(Motions for admission *pro hac vice* to be filed)

Mary Grace W. Metcalfe (N.Y. Bar #5377932)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
marygrace.metcalfe@troutman.com

(Motion for admission *pro hac vice* to be filed)

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

**Page**

I. BACKGROUND ............................................................................................................ 1

    A.    Nature of the Controversy ................................................................................. 1

    B.    The Boston Parent Coalition for Academic Excellence ...................................... 2

    C.    Relief Sought ..................................................................................................... 3

    D.    Posture of the Case ............................................................................................ 4

II. THE PRELIMINARY INJUNCTION SHOULD BE GRANTED .......................................... 4

    A.    The Boston Parents Are Likely to Succeed on the Merits. ................................... 5

          1.    The Zip Code Quota Plan Will Have Racially Disparate Effects. ............. 7

          2.    The Boston School Committee Adopted the Zip Code Quota Plan
               With Racially Discriminatory Purposes .................................................. 11

               a.    The "Projected Shift" Chart ......................................................... 12

               b.    The Exam School Admissions Working Group .......................... 12

               c.    Statements by Individual Defendants ......................................... 15

    B.    Plaintiff Will Be Irreparably Harmed by the Zip Code Quota Plan. ................... 19

    C.    The Balance of Equities Tips in Plaintiff's Favor. .............................................. 22

    D.    The Public Interest Favors a Preliminary Injunction ......................................... 23

    E.    A Bond is Not Necessary ................................................................................... 24

CONCLUSION ............................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AngioDynamics, Inc. v. Biolitec AG*,
    910 F. Supp. 2d 346 (D. Mass. 2012), *aff'd*, 711 F.3d 248 (1st Cir. 2013) ............................23

*Anthony v. Sundlun*,
    952 F.2d 603 (1st Cir. 1991) ................................................................................................18

*Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*,
    996 F. Supp. 409 (D.N.J. 1998) ......................................................................................17, 18

*Bonnell v. Lorenzo*,
    241 F.3d 800 (6th Cir. 2001) ................................................................................................19

*Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*,
    622 F.3d 36 (1st Cir. 2010) ..................................................................................................23

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ....................................................................................20

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ...............................................................................................................5

*Contrast Boston's Children First v. City of Boston*,
    62 F. Supp. 2d 247 (D. Mass. 1999) ....................................................................................23

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020) .........................................................................................................14

*Doe ex rel. Doe v. Yunits*,
    No. 001060A, 2000 WL 33162199 (Mass. Super. Oct. 11, 2000),
    *aff'd sub nom. Doe v. Brockton Sch. Comm.*, No. 2000-J-638,
    2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000) ..........................................................19

*Dorce v. Wolf*,
    2020 WL 7264869 (D. Mass. 2020) ....................................................................................24

*Dwyer v. Conflict of Interest Comm'n*,
    646 F. Supp. 707 (D.R.I. 1986) ...........................................................................................23

*Easter Seal Soc. of New Jersey, Inc. v. Twp. of N. Bergen*,
    798 F. Supp. 228 (D.N.J. 1992) ......................................................................................15, 18

*Fairview Mach. & Tool Co., Inc. v. Oakbrook Intern.*, Inc.,
    77 F. Supp. 2d 199 (D. Mass. 1999) ....................................................................................24

*Family Winemakers of California v. Jenkins*,
   592 F.3d 1 (1st Cir. 2010) ................................................................................15

*Fortenberry v. City of Wiggins, Mississippi*,
   No. 1:16CV320-LG-RHW, 2018 WL 8809236 (S.D. Miss. Feb. 5, 2018) ...........................15

*Freeman v. Pitts*,
   503 U.S. 467 (1992) ..........................................................................................6

*Gov't Ctr. Camera, Inc. v. United States*,
   No. CIV.A. 87-2208-S, 1987 WL 28337 (D. Mass. Nov. 5, 1987) ........................................24

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ..........................................................................................3

*Iadimarco v. Runyon*,
   190 F.3d 151 (3d Cir.1999) ................................................................................7

*Kikumura v. Hurley*,
   242 F.3d 950 (10th Cir. 2001) ...........................................................................19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................20

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018) ....................................................................................17

*McLaughlin by McLaughlin v. Boston School Committee*,
   938 F. Supp. 1001 (D. Mass. 1996) ...................................................................22

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ..........................................................................7, 15

*Miller v. Johnson*,
   515 U.S. 900 (1995) ..........................................................................................5

*New England Biolabs, Inc. v. Miller*,
   No. 20-CV-11234-DJC, 2020 WL 6871015 (D. Mass. Nov. 23, 2020) ...................................4

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007) ................................................................................ *passim*

*Parra v. Four Seasons Hotel*,
   605 F. Supp. 2d 314 (D. Mass. 2009) ...............................................................15

*Pers. Adm'r of Massachusetts v. Feeney*,
   442 U.S. 256 (1979) ..........................................................................................6

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978).................................................................................3, 5, 20

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...........................................................17, 18

*Soto v. Flores*,
  103 F.3d 1056 (1st Cir. 1997)..........................................................................6, 7

*Strahan v. Roughead*,
  No. 08-CV-10919-MLW, 2010 WL 4827880 (D. Mass. Nov. 22, 2010) ...............18

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009) ...............................................................................19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)....................................................................................... *passim*

*Wessmann v. Gittens*,
  160 F.3d 790 (1st Cir. 1998)...............................................................................2, 7

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................................4

*Wygant v. Jackson Bd. of Educ.*,
  476 U.S. 267 (1986)..............................................................................................5

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886)..............................................................................................6

**Statutes**

Mass. Gen. Laws Ann. Ch. 76, § 5 .......................................................................18

Massachusetts General Law 76, § 5 ......................................................................18

**Rules and Other Authorities**

Fed. R. Civ. P. 65(c) ............................................................................................24

*Recommendations of Exam Schools Admission Criteria for School Year 2021-
  2022* ("October 8th Working Group Presentation") ............................................12

The Plaintiff, Boston Parent Coalition for Academic Excellence, by counsel, submits this memorandum in support of its Motion for Preliminary Injunction, seeking relief against all Defendants for the reasons set forth below.

## I.  BACKGROUND

**A.     Nature of the Controversy**

For many years, the City of Boston has offered many of its most accomplished students the opportunity to obtain the incomparable education available at three nationally-renowned public high schools: the Boston Latin School, the Boston Latin Academy, and the O'Bryant School of Science and Math.  Known collectively as the Boston Exam Schools, these institutions have traditionally admitted students through a competitive process with two distinguishing characteristics.  First, the competition has looked at the students' performance on an admissions exam along with their grade point averages.  Second, the competition has been citywide.  No part of Boston has been favored in the admissions process, and none disfavored.

As a result of the Covid pandemic, the School Committee of the City of Boston ("Boston School Committee") decided it would not be feasible to administer an admissions exam for the Boston Exam School class that will enter in the fall of 2021.  Instead, the Boston School Committee decided that admissions for the fall of 2021 class would be based solely on the students' pre-Covid grade point average.  Plaintiff does not challenge the decision not to administer the exam, or the stand-alone use of grade point averages as a means of comparison.  But the Boston School Committee then went beyond anything required by the pandemic and voted to cripple the long-established citywide competition.  In its place, the Boston School Committee would erect a process in which *only 20 percent* of the seats at the Boston Exam Schools would be filled through a citywide admissions process, with the great majority of seats – 80 percent – being allocated by *zip*

*code.*  This hybrid approach – referred to as the "Zip Code Quota Plan" – will result in some students being denied admission to the Boston Exam Schools, even though their grades are better than other students who are offered admission, solely on the basis of the zip code in which they reside.  And, where student grades are identical – and the winner must be chosen by lot – the Zip Code Quota Plan will result in some students having a better chance of selection than others, based on the different sizes of the various zip code pools.

In adopting the Zip Code Quota Plan, the Boston School Committee has deliberately used zip codes as a proxy for race and ethnicity, to favor some racial and ethnic groups and disfavor others.  And, the plan will have precisely that intended effect, favoring African-American and Latino students while disfavoring Asian and White students.  Indeed, the Zip Code Quota Plan suffers the same constitutional defects as an earlier racially-discriminatory scheme devised by the Boston School Committee and struck down by the First Circuit two decades ago:

> The Policy is, at bottom, a mechanism for racial balancing – and placing our imprimatur on racial balancing risks setting a precedent that is both dangerous to our democratic ideals and almost always constitutionally forbidden.
>
> * * * * *
>
> Given both the Constitution's general prohibition against racial balancing and the potential dangers of stereotyping, we cannot allow generalities emanating from the subjective judgments of local officials to dictate whether a particular percentage of a particular racial or ethnic group is sufficient or insufficient for individual students to avoid isolation and express ideas.

*Wessmann v. Gittens*, 160 F.3d 790, 799 & 800 (1st Cir. 1998).  Racial discrimination, by any name, was wrong then, and it is wrong today.  The Zip Code Quota Plan must not be allowed to stand.

**B.     The Boston Parent Coalition for Academic Excellence**

The Plaintiff, Boston Parent Coalition for Academic Excellence (the "Boston Parents"), is a not-for-profit organization established under the laws of Massachusetts and dedicated to

"promot[ing] merit-based admissions to Boston Exam Schools (including Boston Latin School, Boston Latin Academy and O'Bryant School of Science and Math) and [promoting] diversity in Boston high schools by enhancing K-6 education across all schools in Boston."  Compl. ¶ 4. Among other concerned citizens, its members include numerous parents of students who will be prejudiced by the Zip Code Quota Plan. Compl. ¶ 6 (describing 13 examples of such parents and their students).

These parents, and others like them, would each have standing to sue in their own right to challenge the discriminatory, race-based admission process being imposed on their students by the Boston School Committee.  *See Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 280-82 n. 14 (1978) (applicant had standing to challenge racially discriminatory admissions policy which precluded him from competing for all places in the entering class).  Consequently, the Boston Parents likewise have standing to bring this action to challenge that admissions process.  Indeed, the U.S. Supreme Court addressed – and resolved in the parents' favor – the issue of associational standing in a case such as this in *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007).  There the Court held that, where the "group's members have children in the district's elementary, middle, and high schools," the group had standing to challenge the schools' "race-based program" because "being forced to compete in a race-based system that may prejudice the plaintiff" is "an injury that the members of [the group] can validly claim on behalf of their children."  *Id.* at 718-19.  *See also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (approving of associational standing in federal court litigation).

## C.    Relief Sought

The preliminary relief sought by the Boston Parents is simple and straightforward: They seek a preliminary injunction to preserve the status quo of a single, citywide competition based on merit.  To that end, they have named as Defendants the officials responsible for adopting and

implementing the Zip Code Quota Plan, and they ask this Court to enjoin Defendants from implementing that plan.  They further ask that the competition for seats at the Boston Exam Schools, for the class entering in the fall of 2021, be conducted on a citywide basis, without any consideration of zip codes or other method to subdivide the city, and without any use of race or ethnicity in admissions.

## D.    Posture of the Case

The Boston School Committee announced the Zip Code Quota Plan on October 21, 2020. Counsel for the Boston Parents have made multiple attempts to discuss the issues below with counsel for the Boston School Committee without any success.  On February 17, 2021, in the second of two brief phone calls, counsel for the Boston Parents conferred with counsel for the Boston School Committee regarding the implementation of the Zip Code Quota Plan.  Counsel for the Boston School Committee indicated that invitations would be sent out in "late March or early April" in accordance with the announced plan.  The Boston Parents have filed this action accordingly.

## II.  THE PRELIMINARY INJUNCTION SHOULD BE GRANTED

The Court should grant the Boston Parents' request for a preliminary injunction because they meet the four-factor test established by the U.S. Supreme Court in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  There the Court said: "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Id.* at 20.

As this Court has previously noted, a preliminary injunction's "purpose is 'to preserve the status quo so that upon full adjudication on the merits the district court can more effectively remedy any discerned wrongs.'"  *New England Biolabs, Inc. v. Miller*, No. 20-CV-11234-DJC, 2020 WL

6871015, at *1 (D. Mass. Nov. 23, 2020) (quoting *Chiara v. Dizoglio*, 59 F. Supp. 2d 193, 196 (D. Mass. 1999).  Here, the status quo is the use of a *single, citywide competition* to determine admission to the Boston Exam Schools – a competition based on the applicants' *academic performance* without any consideration of *race or ethnicity*.  This is the status quo the Boston Parents seek to maintain.

**A.      The Boston Parents Are Likely to Succeed on the Merits.**

The Basic Principles at Stake:  Count I implicates important equal protection principles that have been well-defined through many cases in many courts over many years.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  "Its central mandate is *racial neutrality* in governmental decisionmaking."  *Miller v. Johnson*, 515 U.S. 900, 904 (1995) (emphasis added) (collecting cases).  "The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color."  *Bakke*, 438 U.S. at 289 – 90.  Consequently, government actions that classify or distinguish based on race "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest."  *Cleburne Living Ctr.*, 473 U.S. at 439-40.

Such compelling state interests are few and far between.  For example, and relevant here, the Supreme Court has repeatedly held "that remedying past societal discrimination does not justify race-conscious government action".  *Parents Involved in Cmty. Sch.*, 551 U.S. at 731.  *See also Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274 (1986) ("societal discrimination alone is sufficient to justify a racial classification").  Whether in commerce or education, "racial balancing" of an industry or school "is not to be achieved for its own sake."  *Freeman v. Pitts*, 503 U.S. 467,

494 (1992) (explaining further that racial balancing is only "to be pursued when racial imbalance has been caused by a constitutional violation"). *See also Parents Involved in Cmty. Sch.*, 551 U.S. at 731 (quoting *Freeman*, 503 U.S. at 494). As a result, plans and programs for school attendance that "are tied to each district's specific racial demographics, rather than to any pedagogic concept of the level of diversity needed to obtain the asserted educational benefits" are "patently unconstitutional" and violate "the Fourteenth Amendment guarantee of equal protection". *Id.*, 551 U.S. at 726 & 710.

On its face, the Boston School Committee's use of zip codes to allocate admission seats to the Boston Exam Schools may appear racially neutral. But the law is not so easily deceived. "A racial classification, regardless of purported motivation, is presumptively invalid" including where "a classification [] is *ostensibly neutral but is an obvious pretext for racial discrimination*." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) (collecting cases) (emphasis added). *See also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."). That is the situation here.

Generally, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Providing direct evidence of a discriminatory purpose is often difficult because "it is rare that discrimination wears its garb openly." *Soto v. Flores*, 103 F.3d 1056, 1067 n.12 (1st Cir. 1997). "Without the smoking gun of an overtly discriminatory statement by a

decisionmaker, it may be very difficult to offer sufficient proof of such a purpose." *Id.*[1]  In this case, however, the Boston School Committee not only "wears its garb [of racial discrimination] openly," it has flaunted that garb defiantly.  There is not only a "smoking gun" illustrating that discriminatory motive, there is a whole battery of guns blazing away at the concept of racial equality.  *See infra* at Section II.A.1.c.

    <u>What Plaintiff Must Show:</u>  In order to succeed on the merits of their constitutional claim, the Boston Parents must show two things.  First, they must show that the Zip Code Quota Plan, while perhaps appearing neutral on its face, will have a *disparate effect* on different racial and ethnic groups.  Second, they must show that the Boston School Committee adopted the Zip Code Quota Plan with the *intention* of causing that disparate effect.  *Vill. of Arlington Heights*, 429 U.S. at 265.

    Once these two things are shown, strict scrutiny will apply, and the Zip Code Quota Plan must be held unconstitutional unless the Boston School Committee can somehow demonstrate that its plan is narrowly tailored to achieve a compelling government interest.  While the Boston Parents need not anticipate or preemptively rebut whatever arguments the Boston School Committee may make, controlling authority already refutes those "racial-balancing" theories that they are on the record as having offered to justify their actions.  *See, e.g., Parents Involved in Cmty. Sch.*, 551 U.S. at 730-731; *Wessmann*, 160 F.3d at 799-800.

      **1.**        **The Zip Code Quota Plan Will Have Racially Disparate Effects.**

    The Boston School Committee's own records show that the Zip Code Quota Plan will have racially disparate effects.  **Exhibit A** is a slide shown by Defendants at a public meeting of the

---

[1]    *See also Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 610–11 (2d Cir. 2016) ("quite obviously, discrimination is rarely admitted"); *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir.1999) (one "who discriminates will almost never announce a discriminatory animus or provide [victims] or courts with direct evidence of discriminatory intent.").

Boston School Committee, held on October 8, 2020, where Defendants introduced the Zip Code Quota Plan to the public.

**Exhibit A:**



Labeled "Projected Shift," Exhibit A contains a set of bar graphs under the heading "Distribution by Race." These graphs show that, while the racial and ethnic composition of the Boston Exam Schools is already diverse, it does not exactly match the racial and ethnic composition of the city. The slide also shows that the effect of the Zip Code Quota Plan is to disfavor Asian and White students by decreasing their numbers at the Boston Exam Schools while favoring Latino and African-American students by increasing their numbers. White students will drop from 39 percent of admissions to 32 percent (a decrease of 18 percent), while Asian students will drop from 21 percent of admissions to 16 percent (a decrease of 24 percent). Mixed race student admissions will not change, but will hold steady at 5 percent. African-American and Latino students will see their numbers increase significantly.

The disparate effect of the Zip Code Quota Plan is further illustrated by examining Exhibit B (shown below), a chart prepared by the Boston School Committee.  Exhibit B lists each Boston zip code and shows, among other things (i) the number of admissions ("invitations") to the Boston Exam Schools for the class that entered in the fall of 2020 under the traditional admissions process, and (ii) the projected number of admissions for the fall of 2021 using the Zip Code Quota Plan (including both the 20 percent citywide allocation and the 80 percent zip code allocation).

**Exhibit B:**



| Zip Code | Neighborhood | % of School-Aged Children | SY20-21 Actual | | Seats under Simulations |
|---|---|---|---|---|---|
| | | | # Applicants | # Invitations | Average # Invitations |
| 02108 | Beacon Hill | 0.3% | <6 | <6 | 4.0 |
| 02109 | Downtown | 0.1% | 8 | 7 | 5.7 |
| 02110 | Downtown | 0.3% | 7 | 7 | 2.7 |
| 02111 | Chinatown | 0.8% | 43 | 24 | 10.0 |
| 02113 | North End | 0.3% | 7 | 7 | 7.7 |
| 02114 | Beacon Hill/West End | 0.7% | 22 | 19 | 13.0 |
| 02115 | Fenway | 1.4% | 33 | 15 | 15.3 |
| 02116 | Back Bay | 1.3% | 44 | 27 | 19.7 |
| 02199 | Back Bay | 0.1% | <6 | <6 | 0.3 |
| 02118 | South End | 3.3% | 105 | 36 | 32.0 |
| 02119 | Roxbury | 6.1% | 136 | 27 | 56.0 |
| 02120 | Roxbury | 1.5% | 46 | 17 | 15.3 |
| 02121 | Roxbury | 8.2% | 218 | 27 | 78.0 |
| 02122 | Dorchester | 4.6% | 186 | 62 | 53.7 |
| 02124 | Dorchester | 12.4% | 335 | 84 | 123.0 |
| 02125 | Dorchester | 6.3% | 174 | 47 | 66.0 |
| 02126 | Mattapan | 6.3% | 131 | 20 | 58.0 |
| 02127 | South Boston | 4.2% | 108 | 35 | 42.3 |
| 02128 | East Boston | 9.0% | 252 | 57 | 80.7 |
| 02129 | Charlestown | 3.0% | 107 | 56 | 39.0 |
| 02130 | Jamaica Plain | 5.1% | 120 | 77 | 61.0 |
| 02131 | Roslindale | 6.5% | 180 | 94 | 69.7 |
| 02132 | West Roxbury | 4.8% | 190 | 133 | 76.0 |
| 02134 | Allston | 1.2% | 36 | 17 | 13.0 |
| 02163 | Allston | 0.1% | <6 | <6 | 0.0 |
| 02135 | Brighton | 3.7% | 97 | 52 | 35.7 |
| 02136 | Hyde Park | 7.8% | 214 | 68 | 80.3 |
| 02210 | Seaport | 0.1% | <6 | <6 | 2.7 |
| 02215 | Fenway/Kenmore | 0.4% | 14 | 8 | 4.7 |

As shown by Exhibit B, six Boston zip codes will lose more than ten seats at the Boston Exam Schools under the Zip Code Quota Plan, with the losses for those zip codes totaling **134** seats.  In each of those six disfavored zip codes, census data shows that Asian and White families make up a large majority of the population.  This is shown by Exhibit C below.[2]

**Exhibit C:**

| Zip Code | Name | Asian/White Population | 2020-21 Seats (citywide competition) | Loss of Seats under Zip Code Quota | Percentage Change |
|---|---|---|---|---|---|
| 02111 | Chinatown | 92 % | 24 | 14 | - 58 % |
| 02132 | West Roxbury | 89 % | 133 | 57 | - 43 % |
| 02129 | Charlestown | 87 % | 56 | 17 | - 30 % |
| 02135 | Brighton | 85 % | 52 | 16 | - 31 % |
| 02130 | Jamaica Plains | 72 % | 77 | 16 | - 21 % |
| 02131 | Roslindale | 60 % | 94 | 24 | - 26 % |

Exhibit B also shows that seven Boston zip codes will gain more than ten seats at the Boston Exam Schools under the Zip Code Quota Plan, with the gains for those zip codes totaling 211 seats.  In each of those seven favored zip codes, census data shows that Latino and African-American families make up a large majority of the population.  This is illustrated in Exhibit E below.[3]

---

[2]    The racial statistics shown in **Exhibit C** are drawn from data published by the U.S. Census Bureau and attached as **Exhibit D.**  All other information is copied or derived from **Exhibit A**, a chart prepared by the Boston School Committee.

**Exhibit E:**

| Zip Code | Name | Latino/African -American Population | 2020-21 Seats (citywide competition) | Gain of Seats under Zip Code Quota | Percentage Change |
|---|---|---|---|---|---|
| 02126 | Mattapan | 99+ % | 20 | 38 | + 190 % |
| 02121 | Roxbury | 98 % | 27 | 51 | + 188 % |
| 02119 | Roxbury | 86 % | 27 | 29 | + 107 % |
| 02124 | Dorchester | 77 % | 84 | 39 | + 46 % |
| 02136 | Hyde Park | 74 % | 68 | 12 | + 18 % |
| 02128 | East Boston | 60 % | 57 | 24 | + 42 % |
| 02125 | Dorchester | 60% | 47 | 19 | + 40 % |

> **2.  The Boston School Committee Adopted the Zip Code Quota Plan With Racially Discriminatory Purposes.**

The Boston School Committee's racially discriminatory purpose is also clear.  The publicly available evidence showing their unconstitutional purpose includes: (a) the chart (Exhibit A) showing the "Projected Shift" in the racial composition of the entering class, (b) publications by the Exam School Admissions Working Group, and (c) statements by individual Defendants at public meetings, including racially-derogatory, anti-Asian comments by at least one official at the same public meeting where the plan was being opposed by speakers of Asian ancestry.[4]

---

[3]      The racial statistics shown in **Exhibit E** are drawn from data published by the U.S. Census Bureau and attached as **Exhibit D**.  All other information is copied or derived from **Exhibit A**, a chart prepared by the Boston School Committee.

[4]      Transcribed pages of the October 21, 2020 meeting were attached as Attachment 1 to the Declaration of Bentao Cui, submitted as Exhibit F. to the Complaint ("Ex. F, Attachment 1").

a.      The "Projected Shift" Chart:  Already discussed in connection with the *effects* of the Zip Code Quota Plan, the chart attached as **Exhibit A** also provides insight into the *purposes* of the Boston School Committee.  The stated goal of "greater racial… diversity" is an obvious euphemism for promoting "racial balancing," which is constitutionally prohibited.  *See, e.g., Parents Involved*, 551 U.S. at 732 ("Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity'").

b.      The Exam School Admissions Working Group:  The Boston School Committee adopted the Zip Code Quota Plan at a meeting held on October 21, 2020.  The vote followed two presentations by the Exam School Admissions Working Group ("Working Group"), which the Boston School Committee had charged with making recommendations about the admission process for the three Boston Exam Schools.[5]  The first presentation was on October 8, and the second was on October 21.

On October 8, the Working Group made a presentation titled *Recommendations of Exam Schools Admission Criteria for School Year 2021-2022* ("October 8th Working Group Presentation").[6]  Part of the presentation was the "Projected Shift" chart shown as Exhibit A and already discussed.  The presentation also included a great deal of discussion about race, including a reference to something called the "BPS Racial Equity Planning Tool"; a timeline of the Exam Schools' history, highlighting efforts "to recruit and retain students of color"; and, a slide that displayed the comparative academic performance of students based on race.

---

[5]      Membership of the Working Group included certain members of the Boston public schools, as well as a former superintendent, community members, and the President of the NAACP Boston Branch.

[6]      A copy of the October 8th Working Group Presentation was attached as Attachment 2 to the Declaration of Bentao Cui, submitted as Exhibit F to the Complaint ("Ex. F, Attachment 2").

Most notably, the Working Group presentation explained that the goal is to modify "student enrollment at each of the exam schools such that it better reflects the **racial**, socioeconomic and geographic diversity of all students (K-12) in the city of Boston." (Emphasis added.) Despite the references to socioeconomic and geographic diversity, the remainder of the presentation confirms that the focus was not on these criteria, but rather on race. For example, the presentation discusses "strategies for racial equity," without any similar discussion for socioeconomic or geographic equity; it devotes an entire slide to the historic racial breakdown of Exam School students without any comparable analysis based on economic background or geographic location; and, it displayed a comparison of students' MCAS results and average GPAs based on race, without any similar discussions of performance based on geographic or economic background.

The references to economic background and geographic location are best viewed as a perfunctory attempt to disguise the true purpose afoot – a point illustrated quite clearly by the case of zip code 02111, commonly known as Chinatown. As noted by the October 8th Working Group Presentation, of nineteen zip codes, this zip code has the *fourth lowest median family income* in the city ($38,846).[7] Yet the Zip Code Quota Plan will deliver an exceptionally hard blow to the students living there. As shown by **Exhibit B,** 24 students from Chinatown entered the Exam Schools last year. This year, under the Zip Code Quota Plan, the area is projected to receive only 14 invitations, a loss of 57 percent.

Supreme Court precedent "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Vill. of Arlington Heights*, 429 U.S. at 266. As the Court has explained:

> Rarely can it be said that a legislature or administrative body operating under a
> broad mandate made a decision motivated solely by a single concern, or even that

---

[7]     Ex. F, Attachment 2, at 27.

a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. ***When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.***

*Id.* (emphasis added). *See also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020) (animus pled where there is "a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision" (quoting *Vill. of Arlington Heights*, 429 U.S. at 266)).

On October 21, the Working Group made another presentation to the Boston School Committee. Again titled *Recommendations of Exam Schools Admission Criteria for School Year 2021-2022*, this presentation again explained the motivations behind the proposed Zip Code Quota Plan. ("October 21st Working Group Presentation").[8] This second presentation occurred during the same meeting as the formal adoption of the Zip Code Quote Plan by the Boston School Committee. Like the October 8 Working Group Presentation, the focus was on the racial effects of the proposal. In addition to reiterating the focus on racial diversity and the strategies for racial equity seen in the earlier presentation, the October 21 Working Group Presentation included an entire slide displaying the continued enrollment of students based on their race and GPA. There were no similar discussions of performance based on geographic or economic background.

In sum, the Defendants' own documents regarding the Zip Code Quota Plan establish that its intended effect is to reduce the number of White and Asian students who receive invitations to the Boston Exam Schools, and to do it in a way that has been deemed patently unconstitutional by the Supreme Court. Thus, the Boston Parents have direct evidence of the discriminatory purpose

---

[8]     A copy of the October 21st Working Group Presentation was attached as Attachment 3 to the Declaration of Bentao Cui, submitted as Exhibit F. to the Complaint ("Ex. F, Attachment 3").

and effect of the Zip Code Quota Plan and, thus, are likely to succeed on the merits of their Equal Protection Clause Claim.

        c.    <u>Statements by Individual Defendants</u>:  Comments from the individual Defendants and other officials provide further evidence of the discriminatory purpose at play.  The Supreme Court has repeatedly noted that, in establishing the existence of a discriminatory purpose, a decision's "legislative or administrative history may be highly relevant, especially where there are ***contemporary statements*** by members of the decisionmaking body, minutes of its meetings, or reports."  *Arlington Heights*, 429 U.S. at 268 (1977) (emphasis added).[9]

Several statements made by members of the Working Group and Boston School Committee in discussing the Zip Code Quote Plan, including at the October 21 meeting where it was adopted, further illustrate the discriminatory purpose of the plan:

- Working Group member Tanisha Sullivan (head of the NAACP Boston Branch) "spoke about Boston's history of race" and read a statement in support of the Zip Code Quota Plan, highlighting its racial impact and noting "this proposal will allow our exam schools to more closely reflect the racial and economic makeup of Boston's kids."  Ex. F, Attachment 1 at 78:18-20.

---

[9]    *See also Mhany Mgmt., Inc.*, 819 F.3d at 612; *Fortenberry v. City of Wiggins, Mississippi*, No. 1:16CV320-LG-RHW, 2018 WL 8809236, at *6 (S.D. Miss. Feb. 5, 2018) ("Relevant considerations for discerning a discriminatory intent include the historical background of the decision particularly if it reveals a series of official actions taken for invidious purposes… or administrative history especially where there are contemporary statements by members of the decision making body…") (internal quotation marks and brackets omitted)); *Parra v. Four Seasons Hotel*, 605 F. Supp. 2d 314, 329 (D. Mass. 2009) ("evidence [of discriminatory purpose] can include, but is not limited to: discriminatory comments made by key-decision makers…"); *Easter Seal Soc. of New Jersey, Inc. v. Twp. of N. Bergen*, 798 F. Supp. 228, 234 (D.N.J. 1992) (noting the "extraordinarily explicit statements by Town officials" contributed to issuance of preliminary injunction); *Family Winemakers of California v. Jenkins*, 592 F.3d 1, 7 (1st Cir. 2010) ("such statements are precisely the kind of evidence the Supreme Court has looked to in … challenging a statute as discriminatory in purpose") (citing *Hunt*, 432 U.S. at 352–53).

- Defendant Lorna Rivera noted that she supported the plan because of its intended racial balancing outcoming and even suggested that the "projected shift" was insufficient because more white students would still be represented in the Exam Schools when compared to the population at large, explaining:

> I joined the Boston school committee in 2019, because I was deeply and am deeply committed to addressing the racial and ethnic disparities in educational achievement and to advance ethnic studies and racial equity in the school district. So, I strongly support the exam schools working proposal as a step in the right direction.
>
> …
>
> I believe it doesn't go far enough because white students continue to benefit from 32 percent of the seats according to this plan, look at the data, it's not a huge change for Asian and white families.  But it is a big change for the black and Latinx students.

*Id.* at 365:18-366:2; 368:9-14.

- At the same meeting, Defendant Alexandra Oliver-Davila also expressed her opinion in racial terms:

> I mean, we know that black and Latino youth are underrepresented, and they have been locked out of this opportunity.  And for me, you know, it's just criminal that the percentages have not increased…

*Id.* at 395:19-22.  And she further opined:

> I think that all of our schools should reflect the student body that we have… it should not be acceptable to have schools that don't represent that, just not acceptable.

*Id.* at 399:5-8.

Moreover, the events of the October 21 meeting reveal more than just a discriminatory purpose; they reveal actual racial animus.  During that meeting, Boston School Committee Chairman Michael Loconto mocked the names of Asian members of the community who had come to the meeting to comment on the plan.  These statements, which were heard publicly because Mr.

Loconto failed to mute his microphone, provide further evidence of the unlawful discriminatory purpose underlying the actions taken by Defendants.  Having been caught exhibiting his anti-Asian animus, Mr. Loconto later resigned, though not before he and the Boston School Committee that he chaired voted for and adopted the Zip Code Quota Plan that disfavored Asian students.  *See Saget v. Trump*, 375 F. Supp. 3d 280, 372 (E.D.N.Y. 2019) ("Although the use of racial slurs, epithets, or other racially charged language does not violate equal protection per se, it can be evidence that official action was motivated by unlawful discriminatory purposes."); *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*, 996 F. Supp. 409, 437 (D.N.J. 1998) (likelihood of success on the merits where, among other things "the minutes betray a hostility toward" protected group).

Although not every member of the Boston School Committee publicly offered such clear statements of intent or animus, a review of the October 21 transcript shows that none of them spoke up to disassociate themselves from any of these comments showing a racially-discriminatory purpose.  This silence only further confirms the discriminatory purpose of the Boston School Committee in pursuing the Zip Code Quota Plan.  *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1730 (2018) (concluding "Court[s] cannot avoid the conclusion that these statements cast doubt on the fairness and impartiality of the Commission's" decision where the comments of two commissioners betrayed "clear and impermissible hostility" and the "record shows no objection to these comments from other commissioners" (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 541 (1993)).

As this Court has explained, a plaintiff establishes his likelihood of success by setting forth a plausible claim for relief and by offering "'proof beyond unverified allegations in the pleadings.'"  *Strahan v. Roughead*, No. 08-CV-10919-MLW, 2010 WL 4827880, at *10 (D. Mass.

Nov. 22, 2010) (quoting *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001).  The

evidence that is already available in this case, even before any discovery has been taken, is more

than sufficient to establish the likelihood that the Boston Parents will succeed on the merits of their

Equal Protection Clause Claim.[10]

      Similarly, and for the same reasons, the Boston Parents are likely to succeed on the merits

of their state law claim, which alleges that the Zip Code Quota Plan violates the anti-discrimination

provisions of  Massachusetts General Law 76, § 5.[11]  Likelihood of success on the merits for an

alleged violation of this statute can be established by setting forth federal case law that

"recognize[s] the impropriety of discriminating against a person."  *Doe ex rel. Doe v. Yunits*, No.

001060A, 2000 WL 33162199, at *6 (Mass. Super. Oct. 11, 2000), *aff'd sub nom. Doe v. Brockton

Sch. Comm.*, No. 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000).  As detailed

above, the Supreme Court has repeatedly determined that Defendants' conduct and motivations

---

[10]    It is well-established that evidence of a discriminatory motive, whether direct or circumstantial, establishes a likelihood of success on a claim of discrimination.  *Anthony v. Sundlun*, 952 F.2d 603, 606 (1st Cir. 1991) ("court, on the basis of an impressive array of circumstantial proof, determined that the plaintiffs were likely to succeed in this political discrimination suit"); *Easter Seal Soc. of New Jersey, Inc. v. Twp. of N. Bergen*, 798 F. Supp. 228, 234 (D.N.J. 1992) (where officials conduct and comments "all strongly suggest official open and explicit discrimination against plaintiffs" "based on the preliminary evidence which plaintiffs have adduced, the court concludes that plaintiffs have a substantial likelihood of success on the merits of their discrimination claim."); *Assisted Living Assocs. of Moorestown, L.L.C.*, 996 F. Supp. at 437 (likelihood of success on the merits established by discriminatory statements); *Saget*, 375 F. Supp. 3d at 372   ("Plaintiffs have shown both a likelihood of success on the merits" where "evidence of animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim").

[11]    This statute provides that "[n]o person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation."  Mass. Gen. Laws Ann. Ch. 76, § 5

are not just improper, but "patently unconstitutional." *See Parents Involved,* 551 U.S. at 723, 730, & 732. Thus, the Boston Parents are likely to succeed on the merits of their second claim, as well.

**B.      Plaintiff Will Be Irreparably Harmed by the Zip Code Quota Plan.**

The Boston Parents have no adequate remedy at law, and there is a high likelihood that they and their members will suffer irreparable harm absent this Court's entry of a preliminary injunction. Two types of harms are likely. First, the students whose interests are at stake will be deprived of a lawful admissions process, and they will be subjected instead to a racially-discriminatory one. Second, their chances of admission to the Boston Exam Schools will dwindle because of the Zip Code Quota Plan. Each harm is addressed in turn.

First, the Supreme Court has plainly declared "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." *Parents Involved*, 551 U.S. at 719.[12]  That is certainly the case here. Applicants to the Boston Exam Schools will be injured by the Zip Code Quota Plan because they have a right to

---

[12]      In *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009), the court discounted the idea that "violations of plaintiffs' rights to due process and equal protection *automatically* result in irreparable harm." (emphasis in original). But, that comment came in the context of a case where plaintiffs were alleging economic harm, not racial discrimination. And, even then, the First Circuit sustained the district court's decision to issue the injunction. Moreover, harm flowing from the odious practice of racial discrimination would surely involve a violation of "rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Id.* at 484. Such a result is especially certain in the wake of the 2007 Supreme Court decision in *Parents Involved, supra*.

Moreover, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice 37 and Procedure § 2948.1 (2d ed. 1995)). *See e.g. Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[T]he Supreme Court held that when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."). See *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 217 (D.D.C. 2020) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373).

participate in a lawful admissions process, whether or not they would ultimately be selected.  In

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), an applicant who challenged the allegedly

unconstitutional admissions program of the University of California was found to have standing

to bring his challenge.  Some supporters of the program claimed that the applicant "lacks standing,

arguing that he never showed that his injury — exclusion from the Medical School — will be

redressed by a favorable decision."  *Id.* at 280-81, n.14 (emphasis added).  The Court firmly

rejected that argument.  As explained by the majority, "even if [he] had been unable to prove that

he would have been admitted in the absence of the [challenged admissions program], it would not

follow that he lacked standing."  *Id.*  To say that the applicant had standing to challenge the

admissions process is, of course, to say that he was injured by that process.  *See e.g. Lujan v. Defs.

of Wildlife*, 504 U.S. 555, 560 (1992) (holding that, in order to find standing, a court must find

injury to the plaintiff).  In *Bakke*, the plaintiff's injury was the denial of his right to compete for

admission through a process that did not discriminate based on race.  Here, the injury is the same.

Absent a preliminary injunction, by the time this litigation is finally resolved Defendants

will have already implemented their unlawful Zip Code Quota Plan and will have already extended

offers of admission to the Boston Exam Schools for the fall of 2021.  According to counsel for the

Boston School Committee, those offers will start to go out in late March or early April.  Quite

likely, next fall's classes will have already started.  Thus, if not redressed by a preliminary

injunction, Plaintiff's first category of injury — the right to participate in a lawful admission

process — will be permanent.

Second, as previously discussed, the Zip Code Quota Plan will sharply reduce the chances

of admission for Asian and White students, including those whose parents are part of the Plaintiff

group.  This can hardly be disputed, since it was the Defendants' declared goal to achieve such a

sharp reduction. *See, supra* at Section II.A.1 (showing that the Zip Code Quota Plan will cause a steep decline in the numbers of Asian and White students being admitted). Moreover, the evidence shows that the parents (and their students) on whose behalf the Boston Parents bring this action include 14 applicants residing in zip codes that are hard hit by the Zip Code Quota Plan. The affected students include:

- Ten sixth grade students in West Roxbury (02132), including six Asian students and four White students. This zip code is expected to lose 57 seats based on the Zip Code Quota Plan, a decrease of 43 percent compared to last year.

- Two sixth grade student who resides in Brighton (02135). The students are White and Asian, respectively. This zip code is expected to lose 16 seats based on the Zip Code Quota Plan, a decrease of 31 percent compared to last year.

- One sixth grade student who resides in Chinatown (02111). The student is Asian. This zip code is expected to lose 14 seats based on the Zip Code Quota Plan, a decrease of 58 percent compared to last year.

- One sixth grade student who resides in Beacon Hill/West End (02114). The student is White. This zip code is expected to lose 6 seats based on the Zip Code Quota Plan, a decrease of 31 percent compared to last year.

In allocating seats by zip codes, the Defendants have created a situation in which some students will be denied admission even though their grades are better than other students who are offered admission. This is the very purpose of the Zip Code Quota Plan, and the Defendants should not be heard to say that their plan will have a different effect than the one they intended.

Just to be clear, to be denied admission to the Boston Exam Schools has real consequences that cannot be remedied by attendance at other schools in the city. In *McLaughlin by McLaughlin*

Case 1:21-cv-10330-WGY   Document 3   Filed 02/26/21   Page 27 of 32


*v. Boston School Committee*, 938 F. Supp. 1001, 1004 (D. Mass. 1996), the court made this observation about the Boston Latin School (BLS):

> BLS is often referred to generally as one of Boston's high schools. It is much more than that. It is a six-year college preparatory school whose graduates compete with those of nationally-known prep schools such as Exeter, Choate, and Lawrenceville for acceptance at the most prestigious colleges in the country. Established in 1635, it is the oldest public school in the United States, and its graduates include Cotton Mather, Samuel Adams, Charles Sumner and John Hancock.

Whether students are denied admission to BLS or to any of the other Exam Schools, the losses to be suffered are incalculable and irreparable. If a student competes for admission based on merit and falls short, so be it. But, the process must not be skewed for anyone – or against anyone – based on race or ethnicity.

## C.    The Balance of Equities Tips in Plaintiff's Favor.

The balance of equities tips in favor of the Boston Parents, especially since there is no harm to the Defendants in requiring them to adjust the admissions standard to a process that does not discriminate based upon race. Such an adjustment would not be difficult for the Boston School Committee to carry out. Given the problems caused by Covid, the Boston Parents do not challenge the lack of a standardized test for the class entering in the fall of 2021. Thus, the only change necessary to make the admissions process lawful would be to cancel the newly-created 80 percent zip code allocation and fill *all* seats – not just 20 percent – on a citywide basis, using the applicants' GPAs. Keeping to a citywide competition would be consistent with the practice of the past 20 years.

The number of applicants to the Boston Exam Schools for the class of 2021 has been finalized, and the first invitations (those going to fill the 20 percent "citywide" seats) are not scheduled to be sent out until "late March or April," according to information provided by counsel for the Boston Parents. Filling all seats, not just 20 percent, by the same citywide process would

pose no hardship on Defendants. In fact, doing so would be less complicated than the multiple rounds of zip code selections currently contemplated by the Zip Code Quota Plan. *Contrast Boston's Children First v. City of Boston*, 62 F. Supp. 2d 247, 262 (D. Mass. 1999) (concluding that the equities and public interest weighed against an injunction given the onerous impact of *reassigning* 15,000 students to different schools).

## D. The Public Interest Favors a Preliminary Injunction

The fourth and final factor in the preliminary injunction calculus requires the court to consider whether the public interest will be adversely affected if the injunction is granted. There are at least three reasons why the public interest favors an injunction here.

First, a preliminary injunction would preserve the *status quo*, which is in the public interest. *See, e.g., AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 358 (D. Mass. 2012), *aff'd*, 711 F.3d 248 (1st Cir. 2013) ("Preserving the status quo … is in the public interest"); *Dwyer v. Conflict of Interest Comm'n*, 646 F. Supp. 707, 712–13 (D.R.I. 1986) ("the public interest is served by allowing the status quo to be preserved until a quick and complete adjudication on the merits can be had"). For purposes of a preliminary injunction, the "status quo" is, of course, not things as they stand on the day the injunction motion is heard, but things as they stood before Defendants took the actions now at issue. *See, e.g., Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) ("We have previously explained that the status quo may be determined by looking at 'the last uncontested status which preceded the pending controversy.'" (quoting *Crowley v. Local No. 82*, 679 F.2d 978, 995-96 (1st Cir.1982)); *Gov't Ctr. Camera, Inc. v. United States*, No. CIV.A. 87-2208-S, 1987 WL 28337, at *2 (D. Mass. 1987) ("'Status quo' has been defined as the 'last uncontested status which preceded the pending controversy.'" (quoting *Crowley*, 679 F.2d at 995-96).

Second, "the public interest weighs in favor of allowing injunctive relief because it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Dorce v. Wolf*, 2020 WL 7264869, at *2 (D. Mass. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal citations omitted).

Third, the Boston Exam Schools have long been a beacon of advanced educational opportunity, providing parents and children alike with hope that a child, through hard work and excellence, could win the right to attend the most prestigious high schools in Boston and in the nation.  Unless enjoined, the Zip Code Quota Plan will frustrate those hopes for many.  The preliminary injunction sought by the Boston Parents will, thus, benefit not just their own parents and students, but also the hundreds of other parents and students who are facing the same irreparable harms.

## E.        A Bond is Not Necessary

Consistent with this Court's discretion, this Court should not require Plaintiff to post a bond pursuant to Federal Rule of Civil Procedure 65(c).  "Moreover, 'there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond.'" *Fairview Mach. & Tool Co., Inc. v. Oakbrook Intern.*, Inc., 77 F. Supp. 2d 199, 205 (D. Mass. 1999) (quoting *International Assoc. of Machinists and Aerospace Workers, et al. v. Eastern Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991)).

## CONCLUSION

For these reasons, this Court should grant Plaintiff's Motion for Preliminary Injunction. The Court should enjoin Defendants from implementing the Zip Code Quota Plan.  The Court should also order that the competition for seats at the Boston Exam Schools, for the class entering

in the fall of 2021, be conducted on a citywide basis without any consideration of zip codes or other method to subdivide the city and without any use of race or ethnicity in admissions.

Respectfully submitted:

/s/ *Callan G. Stein*
Callan G. Stein (BBO # 670569)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com

William H. Hurd (Va. Bar # 16967)
Christopher W. Carlson, Jr. (Va. Bar # 93043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1490
william.hurd@troutman.com
chris.carlson@troutman.com

(Motions for admission *pro hac vice* to be filed)

Mary Grace W. Metcalfe (N.Y. Bar #5377932)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
marygrace.metcalfe@troutman.com

(Motion for admission *pro hac vice* to be filed)

*Counsel for Plaintiff*

Dated: February 26, 2021

<u>**MEMORANDUM EXHIBIT LIST**</u>

| Exhibit | Location |
|---------|----------|
| Exhibit A | Embedded in Memorandum, first referenced at page 7 |
| Exhibit B | Embedded in Memorandum, first referenced at page 9 |
| Exhibit C | Embedded in Memorandum, first referenced at page 10 |
| Exhibit D | Attached to Complaint |
| Exhibit E | Embedded in Memorandum, first referenced at page 10 |
| Exhibit F | Attached to Complaint |

**<u>Certificate of Service</u>**

I, Callan G. Stein, certify that the foregoing document was filed this date via the Court's CM/ECF filing system.  A copy has been provided to counsel for the School Committee of the City of Boston, Legal Advisor, Catherine Lizotte.

_____*/s/ Callan G. Stein*_____