# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEIL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS, | ) Civil Action No. 1:21-cv-10330-WGY ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE BOSTON BRANCH OF THE NAACP, GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTEL, AND H.D. FOR LEAVE TO INTERVENE AS DEFENDANTS

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

PROPOSED INTERVENORS ..............................................................................3

BACKGROUND ...................................................................................................6

ARGUMENT .......................................................................................................10

    I.    Proposed Intervenors Are Entitled as of Right to Intervene in This Action ..........10

        A.    The Motion for Leave to Intervene is Timely ...........................11

        B.    Proposed Intervenors Have Important Interests in this Action .................11

        C.    Proposed Intervenors' Interests Will Be Impaired Absent Intervention....15

        D.    Existing Parties Do Not Adequately Represent Proposed Intervenors' Interests ........15

    II.    In the Alternative, the Court Should Exercise its Discretion to Grant Permissive Intervention ........19

CONCLUSION ....................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Black Fire Fighters Association of Dallas v. City of Dallas*, *Tex.*,
    19 F.3d 992 (5th Cir. 1994) ...................................................................14

*Com. v. U.S. Dep't. of Health & Human Servs.*,
    289 F. Supp.3d 259 (D. Mass. 2018) ..............................................19, 20

*Cotter v. Mass. Ass'n. of Minority Law Enforcement Officers*,
    219 F.3d 31(1st Cir. 2000)................................................................ *passim*

*Daggett v. Comm'n. on Governmental Ethics and Election Practices*,
    172 F.3d 104 (1st Cir. 1999)............................................................15, 16

*Deleo v. City of Boston, Mass.*,
    No. 03-12538-PBS, 2004 WL 5740819 (D. Mass. Nov. 23, 2004)..................................14, 17

*Donaldson v. U.S.*,
    400 U.S. 517 (1971)..................................................................................2

*Johnson v. San Francisco Unified Sch. Dist.*,
    500 F.2d 349 (9th Cir. 1974) ..................................................................13

*Maine v. Director, U.S. Fish and Wildlife Service*,
    262 F.3d 13 (1st Cir. 2001) ...............................................................16, 17

*Morgan v. Hennigan*,
    379 F. Supp. 410 (D. Mass. 1974) .........................................................6, 7

*Mullane v. Portfolio Media, Inc.*,
    No. 19-11496-PBS, 2020 WL 1931525 (D. Mass. Feb. 28, 2020)..................................10, 11

*School Bd. of the City of Richmond, Va. v. Baliles*,
    829 F.2d 1308 (4th Cir. 1987) ................................................................13

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
    308 F.R.D. 39 (D. Mass. 2015), *aff'd* 807 F.3d 472 .........................................13, 14

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
    807 F.3d 472 (1st Cir. 2015).....................................................................19

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
    980 F.3d 157 (1st Cir. 2020)......................................................................13

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*
    *(Harvard Corp.)*,
    397 F.Supp.3d 126 (D. Mass. 2019) .................................................................. 13

*T-Mobile Northeast LLC v. Town of Barnstable*,
    969 F.3d 33 (1st Cir. 2020) .............................................................................. 18

*In re Thompson*,
    965 F.2d 1136 (1st Cir. 1992) .......................................................................... 19

*Travelers Indem. Co. v. Dingwell*,
    884 F.2d 629 (1st Cir. 1989) .............................................................................. 2

*Victim Rights Law Ctr. v. Rosenfelt*,
    __ F.3d ___, 2021 WL 630453 (1st Cir. Feb. 18, 2021) .................................. 17

*Washington v. Davis*,
    426 U.S. 229 (1976) ......................................................................................... 18

*Wessman v. Gittens*,
    160 F.3d 790 (1st Cir. 1998) .......................................................................... 7, 8

**Statutes**

42 U.S.C. § 2000d .................................................................................................. 18

Civil Rights Act of 1964 Title VI .................................................................... 10, 18

Massachusetts General Laws ch. 76 § 5 ................................................................ 18

**Other Authorities**

34 C.F.R. Part 100 ................................................................................................. 18

*Boston Latin*, Massachusetts Department of Elementary and Secondary Education
    (2021),
    https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00350560&orgty
    pecode=6& ........................................................................................................ 8

*Boston's Elite High Schools*, WBUR (March 5, 2020),
    https://www.wbur.org/edify/2020/03/05/boston-exam-school-admissions-
    history ................................................................................................................ 6

*Boston's Exam Schools*, Harvard Kennedy School Rappaport Institute for Greater
    Boston, 9 (Oct. 2018),
    https://www.hks.harvard.edu/sites/default/files/centers/rappaport/files/examsc
    hools%20v10.pdf ............................................................................................... 9

BPS Communications Office, *BPS at a Glance Fact Sheet* (Dec. 2019),
  https://www.bostonpublicschools.org/cms/lib/MA01906464/Centricity/Domai
  n/187/BPS%20at%20a%20Glance%202019-20_FINAL.pdf ................................8

Education, *Latino Education in the Time of COVID: The Pandemic's Unique
  Impact on Latino Students and Families in Massachusetts* (Aug. 2020),
  https://www.latinosforeducation.org/massachusetts-covid-19-impact/;..................9

*Enough is Enough: Strategies and Solutions to Diversify Boston's Exam Schools*
  at 3 (Feb. 28, 2019)............................................................................4

Federal Rule of Civil Procedure 24 .............................................................1

Federal Rule of Civil Procedure 24(a)(2) ....................................................10

*Getting Into Boston Latin*, WGBH (Sept. 5, 2017),
  https://www.wgbh.org/news/2017/09/05/local-news/boston-public-school- ...........9, 10

*ISEE*, The Bay State Banner (Feb. 13, 2020),
  https://www.baystatebanner.com/2020/02/13/testing-firm-lashes-out-at-bps-
  over-its-use-of-isee/ ..........................................................................7

Jeremy C. Fox, *Groups Urge Boston Latin School to Bolster Minority Ranks*,
  Boston Globe (May 24, 2016) ...............................................................3

Justice Press Release, *U.S. Attorney Ortiz Concludes Investigation into Civil
  Rights Allegations at Boston Latin School* (Sept. 26, 2016),
  https://www.justice.gov/usao-ma/pr/us-attorney-ortiz-concludes-investigation-
  civil-rights-allegations-boston-latin-school ..............................................10

Lawyers for Civil Rights *available at* http://lawyersforcivilrights.org/our-
  impact/education/data-on-bostons-exam-schools/ (Mar. 18, 2020)......................8

NAACP, Boston Branch et al., *A Broken Mirror: Exam School Admissions Fail to
  Reflect Boston's Diversity* (May 2017), http://lawyersforcivilrights.org/wp-
  content/uploads/2017/05/ABrokenMirror-
  ExamSchoolAdmissionsFailtoReflectBostonsDiversity.docx.pdf .....................3, 4

NAACP, Boston Branch et al., *Enough is Enough: Strategies & Solutions to
  Diversify Boston's Exam Schools* (Feb. 28, 2019),
  http://lawyersforcivilrights.org/wp-content/uploads/2019/02/Community-
  Strategies-and-Solutions-FINAL.pdf......................................................3

NAACP, Boston Branch et al., *Strategies and Solutions* ....................................7

*O'Bryant Math/Science*, Massachusetts Department of Elementary and Secondary
    Education (2021),
    https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00350575&orgty
    pecode=6&....................................................................................................8

Rule 12(b)(1).........................................................................................................1, 3

Rule 24(a)..............................................................................................................20

Rule 24(b) .............................................................................................................20

Rule 24(b)(1)..........................................................................................................19

Stephanie Ebbert, *At Boston Latin, Little Outreach to City's Black, Latino
    Students*, Boston Globe (Apr. 23, 2016) ...............................................................8

Student Body Diversity, *Report* at 5-6 (Feb. 2, 2016), available at:
    https://inclusionandbelongingtaskforce.harvard.edu/files/inclusion/files/report
    _of_the_committee_to_study_the_importance_of_student_body_diversity_02-
    02-16.pdf................................................................................................................13

## INTRODUCTION

On the eve of the announcement of admissions decisions and in the midst of a global pandemic, Plaintiff Boston Parent Coalition for Academic Excellence Corporation has filed a lawsuit challenging a temporary change to the Boston Public Schools' ("BPS") admissions process for its highly selective public schools—a change that ensures geographic and socioeconomic diversity and accessibility. The change is also a small step towards remediating the longstanding inequities in the admissions process that have unfairly and illegally disadvantaged families of color for decades.[1]

Several membership organizations and families of color ("Proposed Intervenors") now seek to intervene. Proposed Intervenors include two non-profit membership organizations leading the charge to press BPS to fully dismantle its discriminatory admissions process and representing the Black and Latinx communities in Boston, the state-wide Asian American civic engagement network dedicated to furthering equity and opposing discrimination which has constituents awaiting decisions from highly selective public schools, and an Asian American membership-led organization based in Dorchester. Immediate intervention by these organizations and families is necessary to protect their and their members' interests and to provide this Court with important factual and legal context that will otherwise be absent from this litigation. Because Proposed Intervenors meet all the criteria under Federal Rule of Civil Procedure 24 for both intervention as of right and permissive intervention, their motion should be granted.

---

[1] Plaintiff has filed this action even though it lacks Article III standing, rendering its Complaint subject to dismissal under Rule 12(b)(1). Plaintiff's Complaint is devoid of any discussion of the injury it has suffered, a critical element when determining whether the moving party is entitled to a preliminary injunction. That is because Plaintiff has not suffered – and undoubtedly cannot suffer – any injury from the temporary changes sought to be implemented by BPS. BPS' admissions decisions will not be announced until mid-March, therefore making this matter not ripe for consideration or adjudication.

1

On behalf of their members, proposed organizational intervenors NAACP, Boston Branch, Greater Boston Latino Network, Asian Pacific Islanders Civic Action Network, and Asian American Resource Workshop (collectively, "Organizational Intervenors") have long argued that BPS is *compelled*, under federal and state law, to employ admissions criteria for its highly selective public schools that do not unfairly exclude highly-qualified Black, Latinx, and other underrepresented students and perpetuate the segregation that has dogged those schools for years. The challenged policy (the "Interim Plan") is a small but necessary step in accomplishing an inclusive outcome, and Organizational Intervenors thus have a direct interest in this litigation. For their part, Proposed Individual Intervenors Maireny Pimental ("Ms. Pimentel") and her family and H.D. and their family are squarely in the midst of this tug-of-war right now, as applicants currently waiting for their admission decisions under the Interim Plan. Like the proposed Organizational Intervenors, the proposed Individual Intervenors have interests in this litigation—and particularly in the motion for Preliminary Injunction—that are "direct," *Travelers Indem. Co. v. Dingwell,* 884 F.2d 629, 638 (1st Cir. 1989), and "significantly protectable." *Donaldson v. U.S.*, 400 U.S. 517, 531 (1971).

Moreover, no existing party will adequately protect Proposed Intervenors' interests, and intervention would bring factual and legal perspective to this litigation that will otherwise be missing. Plaintiff concedes—as it must—that the challenged admissions process on its face is unassailable. A school district that provides opportunities to students with the best grades in each neighborhood unquestionably acts within the bounds of law. What Plaintiff asks, however, is that the Court examine the broader context, arguing that BPS's admissions process was fair and "merit-based" *until* it was altered by the Interim Plan. Proposed Intervenors seek to intervene in this case to protect their and their members' interests by showing that the Interim Plan is a first but critical

corrective measure necessary to bring BPS into minimal compliance with state and federal anti-discrimination laws.  Plaintiff will never present that full context to this Court—and neither will BPS because its interests are aligned in maintaining the *status quo*.  To effectively determine the constitutionality of the challenged Interim Plan and BPS' alleged intent, the Court must examine the *full* context, which only Proposed Intervenors can provide.

For these reasons, and as explained more fully below, Proposed Intervenors respectfully request that the Court grant their Motion for Leave to Intervene as a matter of right, or, in the alternative, by permission.

## PROPOSED INTERVENORS

**The NAACP Boston Branch ("NAACP"),** a key stakeholder in this matter, is recognized as the first chartered branch of the National NAACP organization.[2] It works to "ensure the political, educational, social and economic equality and rights of all persons and to eliminate racial hatred and racial discrimination" in the City of Boston.[3] The NAACP has a long history of opposing BPS's discriminatory admissions policies and is continuing to press for change.[4] For example, in 2016, the NAACP specifically warned BPS that maintaining policies that lead to disproportionately low numbers of Black and Latinx students could expose it to legal liability.[5] In 2017, the NAACP and other partners released a report on selective public schools highlighting how disparities could not be explained by a lack of Black, Latinx and otherwise diverse

---

[2] Declaration of the NAACP In Support of the Motion to Intervene, attached hereto as Exhibit A.

[3] *Id*.

[4] NAACP, Boston Branch et al., *Enough is Enough: Strategies & Solutions to Diversify Boston's Exam Schools* (Feb. 28, 2019), http://lawyersforcivilrights.org/wp-content/uploads/2019/02/Community-Strategies-and-Solutions-FINAL.pdf.

[5] Jeremy C. Fox, *Groups Urge Boston Latin School to Bolster Minority Ranks*, Boston Globe (May 24, 2016), https://www.bostonglobe.com/metro/2016/05/24/renewed-concern-over-racial-issues-boston-latin-school/ygEe90U7rZ8T4fy0v5572L/story.html.

applicants.[6] The NAACP is seeking intervention on behalf of both itself as well as its members whose children have currently pending applications to the selective public schools, including but not limited to:

- NAACP Member Parent and M.S.: NAACP Member Parent is the guardian of M.S., who is currently in sixth grade at the Nathan Hale Elementary School in Roxbury. They live in zipcode 02119. M.S. has a strong academic record and is eligible for admission to—and has a pending application at—the highly selective public schools.[7]

**Greater Boston Latino Network (GBLN)** is composed of nine Latinx-led and Latinx-serving community-based organizations that provide culturally-appropriate and linguistically-relevant support to Latinx youth and families through an array of free programmatic, educational, social, and community services.[8] Its mission centers on educational equity—especially ending segregation and promoting equal access and opportunity.[9]

GBLN and the NAACP have dedicated significant time and resources to pressing for diversity in BPS's selective public schools. In 2017 and 2018, they co-hosted a series of neighborhood meetings in Jamaica Plain, Dorchester, East Boston, Mattapan, and the North End of Boston to discuss how BPS should change admissions policies for the selective admissions schools to better reflect the demographics of the city.[10] Notably, one of the most prominent

---

[6] NAACP, Boston Branch et al., *A Broken Mirror: Exam School Admissions Fail to Reflect Boston's Diversity* (May 2017), http://lawyersforcivilrights.org/wp-content/uploads/2017/05/ABrokenMirror-ExamSchoolAdmissionsFailtoReflectBostonsDiversity.docx.pdf.
[7] Declaration of the NAACP In Support of Motion to Intervene, attached hereto as Exhibit A.
[8] Declaration of the Greater Boston Latino Network In Support of Motion to Intervene, attached hereto as Exhibit B.
[9] *Id*.
[10] *See Enough is Enough: Strategies and Solutions to Diversify Boston's Exam Schools* at 3 (Feb. 28, 2019), available here: http://lawyersforcivilrights.org/wp-content/uploads/2019/02/Community-Strategies-and-Solutions-FINAL.pdf.

suggestions emerging from those community meetings was a proposal that BPS invite a "top percentage of students in each Boston zip code to attend the BPS high school of their choice." [11]

**Asian Pacific Islander Civic Action Network (APIs CAN)** advances the interests of Massachusetts' Asian and Pacific Islander American communities with a shared agenda to further equity and oppose discrimination through year-round civic action. The member organizations of APIs CAN represents thousands of low-income and immigrant Chinese, Vietnamese, Cambodian, Laotian, Indian, Nepalese, and Korean families, parents, and students throughout Boston and Massachusetts. Multiple member organizations have constituents who are waiting to hear whether their children will be admitted to the highly selective public schools. The range of ethnicities in the Asian American community means that socioeconomic backgrounds within the community vary greatly from some of the wealthiest families to some of the lowest-income and most vulnerable, including refugees who consistently have among the lowest education attainment rates and highest poverty rates. As a result, member organizations have been focused on creating better language access policies in public school systems. [12]

**Asian American Resource Workshop (AARW)**, based in Dorchester, is a grassroots, member-led group organizing Asian American communities throughout Greater Boston through political education, creative expression, and both issue- and neighborhood-based organizing. [13] AARW's work has included extensive discussions with and support for members navigating BPS challenges. These difficulties include a lack of language access for limited English-speaking parents, complicated school policies and procedures, and navigation of the BPS' previous exam school testing system. AARW has numerous member families whose children have attended exam

---

[11] *Id*. (emphasis in original).
[12] Declaration of the Asian Pacific Islander Civic Action Network, attached hereto as Exhibit C.
[13] Declaration of the Asian American Resource Workshop, attached hereto as Exhibit D.

schools as well as families whose children were denied admission under the inequitable admissions system in place before this year.

**Maireny Pimentel** is an immigrant from the Dominican Republic and a single mother. She resides in the Cathedral Housing Project, a low-income community in Boston's South End, in zipcode 02118. Her older son, E.J.S., is an eighth-grade student at the James F. Condon School in South Boston, who was informed by BPS that he was eligible to apply to the highly selective public schools in December 2020 because of his strong academic credentials. He currently has a pending application at Boston Latin Academy. Her younger son, E.S., is a sixth-grade student at the bilingual Hurley School in the South End and intends to apply to the selective public schools in fall 2021.[14]

**H.D.**, who lives in Dorchester, in zipcode 02122, and is Vietnamese American, is a sixth grade student at Richard J. Murphy School. H.D. is currently waiting to hear about admissions decisions from highly selective public schools. H.D.'s family is low-income and has struggled in particular during the pandemic after H. D.'s parent lost her job as a nail salon worker. H.D. hopes to attend one of the selective public schools in fall 2021.[15]

## BACKGROUND

This matter arises within the context of BPS' long history of failing to create equitable access to its most selective schools. Starting in approximately 1963, the City began requiring students to take a test for admission to its selective schools; by the early 1970s, Black students made up over 30% of the District but less than 2% of Boston Latin School ("BLS").[16] Following

---

[14] Declaration of Maireny Pimentel, attached hereto as Exhibit E.
[15] Declaration of H.D., attached hereto as Exhibit F. A motion for leave for H.D. to proceed pseudonymously has been filed contemporaneously with this motion.
[16] Carrie Jung, *Not Always an Exam School: The History of Admissions at Boston's Elite High Schools*, WBUR (March 5, 2020), https://www.wbur.org/edify/2020/03/05/boston-exam-school-admissions-history.

the landmark decision in *Morgan v. Hennigan*, 379 F. Supp. 410 (D. Mass. 1974) which found that the City violated the constitutional rights of Black children "by promoting and maintaining a dual public school system," BPS was ordered to set aside 35% of its exam school seats for underrepresented students of color, based on the Court's conclusion that "the City's examination schools … were complicit in promoting and maintaining the dual system."[17] In the years that followed, highly selective public schools began to better represent the diversity of BPS. The set-aside was maintained until 1995, when it was challenged by an uninvited applicant and discontinued. *See Wessman v. Gittens*, 160 F.3d 790, 792 (1st Cir. 1998) (*citing McLaughlin v. Boston Sch. Comm.*, 938 F. Supp. 1001, 1018 (D. Mass. 1996)). In order to ensure the number of Black and Latinx students did not "drop precipitously," the School Committee adopted, beginning in the 1997-98 school year an admissions policy that, in relevant part, "relie[d] on race and ethnicity, and nothing else, to select a subset of entrants," *Id*. at 793, 794. This specific system was halted by *Wessman* in 1998. *Id*. at 792.

Thereafter, BPS retreated from further attempts to create a fairer admissions process. Until the Interim Plan, admission to the highly selective public schools was based half on a student's GPA and half on her performance on the Independent School Entrance Exam (ISEE), a standardized test heavily criticized by the NAACP and GBLN for testing on material outside of the BPS curriculum and that was never validated for students of color.[18] The testing firm behind the ISEE cut ties with the district in February 2020, stating that it had warned BPS for years that the use of the test "may be unfairly disadvantaging students from 'underrepresented groups.' "[19]

---

[17] *See Wessman v. Gittens*, 160 F.3d 790, 792 (1st Cir. 1998) (reviewing history of City's exam schools and the *Morgan* decision).
[18] NAACP, Boston Branch et al., *Strategies and Solutions*, at 1.
[19] Kenneal Patterson, *Testing Firm Lashes Out at BPS Over Its Use of the ISEE*, The Bay State Banner (Feb. 13, 2020), https://www.baystatebanner.com/2020/02/13/testing-firm-lashes-out-at-bps-over-its-use-of-isee/.

During the period in which admissions were based solely on GPAs and the ISEE, white students from affluent zip codes have been vastly overrepresented in Boston's selective public schools, leaving racially and geographically diverse students largely excluded.[20] Although the district is more than 75% Black and Latinx, this has not been remotely reflected at the highly selective public schools since the *Wessman* decision.[21] Of the three schools—BLS, Boston Latin Academy ("BLA"), and the John D. O'Bryant School of Mathematics and Science (the "O'Bryant")—BLS has been the least representative of the district's diverse student body.[22] In 2020, Black and Latinx students accounted for only 21% of the total number of students invited to enroll in BLS for the 2020-21 academic year.[23] In comparison, white students represented 48% of BLS invitees. Certain neighborhoods are also over-represented, particularly in invitations to BLS.[24] For example, students who reside in West Roxbury made up only 6% of *all* highly selective public school applicants but 17% of students invited to BLS alone.[25] By contrast, only 17% of all invitees came from Dorchester, the City's largest and most diverse neighborhood, even though 33% of all applications were submitted from Dorchester.[26]

---

[20] Stephanie Ebbert, *At Boston Latin, Little Outreach to City's Black, Latino Students*, Boston Globe (Apr. 23, 2016), https://www.bostonglobe.com/metro/2016/04/23/boston-latin-little-outreach-city-black-latino-students/of6NlYrJhR8PvxMUYNi50L/story.html.

[21] BPS Communications Office, *BPS at a Glance Fact Sheet* (Dec. 2019), https://www.bostonpublicschools.org/cms/lib/MA01906464/Centricity/Domain/187/BPS%20at%20a%20Glance%202019-20_FINAL.pdf.

[22] *Compare, e.g.,* School and District Profiles, *Boston Latin*, Massachusetts Department of Elementary and Secondary Education (2021), https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00350560&orgtypecode=6& (Black students constituting 7.7% and Latinx students 13.4% of the student body) *with* School and District Profiles, *O'Bryant Math/Science*, Massachusetts Department of Elementary and Secondary Education (2021), https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00350575&orgtypecode=6& (Black students constituting 32.3% and Latinx students 33.8% of the student body).

[23] "Data on Boston's Exam Schools," Lawyers for Civil Rights *available at* http://lawyersforcivilrights.org/our-impact/education/data-on-bostons-exam-schools/ (Mar. 18, 2020).

[24] *Id.*
[25] *Id.*
[26] *Id.*

Notably, data and experience have shown that Black and Latinx students are fully qualified and able to succeed at the selective public schools. Recent analyses have revealed, for example, that diverse students with similar Massachusetts Comprehensive Assessment System (MCAS) scores as their white and affluent peers are substantially less likely to receive admissions in selective public schools.[27] Nor is the lack of representation for lack of interest. According to data provided by BPS, for the 2020-21 academic year, Black and Latinx students made up nearly 70% of all exam school applicants. By contrast, only 18% of applications were from white students.[28]

But for a wide variety of reasons, ranging from grade inflation at parochial schools to the ability of affluent families to hire expensive private tutors, the admissions process has never reflected this reality. In particular, Organizational Intervenors have long argued that BPS' reliance on GPAs for determining access to selective public schools—a reliance that continues to this day— is discriminatory and has a disproportionately negative impact on Black and Latinx students. Methods for grading and calculating GPAs differ greatly between and among the public, charter, interdistrict, parochial, and private schools that highly selective public school applicants attend. Nevertheless, BPS continues to resist engaging with the reality of grade inflation in parochial and private schools, which enroll a disproportionate number of white students residing in high-income zip codes.[29] For example, in 2016, 69% of the students applying to BLS from Holy Name Parish School in West Roxbury had A+ averages, and 10% of BLS' entering class came from Holy Name

---

[27] Joshua Goodman & Melanie Rucinski, *Increasing Diversity in Boston's Exam Schools*, Harvard Kennedy School Rappaport Institute for Greater Boston, 9 (Oct. 2018), https://www.hks.harvard.edu/sites/default/files/centers/rappaport/files/examschools%20v10.pdf.
[28] "Data on Boston's Exam Schools," *supra.*
[29] *See* Latinos for Education, *Latino Education in the Time of COVID: The Pandemic's Unique Impact on Latino Students and Families in Massachusetts* (Aug. 2020), https://www.latinosforeducation.org/massachusetts-covid-19-impact/; *see also* Boston Public Schools, Exam School Admissions City Council Meeting, 20-21 (Mar. 5, 2019), attached hereto as Exhibit G.1 to the Affidavit of Lauren Sampson, which is attached hereto as Exhibit G.

alone.[30] By contrast, only 22% of students applying from BPS—who are disproportionately diverse students such as M.S., H.D., E.J.S. and E.S.—had those grades. Indeed, BPS students are only awarded the highest possible grade if they are deemed to be performing at a full grade level ahead of their current year.[31]

BPS' exclusionary policies have also contributed to racial and ethnic harassment of the racially isolated diverse students who do gain admission to the selective admission schools. Indeed, as recently as 2016, the U.S. Attorney's Office for the District of Massachusetts concluded that BLS violated Title VI of the Civil Rights of 1964 in its "mishandling" of allegations of racist bullying, its "response to two other racially charged incidents and the overall effectiveness of its efforts to create an inclusive school climate for all of its students."[32]

## ARGUMENT

### I.  Proposed Intervenors Are Entitled as of Right to Intervene in This Action.

Proposed Intervenors amply satisfy each of the requirements of Federal Rule of Civil Procedure 24(a)(2) for intervention as of right. Any party may intervene as of right if they have "an interest relating to the property or transaction that is the subject of the action, and [are] so situated that disposing of the action may as a practical matter impair or impede the movant['s] ability to protect [their] interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

The First Circuit requires proposed intervenors to demonstrate that: 1) their motion is "timely"; 2) that they have an "interest relating to the property or transaction that forms the

---

[30] Bianca Vázquez Toness, *Boston Public School Students May Be at a Disadvantage for Getting Into Boston Latin*, WGBH (Sept. 5, 2017), https://www.wgbh.org/news/2017/09/05/local-news/boston-public-school-students-may-be-disadvantage-getting-boston-latin.
[31] *Id.*
[32] Department of Justice Press Release, *U.S. Attorney Ortiz Concludes Investigation into Civil Rights Allegations at Boston Latin School* (Sept. 26, 2016), https://www.justice.gov/usao-ma/pr/us-attorney-ortiz-concludes-investigation-civil-rights-allegations-boston-latin-school.

foundation of the ongoing action"; 3) that the "disposition of the action threatens to impair or impede [their] ability to protect [their] interest"; and 4) that no "existing party adequately represents" the proposed intervenors' interests. *Mullane v. Portfolio Media, Inc.*, No. 19-11496-PBS, 2020 WL 1931525 at *3 (D. Mass. Feb. 28, 2020) (*quoting Ungar v. Arafat*, 634 F.3d 46, 50 (1st Cir. 2011)). As a general matter, a court "must approach the four-factor test 'holistically' and keep a 'commonsense view of the overall litigation.' " *Id.* (*quoting Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998).  All factors are satisfied here.

### A.  The Motion for Leave to Intervene is Timely.

Plaintiff commenced this action on February 26, 2021.  Proposed Intervenors filed this motion within 96 hours on Tuesday, March 2, 2021, prior to the Court's non-evidentiary hearing on the preliminary injunction motion. Indeed, that pending motion constitutes a critical "circumstance[] which weigh[s] for … intervention." *Id.*  Given that admissions decisions are scheduled to be sent out to prospective students by mid-March 2021 and Plaintiff is requesting preliminary injunctive relief, a decision on Plaintiff's motion will undoubtedly impact students that extend far beyond those allegedly represented by Plaintiff, resulting in foreseeable, irreparable harm and prejudice to the communities represented by Proposed Intervenors. Moreover, an adverse ruling could effectively extinguish Proposed Intervenors' rights, particularly the rights of individual families.

### B.  Proposed Intervenors Have Important Interests in this Action.

To intervene as of right, Proposed Intervenors must identify a viable interest "relating to the property or transaction that forms the foundation of the ongoing action." *Mullane*, No. 19-11496-PBS, 2020 WL 1931525 at *5 (*quoting Ungar*, 634 F.3d at 50). Proposed Intervenors' claims "must bear a sufficiently close relationship to the dispute between the original litigants"

and the interests must be "direct, not contingent or speculative." *Id.* (*quoting Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 42 (1st Cir. 1992)) (quotation marks omitted). Here, Proposed Intervenors have viable, private, and direct interests that are intertwined with the dispute between Plaintiff and Defendants.

The Organizational Intervenors' interests in this litigation are direct, essential, and non-speculative. At the outset, in characterizing statements by the President of the NAACP as "clear [evidence] of intent or animus" and attributing this animus to a public school district, Plaintiff has invited this intervention. ECF 3 at 17.[33] In addition to the fact that the Complaint relies upon misconstrued statements made by the President of the NAACP—even though neither the President nor the NAACP are represented by Defendants—these organizations are uniquely capable of speaking to the decades of discrimination felt by their members and by the intervening families and, discrimination that lies at the heart of the Interim Plan. NAACP and GBLN have a longstanding interest, in diversifying Boston's selective admission schools, promoting greater enrollment of diverse students, and ensuring equal educational opportunity for their members, including students of color, immigrant students, and first-generation students residing in some of Boston's lowest-income zip codes. Additionally, APIs CAN and AARW have long addressed inequitable access issues for families in the BPS system. APIs CAN has multiple member organizations with constituents awaiting admissions decisions from the highly selective public schools.

A critical component of all the Organizational Intervenors' participation in this matter is their advocacy surrounding the benefits to students of *all* races, ethnicities, religions, regions, and

---

[33] In so doing, Plaintiff has opened the door for the NAACP's participation in this matter as a necessary and interested party, at the very least, to challenge what Plaintiff has characterized as a "discriminatory" comment allegedly made while discussing the Interim Plan.

socio-economic backgrounds that flow from a diverse student body. A graduate of BPS would be ill-prepared for our "complex and heterogenous" society if he or she had never befriended or learned beside a child with a completely different background, experience, and identity.[34] If Plaintiff is successful in overhauling the extant admissions policy days before decisions are released, that decision will have an immediate impact on the services, programming, and advocacy engaged in by the Organizational Intervenors and their members, as well as on the ability of the Latinx, Black, and Asian American communities they serve to access the highly selective public schools.

In addition, the Individual Intervenors and NAACP members such as NAACP Member Parent and M.S. "belong to the small group, quite distinct from the ordinary run of citizens, who would be affected directly by the outcome of [this] case." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 308 F.R.D. 39, 47 (D. Mass. 2015), *aff'd* 807 F.3d 472 (*quoting Daggett v. Comm'n. on Governmental Ethics and Election Practices*, 172 F.3d 104, 110 (1st Cir. 1999)). First, they are "established resident[s] of a public school district," whose families will be and have been impacted by the School Committee's change to the selective admission

---

[34] Committee to Study the Important of Student Body Diversity, *Report* at 5-6 (Feb. 2, 2016), available at: https://inclusionandbelongingtaskforce.harvard.edu/files/inclusion/files/report_of_the_committee_to_study_the_importance_of_student_body_diversity_02-02-16.pdf (noting that as "current events across our nation continue to demonstrate," individual experience is shaped by "racial and ethnic heritage" and schools would "fail in a foundational aspect of [their] mission if [they] disregarded that fact" as they prepare students for the outside world); *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 980 F.3d 157, 195 (1st Cir. 2020) (observing that a less racially diverse campus would make the university "less attractive and hospitable to minority applicants while limiting all students' opportunities to engage with and learn from students with different backgrounds from their own."); *see also id.* at 195 n.33 (quoting Harvard student who testified that, in selecting where to attend university, she "wanted to make sure that there would be other students who were people of color like myself...so that I could have a more safe environment, a more welcoming environment, and a better . . . learning environment."). A diverse learning environment both guards against racial isolation and tokenism, while ensuring that the next generation of leaders will "live and learn surrounded by all sorts of people, with all sorts of experiences, beliefs, and talents." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll. (Harvard Corp.)*, 397 F.Supp.3d 126, 205 (D. Mass. 2019); *see also School Bd. of the City of Richmond, Va. v. Baliles*, 829 F.2d 1308, 1313 (4th Cir. 1987) (describing School Board's request for funding to help public school students "overcome the injuries they suffer by virtue of being in [] racially isolated school."). As the Supreme Court noted in *Brown v. Board of Education*, the benefits of diversity and desegregation are no less real and meaningful for middle and high school children than they are for the college students they will become. 347 U.S. 483 (1954).

policies. *Id*. at 48 (D. Mass. 2015) (distinguishing unsuccessful intervention attempt by current students at Harvard College from *Johnson v. San Francisco Unified Sch. Dist.*, 500 F.2d 349 (9th Cir. 1974) where parents of children of Chinese ancestry had right to intervene in action challenging district reassignment policies). Second, E.J.S., a Latino student in zip code 02118, M.S., a Black student in zip code 02119, and H.D., a Vietnamese-American student in zip code 02119, have presently outstanding applications to the selective public schools. *See* Declaration of E.J.S., Declaration of M.S., and Declaration of H.D.; *compare Students for Fair Admission, Inc.*, 308 F.R.D. at 47-48 (distinguishing unsuccessful intervention attempt by current students at Harvard College from *Black Fire Fighters Association of Dallas v. City of Dallas*, *Tex.*, 19 F.3d 992, 994 (5th Cir. 1994), where intervenors were firefighters "presently employed by the city" whose "opportunities for promotional advancement would be immediately and directly impacted by the outcome of a racial discrimination suit."). Insofar as Plaintiff's identified members have a viable interest in the outcome of this litigation, so too do M.S., H.D., and E.J.S.  Should Plaintiff succeed, even on a motion for preliminary injunctive relief, in its attempt to upturn the BPS selective admissions process at the eleventh hour, that decision will necessarily impact the ability of students of color to obtain admission at these selective schools.

To that end, there are powerful parallels between this action and cases where police officers of color have been allowed to intervene as of right when white officers challenged equal opportunity policies, particularly where, as here, organizations have constituents who will be directly impacted by this lawsuit.[35] Intervention by right by longstanding membership

---

[35] *See, e.g., Cotter v. Mass. Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31, 37(1st Cir. 2000)(granting intervention to association of minority law enforcement officers (MAMLEO) in challenge by white officers to promotional decision-making because the "outcome of this case may very well determine how the Boston Police Department handles, and is allowed to handle, comparable situations almost certain to arise in the future and the likely impact on other [] members seems [] substantial, predictable and far more concrete than some general interest in precedent."); *see also Deleo v. City of Boston, Mass.*, No. 03-12538-PBS, 2004 WL 5740819 at *1 (D. Mass.

organizations that represent and protect the right of people of color is necessary where there has been an attack on remedial measures intended to mitigate decades of disenfranchisement and discrimination.

### C.  <u>Proposed Intervenors' Interests Will Be Impaired Absent Intervention.</u>

To determine whether intervention is required for protection of an interest, courts apply a "practical test," querying whether the proposed intervenors' interests would be "adversely affected" based on the outcome of the lawsuit. *Daggett*, 172 F.3d at 110-11. Here, there can be no real dispute that Proposed Intervenors' interests would be adversely affected if Plaintiff was to prevail in the present lawsuit, or even on the motion for preliminary injunctive relief. A ruling against Defendants would have direct, adverse, and immediate consequences for the Proposed Intervenors. BPS' new admissions process was announced in fall 2020 and students, parents, and staff have been acting and proceeding accordingly—for example, by applying, as E.J.S. did, after receiving notice from BPS that they were eligible to do so. If Plaintiff is now permitted to disrupt the admissions process, the children's chances of admission to these schools—and the chances of other Black and Latinx, and underrepresented students living in low-income zipcodes—will be diminished. Depriving Proposed Intervenors an opportunity to intervene, with only a few weeks left before admissions decisions are sent out and when all parties had a settled expectation that the new plan would be implemented, would inevitably impair their interests. Accordingly, Proposed Intervenors' have satisfied the criteria for intervention as of right.

### D.  <u>Existing Parties Do Not Adequately Represent Proposed Intervenors' Interests.</u>

---

Nov. 23, 2004) (Boston Branch of the NAACP and MAMLEO allowed to intervene as party defendants in challenge by eight White police applicants to racial consent decree governing hiring).

Finally, Defendants cannot and will not adequately represent Proposed Intervenors' interests. Although there is a presumption that a governmental defendant will adequately represent the interests of a proposed intervenor,[36] that presumption is rebutted where—as here—the proposed intervenors possess direct, private interests not shared by the governmental defendant and where there is a potential or actual conflict between these parties. The First Circuit has distinguished between those cases where intervenors had "direct private interests" which the government "had and could have no interest in protecting" and those cases involving only a "tactical disagreement." *Id*. at 20. In addition, the First Circuit has cautioned against a "mechanistic application" of the language of presumption, noting that the facts of these cases "vary greatly" and the sufficiency of an explanation of inadequacy "must be determined in keeping with a commonsense view of the overall litigation." *Id*. (quotation omitted).

Here, the First Circuit's decision in *Cotter* provides a close analogy. In that case, eight white officers of the Boston Police Department brought a lawsuit alleging their constitutional rights were violated by the promotions of three Black officers, which were done "for the purpose of maintaining or increasing minority representation among sergeants" with the eight plaintiffs being "excluded from promotion because they were White." 219 F.3d at 32-33. The Massachusetts Association of Minority Law Enforcement Officers (MAMLEO) sought intervention as of right, but this Court denied the motion and instead permitted MAMLEO to participate as amicus curiae. MAMLEO appealed to the First Circuit, which reversed. In its decision overturning the denial of MAMLEO's motion, the First Circuit observed that the "likelihood of conflict or divergence of interest" can defeat any claim of adequate representation. *Id*. at 35. In *Cotter*, MAMLEO had

---

[36] There is an "assumption," subject to "evidence to the contrary," that in cases where parties seek to intervene in support of a government defendant, the government will "adequately defend its actions, at least where its interests appear to be aligned with those of the proposed intervenor." *Maine v. Director, U.S. Fish and Wildlife Service*, 262 F.3d 13, 19 (1st Cir. 2001).

expressed an intention to defend the consideration of race as a proper remedial measure as a "counter to the alleged deficiencies in [the] *current* tests" used by the Department for officer promotions. *Id*. (emphasis in original). The First Circuit concluded that there was "ample reason" for the Department to "resist a defense premised on a showing that its tests are currently in violation of law." *Id*. at 36. That "potential conflict" between MAMLEO and the Department on "how best to defend the consideration of race in promotions is enough to show that the interest of MAMLEO members" was not adequately represented by existing parties, and is not adequately represented here. *Id*. at 37; *see also Deleo*, No. 03-12538-PBS, 2004 WL 5740819 at *1.

The First Circuit's recent decision in *Victim Rights Law Ctr. v. Rosenfelt*, __ F.3d ___, 2021 WL 630453 (1st Cir. Feb. 18, 2021), affirming this Court's denial of intervention to proposed intervenors, makes this precise point again. There, the First Circuit agreed with this Court that the movant-intervenors would "only raise extra constitutional theories not in conflict with the government's defenses nor requiring additional evidentiary development." *Id.* at *4. In affirming this Court's decision, the First Circuit drew an explicit contrast with *Cotter*, noting that in that case, the City's "interests and likely defenses were in conflict with the minority officers' interests and proposed defense that the racial criteria employed in promotional decisions were appropriate" because of alleged deficiencies in extant promotional exams. *Id*.

Here, all the Proposed Intervenors have "direct private interests" which the School Committee and BPS have "no interest in protecting." *Maine*, 262 F.3d at 20. Because of E.J.S.'s, H.D.'s, and M.S.'s pending application, the families have a direct, private interest in the children's acceptance to and enrollment in a highly selective public school on par with the alleged interest of Plaintiff's members. Because they are BPS families, residing in the district and attending BPS schools, the families have a direct, private interest in the district's ongoing efforts to desegregate

17

its middle and high schools. Similarly, through their membership and advocacy efforts, Organizational Intervenors and their members have a direct, private interest in increasing the enrollment of their constituencies at the selective admission schools and protecting against racial isolation once there.

Moreover, as in *Cotter*, there is a near-certain conflict between the arguments the Proposed Intervenors would likely advance and those Defendants are anticipated to advance. *See T-Mobile Northeast LLC v. Town of Barnstable*, 969 F.3d 33, 40 (1st Cir. 2020) (observing test for adequate representation involves consideration of whether party is "likely to raise the putative intervenor's preferred arguments" and probability putative intervenor "will add any missing element."). As detailed above, Proposed Intervenors intend to argue that the revised admission policy is constitutional and the racial context that undoubtedly supports the use of non-racially discriminatory criteria. Not only is BPS constitutionally permitted to take steps to diversify its exam schools, its failure to do so risks violating federal and state anti-discrimination laws. Both federal[37] and state[38] law prohibit racial discrimination in admissions to public schools. Importantly, regulations promulgated under both federal and state law make clear that admissions policies and practices that have an unjustified disproportionate impact on minority students are illegal, even if there is no discriminatory intent.[39]

---

[37] Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.

[38] Massachusetts General Laws ch. 76 § 5 provides that "No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation."

[39] 34 C.F.R. Part 100 (implementing regulations, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*.); 603 C.M.R. 26.02. (implementing regulations for Massachusetts' school attendance law, Ch. 76, that prohibit admissions policies that "*have the effect* of subjecting students to discrimination because of their race, color") (emphasis added). Beyond liability under disparate impact, a school that continued to maintain an exclusionary admissions policy in the face of other clear alternatives available arguably also acts in an intentionally discriminatory fashion. See *Washington v. Davis*, 426 U.S. 229 (1976).

In particular, as outlined above, the Proposed Intervenors will argue that BPS' historical and current overreliance on grade point averages has an unjustified disproportionate impact on Black, Latinx , and other underrepresented students, thereby further necessitating, at a minimum, the present Interim Plan. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 807 F.3d 472, 476-77 (1st Cir. 2015) (distinguishing that case, where proposed student intervenors "concede[d] that they lack[ed] any legal basis for requiring Harvard to maintain its current practices," from *Cotter*, where intervenors "proposed to argue that the defendant was in violation of law and that the practices challenged in the lawsuit were defensible as a remedy for past unlawful discrimination" (quotations omitted)). This need is exacerbated during a global pandemic that disproportionately impacts communities of color and makes it impossible for BPS to rely on its past admissions practices. Because there is "ample reason" for the Defendants to "resist a defense premised on a showing that its [admission metrics] are currently in violation of law," they cannot adequately represent Proposed Intervenors' interests. *Cotter*, 219 F.3d at 36.

## II.  <u>In the Alternative, the Court Should Exercise its Discretion to Grant Permissive Intervention.</u>

Should the Court elect not to grant leave to intervene as of right, Proposed Intervenors respectfully request that the Court exercise its discretion to permit them leave to intervene pursuant to Rule 24(b)(1). Three key factors should be weighed: 1) the proposed intervenor's "claim or defense and the main action have a question of law or fact in common"; 2) the proposed intervenor's interests "are not adequately represented by an existing party" and; 3) intervention "would not result in undue delay or prejudice to the original parties." *In re Thompson*, 965 F.2d 1136, 1142 n.10 (1st Cir. 1992) (citation omitted). However, a district court "may consider almost any factor rationally relevant" to a motion for permissive intervention and enjoys "very broad

discretion in granting or denying the motion." *Com. v. U.S. Dep't. of Health & Human Servs.*, 289 F. Supp.3d 259, 265 (D. Mass. 2018) (*quoting Daggett*, 172 F.3d at 113).

Proposed Intervenors satisfy each of these criteria. First, their proposed defenses are inextricably woven with the main action. Defendants will not adequately represent the Proposed Intervenors' private, direct interests. Moreover, because the litigation is in the earliest stages, permissive intervention would not unduly delay or prejudice either the parties or the Court. Finally, other factors considered by district courts—such as the "helpfulness of applicants in fully developing the case"—also weigh in favor of permissive intervention. *Id*. at 266 (*quoting Daggett*, 172 F.3d at 114). As discussed *supra*, Proposed Intervenors are uniquely positioned to offer testimony and briefing on the indignities and harms of racial isolation, and the disparate impact of BPS' historical and present admissions standards on students from diverse backgrounds and neighborhoods.

## CONCLUSION

For the foregoing reasons, Proposed Intervenors respectfully request that the Court grant their Motion for Leave to Intervene and allow them to intervene as of right in this matter pursuant to Rule 24(a), or, alternatively that the Court exercise its discretion to permit them to intervene pursuant to Rule 24(b).

Respectfully submitted,


NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
BOSTON BRANCH AND OTHER
PROPOSED INTERVENORS


By their attorneys,


/s/ *Doreen Rachal*
Doreen M. Rachal (BBO# 667837)
SIDLEY AUSTIN LLP
60 State Street, 36th floor
Boston, Massachusetts 02109
Tel: (617) 223-0300
drachal@sidley.com




/s/Lauren Sampson
Lauren Sampson (BBO #704319)
Janelle Dempsey (BBO #699379)
Oren Sellstrom (BBO #569045)
Lawyers for Civil Rights
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
lsampson@lawyersforcivilrights.org
617-988-0609


/s/*Bethany Li*
Bethany Li (BBO #673383)
Alex Milvae (BBO #705668)
Jodie Ng, Law Student Intern
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114
bli@gbls.org
Dated: March 2, 2021                617-603-1532




21

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)</u>

The undersigned counsel for the Proposed Intervenors certify that they have conferred with counsel for the plaintiff and defendant by telephone on March 2, 2021 to narrow or resolve the issues raised in the motion, specifically relating to the request to intervene in this matter.

Dated: March 2, 2021

/s/ *Doreen Rachal*
Doreen M. Rachal (BBO# 667837)
drachal@sidley.com

**<u>CERTIFICATE OF SERVICE</u>**

I, Doreen M. Rachal, hereby certify that a true and accurate copy of this document, which was filed via the Court ECF system, will be sent electronically by the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 2, 2021.

Dated: March 2, 2021                              /s/ *Doreen Rachal*

 Doreen M. Rachal (BBO# 667837)
 drachal@sidley.com