## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP., <br><br> Plaintiff, <br><br> v. <br><br> THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEILL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS, <br><br> Defendants, <br><br> THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTEL, and H.D., <br><br> Defendants-Intervenors | Civil Action No. 1:21-cv-10330-WGY |

## INTERVENORS' BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR JUDGMENT AND INJUNCTIVE RELIEF

Doreen M. Rachal (BBO # 667837)
Drew A. Domina (BBO# 703375)
SIDLEY AUSTIN LLP
69 State Street, 36th Floor
Boston, Massachusetts 02109
Tel: (617) 223-0300
drachal@sidley.com
ddomina@sidley.com

Susan M. Finegan (BBO # 559156)
Mathilda S. McGee-Tubb (BBO # 687434)
Jason Burrell (BBO # 705180)
Laura Martin (BBO # 705617)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Tel: (617) 542-6000
smfinegan@mintz.com
msmcgee-tubb@mintz.com
jlburrell@mintz.com
lemartin@mintz.com

Bethany Li (BBO # 673383)
Alex Milvae (BBO # 705668)
Jodie Ng, Law Student Intern
Henry Zhu, Law Student Intern
GREATER BOSTON LEGAL SERVICES
197 Friend Street
Boston, Massachusetts 02114
Tel: (617) 371-1234
bli@gbls.org
amilvae@gbls.org

Lauren Sampson (BBO # 704319)
Janelle Dempsey (BBO # 699379)
Oren Sellstrom (BBO # 569045)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: (617) 988-0609
lsampson@lawyersforcivilrights.org
jdempsey@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org

*Counsel for Defendants-Intervenors*

## Table of Contents

Table of Authorities ................................................................................................ ii

I.  **Introduction and Relevant Facts** ................................................................. 1

II. **The Interim Plan Is Rationally Related to a Legitimate Government Interest and Withstands Rational Basis Review.** ............................ 3

III. **The Interim Plan Does Not Warrant Review Under Strict Scrutiny.** ............................ 4

    a.  **The Interim Plan Does Not Employ Racial Classifications as the Zip Code Component Is Race-Neutral.** ............................ 5

    b.  **The Interim Plan Was Not Enacted with Invidious Discriminatory Intent.** ............................ 7

        i.  **Statements by Individual Defendants and Members of the Working Group Do Not Show an Invidious Intent to Discriminate.** ............................ 9

        ii. **There Is No "Stark" Racial Impact Pattern That Would Indicate Invidious Discriminatory Intent.** ............................ 13

IV. **Even if Strict Scrutiny Applies, the Interim Plan Passes Muster.** ............................ 15

    a.  **The Interim Plan Furthers the Compelling Governmental Interest of Racial, Socioeconomic, and Geographic Diversity of Students.** ............................ 15

    b.  **The Interim Plan Is Narrowly Tailored to Further the Defendants' Compelling Government Interest.** ............................ 17

V.  **Plaintiff Has Waived the State Law Claim in Count II of Its Complaint.** ............................ 20

VI. **Plaintiff Fails to Substantiate Its Request for an Injunction.** ............................ 20

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Alexis v. Leporati*,
   No. CIV. A. 93-10003-WGY, 1996 WL 463675 (D. Mass. July 30, 1996)...........................5

*Arlington Heights v. Metropolitan Housing Dev. Corp.*,
   429 U.S. 252 (1977)................................................................................ *passim*

*Bauza v. Morales Carrion*,
   578 F.2d 447 (1st Cir. 1978)......................................................................5

*Boyapati v. Loudon Cty. Sch. Bd.*,
   No. 1:20-cv-01075, 2020 WL 6797365 (E.D. Va. Oct. 7, 2020) ...............................8

*Bush v. Vera*,
   517 U.S. 952 (1996)..............................................................................12

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
   364 F. Supp. 3d 253 (S.D.N.Y. 2019), *aff'd,* 788 F. App'x 85 (2d Cir. 2019)................ *passim*

*Danzer v. Norden Sys.*,
   151 F.3d 50 (2d Cir. 1998)......................................................................10

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
   665 F.3d 524 (3d Cir. 2011)....................................................................7, 8

*Anderson ex rel. Dowd v. City of Boston*,
   375 F.3d 71 (1st Cir. 2004)..................................................................... *passim*

*eBay Inc v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)..............................................................................20

*Fisher v. Univ. of Texas at Austin*,
   136 S.Ct. 2198 (2016).....................................................................7, 15, 16, 17

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)............................................................................. *passim*

*Hayden v. Grayson*,
   134 F.3d 449 (1st Cir. 1998)......................................................................7

*Heller v. Doe*,
   509 U.S. 312 (1993)...............................................................................3

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)...................................................................................2

*Jana-Rock Constr., Inc. v. New York Dep't. of Econ. Dev.*,
    438 F.3d 195 (2d Cir. 2006)......................................................................11

*Lewis v. Ascension Parish Sch. Bd.*,
    806 F.3d 344 (5th Cir. 2015) .................................................................7, 8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...................................................................................2

*McLaughlin v. Boston Sch. Comm.*,
    938 F.Supp 1001 (D. Mass. 1996) ............................................................7

*Merrick v. Farmers Ins. Grp.*,
    892 F.2d 1434 (9th Cir. 1990) ................................................................10

*Morgan v. Hennigan*,
    379 F. Supp. 410 ....................................................................................11

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)......................................................................... *passim*

*Pers. Adm'r. of Mass. v. Feeney*,
    442 U.S. 256 (1979)...................................................................................7

*Raso v. Lago*,
    135 F.3d 11 (1st Cir. 1998), *cert. denied*, 525 U.S. 811 (1998) ......................10, 12

*Rice v. Cayetano*,
    528 U.S. 495 (2000)...................................................................................5

*Richards v. Relentless, Inc.*,
    341 F.3d 35 (1st Cir. 2003).........................................................................5

*Rocket Learning, Inc. v. Rivera-Sanchez*,
    715 F.3d 1 (1st Cir. 2013).......................................................................3, 4

*Rodríguez v. Municipality of San Juan*,
    659 F.3d 168 (1st Cir. 2011)....................................................................20

*Shaw v. Reno*,
    509 U.S. 630 (1993)................................................................................11

*Shurtleff v. City of Boston*,
    986 F.3d 78 (1st Cir. 2021)........................................................................3

*Smith v. Firestone Tire & Rubber Co.*,
    875 F.2d 1325 (7th Cir. 1989) ..............................................................................10

*Soto v. Flores*,
    103 F.3d 1056 (1st Cir. 1997) ...........................................................................7, 11

*Spurlock v. Fox*,
    716 F.3d 383 (6th Cir. 2013) ..............................................................................7, 8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*
    *(Harvard Corp.)*,
    397 F.Supp. 3d 126 (D. Mass. 2019) ..............................................................13, 17

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*
    *(Harvard Corp.)*,
    980 F.3d 157 (1st Cir. 2020) ....................................................................................7

*Texas Dep't. of Housing and Comy Affairs v. Inclusive Comtys. Project, Inc.*,
    576 U.S. 519 (2015) ...............................................................................................12

*United States v. Caparotta*,
    676 F.3d 213 (1st Cir. 2012) ..................................................................................20

*United States v. Hays*,
    515 U.S. 737 (1995) .................................................................................................3

*United States v. Perez*,
    35 F.3d 632 (1st Cir. 1994) ......................................................................................5

*Voice of the Aram World, Inc. v. MDTV Md. News Now, Inc.*,
    645 F.3d 26 (1st Cir. 2011) ....................................................................................20

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................................3

*Wessmann v. Gittens*,
    160 F.3d 790 (1st Cir. 1998) ........................................................................7, 18, 19

*Yick Wo v. Hopkins*,
    118 U.S. 356 .............................................................................................................5

## I.    Introduction and Relevant Facts

In this lawsuit, Plaintiff challenges a thoughtful solution to an unanticipated problem in a previously unimaginable context: how to determine who is offered a spot in Boston's highly selective public schools in the midst of a global pandemic. In this anomalous admissions cycle for 2021-22, the Boston School Committee (the "Committee") had no choice but to come up with a different, one-year plan. Agreed Statement & Exhibits (ECF No. 38, "ASE") 00009 ¶31; ASE01550. Although the record demonstrates that the Committee did so rationally, with proper purpose, and with a variety of legitimate interests and goals in mind, Plaintiff cries foul, claiming that the true and *primary* intention of the interim admissions policy (the "Interim Plan") was to discriminate against White and Asian students and engage in impermissible racial balancing. ECF No. 63 ("Pls. Br.") at 8.

Plaintiff ignores the real world in which the Interim Plan was developed. Pls. Br. at 19. The Exam School Admissions Criteria Working Group (the "Working Group") was formed to address the unique and unprecedented challenges posed by the COVID-19 pandemic. ASE00009 ¶31, ASE01550. The need for an interim approach was driven, in part, by the fact that the exam purchased by the district could not be safely administered. ASE00014 ¶50; ECF No. 34 ("IAF") ¶43 & Ex. 48 at 9. It was also driven, in part, by the disruption the pandemic had on the lives of Boston Public Schools ("BPS") students—particularly those in lower-income and racial minority communities making it nearly impossible for those students to have the same chance at admission to one of Boston's highly selective public schools as they would have had absent the effects of the pandemic. IAF ¶¶7-10 & Exs. 11-19; *see* IAF ¶43 & Ex. 48 at 9.

Considering issues of racial equity in selective school admissions policies—*especially* in the context of a devastating global pandemic—does not subject a facially neutral policy to strict

scrutiny. Diversity in every sense is indisputably important in an educational setting. IAF ¶¶30-39 & Exs 36-44. While the Interim Plan was informed by such considerations, it is a facially neutral approach that is rationally related to the purpose it serves: to provide a uniform, city-wide mechanism for extending admissions offers to Boston's highly selective public schools to qualified students while broadening the opportunity to attend such schools across Boston's geographic areas and populations during this unprecedented admissions cycle.

Neither the use of zip code in the Interim Plan (the "Zip Code Component") nor the Interim Plan overall consider a student's race in determining whether that student is offered a spot in one of these schools.[1] All students are treated equally within each zip code, regardless of their race and socioeconomic status. The racial animus Plaintiff purports to read into the Interim Plan simply isn't supported by the substantial record.

With no racial classifications, no invidious discriminatory purpose or discriminatory intent, and no proven, statistically significant disparate impact, the Interim Plan is subject to rational basis review. Particularly in the context of the COVID-19 pandemic and all its challenges, the Interim Plan plainly meets this standard. Plaintiff's claims should be denied.[2]

---

[1] To be an eligible applicant, a student must (1) reside in one of Boston's 29 zip codes; (2) hold a minimum B average in ELA and Math or have received a "Meets Expectations" or "Exceeds Expectations" score on the Spring 2019 MCAS exam; and (3) provide verification from the school district (or equivalent) that the student is performing at grade level. ASE00014 ¶51. From the pool of eligible applicants, 20% of seats in each of the three highly selective public schools will be filled using GPA only. The Working Group adopted this mechanism specifically "to provide an additional means of admission for all students, particularly those in neighborhoods with small school-age populations and/or a disproportionate application rate for exam schools." ASE00973. The remaining seats will be apportioned based on a combination of zip code and GPA. ASE00016 ¶¶57, 59; ASE01824; IAF ¶45 & Ex. 49 at 6-7. These remaining seats will be filled through a series of ten assignment rounds, each of which will assign 10% of the seats within that zip code. ASE00017 ¶61, ASE01824; IAF ¶46 & Ex. 49 at 7. The Interim Plan relies upon zip codes and the median family income of each zip code solely for determining the order in which admissions offers are made as zip codes will be ordered from the lowest median income, with children under 18, to the highest. IAF 34 ¶46 & Ex. 49 at 7. This component of the Interim Plan aims to foster geographic and socioeconomic diversity within Boston's highly selective public schools—a permissible and indeed laudable goal. IAF ¶46 & Exs. 39 at 2; 44.
[2] Plaintiff's claims should also be denied because Plaintiff lacks standing to pursue them. For an association to bring suit on behalf of its members, those members must "otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, because Plaintiff has not produced evidence indicating that any member would suffer an injury in fact sufficiently imminent to confer standing, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992), Plaintiff itself lacks associational standing. *Cf. Christa McAuliffe Intermediate Sch. PTO,*

## II. The Interim Plan Is Rationally Related to a Legitimate Government Interest and Withstands Rational Basis Review.

In the absence of racial classification, disparate treatment, or discriminatory purpose, a policy must only survive rational basis review to pass constitutional muster. In other words, the Zip Code Component "need only bear a rational relationship to some legitimate governmental purpose." *Shurtleff v. City of Boston*, 986 F.3d 78, 98 (1st Cir. 2021). Under this standard, the policy must be "accorded a strong presumption of validity," and "upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).

The Zip Code Component plainly survives this level of scrutiny.[3] As the record makes clear, the Interim Plan considers "the educational impact of COVID-19," including, but not limited to, the shift to pass-fail grading, the "feasibility and utility of offering an entrance exam," and the "racial and socioeconomic disparities" exposed and caused by the pandemic in Boston in everything from "infection rates" to "technology access." ASE00967, 972; *see* ASE01704; ASE01788.[4] *Cf. Rocket Learning, Inc. v. Rivera-Sanchez,* 715 F.3d 1, 11 (1st Cir. 2013) (court

---

*Inc. v. de Blasio*, 364 F. Supp. 3d 253, 272 (S.D.N.Y. 2019), aff'd, 788 F. App'x 85 (2d Cir. 2019) (denying standing in equal protection case to individual plaintiffs whose children might apply to affected schools years in future). Furthermore, because a government "always is aware of race" when making neighborhood-based policies, "that sort of race consciousness . . . is inadequate to establish injury in fact." *United States v. Hays*, 515 U.S. 737, 745-46 (1995). Similarly, a "generalized grievance" in opposition to government policy is insufficient. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Here, because Plaintiff's claims amount to mere generalized grievances in the face of race conscious (but race-neutral) government action, Plaintiff has not and cannot suffer an injury in fact and therefore lacks standing.

[3] The Zip Code Component must be weighed in its context: the rapid, unpredictable spread of COVID-19, ASE01704, the unavailability of the standardized test chosen by BPS, ASE01788, the "lack of uniformity between the grading systems" used by schools serving Boston children, ASE00972, and the pandemic's creation, exacerbation, and exposure of "racial and socioeconomic disparities" in infection rates and access to technology, academic support, language support, food, and stable housing, ASE00967.

[4] *See also* ASE01798 (Working Group tasked with creating a "clear and fair process" that accounted for the "circumstances of the COVID-19 global pandemic that disproportionately affected families in the city of Boston" while *also* better reflecting the "racial, socio-economic and geographic diversity of all students" in Boston); ASE01856 (observing revisions to the admissions criteria for the 2021-2022 school year were in "direct response to the impact of the COVID-19 pandemic on applicants during the latter half of School Year (SY) 2019-2020").

will not "infer the existence of an improper motivation" from last-minute rule changes in "idiosyncratic circumstances").

Further, although the district had entered into a contract for a new standardized admission test, the vendor "[did] not support a remote test administration for exam school admissions," and the Commonwealth had restricted, and continues to restrict, indoor gatherings, such that hundreds of children could not take the test together. ASE01562; ASE01788. In the absence of the exam, the district looked to other criteria that could be employed on a citywide basis, examining "models from other cities" and simulating invitation results based on various assessments. ASE01834. The Interim Plan balances the district's goals of ensuring academic excellence and promoting access and opportunity to highly selective public schools for children of all races, ethnicities, neighborhoods, and socioeconomic statuses. In particular, the creation of a specific zip code for homeless children or children in state custody and the ordering of zip codes from lowest median family income to highest reflect the district's interest in creating greater neighborhood and socioeconomic diversity. ASE01787.

Plaintiff has not, and cannot, argue that Defendants lacked a legitimate interest in fairly measuring student success while "minimizing the impact of—and exposure to—COVID 19." ASE00968.[5] Accordingly, when scrutinized utilizing rational basis review, the Zip Code Component must be upheld, and Plaintiff's Equal Protection claim fails.

### III.  The Interim Plan Does Not Warrant Review Under Strict Scrutiny.

---

[5] Even if Defendants' sole goal was improved racial, socioeconomic, and geographic diversity, that goal would pass constitutional muster. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 783 (2007) (Kennedy, J., concurring in part and concurring in the judgment) (diversity, depending on its meaning and definition, is a "compelling educational goal a school district may pursue"); *accord Christa McAuliffe*, 364 F. Supp. at 280.

Plaintiff's assertion that the Zip Code Component must be reviewed under strict scrutiny is incorrect as a matter of law and fact. Strict scrutiny would be appropriate here only if 1) there is an explicit racial classification for the distribution of benefits or burdens, or 2) the policy is facially neutral but "invidious discriminatory purpose" was a motivating factor. *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 82-83 (1st Cir. 2004) (*quoting Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)).[6] Neither circumstance applies to the Interim Plan.

### a. The Interim Plan Does Not Employ Racial Classifications as the Zip Code Component Is Race-Neutral.

The Interim Plan is race-neutral and does not use racial classifications. Students do not ever self-report their race in the interim process, nor are they ever racially classified. Instead, the Interim Plan assigns eligible students to the highly selective public schools either based solely on GPA or a combination of GPA and zip code. Plaintiff's argument that zip codes are merely a proxy for race, and thus, a racial classification, fails. The First Circuit has rejected the argument that an individual's "city of residence was a proxy for . . . race." *Richards v. Relentless, Inc.*, 341 F.3d 35, 45 (1st Cir. 2003). The "statistical fact [of neighborhoods with different racial compositions] alone cannot convert a facially race-neutral explanation into one based on race." *Id.*[7]

---

[6] Strict scrutiny also applies to policies that are facially neutral but applied in a discriminatory manner. *Anderson*, 375 F.3d at 82 (*citing Yick Wo v. Hopkins*, 118 U.S. 356, 373-74) (1886)). To succeed on this argument, a plaintiff must show that the administration of a neutral policy is "directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive" that said administration amounts to a "practical denial" of equal protection under the law. *Yick Wo*, 118 U.S. at 373; *see also Bauza v. Morales Carrion*, 578 F.2d 447, 451-52 (1st Cir. 1978). Plaintiff has not argued that the Zip Code Component has been applied in a discriminatory manner.

[7] The cases Plaintiff cites do not hold otherwise. Plaintiff incorrectly characterizes *Rice v. Cayetano*, 528 U.S. 495 (2000) (holding that *explicitly* limiting voting rights to individuals with Hawaiian ancestry constituted a racial classification), *United States v. Perez*, 35 F.3d 632, 635 (1st Cir. 1994) (rejecting argument that "inner city exposure to drugs" was simple proxy for race and allowing associated peremptory challenge), and *Alexis v. Leporati*, No. CIV. A. 93-10003-WGY, 1996 WL 463675, at *5 (D. Mass. July 30, 1996) (denying peremptory challenge against sole African American venireperson because proffered explanation that employment in minority business development office created certain "sensibilities" was clear dog whistle invocation of racial discrimination). Moreover, Plaintiff misrepresents *Caldwell v. Maloney*, the only case cited that specifically addresses the relationship between geographic areas and race. Pls. Br. at 15. Though Plaintiff quotes *Caldwell* for the claim that "neighborhoods . . . may be [a] race-linked characteristic[]," Plaintiff ignores the holding that a disparate racial impact does not violate Equal Protection

Zip codes are not a proxy for race particularly where, as here, the Working Group recommended the temporary use of zip codes to further geographic and socioeconomic diversity within the highly selective public schools and in light of the pandemic. The Working Group altered the original proposal—which considered only the median income of all households in each zip code—to more accurately reflect the socioeconomic situation of the student pool and capture the median income of families with children under 18. ASE00474. Further, the Working Group stressed that using zip codes in conjunction with median family incomes to select seats "increases the potential that we have greater socio-economic diversity." ASE00282. The provision placing "students experiencing homeless or DCF care" in a separate zip code, which then receives first priority in the seat selection process, also arose out of the Working Group's interest in other forms of diversity by "want[ing] to pay special attention to students suffering from housing instability and those in DCF care." ASE00475. The Working Group was aware of the "great economic disparity" in the City's neighborhoods and considered whether to use geocodes as an alternative. ASE00281-82. It emphasized the "greater inclusion of students *from across our city* by merely introducing the zip code." *Id.* (emphasis added).

This type of plan—which uses solely race-neutral criteria, provides no benefits to any student based on race, and treats students within each zip code equally regardless of their race—does not trigger strict scrutiny. In *Anderson*, for example, the First Circuit applied rational basis review to a 1999 neighborhood assignment plan for BPS that relied on a formula of race-neutral factors, including residing within a school's walk zone and sibling attendance, because the plan did "not employ racial classifications" and thus was "facially race-neutral." *Anderson*, 375 F.3d at 76-77. Other courts have similarly concluded that when a student assignment plan is based on race-

---

"unless the government actor adopted a criterion with the intent of causing the impact asserted." 159 F.3d 639, 654 (1st Cir. 1998).

neutral factors that do not take the race of any particular student into account in any way, the policy is race-neutral and not subject to strict scrutiny. *See, e.g., Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 544-48 (3d Cir. 2011); *Spurlock v. Fox*, 716 F.3d 383, 398-400 (6th Cir. 2013); *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 357-58 (5th Cir. 2015).[8] Because the Interim Plan does not assign, identify, or restrict any student based on race, it does not include any racial classification subject to strict scrutiny.

### b. The Interim Plan Was Not Enacted with Invidious Discriminatory Intent.

Nor has Plaintiff shown that strict scrutiny should apply because a racially "invidious discriminatory purpose was a motivating factor" behind the Interim Plan. *Arlington Heights*, 429 U.S. at 255-66. Plaintiff bears the "onerous" burden to show that Defendants engaged in intentional discrimination targeting White and Asian American students. *Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998). "[I]mpact alone" (*Arlington Heights*, 429 U.S. at 266) or mere "awareness of consequences" is almost never enough to demonstrate an invidious racial discriminatory purpose. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see Soto v. Flores*, 103 F.3d 1056, 1068 (1st Cir. 1997). Plaintiff has not met its "onerous" burden.

Following the Supreme Court's decision in *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007), courts have declined to infer invidious discriminatory intent when reviewing temporary or proposed changes to admissions processes for selective public schools based on comments noting the importance of diversity. For example, in *Christa McAuliffe*

---

[8] In contrast, policies that consider the race of particular students in admissions are subject to strict scrutiny. *See*, *e.g*., *McLaughlin v. Boston Sch. Comm.*, 938 F.Supp 1001, 1008-09 (D. Mass. 1996) (35% minority set-aside); *Wessmann v. Gittens*, 160 F.3d 790, 800 (1st Cir. 1998) (classifying individual students by race). Similarly, in the higher education context, strict scrutiny is reserved for admissions policies that explicitly consider individual students' race. *See*, *e.g*., *Grutter v. Bollinger,* 539 U.S. 306 (2003); *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll. (Harvard Corp.)*, 980 F.3d 157 (1st Cir. 2020); *see also Fisher v. Univ. of Texas at Austin*, 136 S.Ct. 2198, 2213 (2016) ("*Fisher II*") (describing the component of a university's plan that admitted the top graduates of every public high school as "facially neutral" with the "basic purpose" of "boost[ing] minority enrollment" and reserving strict scrutiny only for the component that specifically considered individual students' race).

*Intermediate School PTO, Inc. v. de Blasio*, individual and organizational plaintiffs challenged changes to how students may access New York City's specialized public schools. 364 F. Supp. 3d 253 (S.D.N.Y 2019). The plaintiffs acknowledged that the proposed changes were "facially race-neutral," but claimed a "disparate impact" on Asian American students that was intended by the City, and that the projected increase in Black and Latinx enrollment "will come largely at the expense of Asian-American students." *Id*. at 268. In particular, as here, the plaintiffs relied upon statements by public officials "lauding how the program changes will increase Black and Latino enrollment at the specialized schools." *Id*. at 278.[9] The court rejected this argument, applied rational basis review, and denied the preliminary injunction. *Id.* at 277.

Numerous other courts have similarly applied rational basis review to cases challenging school admissions policies that were developed with general consciousness of race but were facially race-neutral. *See, e.g.*, *Boyapati v. Loudon Cty. Sch. Bd.*, No. 1:20-cv-01075, 2020 WL 6797365 at *4 (E.D. Va. Oct. 7, 2020); *see also Doe*, 665 F.3d at 544-48 ("consideration or awareness of neighborhood racial demographics during the development and selection of a policy" is different from "discriminatory purpose"); *Spurlock*, 716 F.3d at 398-400 ("considering racial data … to understand the demographic consequences of various potential reforms" did not amount to "segregative intent"); *Lewis*, 806 F.3d at 357-58 ("awareness of racial demographics" and consideration of racial balancing for school district did not justify strict scrutiny).

Plaintiff's claim that Defendants have "long sought" to alter the racial composition to favor Black and Latinx students is unsupported by the record. Pls. Br. at 6. Until the testmaker fired BPS as a client (IAF ¶¶3-4), Defendants refused to abandon the ISEE, despite considerable evidence

---

[9] The plaintiffs argued these statements revealed that, in implementing the program changes, the city "sought to decrease the number of Asian-Americans at the specialized schools," amounting to discriminatory intent that, coupled with disparate impact, constitutes racial discrimination warranting strict scrutiny. *Id*. at 278.

that the exam was "not aligned with the district curriculum," such that the overwhelmingly Black and Latinx BPS student population was at a "disadvantage" when applying to the highly selective public schools. ASE01155.[10] Even when a global pandemic forced the district to craft an interim admissions plan, the Working Group and Committee still explicitly rejected criteria that may have depreciated White and Asian American enrollment—most notably, priority for current BPS students, over 70% of whom are Black and Latinx. ASE01859; ASE01867. There is, thus, no record supporting an invidious intent to discriminate warranting strict scrutiny.

### i. Statements by Individual Defendants and Members of the Working Group Do Not Show an Invidious Intent to Discriminate.

Plaintiff's attempts to identify racial discrimination through the statements of Defendants and Working Group members are also unavailing. Plaintiff first focuses on a single incident surrounding insensitive language used by a former Committee member. Pls. Br. at 17-18. Michael Loconto's ("Loconto") comments, while inappropriate, were wholly distinct from the rigorous process used by the Working Group and the decision-making of the Committee to craft a temporary admissions policy. The Working Group (of which Loconto was not a member) conducted extensive research, data analysis, and regular meetings before making recommendations to Superintendent Cassellius. *See* ASE00010-13 ¶¶32-34, 37-38, 44-46. Other Committee members, similarly not a part of the Working Group, as demonstrated in the contemporaneous text messages misconstrued by Plaintiff, expressed immediate shock regarding Loconto's statement, including considering, in that moment, whether he should resign.[11] *See* ASE01862. Here, in stark contrast to

---

[10] Indeed, despite warnings from civil rights attorneys, as well as a "public campaign to force change," the district refused to consider changes to the previous admissions policy—indeed, then-Chairman O'Neill stated in September 2017 that it was "not time to change the way kids get into Boston Latin." ASE01689.

[11] Contemporaneous texts from Vice-Chairperson Alexandra Oliver-Davila include "omfg [Loconto]'s going to get killed," "yikes," and "[i]t's gonna be ugly," while those from Member Lorna Rivera include "Dios Mia!!," and "[s]omeone texted me Loconto should resign." ASE01862.

*Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Comm'n*, a case on which Plaintiff relies, the individual who made inappropriate comments was forced to resign promptly the following morning—an obvious rebuke of the statement.[12] 138 S.Ct. 1719, 1730 (2018). An instance of inappropriate conduct by one individual—outside of the process, and swiftly sanctioned—hardly suffices to imbue a months-long undertaking and decision-making with discriminatory intent. *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989) (stray remarks "when unrelated to the decisional process, are insufficient to demonstrate that the [defendant] relied on illegitimate criteria, even when such statements are made by the decision-maker in issue"); *accord Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990); *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir. 1998).

Plaintiff next purports to attribute invidious discriminatory intent to general statements about the benefits of diversity by Working Group members and individual Defendants. *See* Pls. Br. at 17.[13] However, statements or comments regarding the benefits or importance of racial equity and diversity—which account for the vast majority of Plaintiff's supposed "smoking gun[s]"— do not transform a facially race-neutral policy into one that warrants strict scrutiny. *Anderson*, 375 F.3d at 87 ("the mere invocation of racial diversity as a goal is insufficient . . . [to require] strict scrutiny"). Plaintiff's spurious logic would put a stranglehold on "every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, [which necessarily] reflect a concern with race." *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998), *cert.*

---

[12] The other two cases cited by Plaintiff for the proposition that hostile comments without prompt objection indicate discriminatory purpose do not actually address this point. *See* Pls. Br. at 18.

[13] *See, e.g.,* Pls. Br. at 4 (*one* of the two "imperatives of the Working Group was "rectifying historic racial inequities afflicting exam school admissions for generations"); *id.* at 4 n.2 (Working Group will "apply an equity lens to their work and recommendations"); *id.* at 5 (Committee Member had desire to "be explicit about racial equity" and "consider[] race and ethnicity"); *id.* at 6 (Working Group Member and NAACP Boston President Sullivan "spoke about Boston's history of race"); *id.* (Committee Member joined Committee because she was "deeply committed to addressing the racial and ethnic disparities in educational achievement"); *id.* at 23 (Black and Latinx youth are "underrepresented" and have been "locked out" of the opportunity presented by Boston's selective public schools).

*denied*, 525 U.S. 811 (1998); *see also Shaw v. Reno,* 509 U.S. 630, 646 (1993) ("race consciousness does not lead inevitably to impermissible race discrimination").

To the contrary, statements that evince a general awareness of racial demographics and of the need to ensure equity (*i.e.*, race consciousness) are perfectly permissible—indeed laudable— and do not convert a race-neutral policy into one that warrants strict scrutiny. Race-conscious measures *can* be used to address issues in a general way so long as they do not treat students differently based solely on race. *Parents Involved*, 551 U.S. at 788 (Kennedy, J., concurring in part and concurring in the judgment). The use of the word "diversity" in the planning process is not a "subterfuge for racial balancing" without context to the entire record. *Anderson*, 375 F.3d at 85.

None of the *Arlington Heights* factors Plaintiff has identified support a finding of invidious discriminatory intent, particularly in light of the history of inequities in BPS.[14] Critically, the attentiveness to Boston's history of segregation and discrimination did not represent a "[s]ubstantive departure" or unusual factor in Defendants' decision-making. *Arlington Heights*, 429 U.S. at 267. Rather, *as with any review of BPS policy*, the Working Group's use of the Racial Equity Planning Tool ensured that "each decision [BPS] make[s] is aimed at closing opportunity gaps and advancing racial equity." ASE01762; *see also* ASE00967. Plaintiff mischaracterizes the use of the tool as an indicator of discriminatory intent. Instead, the tool's purpose is to dismantle barriers to educational opportunity for every child, especially the most marginalized students, and

---

[14] It is fully appropriate for the district to adopt a racial equity lens when making decisions given Boston's undisputed, lengthy history of *de facto* and *de jure* housing and educational discrimination and the stark racial inequities in the school system. *See Morgan v. Hennigan*, 379 F. Supp. 410, 424-76 (describing Committee's role in "intentionally and purposefully" causing and maintaining racial segregation throughout Boston's school system.); *see also Soto*, 103 F.3d at 1068-69 (inquiry into discriminatory purpose should look at the history behind the development of a policy, including looking at the problems it was intended to address); *accord Jana-Rock Constr., Inc. v. New York Dep't. of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) (desire to eliminate a discriminatory impact on "some disadvantaged groups" should not be equated with an "intent to discriminate against other groups" (internal quotation marks omitted)). The contemporaneous statements by Members of the Working Group or Committee reveal just that: a desire to eliminate barriers to educational opportunities that disproportionately affected Black and Latinx students, in crafting an Interim Plan, rather than to punish or harm White and Asian American students. Pls. Br. at 6.

the Working Group's goal was to address disparities ranging from racial, socioeconomic, geography, ability and statistics while exploring measures to achieve equity. ASE01758; ASE01762-77. In furthering that goal, the Working Group was also mindful that other approaches had been tried, with little success, to increase "equity of access" to the selective public schools, ranging from increasing the number of seats in the Exam School Initiative (a free test preparation course) to offering the standardized test during the school day to all currently enrolled BPS students. ASE01796. The Working Group was also mindful of the widespread variation in grading systems used by private, parochial, public, and other schools, ASE00972, as well as concerns of "grade inflation" in some schools.[15]

The Supreme Court has also long disagreed with Plaintiff's assertion that any consideration of race transforms a race-neutral plan into a racial classification, or that recognizing the value of racial diversity is an automatic proxy for racial balancing. *See Parents Involved*, 1551 U.S. at 788 (Kennedy, J., concurring in part and concurring in the judgment) (highlighting the necessity of evaluating data, including on racial composition, "to encourage a diverse student body"). Instead, the Court has been clear that "race may be considered in certain circumstances and in a proper fashion." *Texas Dep't. of Housing and Comy Affairs v. Inclusive Comtys. Project, Inc.*, 576 U.S. 519, 545 (2015). The "mere awareness of race in attempting to solve the problems" facing cities and school districts still bearing the vestiges of segregation and discrimination "does not doom that endeavor at the outset." *Id*. The Court has repeated this formulation in multiple contexts. *See, e.g., id.* at 545 (housing); *Bush v. Vera*, 517 U.S. 952, 958-59 (1996) (redistricting); *see also Raso*, 135 F.3d at 16.

---

[15] For example, in 2016, 69% of the students applying to the highly selective public schools from Holy Name Parish School in West Roxbury had A+ averages. ASE01688.

When situated in the context of *Anderson* and *Parents Involved*, the fact that, along with a host of factors and practical realities brought on by the COVID-19 pandemic, BPS considered the impact of potential admissions policies on students of color, is not the "smoking gun" that Plaintiff claims it to be. To the contrary, such considerations, made in the context of a race-neutral policy, have long been upheld by courts and analyzed under rational basis review.

### ii. There Is No "Stark" Racial Impact Pattern That Would Indicate Invidious Discriminatory Intent.

As the Supreme Court has noted, cases with a "clear pattern, unexplainable on grounds other than race, emerged from the effect" of facially neutral government action" are and continue to be "rare." *Arlington Heights*, 429 U.S. at 266; *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126, 189 n.55 (D. Mass. 2019) ("Policies that do not explicitly consider race are facially neutral and violate the Equal Protection Clause based on statistical evidence only where they form a clear pattern, unexplainable on grounds other than race."). This is not such a case.

Plaintiff has retained no statistical experts nor engaged in any rigorous quantitative analysis; instead, it is asking this Court to simply "eyeball" some numbers and on that basis, invalidate a duly-passed policy, relied upon by hundreds of families in the midst of a pandemic. Plaintiff mistakenly highlights the difference between the percentage of invitations extended to Asian American and White students for the 2020-2021 academic year versus the Interim Plan. *See, e.g.,* Pls. Br. at 8-9. But unlike the plaintiffs in *Christa McAuliffe*, Plaintiff is not asking the Court to direct Defendants to revert to the previous system for 2021-22. Nor can it; the district is prohibited by the makers of the ISEE from using that exam, and the new test cannot be administered remotely. ASE0156. Under these circumstances, the appropriate comparison is between the Interim Plan with the Zip Code Component (20% of seats based on GPA alone, 80%

13

of seats based on a combination of zip code and GPA) and the Interim Plan *without* the Zip Code Component (100% of seats based on GPA alone)—the latter being the remedy Plaintiff is actually seeking.[16]

If Plaintiff had undertaken this proper comparison (and supported it with expert statistical evidence), Plaintiff's allegation of discriminatory intent becomes even more baseless. For example, Plaintiff ignores that seats may be diminished in neighborhoods, such as Chinatown, will be gained in other neighborhoods with considerable Asian American populations, such as Dorchester. ASE01586. Plaintiff also fails to acknowledge that White and Asian American children live in nearly every zip code that stands to benefit from gained seats.[17] *Id.*

Under the challenged system, Asian Americans are projected to make up approximately 16% of 2021-2022 invitations. ASE01323. Yet, if 2021-2022 invitations were based on GPA alone, Asian Americans would constitute approximately 17% of the pool—a difference of only *one percentage point* from the Interim Plan. ASE01631; *see Christa McAuliffe*, 364 F. Supp. 3d at 278 n. 22 (noting that the minor impacts on Asian American students caused by the program changes "cast doubt" on the plaintiffs' theory that the defendants "specifically targeted" Asian Americans). The 9 fewer seats projected for Asian American students under the Interim Plan, Pls. Br. 63 at 11, is an even smaller impact than that found insufficient to demonstrate discriminatory

---

[16] Plaintiff further rests its baseless analysis on census data that was neither relevant to nor even part of the Working Group's analysis. *Compare* Pls. Br. at 13 (analyzing *presumably* census data contained in ASE01341-1428, *2015-2019* ACS 5-year estimate from U.S. Census Bureau 5-year estimates) *with* Ex. 20, ASE01337 (referencing Working Group's use of *2014-2018* ACS 5-year estimates in determining median family income and percentage of school-aged children); *see also* ASE01800 (same).

[17] Nor does Plaintiff acknowledge that the race-neutral structure of the Zip Code Component creates opportunities for many low-income White and Asian American children. In particular, because zip codes are ranked by median household income for families with children under 18, multiple zip codes that Plaintiff claims are disfavored, including zip codes that enroll significant numbers of Asian American and White children, will be in the earlier rounds. Setting aside zip code 99999, which represents children in state custody and homeless children, the zip code with the lowest median family income with children under 18, two of the first five zip codes in the round order are 02115-Fenway (#1) and 02111-Chinatown (#5). ASE01825.

purpose in *Anderson*. *See id.* at 89-90 ("isolated instances" of a "net loss of thirteen seats" for White students under 1999 school assignment did not suggest a "clear pattern of disparate racial impact, much less the stark pattern contemplated by *Arlington Heights*"). The de minimus decrease here further demonstrates that Defendants did not deliberately select an admissions metric with the express purpose of harming White and Asian American students.

### IV.    Even if Strict Scrutiny Applies, the Interim Plan Passes Muster.[18]

Even if this Court were to apply strict scrutiny—which it should not because the Interim Plan does not include any racial classifications, was not adopted with a discriminatory purpose, and has not been applied in a discriminatory manner—the Interim Plan should still be upheld because it is narrowly tailored to serve a compelling government interest.

### a.    The Interim Plan Furthers the Compelling Governmental Interest of Racial, Socioeconomic, and Geographic Diversity of Students.

To the extent Plaintiff suggests that the Constitution mandates the acceptance of racial isolation as the status quo in the highly selective public schools, it is profoundly mistaken. *See Parents Involved*, 551 U.S. at 788 (Kennedy, J. concurring in part and concurring in the judgment). Creating a diverse student body, and reaping the immense benefits that flow from that diversity, is a compelling state interest. *Grutter v Bollinger*, 539 U.S. 306, 330-31 (2003); *see also Fisher v. Univ. of Texas at Austin*, 136 S.Ct. 2198, 2211 (2016) ("*Fisher II*") ; *Christa McAuliffe*, 364 F. Supp. 3d at 282 ("five Justices [in *Parents Involved*] agreed that achieving racially diverse

---

[18] A court applying strict scrutiny is charged with conducting a "searching judicial inquiry" into the justifications for challenged government classifications, to determine whether those classifications are legitimate. *Grutter*, 539 U.S. at 326 (citation omitted). Intervenors respectfully submit that should the Court accept that strict scrutiny applies in this case, the present record is lacking in crucial information necessary for the Court to undertake this inquiry and render a decision. *See e.g.*, ECF No. 34; ECF No. 35; ECF No. 36. Should the Court apply strict scrutiny, Intervenors request the opportunity to supplement the factual record with additional evidence of the compelling government interest and measures undertaken that would show Defendants' efforts were narrowly tailored. Nevertheless, with an eye towards the practical timelines involved in this matter and the real-world effects on the families awaiting admissions decisions, Intervenors respectfully direct the Court to the below guiding precedent and factual information already in the record that show that the Interim Plan is narrowly tailored to advance Defendants' compelling government interest.

classrooms in elementary and secondary schools is a compelling government interest"). "In the administration of public schools by . . . local authorities, it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition." *Parents Involved*, 551 U.S. at 788 (Kennedy, J. concurring in part and concurring in the judgment); *Christa McAuliffe*, 364 F. Supp. 3d at 283 ("If these benefits flow from increasing racial diversity in universities, the Court sees no logical reason why increasing racial diversity in high schools would not benefit students to the same extent.").

The Interim Plan's explicit goal—and the identified method to achieve that goal—fall well within this constitutionally-permissible compelling interest. The Working Group operated under the continued goal of "identify[ing] opportunities ***to ensure more equitable access to the three*** [highly selective public schools], ***so each school's enrollment would more closely reflect the district's overall enrollment.***" ASE01858 (emphasis added). Additionally, the Interim Plan reflects two main goals:

> 1) Ensure that students will be enrolled through a clear and fair process for admission in the 2021-2022 school year that takes into account the circumstances of the COVID-19 global pandemic that disproportionately affected families in the city of Boston; and
>
> 2) Work towards an admissions process that will support student enrollment at each of the exam schools such that it better reflects the socioeconomic, racial, and geographic diversity of all students (K-12) in the City of Boston.

ASE01310.

Defendants' explicit goal and their methods for achieving it have not limited "in any way the broad range of qualities and experiences that may be considered valuable contributions to student body diversity." *Grutter*, 539 U.S. at 338; *see Fisher II*, 136 S. Ct. at 2211 (compelling diversity interest based on "concrete and precise goals" and a "reasoned, principled explanation" for pursuit of those goals). The evidence establishes that the projected student body will more

closely reflect the racial, socioeconomic, and geographic diversity of Boston's school-aged children, in addition to considering median family income. *See* ASE01800.

As detailed above, the Interim Plan does not approach any constitutionally-impermissible racial balancing. Of significant note, under the Interim Plan, invitations to the selective admissions schools for Black and Latinx students are projected to increase by 11%—to only 46%—of total invitations, despite those students collectively making up 71% of the BPS K-12 student population. *See* ASE01323. This rather modest projected increase in invitations is consistent with the creation of a critical mass of underrepresented students, not racial balancing. *See Grutter*, 539 U.S. at 336 (noting that fluctuation in the percentage of underrepresented minorities in a law school class from 13.5 to 20.1 percent over a five year period was inconsistent with a quota system); *Fisher*, 136 S.Ct. at 2211 (finding sufficiently concrete goals in pursuing benefits that flow from diverse student body); *Harvard Corp.,* 397 F. Supp. at 134 (finding sufficiently defined compelling interest of student body diversity based on, *inter alia*, "geographic origins, family circumstances, and racial identities").

### b. The Interim Plan Is Narrowly Tailored to Further the Defendants' Compelling Government Interest.

Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." *Parents Involved*, 551 U.S. at 735 (quoting *Grutter*, 539 U.S. at 339). A court should "ensure that the use of racial classifications was indeed part of a broader assessment of diversity, and not simply an effort to achieve racial balance . . . ." *Parents Involved*, 551 U.S. at 723 (plurality). It is not necessary to exhaust "every conceivable race-neutral alternative" to survive strict scrutiny. *See Grutter*, 539 U.S. at 339. Instead, Defendants must have compared options to determine which option most adequately advanced the state interest. *See Parents Involved*, 551 U.S. at 735.

Here, the limited record before the Court contains ample evidence that Defendants considered race-neutral alternatives. Through the Working Group, Defendants evaluated myriad alternatives, including other race-neutral alternatives. The Working Group considered various options for using past test scores or administering new exams, such as the MCAS, MAP, and school-specific assessments, as admissions criteria. ASE00011 ¶37; ASE01556. Each was found to be unworkable. ASE00011 ¶37; ASE01558-1560; ASE01562. It analyzed potentially comparable admissions criteria from cities across the country. ASE00011 ¶38; ASE01564 (comparing 9 other districts); ASE01566 (San Francisco); ASE01568 (Detroit); ASE01570-1580 (Chicago). It considered alternatives, including a 100% zip code plan policy, and a 100% GPA policy, and amalgamations of these two options, and the various impacts of these plans on increasing diversity within the selective admissions schools. ASE01594. Simulations were conducted and analyzed comparing the various alternatives to determine each's impact on promoting diversity in the highly selective public schools. ASE00011 ¶41 (and Exhibits). Defendants' exhaustive analysis of race-neutral alternatives undoubtedly falls within the constitutional bounds imposed by the Supreme Court—not least of which because they ultimately chose one of those race-neutral alternatives in adopting the Interim Plan.[19]

Further, there is no suggestion by Plaintiff that the plan will be unworkable or would be deleterious of its stated goal. Far from the blunt, unworkable instruments employed in *Parents Involved* and *Wessmann*, the Interim Plan employs nuanced considerations, including zip code of

---

[19] The Interim Plan is further narrowly tailored in its flexible and individualized review of students that minimizes the burden placed on students not within a certain group. *See Grutter*, 539 U.S. at 341. For example, all students, regardless of zip code or race can earn an invitation in the top 20%; no school will reach its capacity until at least the 5th round of selection; all students within each zip code are treated alike, regardless of race; and race is not only not the sole factor, but it is not a factor at all. *Id.* at 334 (narrowly tailored plan is one that is "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant"). The Interim Plan is further tailored through its limited application only to the 2021-2022 school year. ASE01788 ("This is an one-year recommendation after which the district reverts to the current policy") (emphasis in original); *Grutter*, 539 U.S. at 342 (upholding narrowly tailored program with "reasonable durational limits").

residence, and median family income within that zip code, in addition to academic performance to structure the SY21-22 admissions process so that it supports enrollment better reflecting the socioeconomic, racial, and geographic diversity of Boston's student population. The Supreme Court rejected the Louisville and Seattle plans in *Parents Involved* because they either failed to demonstrate their consideration of alternatives, or employed blunt and overbroad distinctions, such as "white and non-white," that threatened to defeat their own ends. *Parents Involved*, 551 U.S. at 734-35; *Id.* at 787 (Kennedy, J. concurring in part and concurring in the judgment). Similarly, in *Wessman* the school board imposed a rigid, formula relying "on race and ethnicity, and nothing else to select a subset of entrants" under a quota system that narrowed the scope of racial and ethnic diversity to five groups "without recognizing that none is monolithic." *Wessman v. Gittens*, 160 F.3d 790, 794, 798 (1st Cir. 1998). In stark contrast, and as discussed *supra*, the Interim Plan embraces the broad diversity within the BPS student population, and allocates invitations based on 29 geographically-distinct zip codes and the unique socioeconomic conditions within them.

Moreover, Plaintiff has glossed over the geographic and socioeconomic diversity accomplished with the Interim Plan. Far from being "not relevant here" (Pls. Br. at 2), by modifying the criteria used to rank zip codes from median income to median family income at their October 21, 2020 meeting, Defendants further narrowly tailored the Interim Plan to achieve socioeconomic diversity. *See* ASE01786. The reverse-ordering of zip codes by median family income seeks to remedy the past concentration of invitations in Boston's most affluent neighborhoods. *See* ASE01800 (showing changes to zip code ranking under median family income modification). The Interim Plan was narrowly tailored to achieve its desired effect.

The Interim Plan does not rely on any proscriptive dictates of the racial composition of any school nor does it seek to employ racial tiebreakers of any sort or impose blunt and crude

classifications on the ethnically, geographically, and economically diverse students of the City of Boston. It does not seek any type of racial balancing, nor does it classify any individual student based on race. What the Interim Plan does do is promote the racial, geographic, and socioeconomic diversity of the student population within Boston's highly selective public schools and the educational benefits derived therefrom, in a manner that is race-neutral and narrowly tailored to achieve that end. Accordingly, the Interim Plan must pass strict scrutiny.

## V.    Plaintiff Has Waived the State Law Claim in Count II of Its Complaint.

Plaintiff's state law claim fails for the same reasons Count I fails. Any argument that the state law claim is broader than Count I is waived; Plaintiff raises this in one sentence without any citation. "[C]laims adverted to in a cursory fashion, unaccompanied by developed argument," are waived. *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011); *see United States v. Caparotta*, 676 F.3d 213, 218 (1st Cir. 2012).

## VI.    Plaintiff Fails to Substantiate Its Request for an Injunction.

"A preliminary injunction is an 'extraordinary and drastic remedy[]'" … that 'is never awarded as of right.'" *Voice of the Aram World, Inc. v. MDTV Md. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations omitted). The standard for a permanent injunction is "essentially the same." *Id.* at 34 (citation omitted); *see eBay Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (articulating standard for injunctive relief). Here, Plaintiff offers *no* argument on why such extraordinary relief is justified, particularly failing to address in any way Plaintiff's actual injury, the balance of hardships, and the grave impact on public interest if a permanent injunction were issued. Plaintiff does not seek to preserve the status quo, but rather asks the Court to order a policy that has never existed and has never been considered by the duly-appointed Committee.

Respectfully submitted,

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
BOSTON BRANCH AND OTHER
INTERVENORS

By their attorneys,

/s/ *Doreen M. Rachal*                          /s/ *Susan M. Finegan*

Doreen M. Rachal (BBO # 667837)          Susan M. Finegan (BBO # 559156)
Drew A. Domina (BBO# 703375)             Mathilda S. McGee-Tubb (BBO # 687434)
SIDLEY AUSTIN LLP                        Jason Burrell (BBO # 705180)
69 State Street, 36th Floor              Laura Martin (BBO # 705617)
Boston, Massachusetts 02109              MINTZ, LEVIN, COHN, FERRIS,
Tel: (617) 223-0300                      GLOVSKY AND POPEO, P.C.
drachal@sidley.com                       One Financial Center
ddomina@sidley.com                       Boston, Massachusetts 02111
                                         Tel: (617) 542-6000
                                         smfinegan@mintz.com
                                         msmcgee-tubb@mintz.com
                                         jlburrell@mintz.com
                                         lemartin@mintz.com


/s/ *Bethany Li*                                /s/ *Lauren Sampson*

Bethany Li (BBO # 673383)                Lauren Sampson (BBO # 704319)
Alex Milvae (BBO # 705668)               Janelle Dempsey (BBO # 699379)
Jodie Ng, Law Student Intern             Oren Sellstrom (BBO # 569045)
Henry Zhu, Law Student Intern            LAWYERS FOR CIVIL RIGHTS
GREATER BOSTON LEGAL SERVICES            61 Batterymarch Street, Fifth Floor
197 Friend Street                        Boston, MA 02110
Boston, Massachusetts 02114              Tel: (617) 988-0609
Tel: (617) 371-1234                      lsampson@lawyersforcivilrights.org
bli@gbls.org                             jdempsey@lawyersforcivilrights.org
amilvae@gbls.org                         osellstrom@lawyersforcivilrights.org


Dated: April 2, 2021

21

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants identified on the Notice of Electronic Filing, and

paper copies will be sent to those indicated as non-registered participants on April 2, 2021.


 /s/ *Doreen M. Rachal*
Doreen M. Rachal