# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,<br><br>                    Plaintiff,<br><br>      v.<br><br>THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEIL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS,<br><br>                    Defendants,<br><br>and<br><br>THE BOSTON BRANCH OF THE NAACP, GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTEL, and H.D.,<br><br>                    Intervenor-Defendants. | C.A. No. 1:21-cv-10330-WGY<br><br>Leave to File Amicus Brief Granted on March 22, 2021 [ECF No. 55] |

**BRIEF OF *AMICI CURIAE* THE ANTI-DEFAMATION LEAGUE, AMPLIFY LATINX, THE BLACK ECONOMIC COUNCIL OF MASSACHUSETTS, THE BOSTON BAR ASSOCIATION, THE BOSTON CELTICS, THE BOSTON RED SOX, THE JEWISH ALLIANCE FOR LAW AND SOCIAL ACTION, KING BOSTON, THE MASSACHUSETTS IMMIGRANT AND REFUGEE ADVOCACY COALITION, THE MASSACHUSETTS LGBT CHAMBER OF COMMERCE, THE MENTAL HEALTH LEGAL ADVISORS COMMITTEE, THE NEW COMMONWEALTH RACIAL EQUITY AND SOCIAL JUSTICE FUND, AND RAPID7
<u>IN SUPPORT OF DEFENDANTS AND INTERVENOR-DEFENDANTS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTEREST OF AMICI CURIAE ............................................................................................... 1

RELEVANT BACKGROUND ................................................................................................. 2

ARGUMENT ............................................................................................................................. 6

    I.    BOSTON HAS A COMPELLING INTEREST IN DIVERSITY AT THE EXAM
    SCHOOLS .......................................................................................................................... 8

    II.   THE PROGRAM HELPS BOSTON BUSINESSES RECRUIT DIVERSE, TALENTED,
    AND COMPETITIVE WORKFORCES ......................................................................... 12

CONCLUSION ......................................................................................................................... 17

CERTIFICATE OF SERVICE ................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. City of Boston*,
  375 F.3d 71 (1st Cir. 2004)........................................................................................ 7

*Brown v. Board of Education*,
  347 U.S. 483 (1954),
  *supplemented* 349 U.S. 294 (1955) .......................................................................... 9

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019) ........................................................... 7, 10, 11

*Fisher v. Univ. of Tex.* ("*Fisher I*"),
  570 U.S. 297 (2013) ................................................................................................... 9

*Fisher v. Univ. of Tex.* ("*Fisher II*"),
  136 S. Ct. 2198 (2016)............................................................................................ 7, 9

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) .......................................................................................... passim

*Hart v. Cmty. Sch. Bd.*,
  536 F. Supp. 2d 274 (E.D.N.Y. 2008) ..................................................................... 10

*Marks v. United States*,
  430 U.S. 188 (1977) ................................................................................................. 10

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ................................................................................................. 10

*Regents of Univ. of California v. Bakke*,
  438 U.S. 265 (1978) ......................................................................................... 7, 9, 15

*Spurlock v. Fox*,
  716 F.3d 383 (6th Cir. 2013) ................................................................................... 10

*Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*,
  980 F.3d 157 (1st Cir. 2020)............................................................................... 11, 12

*United States v. Alamance-Burlington Bd. of Educ.*,
  640 F. Supp. 2d 670 (M.D.N.C. 2009) .................................................................... 10

**Other Authorities**

*A question of talent: how human capital will determine the next global leaders*,
  A.T. KEARNEY (2019),
  https://www.kearney.com/global-cities/2019 .......................................................... 13

Amy S. Wells, et al.,
*How Racially Diverse Schools and Classrooms Can Benefit All Students*, THE CENTURY
FOUNDATION (Feb. 9, 2016),
https://tcf.org/content/report/how-racially-diverse-schools-and-classrooms-can-benefit-all-
students ........................................................................................................... 11

Andres Mendoza Pena & Nicole Dessibourg-Freer,
*Talent makes the city*, THE HILL (June 14, 2019),
https://thehill.com/opinion/finance/448371-talent-makes-the-city ........................................... 13

Aprile D. Benner & Robert Crosnoe,
*The Racial/Ethnic Composition of Elementary Schools and Young Children's Academic and
Socioemotional Functioning*,
48 AM. EDUC. RSCH. J. 621 (2011) ........................................................................................ 11

Boston Latin School,
LINKEDIN,
https://www.linkedin.com/school/boston-latin-school/people/ (last visited Apr. 1, 2021)....... 12

Carrie Jung,
*Not Always an Exam School: The History of Admissions at Boston's Elite High Schools*,
WBUR (Mar. 5, 2020),
https://www.wbur.org/edify/2020/03/05/boston-exam-school-admissions-history ................... 5

Christiaan Rizy, et al.,
*Global Diversity and Inclusion: Fostering Innovation Through a Diverse Workforce*, FORBES
INSIGHTS (2011),
https://www.forbes.com/forbesinsights/StudyPDFs/Innovation_Through_Diversity.pdf ........ 15

Christie Smith & Stephanie Turner,
*The Radical Transformation of Diversity and Inclusion: The Millennial Influence*,
DELOITTE (2015),
https://www2.deloitte.com/content/dam/Deloitte/us/Documents/about-deloitte/us-inclus-
millennial-influence-120215.pdf ........................................................................................... 16

*Diversity in the Workplace Statistics: Job Seeker Survey Reveals What Matters*,
YELLO,
https://yello.co/blog/diversity-in-the-workplace-statistics/ (last visited Mar. 24, 2021)........... 16

Francesca Odell, et al.,
*3 Cases Spotlight Shareholder Interest in Public Co. Diversity*,
LAW360 (Aug. 4, 2020),
https://www.law360.com/articles/1296071/3-cases-spotlight-shareholder-interest-in-public-co-
diversity ........................................................................................................... 17

Gregory Palardy,
*Differential school effects among low, middle, and high social class composition schools: A*

*multiple group, multilevel latent growth curve analysis*,
19 SCH. EFFECTIVENESS AND SCH. IMPROVEMENT 21 (Mar. 2008) .......................................... 12

J. Harvie Wilkinson III,
*The Seattle and Louisville School Cases: There is No Other Way*, 121 HARV. L. REV. 158
(2007) ................................................................................................................................... 10

James E. Ryan,
*The Supreme Court and Voluntary Integration*,
121 HARV. L. REV. 131 (2007) ............................................................................................. 10

James Vaznis,
*Proposal to suspend exam schools admissions test highlights inequities*,
THE BOSTON GLOBE (Oct. 20, 2020),
https://www.bostonglobe.com/2020/10/20/metro/proposal-suspend-exam-schools-admissions-
test-highlights-inequities ........................................................................................................ 3

Joshua Goodman & Melanie Rucinski,
 *Increasing Diversity in Boston's Exam Schools*,
HARVARD KENNEDY SCHOOL RAPPAPORT INSTITUTE (Oct. 2018),
https://scholar.harvard.edu/files/joshuagoodman/files/rappaport_brief.pdf ............................... 3

Lisa Hayles,
*The case for diversity: Why institutional investors are using their proxy votes to leverage
greater board diversity*,
FINANCIAL DIRECTOR (July 10, 2019),
https://www.financialdirector.co.uk/2019/07/10/the-case-for-diversity-why-institutional-
investors-are-using-their-proxy-votes-to-leverage-greater-board-diversity ............................. 17

Malcolm Gay,
*The race to get into Boston's exam schools*,
THE BOSTON GLOBE (Jan. 17, 2019),
https://apps.bostonglobe.com/magazine/graphics/2019/01/17/valedictorians/exam-school-
divide ................................................................................................................................. 2, 5

Manasi Sakpal,
*Diversity and Inclusion Build High-Performance Teams*,
GARTNER (Sept. 20, 2019),
https://www.gartner.com/smarterwithgartner/diversity-and-inclusion-build-high-performance-
teams ................................................................................................................................... 15

Meg P. Bernard,
*The Making of a Harvard Feeder School*, THE HARVARD CRIMSON (Dec. 13, 2013),
https://www.thecrimson.com/article/2013/12/13/making-harvard-feeder-schools ................... 5

Melissa Bailey,
*A golden ticket: Efforts to diversify Boston's elite high schools spur hope and outrage*,
NBC NEWS (Mar. 17, 2021),

https://www.nbcnews.com/news/education/golden-ticket-efforts-diversify-boston-s-elite-high-schools-spur-n1261199 ................................................................................................ 4, 5

*Nasdaq to Advance Diversity through New Proposed Listing Requirements*,
  NASDAQ (Dec. 1, 2020),
  https://www.nasdaq.com/press-release/nasdaq-to-advance-diversity-through-new-proposed-listing-requirements-2020-12-01 ..................................................................................... 16

Nicholas A. Bowman & Nida Denson,
  *What's Past is Prologue: How Precollege Exposure to Racial Diversity Shapes the Impact of College Interracial Interactions*,
  53 RSCH. IN HIGHER EDUC. 406 (2012) ................................................................... 10

Paul A. Gompers & Silpa Kovvali,
  *The Other Diversity Dividend*,
  HARVARD BUS. R. (July-Aug. 2018),
  https://hbr.org/2018/07/the-other-diversity-dividend ............................................... 15

Peter Ciurczak, et al.,
  *Kids Today*: *Boston's Declining Child Population and Its Effect on School Enrollment*,
  BOSTON INDICATORS (Jan. 2020),
  https://www.bostonindicators.org/-/media/indicators/boston-indicators-reports/report-files/kids-today.pdf?la=en&hash=AFEE64818EA25B5A8428ABDE8A51D5D142305CB3 ... 5

Philipp Jugert & Allard R. Feddes,
  *Children's and adolescents' cross-ethnic friendships*,
  *in* THE WILEY HANDBOOK OF GROUP PROCESSES IN CHILDREN AND ADOLESCENTS 373 (Oct. 2015)............................................................................................................................ 10

Poppy Lauretta McLeod, et al.,
  *Ethnic Diversity and Creativity in Small Groups*,
  27 SMALL GRP. RSCH. 248 (May 1996)..................................................................... 16

Rebecca S. Bigler & Lynn S. Liben,
  *A developmental intergroup theory of social stereotypes and prejudice*,
  34 ADVANCES IN CHILD DEVELOPMENT AND BEHAVIOR 39 (2006) ......................... 10

Rocío Lorenzo, et al.,
  *How Diverse Leadership Teams Boost Innovation*,
  BOSTON CONSULTING GROUP HENDERSON INSTITUTE (Jan. 23, 2018),
  https://www.bcg.com/en-us/publications/2018/how-diverse-leadership-teams-boost-innovation .................................................................................................................................... 15

Roslyn Arlin Michelson & Mokubung Nkomo,
  *Integrated Schooling, Life Course Outcomes, and Social Cohesion in Multiethnic Democratic Societies*,
  36 REV. OF RSCH. IN EDUC. 197 (Mar. 2012) ......................................................... 12

Shelly Brown-Jeffy,
*The Race Gap in High School Reading Achievement: Why School Racial Composition Still Matters*,
13 RACE, GENDER & CLASS 268 (2006) .................................................................................. 11

Stanley F. Slater, et al.,
*The Business Case for Commitment to Diversity*,
51 BUS. HORIZONS 201 (2008) .............................................................................................. 15

Sundiatu Dixon-Fyle, et al.,
*Diversity wins: How inclusion matters*,
MCKINSEY & COMPANY (May 19, 2020) ................................................................................ 14

*The Benefits of Socioeconomically and Racially Integrated Schools and Classrooms*,
THE CENTURY FOUNDATION (Apr. 29, 2019),
https://tcf.org/content/facts/the-benefits-of-socioeconomically-and-racially-integrated-schools-and-classrooms ........................................................................................................................ 11

The Spotlight Team,
*Boston. Racism. Image. Reality,*
THE BOSTON GLOBE (Dec. 10, 2017),
https://apps.bostonglobe.com/spotlight/boston-racism-image-reality/series/image/ ........... 13, 17

Thomas F. Pettigrew & Linda R. Tropp,
*A meta-analytic test of intergroup contact theory*,
90 J. OF PERSONALITY AND SOCIAL PSYCH. 751 (2006) ......................................................... 10

Zeninjor Enwemeka,
*Change, or Checking the Box? Mass. Companies are on a Diversity Exec Hiring Spree*,
WBUR (Aug. 17, 2020),
https://www.wbur.org/bostonomix/2020/08/17/chief-diversity-officers-gaining-popularity ... 14

## RULE 7.1 CORPORATE DISCLOSURE STATEMENT

Counsel for *Amici Curiae* certifies the following information for those *Amici* subject to the disclosure requirement under Federal Rule of Civil Procedure 7.1 and who have not yet made a disclosure:

The Black Economic Council of Massachusetts, Inc. hereby states that it is a nonprofit corporation that does not have a parent corporation and does not issue stock.

The Boston Bar Association hereby states that it is a nonprofit corporation that does not have a parent corporation and does not issue stock.

The Jewish Alliance for Law and Social Action, Inc. a/k/a Jewish Alliance for Law and Social Impact Action, Inc. hereby states that it is a nonprofit corporation that does not have a parent corporation and does not issue stock.

The Massachusetts Immigrant and Refugee Advocacy Coalition, Inc. hereby states that it is a nonprofit corporation that does not have a parent corporation and does not issue stock.

The Massachusetts LGBT Chamber of Commerce, Inc. hereby states that it is a nonprofit corporation that does not have a parent corporation and does not issue stock.

Rapid7, Inc. hereby states that it has no parent company, and no publicly held company owns 10% or more of Rapid7, Inc.

## INTEREST OF *AMICI CURIAE*

*Amici* are non-profits, organizations, and business entities that support equity in Boston's public education system. As set forth in the Addendum, *Amici* each have an interest in and directly benefit from having local students—their future employees and Boston's leaders of tomorrow—educated in schools that are diverse. *Amici* who join this brief are:

- The Anti-Defamation League

- Amplify Latinx

- The Black Economic Council of Massachusetts

- The Boston Bar Association

- The Boston Celtics

- The Boston Red Sox

- The Jewish Alliance for Law and Social Action

- King Boston

- The Massachusetts Immigrant and Refugee Advocacy Coalition

- The Massachusetts LGBT Chamber of Commerce

- The Mental Health Legal Advisors Committee

- The New Commonwealth Racial Equity and Social Justice Fund

- Rapid7

*Amici* file this brief in support of Defendants and Intervenor-Defendants to affirm the important and compelling interest that the Boston School Committee has in fostering diversity in its broadest strokes—geographic, racial, socioeconomic, and otherwise—at some of Boston's most highly-selective schools. This includes the Boston Latin School ("BLS"), the Boston Latin Academy, and the John D. O'Bryant School of Mathematics and Science (collectively, "the Exam

1

Schools").  These schools are consistently ranked as among the top schools in Boston.  But, as with many other prestigious institutions in the United States, they have remained largely inaccessible to far too many students, including students of color and students residing in some of Boston's lowest-income zip codes.

*Amici* support the race-neutral temporary admissions program to the Exam Schools that the School Committee adopted for the 2021–22 school year (the "Program") because it will give more of Boston's talented students a chance to compete for some of the best public educational opportunities in Boston.  By broadening the pool to potentially include additional highly talented students from all corners of the City, students who will bring to the classroom diverse perspectives, the Program benefits *all* the Exam Schools' students and the City itself.

## RELEVANT BACKGROUND

In an increasingly diverse nation and City, public schools play a crucial role in knitting the fabric of our society, and in shaping the next generation of community and business leaders.  Yet as Boston grows more diverse, segregation and discrimination persist.  The Boston Public Schools ("BPS") are a prime example, with the overwhelming majority of the City's students toiling in underperforming schools, while a select few enjoy entrance to the Exam Schools, which offer a stellar education and a passport to some of the finest colleges in the world.[1]

For far too long, there has been inequitable access to these highly-selective Exam Schools, particularly for students of color and students residing in some of Boston's lowest-income zip codes—even though the Boston Exam Schools are public schools.  The reasons for this are manifold, including longstanding systemic racism in Boston, grade inflation in certain schools that

---

[1] Malcolm Gay, *The race to get into Boston's exam schools*, THE BOSTON GLOBE (Jan. 17, 2019), https://apps.bostonglobe.com/magazine/graphics/2019/01/17/valedictorians/exam-school-divide.

serve as "feeders" to the Exam Schools,[2] and wealthier families' prolific use of private tutors to prepare for entrance exams, which gives certain students an unfair advantage over those whose families cannot afford these aids.[3]

**The One-Year Program.**   Notwithstanding these persistent inequities, and contrary to Plaintiffs' insinuations, the School Committee has not enacted any radical change to the admissions process for the Exam Schools.  The Program is a temporary one-year measure, adopted pursuant to a considered judgment by school administrators about how best to handle the impact of the COVID-19 pandemic.  Before the pandemic, admission was based on students' GPAs and entrance exam scores.  For the 2021-22 school year, the Committee expressly noted the difficult logistics of administering an in-person exam due to the pandemic, the inability to ensure test security with a remote administration, and the "[d]isparate impact of educational disruption on low-income families and families of color."  ECF No. 38, Joint Statements of Facts ("JSOF"), Ex. 4.  For these reasons, the Program suspended the entrance exam as an admission requirement for the Exam Schools.

With no entrance exam required, the School Committee transparently adopted a Program with three easily administrable steps to guide placement.  First, the Program limits the admissions pool to qualified students based on uniform admissions criteria.  JSOF ¶ 51.  Second, the Program allocates invitations to 20% of seats based solely on GPA.  *Id*. ¶ 57.  Third, the Program allocates the remaining 80% of seats at each Exam School based on a combination of a student's GPA and

---

[2] James Vaznis, *Proposal to suspend exam schools admissions test highlights inequities*, THE BOSTON GLOBE (Oct. 20, 2020), https://www.bostonglobe.com/2020/10/20/metro/proposal-suspend-exam-schools-admissions-test-highlights-inequities (noting that 69% of Exam School applicants from a school in West Roxbury had A-plus averages).

[3] *See* Joshua Goodman & Melanie Rucinski, *Increasing Diversity in Boston's Exam Schools*, HARVARD KENNEDY SCHOOL RAPPAPORT INSTITUTE (Oct. 2018), https://scholar.harvard.edu/files/joshuagoodman/files/rappaport_brief.pdf (noting "evidence that many students receive out-of-school tutoring to help prepare for" the entrance exams).

zip code. *Id.* ¶¶ 58–59. Each zip code receives seats based on the percentage of school-aged children living in that zip code. *Id.* ¶¶ 59–60. Eligible students are ranked by GPA within their zip code. *Id.* ¶ 58. Zip codes are ranked by median income for a family with school-age children, and then 10% of each zip code's available seats are filled in order of students' GPAs, beginning with the lowest median income zip code. *Id*. Ex. 66 at 23. If a student's first-choice seat is not available, then the student is assigned to their second- or third-choice seat. *Id.* This process is repeated for ten "rounds," until all seats are filled. *Id.*

**Unequal Access to the Exam Schools.** Across geographic, racial, and socioeconomic lines, Boston's students face sizeable barriers to access the Exam Schools. Statistics demonstrate the depths of these disparities and the resulting exclusivity. For example, the School Committee's data confirm that 4.8% of Boston's school-aged children reside in West Roxbury, where the median income for a family with school-aged children is $138,000. *Id.* Ex. 66 at 24. Nearly twice as many school-aged children, 9%, reside in East Boston, where these families' median income is approximately $40,000. *Id*. Yet, over the past three application cycles, 441 West Roxbury students were invited to the Exam Schools, compared to only 185 East Boston students. *Id.* Ex. 42 at 3. A student from West Roxbury was approximately *five times more likely* than a student from East Boston to gain admission. Students in Boston's low-income zip codes have rarely received invitations to scratch the "golden ticket" that entrance into the Exam Schools represents.[4]

These geographic and socioeconomic discrepancies have also manifested in a persistent lack of racial diversity at the Exam Schools. In 1971, when Black students represented over *30%* of the City's student population, they comprised less than *2%* of the population at BLS—the

---

[4] Melissa Bailey, *A golden ticket: Efforts to diversify Boston's elite high schools spur hope and outrage*, NBC News (Mar. 17, 2021), https://www.nbcnews.com/news/education/golden-ticket-efforts-diversify-boston-s-elite-high-schools-spur-n1261199.

highest ranked Exam School, according to U.S. News & World Report.[5]  JSOF ¶ 11.  After court-ordered adjustments, Black and Latinx admissions initially surged, but lawsuits led the School Committee to abandon consideration of an individual student's race, and the number of Black and Latinx students at BLS once again plummeted.  By 2005, Black and Latinx students respectively comprised 9.4% and 6.7% percent of the students at BLS—substantially less than half of their composition of the overall Boston population.[6]  As recently as 2018–19, Black students represented just 7.5% of the BLS student body.[7]  Meanwhile, in recent decades, Boston schools have become far less integrated, racially and socioeconomically.[8]

**The "Unsurpassed" Opportunities Offered by the Exam Schools.**  Students from underrepresented communities around the City are missing out on significant opportunities and advantages that Plaintiffs acknowledge are "unsurpassed" by "typical public high schools."  ECF No. 1, Compl. ¶ 18.  According to Massachusetts state data, 90% of Exam School graduates go on to attend college; only 55% of the other Boston Public School graduates do.[9]  Exam School students also gain admission to elite colleges in striking numbers.  For example, BLS alone sent 15 students to the Harvard Class of 2017.[10]  Five out of eight Exam School valedictorians from 2005 to 2007 attended Harvard.[11]  Only three of 80 valedictorians from other Boston Public

---

[5] Carrie Jung, *Not Always an Exam School: The History of Admissions at Boston's Elite High Schools*, WBUR (Mar. 5, 2020), https://www.wbur.org/edify/2020/03/05/boston-exam-school-admissions-history.

[6] *Id.*

[7] *Id.*

[8] Peter Ciurczak, et al., *Kids Today*: *Boston's Declining Child Population and Its Effect on School Enrollment*, Boston Indicators (Jan. 2020), at 24, https://www.bostonindicators.org/-/media/indicators/boston-indicators-reports/report-files/kids-today.pdf?la=en&hash=AFEE64818EA25B5A8428ABDE8A51D5D142305CB3.   In Boston overall, 77% of Black students and 64% of Latinx students attend schools in which 90% or more of the enrolled students are students of color.  *Id.* at 26.  Two thirds of all students of color attended what researchers term "intensely segregated schools."  *Id.*

[9] Bailey, *supra* note 4.

[10] Meg P. Bernard, *The Making of a Harvard Feeder School*, THE HARVARD CRIMSON (Dec. 13, 2013), https://www.thecrimson.com/article/2013/12/13/making-harvard-feeder-schools.

[11] Gay, *supra* note 1.

Schools during the same period attended Ivy League schools, and none attended Harvard.[12]

**The Program Will Help Level the Playing Field.** The parties agree that diversity in all forms—geographic, racial, socioeconomic status, national origin, views and other factors—delivers benefits to all students. JSOF ¶ 69. The Program, which does not invoke or rely on race, and which imposes no quotas or balancing tests, will likely have the effect of enhancing these multiple forms of diversity because it (1) provides for consideration of candidates from all of Boston's zip codes; and (2) prioritizes zip codes where families with students have the lowest incomes. Nonetheless, Plaintiffs have sued, contending that the Program is somehow unfair and unlawful because it would likely "shift" some seats at the Exam Schools away from neighborhoods that have historically held a near monopoly on those seats, and include a greater number of students from neighborhoods that have historically been left outside the Exam Schools' doors.

## ARGUMENT

Plaintiffs admit that the educational opportunities available at the Exam Schools are "substantially better" than the opportunities at other Boston public schools. Compl. ¶ 18. And there is no dispute that students benefit "educationally when the student body of their school is diverse in terms of race, socioeconomic status, national origin, views, and other factors." JSOF ¶ 69. The only issue is whether the School Committee's Program, which is expected to enhance diversity across these metrics—and thus deliver these benefits to *all* students at the Exam Schools—is somehow an unlawful race-conscious admissions policy that violates the Equal Protection Clause of the Fourteenth Amendment. ECF No. 63 at 3–8.

The Program—which does not consider race *at all*, let alone as a basis for student placement—necessarily survives Plaintiffs' constitutional challenge, regardless of whether

---

[12] *Id.*

6

rational basis review or strict scrutiny applies. The "mere invocation" of racial diversity among other forms of diversity advanced by the Program—or discussion of racial inequity by School Committee members prior to the adoption of the Program[13]—"is insufficient to [either] subject the [Program] to strict scrutiny" or to transform a plan based on zip codes—a *geographic* signifier— into an impermissible attempt at racial balancing. *See Anderson v. City of Boston*, 375 F.3d 71, 86–87 (1st Cir. 2004). As the Supreme Court has underscored, unconstitutional racial balancing occurs when an institution seeks "simply 'to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin.'" *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (quoting *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 307 (1978)). There is no evidence of that here.

Nor is there evidence that the temporary Program imposes racial quotas. To the contrary, at no point in the Program is an individual student's race or ethnicity even *a consideration* for placement at an Exam School, let alone the sole or defining factor. The Program considers each student's academic achievement and school preference. And for most students, the Program allocates available seats *proportionate to the percentage of school-aged children in a given zip code* and relies on the median family income of a given zip code to allow students from the poorest zip code to place at an Exam School first—considerations that will generate far more than just

---

[13] Plaintiffs' focus on School Committee members' stray remarks regarding the longstanding racial inequity in Boston and the impact of any admissions program on Black and Latinx students is misplaced. The Supreme Court has repeatedly affirmed that schools need not be indifferent to whether the admissions programs they pursue will allow them to achieve the educational benefits of diversity. *See Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2211–12 (2016) ("*Fisher II*") (approving the University of Texas's review of racial demographics for student enrollment to help determine whether admissions policies were successful to obtain "sufficient racial diversity"); *Grutter v. Bollinger*, 539 U.S. 306, 329–30 (2003) (concluding that the University of Michigan Law School's interest in a "critical mass" of underrepresented students was not racial balancing). Here, the Program's modest projected demographic shifts across three schools for a single school year are more consonant with an intention to achieve the educational benefits that obtain from having a more diverse student body than with any attempt at racial balancing. *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 283 (S.D.N.Y. 2019). The Program will not guarantee *any* set percentage of *any* racial group at *any* school. It will simply ensure that when students discuss, for example, Matthew Desmond's *Evicted: Poverty and Profit in the American City*, they will hear voices from not only West Roxbury, but also Dorchester and Mattapan.

racial diversity in the Boston Exam Schools.[14]  There is no quota, no balancing, and no myopic focus on race alone.  There is only a temporary narrowly tailored plan that will secure the benefits of diversity in myriad forms.

The Court should therefore reject Plaintiffs' challenge and uphold the Program for the reasons set forth in Defendants' and Intervenor-Defendants' briefs, and for two additional reasons of importance to *Amici*, as set forth below:

*First*, public schools have a compelling interest in ensuring student body diversity.  Public schools occupy a central role in developing the nation's children.  In an increasingly diverse City and country, Boston schools, including the Exam Schools, have strong incentives to foster and maintain a diverse student body so that students have access to the myriad, well-established educational benefits of diversity.

*Second*, Boston businesses have an interest in ensuring the Exam Schools attract, educate, and graduate talented students from diverse backgrounds.  These students will ultimately constitute an important part of the City's workforce.   Diverse and inclusive workforces outperform homogenous workforces because they reflect a broader talent pool, capture different perspectives, and improve the bottom line.  In today's marketplace, having more diverse, well-credentialed graduates is an essential competitive advantage—a selling point for Boston and businesses looking to attract talent to Boston.  And students educated in diverse environments are better equipped to handle, and thrive in, diverse workplaces.

## I.   BOSTON HAS A COMPELLING INTEREST IN DIVERSITY AT THE EXAM SCHOOLS

---

[14] Even if the mere correlation of zip codes with racial demographics in Boston had some constitutional significance in this case (which it does not), race would remain, at most, but "one factor among many, in an effort to assemble a student body that is diverse in ways broader than race."  *Grutter*, 539 U.S. at 340.

Supreme Court precedents have squarely established that there is a "compelling interest in securing the educational benefits of a diverse student body." *Grutter*, 539 U.S. at 333; *see also Fisher II*, 136 S. Ct. at 2208; *Fisher v. Univ. of Tex.*, 570 U.S. 297, 308–09 (2013) ("*Fisher I*"); *Bakke*, 438 U.S. at 312 (opinion of Powell, J.) ("[A]ttainment of a diverse student body" is "clearly . . . a constitutionally permissible goal").  Diversity delivers substantial benefits because students with diverse backgrounds "may bring . . . experiences, outlooks, and ideas that enrich the training of [a school's] student body[.]" *Bakke*, 438 U.S. at 314.  Benefits that make the government interest in diversity compelling include the promotion of "cross-racial understanding," "break[ing] down racial stereotypes," "enab[ling] [students] to better understand persons of different races," the "promo[tion] [of] learning outcomes," "better prepar[ing] students for an increasingly diverse workforce and society," and "better prepar[ing] them as professionals." *Grutter*, 539 U.S. at 330; *Fisher II*, 136 S. Ct. at 2210.[15]

Although these decisions arose in the context of higher education, the compelling interest in diversity applies with at least equal force to public high schools.  As the Supreme Court recognized in the landmark case of *Brown v. Board of Education*, which concerned "children of both elementary and high school age," these schools provide students with "the very foundation of good citizenship." 347 U.S. 483, 486 n.1, 493 (1954), *supplemented* 349 U.S. 294 (1955).  The environments that shape these young students are "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Id.* at 493.  For such reasons, Justice Kennedy concluded more recently that "[i]n the administration of public schools by the state and local authorities it is

---

[15] *Fisher II* also forecloses arguments such as the claim Plaintiffs advance here, that the Exam Schools are somehow already diverse "enough." *Compare* ECF No. 63 at 1 (arguing that "the Exam Schools already display substantial racial diversity"), *with Fisher II*, 136 S. Ct. at 2211 (rejecting the argument that the school's plan was unlawful because the school had already achieved a "critical mass" of diverse students).

permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788 (2007) (Kennedy, J., concurring in part and concurring in the judgment).[16]

Moreover, the benefits of diversity to students in the K-12 context are largely indistinguishable from those that the Court embraced in *Grutter*. *See Grutter*, 539 U.S. at 330. First, diversity improves cross-racial interaction and development. Researchers Philipp Jugert and Allard Feddes found that "cross-ethnic friendships ha[ve] positive psychosocial consequences which include better social adjustment and more positive attitudes towards ethnic out-groups."[17] Second, diversity correlates with improved student satisfaction, intellectual self-confidence, and leadership skills. Data suggests the positive relationship between diversity in higher education and outcomes related to satisfaction, well-being, and racial attitudes is stronger among students who had more experiences with diverse learning environments before college.[18] Third, increased diversity reduces racial prejudice, bias, and stereotypes.[19] The Century Foundation, an independent think tank that researched the benefits of socioeconomically and racially diverse

---

[16] Most courts following *Parents Involved* have deemed Justice Kennedy's concurrence controlling. *See Spurlock v. Fox*, 716 F.3d 383, 395 (6th Cir. 2013) (assuming the concurrence controls); *United States v. Alamance-Burlington Bd. of Educ.*, 640 F. Supp. 2d 670, 683 n.5 (M.D.N.C. 2009) (concluding that the concurrence controls under *Marks v. United States*, 430 U.S. 188, 193 (1977)); *Hart v. Cmty. Sch. Bd.*, 536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008) (same). *But see Christa McAuliffe,* 364 F. Supp. 3d at 282 n.25 (disagreeing that the concurrence is controlling under *Marks*). Legal scholarship has also recognized Justice Kennedy's concurrence as controlling. *See* J. Harvie Wilkinson III, *The Seattle and Louisville School Cases: There is No Other Way*, 121 HARV. L. REV. 158, 170 (2007) ("As the narrowest rationale in support of the prevailing judgment, the Kennedy opinion becomes the controlling one and the subject of close scrutiny for educators and lawyers alike."); James E. Ryan, *The Supreme Court and Voluntary Integration*, 121 HARV. L. REV. 131, 137 (2007) ("Kennedy's opinion appears controlling.").

[17] Philipp Jugert & Allard R. Feddes, *Children's and adolescents' cross-ethnic friendships*, *in* THE WILEY HANDBOOK OF GROUP PROCESSES IN CHILDREN AND ADOLESCENTS 373, 389 (Oct. 2015).

[18] *See generally* Nicholas A. Bowman & Nida Denson, *What's Past is Prologue: How Precollege Exposure to Racial Diversity Shapes the Impact of College Interracial Interactions*, 53 RSCH. IN HIGHER EDUC. 406, 406-25 (2012).

[19] *See generally* Rebecca S. Bigler & Lynn S. Liben, *A developmental intergroup theory of social stereotypes and prejudice*, 34 ADVANCES IN CHILD DEVELOPMENT AND BEHAVIOR 39, 39-89 (2006); Thomas F. Pettigrew & Linda R. Tropp, *A meta-analytic test of intergroup contact theory*, 90 J. OF PERSONALITY AND SOCIAL PSYCH. 751, 751-83 (2006).

schools and classrooms, concluded that, "when school settings include students from multiple racial groups, students become more comfortable with people of other races, which leads to a dramatic decrease in discriminatory attitudes and prejudices."[20]

The reasons Harvard has long championed diversity are also relevant to the Exam Schools. The Exam Schools, too, will benefit from increased diversity in "(1) training future leaders . . . (2) equipping [their] graduates and [the schools] to adapt to an increasingly pluralistic society . . . (3) better educating [their] students through diversity . . . and (4) producing new knowledge stemming from diverse outlooks." *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 980 F.3d 157, 173–74 (1st Cir. 2020); *see Christa McAuliffe*, 364 F. Supp. 3d at 283 (explaining there is "no logical reason why increasing racial diversity in high schools would not benefit students to the same extent" as university students). It is hard to imagine that any students or parents—even among Plaintiffs—would want to keep these benefits from students fortunate enough to gain entry to the highly-selective Exam Schools.

Diversity also results in additional, unique benefits for K-12 student academic outcomes. Attending racially diverse schools decreases the test score gap between white and Black and/or Latinx students.[21] And as K-12 researchers Roslyn Michelson and Mokubung Nkomo determined, "[w]hether a school is racially and socioeconomically diverse or segregated makes a critical difference for K-12 achievement across the curriculum: [s]tudents who attend racially and socioeconomically diverse schools are more likely to achieve higher test scores and better grades,

---

[20] *The Benefits of Socioeconomically and Racially Integrated Schools and Classrooms*, THE CENTURY FOUNDATION (Apr. 29, 2019), https://tcf.org/content/facts/the-benefits-of-socioeconomically-and-racially-integrated-schools-and-classrooms.

[21] Amy S. Wells, et al., *How Racially Diverse Schools and Classrooms Can Benefit All Students*, THE CENTURY FOUNDATION (Feb. 9, 2016), https://tcf.org/content/report/how-racially-diverse-schools-and-classrooms-can-benefit-all-students; *see generally* Aprile D. Benner & Robert Crosnoe, *The Racial/Ethnic Composition of Elementary Schools and Young Children's Academic and Socioemotional Functioning*, 48 AM. EDUC. RSCH. J. 621, 621-46 (2011); Shelly Brown-Jeffy, *The Race Gap in High School Reading Achievement: Why School Racial Composition Still Matters*, 13 RACE, GENDER & CLASS 268, 268-94 (2006).

to graduate from high school, and to attend and graduate from college" compared with their otherwise comparable counterparts who attend less diverse schools.[22]  All these benefits confirm that diversity in public high schools is a compelling government interest.

## II.   THE PROGRAM HELPS BOSTON BUSINESSES RECRUIT DIVERSE, TALENTED, AND COMPETITIVE WORKFORCES

"The skills needed in today's increasingly global marketplace can *only* be developed through exposure to widely diverse people, culture, ideas, and viewpoints." *Grutter*, 539 U.S. at 330 (emphasis added).  The First Circuit recently acknowledged the business community's "interest in having a well-educated, diverse hiring pool," and recognized that "policies like those approved by the Supreme Court in *Grutter* are essential to [the business'] ongoing efforts to attract and benefit from the best possible people." *Students for Fair Admissions,* 980 F.3d at 187, 187 n. 25 (holding that Harvard's policies aimed at increasing admissions of Black, Latinx, and other underrepresented students were constitutionally sound).

The Exam Schools are a crucial part of the pipeline by which promising and diverse students in Boston enter the local talent pool.  And while not every graduate will attend a university in the area, ultimately, Boston businesses disproportionately hire these talented students.  A recent search of the alumni of one Exam School (BLS) on LinkedIn shows that nearly two-thirds (5,779 out of 8,666 alumni) remained in or returned to the Greater Boston area, many working for notable local employers such as State Street (50 identified alumni), Liberty Mutual Insurance (32 alumni), and Google (23 alumni).[23]  *Amici's* experiences also confirm the Exam Schools are a crucial link in the pipeline through which Boston's diverse students will become the City's next generation of

---

[22] Roslyn Arlin Michelson & Mokubung Nkomo, *Integrated Schooling, Life Course Outcomes, and Social Cohesion in Multiethnic Democratic Societies*, 36 REV. OF RSCH. IN EDUC. 197, 226 (Mar. 2012); Gregory Palardy, *Differential school effects among low, middle, and high social class composition schools: A multiple group, multilevel latent growth curve analysis*, 19 SCH. EFFECTIVENESS AND SCH. IMPROVEMENT 21, 37 (Mar. 2008).

[23] Boston Latin School, LINKEDIN, https://www.linkedin.com/school/boston-latin-school/people/ (last visited Apr. 1, 2021).

business leaders.  To that end, *Amici* have expended substantial resources to attract, retain, and provide pathways to leadership for talent from diverse backgrounds for at least three reasons.

**First**, Boston businesses, law firms, nonprofit organizations, and government agencies, including *Amici*, do not compete in a vacuum: today Boston competes with other cities—nationally and globally—to attract business and talent.[24]  A 2019 management consultant analysis concluded that "[t]he common denominator" among the most successful and competitive cities was human capital, and noted "the world's most competitive cities have a growing and diverse workforce."[25] The study ranked Boston 21st globally, *behind* several other U.S. cities, including Washington D.C., Los Angeles, Chicago, and New York.[26]  If Boston fails to ensure that Black, Latinx, and other underrepresented communities—including communities facing economic instability and/or challenges due to poverty—have access to top-tier schools including its Exam Schools, highly qualified and talented students from those communities will be less likely to gain the education and opportunities that will pave the way to join organizations such as *Amici*.[27]  This would ultimately weaken *Amici*'s ability to compete with businesses and organizations based in cities that ensure that *all* students have access to the best educational opportunities.  The Program is one modest step that will help Boston's businesses compete.

**Second**, Boston is inherently diverse but traditionally segregated, including in its schools. As highlighted by The Boston Globe's Spotlight Team, Boston has had an unshakable reputation and history tied to racism.[28]  This runs counter to the *Amici*'s goals of recruiting talented people

---

[24] Andres Mendoza Pena & Nicole Dessibourg-Freer, *Talent makes the city*, THE HILL (June 14, 2019), https://thehill.com/opinion/finance/448371-talent-makes-the-city.
[25] *A question of talent: how human capital will determine the next global leaders*, A.T. KEARNEY (2019), https://www.kearney.com/global-cities/2019.
[26] *Id.*
[27] *See, e.g.*, *supra* notes 9–12 and accompanying text (noting how the Exam Schools send a higher percentage of students to college, and overall more highly-ranked colleges).
[28] *See* The Spotlight Team, *Boston. Racism. Image. Reality,* THE BOSTON GLOBE (Dec. 10, 2017), https://apps.bostonglobe.com/spotlight/boston-racism-image-reality/series/image/ (noting "Google the phrase 'Most

from diverse backgrounds and fostering an inclusive and equitable working environment. Massachusetts businesses have responded to this need by beginning "a diversity executive hiring spree."[29]  *Amici* have announced and/or fortified diversity, equity, and inclusion initiatives with the goal of attracting and retaining diverse workforces and elevating diverse employees to positions of leadership.  For example, in 2018, Rapid7 launched a diversity initiative (50/50 by 2020) to increase the number of under-represented groups (women and people of color) to half of the employee base in the United States by the end of 2020.

*Third*, in today's global economy, a diverse and inclusive workforce is not optional.  It is a necessity for the bottom line of *Amici* and other businesses for multiple reasons:

**Diversity is good for business:**  Diversity in schools matters partly because of "the overriding importance of preparing students for work[.]"  *Grutter*, 539 U.S. at 329.  And diverse organizations perform better financially than non-diverse organizations.  According to an oft-cited study by global consulting firm McKinsey & Company, companies in the top quartile of "ethnic and cultural diversity" outperformed companies in the bottom quartile by 36 percent in terms of overall profitability.[30]  The study recommended that companies "ensure the representation of diverse talent," "enable equality of opportunity," and "foster belonging through unequivocal support for multivariate diversity" to generate an increased likelihood of "financial outperformance."[31]  A 2018 report by locally-based Boston Consulting Group similarly found that

---

racist city,' and Boston pops up more than any other place, time and time again.").  The Boston Globe Spotlight Team, in a troubling report investigating racism in the City, reported that "among eight major cities, [B]lack people ranked Boston as least welcoming to people of color.  More than half—54 percent—rated Boston as unwelcoming."  *Id.*

[29] Zeninjor Enwemeka, *Change, or Checking the Box? Mass. Companies are on a Diversity Exec Hiring Spree*, WBUR (Aug. 17, 2020), https://www.wbur.org/bostonomix/2020/08/17/chief-diversity-officers-gaining-popularity  (last accessed Mar. 24, 2021).

[30] Sundiatu Dixon-Fyle, et al., *Diversity wins: How inclusion matters*, MCKINSEY & COMPANY (May 19, 2020), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters.

[31] *Id.*

companies with more diverse leadership teams report higher innovation revenue.[32]  A 2019 Gartner study predicted that, "[t]hrough 2022, 75% of organizations with frontline decision-making teams reflecting a diverse and inclusive culture will exceed their financial targets."[33]  Finally, a study by Harvard economists found that the success rate of acquisitions and IPOs undertaken by venture capital partners of the same ethnicity was on average significantly lower (*i.e.*, 30%) than for those undertaken by partners of different ethnicities.[34]

**Diversity spurs innovation:** As Justice Powell articulated, "the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples."  *Bakke*, 438 U.S. at 313.  Experts have determined that by maximizing the range of thoughts and ideas housed within it, an organization today is "more likely to have access to the breadth of information necessary to solve complex problems."[35]  Diversity also leads to innovation, because "[m]ultiple and varied voices have a wide range of experiences, and this can help generate new ideas about products and practices."[36]  A 2011 Forbes study found that "a diverse and inclusive workforce can . . . help ensure that a company's products and services are respectful of their clients' cultures."[37]  Another study found that "[d]iverse work teams, including racially and ethnically diverse teams, generate ideas that are more creative, effective, and feasible

---

[32] Rocío Lorenzo, et al., *How Diverse Leadership Teams Boost Innovation*, BOSTON CONSULTING GROUP HENDERSON INSTITUTE (Jan. 23, 2018), https://www.bcg.com/en-us/publications/2018/how-diverse-leadership-teams-boost-innovation.

[33] Manasi Sakpal, *Diversity and Inclusion Build High-Performance Teams*, GARTNER (Sept. 20, 2019), https://www.gartner.com/smarterwithgartner/diversity-and-inclusion-build-high-performance-teams.

[34] Paul A. Gompers & Silpa Kovvali, *The Other Diversity Dividend*, HARVARD BUS. R. (July-Aug. 2018), https://hbr.org/2018/07/the-other-diversity-dividend.  The authors further noted: "Over the past several years one of us (Paul Gompers) has examined the decisions of thousands of venture capitalists and tens of thousands of investments, and the evidence is clear: Diversity significantly improves financial performance on measures such as profitable investments at the individual portfolio-company level and overall fund returns."

[35] Stanley F. Slater, et al., *The Business Case for Commitment to Diversity*, 51 BUS. HORIZONS 201, 203 (2008).

[36] Christiaan Rizy, et al., *Global Diversity and Inclusion: Fostering Innovation Through a Diverse Workforce*, FORBES INSIGHTS (2011), at 5, https://www.forbes.com/forbesinsights/StudyPDFs/Innovation_Through_Diversity.pdf.

[37] *Id.*

15

than non-diverse teams, but only when diverse teams are able to work together effectively."[38] These findings are consistent with *Amici*'s experience that a diverse workforce allows a company to draw on a variety of backgrounds and perspectives, producing innovation and creativity.

**Diversity promotes retention:** "In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332. Indeed, in *Amici*'s experience, diversity promotes retention. According to a 2015 study, 83% of millennials reported higher levels of engagement when they perceived their organization as fostering inclusion.[39] In a 2019 survey, 70% of respondents said they would consider looking for a new job if their employer did not demonstrate a commitment to diversity.[40] Pursuing diversity, equity, and inclusion helps Boston businesses face the challenge of recruiting and retaining top talent.

**Institutional actors and shareholders demand diversity:** Institutional actors in the markets where Boston businesses operate value diversity. For example, NASDAQ has proposed rules that "would require all companies listed on NASDAQ's U.S. Exchange to publicly disclose consistent, transparent diversity statistics regarding their board of directors."[41] The rules "would require most NASDAQ-listed companies to have, or explain why they do not have, at least two diverse directors, including one who self-identifies as female and one who self-identifies as either [belonging to] an underrepresented minority [group] or [as] LGBTQ+."[42] Shareholder pressure

---

[38] Poppy Lauretta McLeod, et al., *Ethnic Diversity and Creativity in Small Groups*, 27 SMALL GRP. RSCH. 248, 260-61 (May 1996).

[39] Christie Smith & Stephanie Turner, *The Radical Transformation of Diversity and Inclusion: The Millennial Influence*, DELOITTE (2015), at 13, https://www2.deloitte.com/content/dam/Deloitte/us/Documents/about-deloitte/us-inclus-millennial-influence-120215.pdf.

[40] *Diversity in the Workplace Statistics: Job Seeker Survey Reveals What Matters*, YELLO, https://yello.co/blog/diversity-in-the-workplace-statistics/ (last visited Mar. 24, 2021).

[41] *Nasdaq to Advance Diversity through New Proposed Listing Requirements*, NASDAQ (Dec. 1, 2020), https://www.nasdaq.com/press-release/nasdaq-to-advance-diversity-through-new-proposed-listing-requirements-2020-12-01.

[42] *Id.*

also has increased on businesses to further diversity initiatives, as institutional investors have recently shown a greater willingness to use their proxy votes to increase board diversity,[43] and there have been a number of shareholder derivative suits resulting from overly homogeneous boards.[44]

In short, if Boston businesses fail to recruit and retain diverse employees, it stands to reflect negatively on them, their bottom line, and potentially the City itself.[45]

For each of these reasons, Boston has a significant interest in ensuring equitable access to Boston's top schools, including the Exam Schools, for all its talented students.  Upholding the Program—thoughtfully and fairly crafted to address serious concerns exacerbated this year by the pandemic—is one critical step forward, with clear and otherwise unachievable benefits for Boston's schoolchildren and its business community.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully submit that the Court should uphold the Program, and rule in favor of the Defendants and Intervenor-Defendants.

---

[43] Lisa Hayles, *The case for diversity: Why institutional investors are using their proxy votes to leverage greater board diversity*, FINANCIAL DIRECTOR (July 10, 2019), https://www.financialdirector.co.uk/2019/07/10/the-case-for-diversity-why-institutional-investors-are-using-their-proxy-votes-to-leverage-greater-board-diversity.
[44] Francesca Odell, et al., *3 Cases Spotlight Shareholder Interest in Public Co. Diversity*, LAW360 (Aug. 4, 2020), https://www.law360.com/articles/1296071/3-cases-spotlight-shareholder-interest-in-public-co-diversity.
[45] *See Boston. Racism. Image. Reality*, *supra* note 27.

Dated:  April 2, 2021

Respectfully submitted,

THE ANTI-DEFAMATION LEAGUE
AND RELATED *AMICI CURIAE*

By Their Attorneys,

*/s/ Adam S. Gershenson*
Michael N. Sheetz (BBO #548776)
Adam S. Gershenson (BBO #671296)
Bryan Koch (BBO #703577)
Cooley LLP
500 Boylston Street
Boston, MA 02116
Tel.: (617) 937-2300
Fax: (617) 937-2400
msheetz@cooley.com
agershenson@cooley.com
bkoch@cooley.com

Robby L.R. Saldaña (*pro hac vice* motion
filed)
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC, 20004
Tel.: (202) 776-2109
Fax: (202) 842-7899
rsaldana@cooley.com

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that on this 2nd day of April, 2021, the foregoing document was filed through the ECF system and will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

/s/ Adam Gershenson
Adam Gershenson