UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 1:21-cv-10330-WGY ) |
| SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEIL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS, | ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTAL, and H.D., | ) ) ) ) ) ) ) |
| Defendants-Intervenors. | ) ) ) |

## DEFENDANTS' BRIEF FOR JUDGMENT

Kay H. Hodge (BBO # 236560)
    khodge@scmllp.com
John M. Simon (BBO #645557)
    jsimon@scmllp.com
Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA 02119
(617) 542-6789

Catherine A. Lizotte (BBO #666468)
    catherine.lizotte@cityofboston.gov
Legal Advisor
Boston Public Schools
2300 Washington Street
Boston, MA 02110
(617) 635-9250

Dated: April 2, 2021

# **TABLE OF CONTENTS**

Page

Table of Contents ............................................................................................................. i

Table of Authorities ....................................................................................................... ii

Introduction .....................................................................................................................1

Factual Background .........................................................................................................2

Argument .........................................................................................................................3

I.      The Interim Plan Is Facially Race-Neutral And Subject To Rational
        Basis Review ........................................................................................................3

II.     Plaintiff Has Not Shown Discriminatory Impact, Discriminatory
        Purpose, Or Article III Standing ..........................................................................7

        A.      Plaintiff Has Shown No Discriminatory Impact ......................................7

        B.      Plaintiff Has Shown No Discriminatory Purpose ..................................12

        C.      Plaintiff Lacks Article III Standing .......................................................16

III.    The Interim Plan Withstands Strict Scrutiny .....................................................18

Conclusion .....................................................................................................................20

i

## TABLE OF AUTHORITIES

**Cases**  **Page(s)**

Allstate Ins. Co. v. Abbott,
495 F.3d 151 (5th Cir. 2007)............................................................................15

Anderson ex rel. Dowd v. City of Boston,
375 F.3d 71 (1st Cir. 2004)...........................................................................4, 8, 9

Arlington Heights v. Metro. Hous. Dev. Corp.,
429 U.S. 252 (1977).....................................................................................7, 12

Brown v. Board of Educ.,
347 U.S. 483 (1954)..........................................................................................19

Carpenter v. Boeing Co.,
456 F.3d 1183 (10th Cir. 2006).........................................................................8

Castaneda v. Partida,
430 U.S. 482.....................................................................................................10

Chavez v. Ill. State Police,
251 F.3d 612 (7th Cir. 2001)..............................................................................8

City of New Orleans v. Dukes,
427 U.S. 297 (1976)............................................................................................5

Clapper v. Amnesty Int'l USA,
568 U.S. 398 (2013)..........................................................................................18

Cohen v. Brown Univ.,
101 F.3d 155 (1st Cir. 1996)..............................................................................9

Doe ex rel. Doe v. Lower Merion Sch. Dist.,
665 F.3d 524 (3d Cir. 2011)....................................................................4, 12, 13

FCC v. Beach Communications Inc.,
508 U.S. 307 (1993)............................................................................................5

FW/PBS, Inc. v. City of Dallas,
493 U.S. 215 (1990)..........................................................................................17

Grutter v. Bollinger,
539 U.S. 306 (2003)....................................................................................19, 20

Hallmark Developers, Inc. v. Fulton Cty. Ga.,
466 F.3d 1276 (11th Cir. 2006).................................................................................8

Hayden v. Grayson,
134 F.3d 449 (1st Cir. 1998)....................................................................................7

Heller v. Doe,
509 U.S. 312 (1993).................................................................................................5

Jones v. City of Boston,
752 F.3d 38 (1st Cir. 2014)....................................................................................10

Lewis v. Ascension Parish School Bd.,
806 F.3d 344 (5th Cir. 2015)...........................................................................Passim

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992)...............................................................................................16

Northeastern Florida Chap. of Assoc. Gen'l Contractors of America
v. City of Jacksonville,
508 U.S. 656 (1993)...............................................................................................17

Parents Involved in Community Schools v. Seattle Sch. Dist. No.,
551 U.S. 701 (2007)...................................................................................3, 19, 20

Pers. Adm'r of Massachusetts v. Feeney,
442 U.S. 256 (1979).................................................................................................7

Plyler v. Doe,
457 U.S. 202 (1982)...............................................................................................19

Raso v. Lago,
135 F.3d 11 (1st Cir. 1998)......................................................................................4

Regents of Univ. of Cal. v. Bakke,
438 U.S. 265 (1978)...............................................................................................19

Ricci v. DeStefano,
557 U.S. 557 (2009).................................................................................................9

Sch. PTO v. de Blasio,
364 F. Supp. 3d 253 (S.D.N.Y. 2019).....................................................................13

Scott v. Pasadena Unified Sch. Dist.,
306 F.3d 646 (9th Cir. 2002)............................................................................17, 18

Shaw v. Reno,
509 U.S. 630 (1993)................................................................................................3

Spurlock v. Fox,
716 F.3d 383 (6th Cir. 2013).................................................................................4

Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,
980 F.3d 157 (1st Cir. 2020)............................................................................2, 17

United States v. AVX Corp.,
962 F.2d 108 (1st Cir. 1992).................................................................................17

**Statutes**                                                                                          **Page(s)**

42 U.S.C. § 1983...................................................................................................2

M.G.L. c. 76, § 5..................................................................................................2

U.S. CONST. amend. XIV, § 1................................................................................3

## INTRODUCTION

BPS's[1] one year, pandemic-caused, exam-less plan for admission to its three Exam Schools for the 2021-2022 school year ("Interim Plan") is facially race-neutral and does not implicate equal protection. The Interim Plan relies on student-applicants' pre-COVID grade point averages ("GPAs"), 20% city-wide and 80% within the zip code of their residence. BPS's acknowledged consideration of the Interim Plan's racial implications, and its stated goal, among others, that the Plan increase socioeconomic, geographic and racial diversity at its Exam Schools is not a racial classification or a proxy therefor that triggers strict scrutiny.

Against this well-established legal backdrop, Plaintiff's argument – that the Interim Plan is racially discriminatory in impact and purpose – fails. As to impact, Plaintiff's basic premise is fatally flawed. That the Plan may result in fewer seats for Whites and Asians than Plaintiff's preferred city-wide ranking only by GPA simply does not show any constitutionally-proscribed discriminatory impact, particularly in light of Plaintiff's projections that would result in significant Exam School admissions overrepresentation of Whites and Asians as compared to Boston's student population. Indeed, in offering overly-simplistic percentages, Plaintiff falls woefully short of the expert mathematical analysis required to show any actionable, statistically significant disparate impact under any theory.

As to discriminatory purpose, Plaintiff wholly ignores the breadth of record evidence regarding BPS's true motivations in including the Plan's 80% zip-code-based selection provision. These motivations include BPS's overarching need for an equitable, city-wide means for selecting students in the COVID-necessitated absence of a single exam, addressing grade-

---

[1] "BPS" is short for "Boston Public Schools" and is meant herein to include all Defendants – the School Committee of the City of Boston, School Committee members Alexandra Oliver-Davila, Michael O'Neil, Hardin Coleman, Lorna Rivera, Jeri Robinson, Quoc Tran, and Ernani DeAraujo and BPS Superintendent Brenda Cassellius.

1

inflation and variabilities that made reliance on GPA alone untenable, and the promotion of Exam School socioeconomic, geographic and racial diversity. Merely cherry-picking the record to highlight every mention of race, Plaintiff does not come close to meeting its difficult burden of showing that BPS acted with an invidious discriminatory purpose. Plaintiff's shortcomings with respect to discriminatory impact and purpose also preclude it from showing that its student-members will suffer the concrete, non-speculative injury-in-fact necessary for them to establish Article III standing to bring this suit in the first place.

Finally, even were strict scrutiny applied to the Interim Plan, it would still pass muster. BPS has an undeniably compelling interest in promoting diversity, including socioeconomic and racial diversity, at its Exam Schools. And given the exigencies of the COVID-19 pandemic, which precluded use of an exam, the Interim Plan is a carefully considered, narrowly tailored means for achieving that goal, indeed, one that does not expressly use race at all.

In sum, Plaintiff has wholly failed to make out its claim of an equal protection violation.[2] Judgment should enter in BPS's favor.

## **FACTUAL BACKGROUND**

The facts relevant to this matter are contained in Defendants' Proposed Statement of Fact and Findings of Law, filed herewith. Citations to BPS's Proposed Facts are indicated herein as "BPS ¶ __."

---

[2] Plaintiff asserts two claims: one for an equal protection violation under 42 U.S.C. § 1983, and another for violation of M.G.L. c. 76, § 5, which provides "[n]o person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race…." Both prohibiting race discrimination in public education, the analysis of these claims is essentially the same. See, e.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 980 F.3d 157, 195-96 (1st Cir. 2020) (holding analysis of claim under Title VI, analogous federal law prohibiting race discrimination in education, is same as one for violation of equal protection).

## ARGUMENT

### I. The Interim Plan Is Race-Neutral And Subject To Rational Basis Review.

The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall...deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "Its central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." Shaw v. Reno, 509 U.S. 630, 642 (1993). Accordingly, "[i]t is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720 (2007).

However, race-neutral school selection policies – even undertaken with race-conscious considerations and goals – are constitutionally permissible and not subject to strict scrutiny. Justice Kennedy's controlling concurrence in Parents Involved sets the baseline:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races. Assigning to each student a personal designation according to a crude system of individual racial classifications is quite a different matter; and the legal analysis changes accordingly.

551 U.S. at 789 (Kennedy, J., concurring in part and concurring in judgment) (citation omitted).

Since Parents Involved, at least three Courts of Appeal have ruled that school-assignment policies based on geography are facially race-neutral and do not employ racial classifications despite arguments that geography was a surrogate for race. See Lewis v. Ascension Parish

3

School Bd., 806 F.3d 344, 356-58 (5th Cir. 2015), cert. denied, 136 S.Ct. 1662 (2016); Spurlock v. Fox, 716 F.3d 383, 394 (6th Cir. 2013), cert. denied, 571 U.S. 954 (2013); Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 545 (3d Cir. 2011), cert. denied, 567 U.S. 916 (2012). All three Courts concluded that a school board's consideration of race in the development of these race-neutral polices did not trigger strict scrutiny review. See Lewis, 806 F.3d at 357-58; Spurlock, 716 F.3d at 394; Lower Merion, 665 F.3d at 548.

First Circuit law, established before Parent's United, is not only in accord, but goes further, providing that even a school district's *stated goal* of racial diversity will not subject a race-neutral policy to strict scrutiny:

> [T]he mere invocation of racial diversity as a goal is insufficient to subject the [race neutral] New Plan to strict scrutiny. In those cases where the Supreme Court inquired whether diversity is a compelling state interest and whether the program at issue could survive strict scrutiny, the programs were all subjected to strict scrutiny because they used explicit racial classifications to achieve the goal of diversity. None of these cases, nor any other case to which our attention has been drawn, has subjected a governmental program to strict scrutiny simply because the state mentioned diversity as a goal.

Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71, 87 (1st Cir. 2004) (footnote omitted); see also Raso v. Lago, 135 F.3d 11, 16 (1st Cir. 1998) ("plaintiffs are mistaken in treating 'racial motive' as a synonym for a constitutional violation").

These clear, longstanding principles, which Plaintiff ignores completely, wholly undermine its attempt to impose strict scrutiny on BPS's race-neutral Plan. Despite Plaintiff's characterization of its argument as one of "discriminatory purpose and impact" (which BPS specifically addresses below), Plaintiff's overarching claim – that the Interim Plan's use of zip codes is a proxy for express, constitutionally-suspect racial balancing (as evidenced by Boston's demographics and BPS's consideration of the Plan's racial implications) – is one the law resoundingly rejects.

As strict scrutiny is inapplicable, the Court need only determine whether BPS's implementation of the Interim Plan rationally relates to a legitimate government interest. City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam). In general, plans are rationally related to such interests "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Communications Inc., 508 U.S. 307, 313 (1993); see also Lewis, 662 F.3d at 348 (holding where there is no proof of *either* discriminatory purpose *or* discriminatory impact, the government action is subject to rational basis review and the burden is on challenger to rebut the "strong presumption of validity" accorded the action and prove that the action is not rationally related to a legitimate government purpose) (citing Heller v. Doe, 509 U.S. 312, 319-20 (1993)).

Under the rational basis standard of review, the Interim Plan is clearly constitutional. Plaintiff does not claim otherwise. The Plan is rationally related to BPS's need for an equitable, city-wide means for selecting students for Exam Schools for SY 2021-22 when COVID requirements precluded an exam. See ASE01310 (stating Working Group desired outcome was to "[e]nsure that students will be enrolled through a clear and fair process for admission in the 21-22 school year that takes into account the circumstances of the COVID-19 global pandemic that disproportionately affected families in the city of Boston").

The Plan, moreover, promotes BPS's interest in mitigating the effects of grade variation and inflation and ensuring that all students, regardless of the school they attend, have equal and fair access to Exam School admission. There is significant grade variation. BPS ¶ 55. BPS has no standard policy on grading and does not provide guidance on grading by non-BPS schools. BPS ¶ 56. Variability of grading systems by applicants' schools would be exacerbated by the lack of an exam. See ASE00972; BPS ¶ 57. For example, in 2016, ten percent of the BLS entering class

5

was from one school, Holy Name Parish School in West Roxbury, 69% of the applicants from which had A+ average GPAs. ASE01697, 01685-89. See BPS ¶ 59. The use of zip codes provides some protection by limiting the ability of any one school to benefit unfairly due to its grading practices. BPS ¶ 58.

Finally, the Plan is unquestionably related to BPS's stated interests in promoting socioeconomic, geographic and racial diversity in its Exam Schools. See, e.g., ASE01310 (Working Group desired outcome to "[w]ork towards an admissions process that will support student enrollment at each of the exam schools such that it better reflects the socioeconomic, racial and geographic diversity of all students (K-12) in the city of Boston."); ASE01757 (Working Group reports that the Interim Plan "is projected to better reflect the racial, socioeconomic, and geographic diversity during COVID-19, based on the data and simulations provided."). Indeed, socioeconomic diversity was plainly at the forefront of BPS's overall considerations, given the Plan's inclusion of a "zip code" for homeless students and those in DCF custody children, as well as its ranking of zip codes inversely by median income, which was changed, after discussion about income disparities within zip codes at the October 8th School Committee meeting, to median family income with children under 18 to accentuate the Plan's focus on the socioeconomic status of BPS families and protect them from median income inflation by professionals without children living in many Boston neighborhoods. ASE01785-87; 1800; BPS ¶¶ 64-67. It also addressed the Massachusetts Department of Elementary and Secondary Education's ("DESE") criticism about the low number of economically disadvantaged students at Exam Schools, particularly BLS. BPS ¶ 68; ASE01012.

In sum, review of the Interim Plan under the proper, rational basis standard, requires judgment in BPS's favor.

6

## II.     Plaintiff Has Not Shown Discriminatory Impact, Discriminatory Purpose, Or Article III Standing.

Plaintiff nevertheless claims that the Interim Plan violates equal protection because it is racially discriminatory in impact and purpose. To be sure, an equal protection claim premised on an outwardly neutral policy can prevail with proof of both a discriminatory impact and an invidious discriminatory purpose.[3] Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 272 (1979); Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977); see also Lewis, 806 F.3d at 359 ("To subject a facially race neutral government action to strict scrutiny, the plaintiff must establish both discriminatory intent and a disproportionate adverse effect upon the targeted group.") (citing Feeney, 442 U.S. at 272). As Plaintiff fails to show either, its equal protection claim fails, which also precludes its standing to bring this suit in the first instance.

### A.     Plaintiff has shown no discriminatory impact.

Plaintiff's argument for discriminatory impact is fatally flawed. Based on a single BPS "simulation" (ASE01858-59), Plaintiff projects that under the Interim Plan White and Asian applicants will receive a total of 65 fewer Exam School seats (56 fewer seats for White applicants and nine fewer for Asians) than they would receive under the city-wide ranking of GPA only. Plaintiff's Brief at 10-11.

Even were this true (which, as discussed below, Plaintiff has not and cannot prove as an evidentiary matter),[4] it simply does not establish that the Interim Plan "creates disproportionate

---

[3]Although evidence of disparate impact may serve as evidence of discriminatory purpose, it rarely will prevail in the absence of evidence of discriminatory purpose. Hayden v. Grayson, 134 F.3d 449, 452-53 (1st Cir. 1998), cert. denied, 524 U.S. 953 (1998) ("[E]vidence of a widely disproportionate impact on the plaintiff class normally is not enough, standing alone, to establish an equal protection violation...Rather, [the plaintiff] must adduce competent evidence of 'purposeful discrimination.'") (citations omitted).

[4]"Simulations" provide only a model about potential impacts of the various admissions plans. BPS explicitly described those limitations. ASE01591, 01858. As such, BPS's simulations are just that – simulations of possible outcomes based on past data and hypotheticals. See BPS ¶¶ 69, 71. As more fully as argued below, Plaintiff's exclusive reliance on these simulations falls woefully short of its ultimate burden to show statistically reliable and significant evidence of discriminatory impact.

racial results." Anderson, 375 F.3d at 90; see also Id. ("If plaintiffs had been able to show that

the New Plan resulted in *stark systemwide racial disparities* regarding assignments to first choice

schools, we might – depending on the circumstances – have reached the conclusion that

intentional discrimination occurred and so adopt a stricter standard of scrutiny in assessing

justification.") (emphasis supplied).

The starting point for measuring discriminatory impact is always "the impact on the total

group to which a policy or decision applies." Hallmark Developers, Inc. v. Fulton Cty. Ga., 466

F.3d 1276 (11th Cir. 2006); see also Carpenter v. Boeing Co., 456 F.3d 1183, 1188 (10th Cir.

2006) ("The essential requirement is that the data concern those persons subject to the

challenged…practice."). While the discriminatory impact element of an equal protection claim

may be satisfied with statistical evidence, "'[t]he statistics proffered must address the crucial

question of whether one class is being treated differently from another class that is otherwise

similarly situated.'" Lewis, 806 F.3d at 360 (quoting Chavez v. Ill. State Police, 251 F.3d 612,

638 (7th Cir. 2001)).

In the broadest view, Plaintiff's projections – even if believed – show only that under the

Interim Plan Whites and Asians would make up 32% and 16% of the entering Exam School

classes, despite BPS student populations of 14% and 9%, respectively. ASE00976. Plaintiff

makes no attempt to explain how such admission rates could possibly be seen as resulting in

"disproportionate racial results" or "stark systemwide racial disparities" against Whites and

Asians. See Anderson, 375 F.3d at 90.

Plaintiff also fails to explain why its preferred plan – city-wide GPA, which would

(apparently) result in more White and Asian admissions – must serve as the baseline from which

its alleged equal protection violations are measured. BPS, not Plaintiff, is charged with the

policymaking authority for its Exam Schools. Plaintiff has not shown, and cannot show, that

Whites or Asians are subjected to discriminatory impact resulting from the Interim Plan

compared to a different plan (e.g., city-wide, GPA-only) that would have been more favorable to

them had BPS selected it. See, e.g., Anderson, 375 F.3d at 88-89 (rejecting expert's comparison

of racial demographics of students admitted under new plan with those who would have been

eligible under alternative plan without "any systemwide analysis of the racial impact" of plan).

Indeed, BPS has not used GPA-only in selecting students for Exam Schools in at least fifty years.

The Court should reject Plaintiff's preferred GPA-only model as the straw man it so clearly is.

      For this reason, the Court should reject outright Plaintiff's request for affirmative

injunctive relief. Even were the Court to determine that the Interim Plan violated equal

protection, there is no legitimate basis for also concluding that city-wide GPA is the only viable,

constitutionally-sound alternative. It is up to BPS, not Plaintiff, to make this determination. See

Cohen v. Brown Univ., 101 F.3d 155, 187 (1st Cir. 1996) (holding court cannot substitute its

own remedial plan and should have given defendant University opportunity to create alternative).

      Equally and separately damning is Plaintiff's wholesale failure to show how any of its

"evidence" of discriminatory impact is reliable. Courts generally look to a plaintiff's statistical

analyses and expert assessments to establish that state actions have led to a discriminatory

impact. See, e.g., Lewis, 806 F.3d at 359-62. A plaintiff's burden is one of "showing of a

significant statistical disparity" with respect to the challenged practice. Ricci v. DeStefano, 557

U.S. 557, 587 (2009).

      Here, as the SY 21-22 Exam School class has not yet been invited, any analysis is

necessarily speculative. There is no real evidence that White or Asian invites will decrease

overall. And, depending on GPA, White and Asian may well receive more invites in the 20%

round and from zip codes different the Chinatown and West Roxbury zip codes on which

Plaintiff focuses. BPS ¶ 83. Plaintiff's "evidence" of disparate impact therefore falls far short of

"statistical significance," a conclusion drawn from an expert statistician's analysis of "whether

the outcomes of a…practice are correlated with a specified characteristic, such as race, and, if so,

whether the correlation can reasonably be attributed to random chance." Jones v. City of Boston,

752 F.3d 38, 43-44 (1st Cir. 2014). As Jones teaches, a probability value (or "p-value") for

promotions by race is statistically significant only when the disparate impact measured is five

percent (0.05) or less – that is, when there is a five percent or less chance that any measured

disparate impact is merely random. Jones, 752 F.3d at 43-44; 46-47; n.9 (citing Castaneda v.

Partida, 430 U.S. 482, 496 n. 17 (1977), the Federal Judicial Center's Reference Manual on

Scientific Evidence (2011), and other courts of appeals).

Indeed, Plaintiff makes no effort whatsoever to show, through expert opinion or

otherwise, statistical significance. For example, the projected difference in Asian admissions

between the GPA-only and the Interim Plan (i.e., nine fewer Asians (183 instead of 192) out of

315 applicants) is almost certainly not statistically significant.[5]

This result is even more apparent given the year-to-year variability of Asians applying

and admitted to the Exam Schools. For example, the Asian applicant pool of 4,057 in SY 20-21

was much larger than the pool of 3,647 in SY 18-19 and 3,371 in SY 19-20. BPS ¶ 88. Out of the

pool of applicants, there was also considerable fluctuation in the number of Asian students

invited for admission. In SY 18-19, 264 Asians were invited, while in SY 19-20, 310 Asian

students were invited and in SY 2021 the number of Asian students was 300. BPS ¶ 88.

Obviously, any number of variables other than race, including mere random chance, clearly play

---

[5] In other words, the difference between projected Asian admission rates under a GPA-only plan (192/315 = .610) and the Interim Plan (183/315 = .581) is no different statistically.

a significant role in Exam School admission rates historically, a fact with which Plaintiff does not even attempt to grapple, an especially significant oversight given Plaintiff's overriding theory, that is, that Asians (and Whites) are constitutionally entitled to Exam School seats at levels they have historically held.

While perhaps less intuitive, the same analysis applies to White applicants. There is no basis on which the Court could conclude that 56 fewer Whites (352 instead of 408 out of 593 applicants) has statistical significance. And the same year-to-year variations exist for White applications and admissions to the Exam Schools, suggesting that much more than race, including random chance, is a real determinative factor. See ¶¶ 88, 89. In short, the difference of 46 Asian students (from a high of 310 in SY 19-20 to a low of 264 in SY 18-19) and of 76 White students (from a high of 504 in SY 19-20 to a low of 428 in SY 18-19) demonstrates that the alleged loss of 9 seats for Asians and 56 seats for White students as a result of the use of the Plan is not statistically significant.

Another problem inherent with Plaintiff's statistics[6] is they do not account for the fact that eligible students of virtually all races live in all but a few zip codes. BPS ¶ 83; ASE01584, 01586, 01589. Thus, for example, although under the Plan the Chinatown and West Roxbury zip codes may "lose" total seats that Asians residing there might be more likely to have gotten with a GPA-only plan, Asians residing in other zip codes that "gain" total seats – particularly, Dorchester's three zip codes, in which 145 Asian BPS 6th graders reside – will likely benefit. At the very least, Plaintiff's assumption that Exam School seats lost to Whites and Asians in certain zip codes will not be gained by White and Asian students in others is purely speculative.

---

[6] BPS does not, and need not, address herein all of the problems with Plaintiff's discriminatory impact argument. BPS merely points out some of its more major shortcomings for purposes of illustrating Plaintiff's overall failure to meet its evidentiary burden.

In <u>Lewis</u>, the court rejected plaintiff's discriminatory impact claim because he "offered no evidence of statistical significance at trial…nor, for that matter, does he cite any case law in support of his contention that his evidence proved discriminatory impact as a matter of law." <u>Lewis</u>, 806 F.3d at 362 (footnote omitted). And so it is here. Judgment should enter for BPS.

**B.      Plaintiff has shown no discriminatory purpose.**

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." <u>Arlington Heights</u>, 429 U.S. at 266. "Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group." <u>Lower Merion</u>, 665 F.3d at 552. The decisionmaker's "awareness or consideration of racial demographics" is not enough. <u>Lewis</u>, 806 F.3d at 355. Rather, "the challenger must demonstrate that race was 'the predominant factor motivating [the body's] decision." <u>Miller</u>, 515 U.S. at 916. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." <u>Arlington Heights</u>, 429 U.S. at 266.

Here, Plaintiff's evidence of BPS's invidious discriminatory purpose involves merely pointing to (and only to) those instances in the record where race is mentioned. As an overarching matter, this "evidence" ignores the above-described case law firmly holding that race-neutral school selection policies – even undertaken with race-conscious considerations and goals – are constitutionally permissible. That the Working Group considered the potential racial impact of the Interim Plan and various School Committee members made various comments about a desire for, among other things, enhanced racial diversity at the Exam Schools, simply does not establish that that BPS acted with an invidious discriminatory purpose. Indeed, if

12

anything it shows the opposite, that is, that BPS considered race in an overt attempt *not* to discriminate. See, e.g., Lower Merion, 665 F.3d at 553 (no discriminatory purpose where statements by school-board officials "may indicate awareness or consciousness of race," but "[i]nstead of being adopted for the purpose of discrimination, the statements indicate, if anything, that Board members and Administrators adopted [the] Plan [at issue] in an attempt *not* to discriminate on the basis of race") (emphasis in original); Christa McAuliffe Intermed. Sch. PTO v. de Blasio, 364 F. Supp. 3d 253, 279 (S.D.N.Y. 2019) (holding statements lauding how admission program changes would increase Black and Latinx enrollment at specialized high schools and regarding the "monumental injustice" of these groups' historical underrepresentation did not reflect discriminatory intent against Asians).

Yet, even more clearly, Plaintiff's discriminatory purpose argument disingenuously ignores the breadth and range of all the considerations the Working Group and BPS took into account in devising and selecting the Interim Plan. The Working Group considered a variety of admissions criteria and invitation mechanisms, including pre-COVID grades, Fall 2020 grades, pre-COVID assessments, including prior MCAS scores and other exam data, ability to administer new assessments including the newly MAP and/or previous ISEE exam, new qualitive measures (interview, essay, recommendations, etc.), straight rank, percentage of students from sending schools, percentage of students from zip code, allocation of seats based on socioeconomic status, a straight lottery, and median household income, the median family income and the median family income with children under 18. See, e.g., BPS ¶¶ 16, 27-36, 39, 55-57. It reviewed the admissions criteria used by other cities with selective schools, including San Francisco, Detroit and Chicago. BPS ¶¶ 60-62.

The Working Group, moreover, thoroughly considered current and historic Exam School admissions plans and rates, as well as several simulations based on available data from prior years to evaluate the possible socioeconomic, geographic and racial impacts of the various proposals it was considering. In addition, the Group utilized BPS's "Racial Equity Planning Tool," designed to ensure that BPS takes "deliberate action to identify and dismantle cultural, structural, racial and social barriers that create opportunity gaps for students," to "produce decisions that move the needle on closing opportunity gaps and other racial disparities for historically marginalized populations in BPS, including students, families, and employees," focuses BPS's "finite resources [on] strategies that produce the best results for the most vulnerable," and "pivots" consideration of the impact of BPS policies on "Black, Latinx, English Language ('EL'), Special Education, and economically disadvantaged students and other historically marginalized communities. BPS ¶¶ 76-78.

Throughout its work, the Working Group continually emphasized its ultimate goal was to provide BPS with an equitable, city-wide means for selecting students for Exam Schools for SY 21-22 in the COVID-caused absence of the exam it has historically used. See, e.g., ASE01310. It stressed BPS's desire to mitigate the effects of grade inflation, including the variability among grading systems by applicants' schools, which would be exacerbated by the lack of a city-wide exam. ASE00972, 01300, 01697, 01685-89. The Working Group also repeatedly emphasized BPS's interests in promoting socioeconomic, geographic and racial diversity in its Exam Schools (BPS ¶¶ 55, 59, ASE01310, 01757), as evidenced by its recommendation of the inclusion of a "zip code" for the homeless and students in DCF custody, and ranking zip codes inversely by median income of families with children. ASE01785-87, 1800.

14

Given all this, to claim that the Interim Plan was all and only about race – indeed, that it was specifically designed to invidiously target Whites and Asians – is simply not credible. Indeed, that BPS had before it, but did not select, one of the many options that would have likely resulted in many more Black and Latinx admissions (and therefore necessarily fewer White and Asian admissions) is evidence enough of its lack of discriminatory purpose. Were BPS truly bent on discriminating against Whites and Asians, it chose one of the worst options available to accomplish this purported goal.

Similarly, that Plaintiff plucked from the record a few School Committee members' statements about the projected racial impact of the Interim Plan ignores the vast majority of *all* member commentary on *all* of the reasons behind the Plan. Indeed, a fulsome review of School Committee member comments reveals an overarching concern for all students on all dimensions, including socioeconomic status, class, geography, as well as race and ethnicity. See BPS ¶¶ 42-45.

Finally, Plaintiff's focus on former School Committee chair Michael Locanto's statement at the October 21, 2020 meeting, and two School Committee member texts about that statement, is misplaced. On its face, there is nothing in Locanto's cryptic comment ("That was like Shania (phonetic), Shanene (phonetic) and Boo Boo (phonetic)" (ASE 00730)), that reflects race-based animus against any particular group. Further, even could his comment could be interpreted to be mocking the names of constituent speakers, there is no connection whatsoever to the Interim Plan. Such a random remark that had no bearing on the Plan's terms or BPS's decision-making about the Plan cannot reasonably provide the basis for concluding that the Plan was motivated by a purpose to discriminate against Asians, never mind Whites. See, e.g., Allstate Ins. Co. v. Abbott, 495 F.3d 151, 161 (5th Cir. 2007) (stray remarks by legislators reflecting protectionist

views did not support finding that statute had discriminatory purpose against out-of-state businesses when there was ample evidence that other legitimate purposes were considered).

Similarly, the text exchange by two committee members who overheard Locanto's "hot mic" comment do not on their face reflect any discriminatory animosity against anyone. Rather, they are focused on the fact that Locanto had been overheard making a remark and its potential consequences, an exchange simply not relevant to the Interim Plan or its purpose. In sum, Plaintiff has not shown BPS acted with invidious discriminatory purpose.

### C.    Plaintiff Lacks Article III Standing.

Plaintiff's failures as to discriminatory impact and purpose also illustrate its inability to show standing to bring this suit in the first place. For Article III standing, plaintiffs must demonstrate (1) that they "have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized...and (b) actual or imminent, not conjectural or hypothetical," (2) that "a causal connection [exists] between the injury and the conduct complained of" and (3) that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and quotations omitted). All three elements – injury, causation, and redressability – must be met in order to establish standing. Id. at 561.

The "party invoking federal jurisdiction bears the burden" of showing its standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Id. For this reason, "[i]t is a long-settled principle that standing cannot be inferred argumentatively from

averments in the pleadings but rather must affirmatively appear in the record." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990) (quotations and citations omitted)).[7]

Here, Plaintiff has offered no legitimate evidence that any of the students it represents will suffer actual injury as a result of the Interim Plan or that their prospect of being injured is anything but speculative. Although true that "'injury in fact' in an equal protection case...is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit," Northeastern Florida Chap. of Assoc. Gen'l Contractors of America v. City of Jacksonville, 508 U.S. 656, 666 (1993), Plaintiff must show much more than the hypothetical existence of a racial barrier. It must show that its members have been, or are genuinely threatened with the likelihood of being, subjected to such a barrier because of their races – in this case, that the Interim Plan threatens to prevent the White and Asian students, because of their races, from applying to the Exam Schools on an equal basis with other students. Because the Plan clearly imposes no such race-based barriers, standing is lacking. See, e.g., Scott v. Pasadena Unified Sch. Dist., 306 F.3d 646, 657 (9th Cir. 2002) ("We deny standing because Scott has failed to demonstrate an imminent threat of enforcement of any racial or gender classification against any individual plaintiff's application to one of the voluntary schools and because, even if such a threat were imminent, Scott has failed to demonstrate that any plaintiff would suffer a barrier to her application.").

And, as shown, Plaintiff does not (indeed, cannot) show that specific students are affected individually by the Interim Plan because of their races. There is no evidence, aside from

---

[7]Where, as here, a plaintiff asserts associational standing, it "has standing to sue on behalf of its members when three requisites have been fulfilled: (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." Students for Fair Admissions, Inc., 980 F.3d at 183 (quoting United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992).

Plaintiff's baseless (and frankly racist) assertion that Boston's zip codes are one and the same with race, that any of the Plaintiff-represented students would be admitted to the Exam Schools this year if the prior admittance structure or its city-wide, GPA-only alternative were in place, or that they now face imminent rejection because of the Interim Plan. There is simply no way to infer from the evidence that Plaintiff represents otherwise-qualified students who are, because of race, likely to be excluded from Exam School admission because of the Interim Plan and thus face injury that is "certainly impending" and not speculative or hypothetical. See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013).

Perhaps most obviously, the Interim Plan has not yet yielded any admissions results. There is thus no factually tangible basis upon which Plaintiff might be able to affirmatively show a concrete injury. See, e.g., Scott, 306 F.3d at 661 ("the lack of prior implementation of the policy leaves us without a basis upon which to infer that the threat to [plaintiff] is genuine;" plaintiff "can establish neither past adverse treatment by an illegal practice nor real and immediate threat that she will be victimized by such a practice in the future"). For all these reasons, Plaintiff has no legitimate basis on which to assert Article III standing for bringing suit in the first instance.

## III.   The Interim Plan Withstands Strict Scrutiny.

Finally, even were the Court to somehow accept the entirety of Plaintiffs' allegations, that is, that the Interim Plan is BPS's grand design to use zip codes as a proxy for race-based Exam School selection so as to disadvantage Whites and Asians, the Plan would *still* not violate the Equal Protection Clause. The Plan is narrowly tailored to further BPS's compelling interest in providing fair access to and diversity in the Exam Schools.

It cannot be gainsaid that BPS has a compelling interest in promoting diversity in Boston's public schools. The Supreme Court has said as much. "[E]ducation is perhaps the most important function of state and local governments...It is the very foundation of good citizenship." Brown v. Board of Educ., 347 U.S. 483, 493 (1954). To this end, public schools are "pivotal to 'sustaining our political and cultural heritage.'" Grutter v. Bollinger, 539 U.S. 306, 331 (2003) (quoting Plyler v. Doe, 457 U.S. 202, 221 (1982)). They teach, moreover, "that our strength comes from people of different races, creeds, and cultures uniting in commitment to the freedom of all." Parents Involved, 551 U.S. at 782 (Kennedy, J., concurring in part and concurring in judgment). Indeed, our "'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples." Grutter, 539 U.S. at 324 (quoting Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 313 (1978) (opinion of Powell, J.)); see also BPS ¶¶ 90-91.

Given these undeniable truths, schools diverse in socioeconomic status, geographic communities, and race provide incalculable educational and civic benefits by promoting understanding, breaking down stereotypes, and eliminating bias and prejudice.[8] Conversely, schools lacking a diverse student body are often isolated and fail to provide the full panoply of benefits that diverse schools can offer. The academic achievement of students at racially isolated schools often lags behind that of their peers at more diverse schools. Plaintiff generally agrees. See ASF at ¶ 69 ("As a general proposition, students can benefit educationally when the student body of their school is diverse in terms of race, socioeconomic status, national origin, views and other factors."). Thus, BPS has a compelling interest in diverse Exam Schools, including racial diversity in the student body.

---

[8] At the March 16, 2021 status conference, the Court indicated that it would allow BPS to present evidence on this point to the extent that the Court reached this issue and found it necessary.

And the Interim Plan is narrowly tailored to this end. Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." Grutter, 539 U.S. at 339. BPS exhaustively considered a wide variety of other alternatives that would have involved different selection criteria. There were alternatives that were projected to result in greater racial diversity than the adopted Interim Plan, yet BPS rejected those. Under these circumstances, the Interim Plan is narrowly tailored to further BPS's compelling interest in providing equitable access to the Exam Schools during the pandemic.

Moreover, and unlike the plans struck down in Parents Involved, the Interim Plan does not use impermissible race-based classifications to increase diversity. Instead, the Plan uses race-neutral classifications that may further diversity objectives related to socioeconomic status, geography, and race. Far from creating impermissible racial balancing, the race-neutral Interim Plan will likely result in only modest changes, if any, to the racial diversity in the student body under the pre-COVID exam-based system. See McAuliffe Intermed. Sch., 364 F.Supp.3d at 284 (even under strict scrutiny, new admissions plan for specialized high schools would likely survive because race-neutral criteria to achieve diversity were narrowly tailored). Accordingly, the Interim Plan is narrowly tailored to achieve compelling objectives and survives strict scrutiny.

## CONCLUSION

For all of the foregoing reasons, BPS respectfully requests that this Honorable Court enter judgment in its favor thereby allowing BPS to proceed with its race-neutral, rationally-based Interim Plan for selecting students for its Exam Schools for the 2021-22 school year.

Respectfully submitted,

SCHOOL COMMITTEE OF THE CITY OF
BOSTON, ALEXANDRA OLIVER-DAVILA,
MICHAEL O'NEIL, HARDIN COLEMAN,
LORNA RIVERA, JERI ROBINSON, QUOC
TRAN, ERNANI DeARAUJO, and BRENDA
CASSELLIUS,

By their attorneys,


/s/*Kay H. Hodge*
Kay H. Hodge (BBO # 236560)
        khodge@scmllp.com
John M. Simon (BBO #645557)
        jsimon@scmllp.com
Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA 02110
(617) 542-6789

Catherine A. Lizotte (BBO #666468)
        catherine.lizotte@cityofboston.gov
Legal Advisor
Boston Public Schools
2300 Washington Street Boston, MA 02119
(617) 635-9250

Dated: April 2, 2021


<u>Certificate of Service</u>
    I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and that paper copies will be sent by first class mail, postage prepaid, to those indicated as non-
registered participants on April 2, 2021.

/s/*Kay H. Hodge*
Kay H. Hodge