**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| **BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,** | |
| **Plaintiff,** | |
| **v.** | |
| **THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEIL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS,** | **Civil Action No. 1:21-cv-10330-WGY** |
| **Defendants** | |
| **and** | |
| **THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTAL, and H.D.,** | |
| **Defendants-Intervenors.** | |

**PLAINTIFF'S RESPONSES TO DEFENDANTS'**
**PROPOSED FINDINGS OF FACT**

Plaintiff, Boston Parent Coalition for Academic Excellence ("Plaintiff" of the "Boston Parents"), by counsel, provide this response to each of the proposed findings of fact contained in Defendants' Proposed Findings of Fact and Conclusions of Law, filed as Doc. 77, in the above captioned case.[1]  Responses to the Proposed Conclusions of Law will follow separately.

---

[1]    References to the Joint Agreed Statement of Facts will be referred to as "ASF at ¶ __" and to Agreed Exhibits as "Exh. ___" followed by the specific Bates stamped page, i.e., "ASE_____."

For the convenience of the Court and the parties, Plaintiff has reproduced below each of the Defendants' Proposed Findings of Fact, with Plaintiff's specific response set below each one. For the convenience of the reader, Plaintiff is retaining the Defendant's headings, but will note an objection to any heading containing a substantive statement in dispute by placing the disputed heading in brackets and noting the objection in a footnote.

As a preliminary matter, however, the Court should make these three findings:

**A.** For more than 20 years, BPS has used a single, citywide competition to determine admission to the Exam Schools. The competition has used an admissions score composed of two parts: the student's exam score and the student's grade point average.

**B.** The admissions plan adopted for the class entering in the fall of 2021 will eliminate the citywide competition for all but 20% of the Exam School seats. Eighty percent of the seats will be allocated to zip codes in a quota that is both an entitlement (students in other zip codes cannot compete for those seats) and a hard cap (students cannot compete for seats in other zip codes).

**C.** Before the adoption of the Zip Code Quota Plan, there was no zip code in which students were entitled to any seats or in which students were under a cap limiting the number of seats for that zip code.

<u>**Defendants' Proposed Findings of Fact**</u>

<u>**Boston Public Schools**</u>

1. The School Committee of the City of Boston ("School Committee") is the governing body of the Boston Public Schools ("BPS"). ASF at ¶ 1. It is comprised of seven persons appointed by the Mayor of Boston. ASF at ¶ 2. At the relevant times, the School Committee was comprised of Chairperson Michael Loconto, Vice-Chairperson Alexandra Oliver-Davila, and

voting members Michael O'Neill, Dr. Hardin Coleman, Dr. Lorna Rivera, Jeri Robinson, and Quoc Tran. ASF at ¶ 4.

**RESPONSE:**

AGREED; except for the characterization "at the relevant times." There are or may be events relevant to this action when Mr. Loconto was not the Chairperson.

2.     Dr. Brenda Cassellius serves as the Superintendent of BPS. In this role, the Superintendent has the responsibility for implementing policies approved by the School Committee. ASF at ¶ 6.

**RESPONSE:**

AGREED.

3.     In School Year 2018-2019 ("SY 18-19"), 54,593 students were enrolled in the BPS. This was approximately 70% of Boston's total K-12 school aged children. The other children attended Charter, Private or other schools. Exh. 11 at ASE00976. Some students are home schooled. The demographics of those students is described in Exh. 11 ASE00976. ASF at ¶ 16.

**RESPONSE:**

AGREED.

**COVID-19**

4.     On March 10, 2020, as a result of the COVID-19 pandemic, Massachusetts Governor Charles Baker declared a State of Emergency. Exh. 22 ASE01430-31. On March 15, 2020, the Governor suspended all normal, in-person instruction and other educational operations of K-12 public schools through the end of the SY 19-20 (Exh. 23 ASE01434-35. ASF at ¶ 22. See also Exh. 24 ASE01437-40 (*COVID-19 Order Nos. 16, 28*).

**RESPONSE:**

115017342v2

AGREED; however, COVID-19 is not relevant to the decision to allocate Exam School seats by zip code.

5.      Since March 10, 2020, Massachusetts has limited the size of gatherings up and down depending on the fluctuations in the COVID-19 pandemic. ASF at ¶ 23. Exh. 25 ASE01442-70 (*COVID Order Nos. 2, 5, 13, 21, 30, 38, 44, 52*).

**RESPONSE:**

AGREED; however, COVID-19 is not relevant to the decision to allocate Exam School seats by zip code.

6.      As a result of the COVID pandemic, from March 17, 2020 until October 1, 2020, BPS was fully remote. On May 1, 2020, BPS issued *Remote Learning Expectations*. Exh. 26 ASE01472-91. The BPS document aligns with the Massachusetts Department of Elementary and Secondary Education ("DESE") on remote learning. Exh. 27 ASE01493 (DESE "*Strengthening Our Remote Learning Experience*" (April 2020)). ASF at ¶ 24.

**RESPONSE:**

AGREED; however, COVID-19 is not relevant to the decision to allocate Exam School seats by zip code.

7.      To respond to the COVID-19 pandemic, BPS modified its educational process repeatedly. On October 1, 2020, high needs students in all schools started in person two days a week. On October 22, 2020, all BPS schools transitioned to full remote learning again. On November 16, 2020, high-needs students in four schools started in-person four days a week. Additional high needs students started in 28 more schools on December 14, 2020 and all schools opened for high needs students on February 1, 2021. On March 1, 2021, grades KO-3 started back 2 days a week and on March 15, 2021, grades 4-8 will start back 2 days a week. ASF at ¶ 24.

**RESPONSE:**

AGREED; however, COVID-19 is not relevant to the decision to allocate Exam School seats by zip code.

8.      The impact of the COVID pandemic on BPS students and families is/was a regular topic of discussion at School Committee meetings. *See e.g.* Exhs. 1, 2[2/], 3, 4. The School Committee received regular reports on the impact of COVID-19 pandemic on the economic status of Boston's children and families, including meal service and technology. Exh. 3; ASE00062-64; Exh. 4 ASE00076-78. BPS addressed that impact in various ways, including providing chrome books and hot spots to assist students in accessing remote education. Exh. 2 ASE00044; Exh. 28 ASE01520; ASF at ¶ 25.

**RESPONSE:**

AGREED; however, COVID-19 is not relevant to the decision to allocate Exam School seats by zip code.

9.      DESE cancelled administration of the Massachusetts Comprehensive Assessment System ("MCAS") test – an exam administered to public school students across the state – for Spring, 2020.[3/] ASF at ¶ 26; Exh. 30 at ASE01542.

**RESPONSE:**

---

[2]      Note Exh. 2 and Exh. 29 are the same document. **Response:** Plaintiff notes that the documents overlap and do not contradict each other, but they are not identical.

[3]      MCAS is given annually in grades 3 through 8, and in high schools in grades 9 and 10. If a student does not pass the MCAS in 10th grade, s/he must take it again.

AGREED; however, COVID-19 is not relevant to the decision to allocate Exam School seats by zip code.

## The Exam Schools[4]/

10.     BPS has three Exam schools – Boston Latin School ("BLS"), Boston Latin Academy ("BLA") and John D. O'Bryant School of Mathematics and Science ("O'Bryant") that serve students in grades 7-12. Generally, 6th grade students apply for admission into the 7th grade and 8th grade students apply for admission into the 9th grade. Students, who are residents of Boston, are eligible to apply for admission, ASF at ¶7; *see* ASE00985, including students attending BPS, students who attend private schools, parochial schools, public charter schools, METCO students, schools outside of Boston, and students who are home schooled. *See* Exh. 12 ASE00991.

**RESPONSE:**

AGREED.

11.     BLS was founded in 1635 and is the oldest school currently operating in America. Rachel Skerritt currently serves as the Head of School. ASF at ¶ 8.

**RESPONSE:**

AGREED.

12.     O'Bryant was founded in 1893 and specializes in science, technology, engineering, and mathematics. Tanya Freeman-Wisdom currently serves as the Head of School. ASF at ¶ 9.

**RESPONSE:**

---

[4]     Intervenors object to the use of the term "Exam Schools" and to several of the Proposed Findings of Fact contained herein as identified in the Joint Agreed Statement of Facts.  Plaintiff says that Intervenors objection to the term "Exam Schools" reflects their opposition to the use of exams as part of the admission process even after COVID is over; however, that is not an issue in their case.

AGREED.

13.     BLA was founded in 1878. Jerry Howland currently serves as the interim Head of School. ASF at ¶ 10.

**RESPONSE:**

AGREED.

14.     The Exam Schools are ranked as the top Boston Public High Schools in the 2020 *U.S. News & World Report* rankings. Specifically, BLS is ranked first, O'Bryant is second, and BLA is third. ASF at ¶ 11.

**RESPONSE:**

AGREED.

15.     Currently in SY 20-21, 5,859 students are enrolled in the Exam Schools with 2,472 at BLS, 1771 at BLA and 1,616 at O'Bryant. ASF at ¶ 12; Exh. 8 ASE00961. There is considerable variation in the racial composition of each Exam School class. Exh. 8 ASE00961.[5]

**RESPONSE:**

AGREED; however, the Court should also make the following findings of fact, based on Exhibit 8, ASE 961 and 1335:

- No racial group is a majority in any of the Exam Schools.  And overall, Black students comprise 19% and Latino students comprise 23%.

- In O'Bryant, Black and Latino students are the two largest racial groups, and together comprise 66% of the school.

- In Boston Latin Academy, Black and Latino students are the second and third largest racial groups, respectively, and together comprise just under half the school (47%).

---

[5]     Exh. 8 ASE 00961 and Exh. 19 ASE01335 are the same document.

- In Boston Latin School, the numbers are smaller, as Black and Latino students together comprise about one quarter of the school.

16.     Over the years, the racial composition of the Exam Schools has varied. Exh. 18 ASE01313. For example, Asian students at BLS go from a low of 96 in the 9th grade to a high of 137 in the 12th grade. Exh. 8 ASE00961. When the population of the three Exam Schools is added together by grade and examined by race, there is considerable variation in the number of students of a particular race from year to year.[6]

## SY20-21 Exam School Enrollment by Race and Grade
Total All Schools in Exhibit 8 ASE00961

| Grade | Asian | | Black | | Latinx | | Multirace/Other | | White | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | 197 | 14% | 114 | 10% | 176 | 13% | 40 | 19% | 295 | 16% | 822 | 14% |
| 8 | 203 | 15% | 134 | 12% | 181 | 13% | 42 | 20% | 304 | 17% | 864 | 15% |
| 9 | 209 | 15% | 227 | 21% | 262 | 20% | 32 | 15% | 317 | 17% | 1047 | 18% |
| 10 | 278 | 20% | 212 | 19% | 272 | 20% | 37 | 17% | 321 | 18% | 1120 | 19% |
| 11 | 238 | 17% | 189 | 17% | 202 | 15% | 35 | 17% | 262 | 14% | 926 | 16% |
| 12 | 272 | 19% | 217 | 20% | 250 | 19% | 26 | 12% | 315 | 17% | 1080 | 18% |
| Total | 1397 | 100% | 1093 | 100% | 1343 | 100% | 212 | 100% | 1814 | 100% | 5859 | 100% |

**RESPONSE:**

AGREED; except that Plaintiff objects to the word "considerable."

### Pre-COVID Admission Processes for Exam Schools

17.     Boston residents who are in 6th and 8th grades at the time of application may seek admission to the Exam Schools for the classes entering in the fall of the next academic year. As the Exam Schools begin in the 7th grade, the majority of applicants are students in the 6th grade. ASF at ¶ 13.

**RESPONSE:**

---

[6]     The parties agreed that either party could refer to the Exhibits for a more thorough discussion of the facts.

AGREED.

18.     For at least the past 20 years, the three Exam Schools use a unified process. Admission to the Exam Schools has been based on the applicant's grades in English Language Arts ("ELA") and Math (final grades of prior academic year and fall and winter/quarters 1 and quarter 2 of application year[7]) and performance on the Independent School Entrance Examination ("ISEE") standardized test. During the Exam School application process, applicants are asked to rank Exam Schools by order of the applicant's preference. ASF at ¶ 13; Exh. 9 ASE00995. The particular Exam School attended by a student is a function of the student's choice and the availability of an open position. *See* Exh. 17 ASE01304.

**RESPONSE:**

AGREED.

19.     Students were then ranked in order of composite score citywide to determine whether they would be invited (offered admission) to an Exam School. The student with the highest composite score was invited, then the next student through the list until all available seats were filled based on the student's ranked choice. If the student's first choice school was full, the student would be placed in his/her next choice until all Exam School seats were filled. ASF at ¶ 15; Exh. 9 ASE00963-64; Exh. 10 ASE00970-71; Exh. 12 ASE00979; Exh. 13 ASE00985, ASE00996.

**RESPONSE:**

AGREED.

20.     Exam Schools are open to any Boston resident regardless of the school attended. The primary sources of the applicant pool for Exam Schools includes BPS, Charter, METCO and private schools. ASF at ¶ 18; Exh. 15 ASE01299.

---

[7]     In BPS, the 5th grade has trimesters, and the 6th grade quarters.

**RESPONSE:**

AGREED.

## **Creation of Working Group**

24.     On July 22, 2020, the School Committee agreed to support the recommendation of Superintendent Brenda Cassellius to establish an advisory Exam School Admissions Criteria Working Group (the "Working Group") to "[d]evelop and submit a recommendation to the Superintendent on revised exam school admissions criteria for SY 21-22 entrance in light of the potential impact of the COVID-19 pandemic on the prospective applicants during the latter half of SY 19-20 and potential impact on SY 20-21." ASF at ¶ 31; Exh. 18 ASE01310; Exh. 32 ASE01550; Exh. 65 ASE01780. *See* Exhibit 1 ASE00036; Exh. 2 ASE00043-44.

**RESPONSE:**

AGREED.

25.     The Working Group was composed of the following members: Samuel Acevedo, BPS Opportunity and Achievement Gap Task Force Co-Chair; Acacia Aguirre, O'Bryant Parent; Michael Contompasis, Former BLS Headmaster and BPS Superintendent; Matt Cregor, Staff Attorney, Mental Health Legal Advisors Committee; Tanya Freeman-Wisdom, O'Bryant Head of School; Katherine Grassa, Curley K-8, Principal; Zena Lum, BLA Parent; Rachel Skerritt, BLS Head of School; and, Tanisha Sullivan, President of the NAACP – Boston Branch. ASF at ¶ 32; Exh. 2 ASE00043; Exh. 10 ASE00967-68; Exh. 18 ASE013089; Exh. 65 ASE01780. The Working Group met weekly and bi-weekly from August-October 2020. ASF at ¶ 34.

**RESPONSE:**

AGREED.

26.     The desired outcome for the Working Group was:

- "Ensure that students will be enrolled through a clear and fair process for admission in the 21-22 school year that takes into account the circumstances of the COVID-19 global pandemic that disproportionately affected families in the city of Boston.
- Work towards an admissions process that will support student enrollment at each of the exam schools such that it better reflects the racial, socioeconomic and geographic diversity of all students (K-12) in the city of Boston."

Exh. 18 ASE01310.

**RESPONSE:**

AGREED that the foregoing statement reflects the Working Group's statement of its desired outcome.  However, in terms of "diversity," the Working Group's desired outcome of racial diversity predominates over socioeconomic and geographic diversity.  In addition, the Working Group used the term "diversity" to mean balancing the racial composition of the student body population of the Exam School so that it mirrored the racial composition of the student population of the City of Boston.  The Working Group did not use the term "diversity" to mean diversity for purposes of educational benefit to students in the Exam Schools.

27.    BPS Staff provided the Working Group with extensive data regarding the results of the Exam School's existing process, the selection methods used by other cities with schools having selective admissions processes, the potential feasibility, equity and impacts of various proposed methodologies on BPS students, and other data and information. ASF at ¶ 34.

**RESPONSE:**

AGREED,

28.    The Working Group considered a variety of admissions criteria and mechanisms. ASF at ¶ 44; Exh. 62 ASE01751-53. Among admissions criteria, the Working Group considered: grades, pre-COVID-19; Fall 2020 Grades; Existing Assessments, Pre-COVID-19; Administration of Assessments, Qualitative Factors (interview, essay, recommendation). It also considered among

invitation mechanisms: straight rank; percentage of students from sending schools; percentage of students from zip code; allocation of seats based on socioeconomic status; and lottery. Exh. 18 ASE01316. It also looked at analyses done in the past to determine how potential changes to the Exam School admissions criteria would affect Exam School diversity. ASF at ¶ 27; Exhibit 31 ASE01547-48. See ASF at ¶¶ 28, 29, 30.

**RESPONSE:**

DISAGREED.  The documents cited by Defendants show that the Working Group *identified* a variety of potential admissions criteria and mechanisms (including those listed), but they do not show that the Working Group actually *considered* any of them.

In addition, the following statement by Defendants is misleading: "[The Working Group] also looked at analyses *done in the past* to *determine* how potential changes to the Exam School admissions criteria would affect Exam School *diversity*."  (emphasis added)  The Working Group looked at *current* analyses, and not just to see what would be the effects of potential changes to the Exam School admissions criteria, but in an effort to find a change that would produce the *effects the Working Group desired*, namely, racial balancing of the student population of the Exam Schools to mirror that of the City of Boston.  Moreover, the effects that the Working Group desired were not "diversity" in the sense that has been approved by the Supreme Court for institutions of higher education.  Rather, the effect that the Working Group desired was racial balancing of the Exam Schools.

## Use of Test Scores

29.    The Working Group considered options for using test scores as a criterion. ASF at ¶ 37. It considered the following options: using test scores as a "qualification" to enter the applicant pool, then using GPA; using the MAP test score, instead of ISEE, as part of the criteria in

conjunction with GPA but recognized logistical difficulties, and the potential of administering a test after admission to assess grade level standards upon entry.[8] Exh. 34 ASE01556.

**RESPONSE:**

NOT RELEVANT; the Boston Parents do not challenge the suspension of the entrance exam for the class entering in the Fall of 2021.

30.     The Working Group considered the availability of prior test scores and available data. ASF at ¶ 37. For rising 6th graders, BPS had 4th grade MCAS scores for SY 18-19 for any student then enrolled in BPS (including students now enrolled in a non-BPS school who attended BPS in the 4th grade). Exh. 35 ASE01560. However, students classified as economically disadvantaged had the greatest number of missing test scores. Exh. 35 ASE01559.

**RESPONSE:**

NOT RELEVANT; the Boston Parents do not challenge the suspension of the entrance exam for the class entering in the Fall of 2021.

31.     The Working Group concluded that "[t]here was no acceptable way to compare student performance on the many different standardized tests taken by the students in the exam schools' traditional applicant pool (i.e. students attending BPS, Boston-based charter schools, parochial and private schools, neighboring public school districts serving Boston's students of

---

[8]     In the fall of 2019, BPS began planning to conduct a process to identify a new exam to be administered to applicants seeking admission to the Exam Schools for the 2021-2022 school year. The Superintendent established an RFP Review Committee to solicit and evaluate responses to a Request for Proposal ("RFP") for a new examination. ASF at ¶ 28. On July 2, 2020, following the RFP Review Committee's review and recommendation, the Superintendent announced a plan to use the Measures of Academic Progress (MAP) Growth assessment to administer to applicants seeking admission to the Exam Schools for the 2021-2022 school year. ASF at ¶ 29. The discussion of this plan is reflected in the meeting Minutes from the July 22, 2020, School Committee meeting (Exhibit 1ASE00024-00038). ASF at ¶ 30.

color through the METCO program and under the McKinney-Vento Act, and homeschools)." Exh. 10 ASE00971.

**RESPONSE:**

NOT RELEVANT; the Boston Parents do not challenge the suspension of the entrance exam for the class entering in the Fall of 2021.

32.     The Working Group also considered key issues regarding test administration. In particular the fact that the Northwest Evaluation Association ("NWEA"), the company with whom BPS had contracted to administer its MAP Growth test as the Exam School entrance exam for the Fall of 2020, did not support remote test administration due to limited test security and the high stakes associated with the use of the test for Exam School entry. Exh. 36 ASE01562.

**RESPONSE:**

NOT RELEVANT; the Boston Parents do not challenge the suspension of the entrance exam for the class entering in the Fall of 2021.

33.     Administering the exam presented a number of difficulties amidst the COVID-19 pandemic including:

- "Administering the exam in a manner that allowed all students to remain socially distanced and honor the choice of families who choose not to send their children to school in person;

- The impossibility of administering the exam remotely due to test security;

- Significant concern over any exam's ability to assess students' preparedness for exam school classes given the continued educational disruption caused by the pandemic;

- The disparate impact of that educational disruption on low-income families and families of color, who contracted COVID-19 in higher rates and had greater challenges with accessing remote learning last spring due to the disproportionate effects of the pandemic; and

- The prospect of disruption to administering an exam this fall should Boston's COVID-19 rates continue escalating."

14

Exh. 10 ASE00971. *See* Exh. 18 ASE01317.

**RESPONSE:**

NOT RELEVANT; the Boston Parents do not challenge the suspension of the entrance exam for the class entering in the Fall of 2021.

34.     Therefore, the Working Group did not recommend that BPS administer an examination to students applying to the Exam Schools for SY 21-22. Exh. 10 ASE00971. It did, however, recommend "the limited use of 4th grade MCAS as an alternate entry point to the applicant pool." Exh. 10 ASE00972.

**RESPONSE:**

NOT RELEVANT; the Boston Parents do not challenge the suspension of the entrance exam for the class entering in the Fall of 2021, nor do they challenge the use of 4th grade MCAS scores for the class entering in the Fall of 2021.

### Use of Grades

35.     The Working Group considered reliance on grades as the Exam School admission criteria. It found that not only was a special grading process used during the Spring Semester of SY 19-20 due to COVID-19, but also "[p]lacing too great a reliance on grades [was] problematic given the lack of uniformity between the grading systems used by BPS, charter schools, parochial schools, private schools and other public schools serving Boston students." Exh. 10 ASE00972.

**RESPONSE:**

DISAGREE IN PART.  Defendants' proposed finding is misleading.  Defendants have omitted key words from the second sentence.  As a result, this proposed finding does not faithfully quote what the Working Group said about grades and further makes it appear that the Working Group had a long-term concern about grade variability, rather than a COVID-specific concern. The fully quoted passage is as follows:  "Placing too great a reliance on grades is also problematic given the lack of uniformity between the grading systems used by BPS, charter schools, parochial schools, private schools and other public schools serving Boston students *during a pandemic*." Exh. 10 ASE 972 (emphasis added).  Defendants omitted the bolded words at the end of the quotation from their proposed finding (and also did not use an ellipsis to indicate to the Court that they had cut the quotation short).

36.     The Working Group rejected the use of Fall 2020 semester grades because of the impact of the COVID-19 pandemic on the type and amount of instruction that students received and the educational disruption which "has disparately disrupted the education of children of color and students from low income families, who contract COVID-19 in greater rates and are less likely to have financial flexibility to secure additional educational supports (e.g. tutors, learning pods,

educational software, etc.)." Exh. 10 ASE00972. The Working Group  recommended the use of pre-COVID grades earned during the first two terms of SY 19-20. Exh. 18 ASE01320.

**RESPONSE:**

NOT RELEVANT; the Boston Parents do not challenge the use of pre-COVID grades for the class entering in the Fall of 2021.

### [School Committee Consideration of Interim Plan][9]

37.     At a meeting on September 29, 2020, the Working Group made its recommendations to Superintendent Cassellius and provided a written memo dated October 5, 2020 (Exh. 10). This Admissions Recommendation was made available to the School Committee at its October 8, 2020 meeting. ASF at ¶ 45.

**RESPONSE:**

AGREED.

38.     With the support of the Superintendent, the Working Group made its initial recommendations to the School Committee at its October 8, 2020 meeting. ASF at ¶ 46; Exh. 18 ASE01306-33. *See* Exh. 4 (School Committee Minutes); Exh. 5 ASE00086-396 (*Transcript*).

**RESPONSE:**

AGREED.

39.     Among other information, the Working Group presented the School Committee with the following data and recommendations:

- Enrollment Trend at Exam Schools by Race (Exh. 18 ASE01313);

- Exam School Enrollment Trends that revealed that student preferences between the Exam Schools appeared to be related to median household income, that half of the non-BPS students got into BLS, twice the rate of BPS students and that students with an average GPA of B had high rates of continued enrollment in

---

[9]     For reasons explained herein, it is doubtful whether the School Committee considers this to be only a one-year plan.

exam schools, particularly economically disadvantaged (81%) students (Exh. 18 ASE01314); and

- Increasing Equity Access to Exam Schools, including increasing the number of seats in the Exam School Initiative (ESI) in summer 2016, offering Exam School admissions test during the school day and selection of a new test (Exh. 18 ASE01315).

**RESPONSE:**

DISAGREE IN PART.  The Boston Parents AGREE with the first bullet.  However, the second and third bullets in Defendants proposed finding are misleading in that they do not faithfully reflect the full statements made by the Working Group in the slide found at ASE 1315. For example, in the second bullet Defendants omit the point that "Current BPS students account from roughly two-thirds of incoming students to Boston's exam schools, and about 60% of incoming students at BLS."  In the third bullet, Defendants use gerunds (i.e., "increasing" and "offering") rather than the past tense that the slide uses in all three examples, thereby obscuring the fact that these things *had already been done*; they are not simply recommendations.

40.    The Working Group projected that its proposed recommendation would result in greater racial, socioeconomic and geographic diversity. Exh. 18 ASE01323. The use of zip codes provided greater geographic and socioeconomic diversity as seats that had traditionally been filled from certain limited areas of the city were now allocated to zip codes throughout the city. *See* Exh. 20 ASE01339; Exh. 18 ASE01323; Exh. 65 ASE01786, 01800.

**RESPONSE:**

DISAGREE IN PART.  Defendants proposed finding incorrectly suggests that the Working Group was equally concerned with "greater racial, socioeconomic and geographic diversity."  Any such equivalence is belied by the Working Group's slide called "Projected Shift" which singularly focuses on the shift in the racial composition of the class entering SY 21-22, which includes 11%

18

more Black/Latino students and 12% fewer Asian/White students.  (The numbers do not match, apparently due to rounding.)  That slide (found at ASE 1323) is reproduced below:



In addition, Defendants' reference to "seats that had traditionally been filled from certain limited areas of the city" is misleading because it obscures the fact that previously all seats were filled by a single citywide competition.

41.     As Working Group member Sullivan told the School Committee: "I want to really emphasize that the zip code factor combined with the using of the median income of the household is potentially a game-changer." Exh. 5 ASE00282.

**RESPONSE:**

AGREED IN PART. While Ms. Sullivan said the words Defendants attribute to her, that passage does not fairly reflect the primary thrust of her remarks, which showed *racial* motivation. For example, she noted the achievement gap between students of different races and called that gap "a defining moment in our process."  ASE 251.  She then said:

Well over half of White and Asian fourth grade students met or exceeded expectations in both ELA and math in the '18-'19 – fourth grade '18-'19 MCAS scores.  Less than 15 percent of Latinx students and less than 13 percent of Black students received the same scores.

Additionally, when looking at fifth grade GPA from the same year, what we saw is that all – across all racial demographics there is an increase in fifth grade GPA from fall to spring. However, the rate of increase is higher for white and Asian students that it is for Black and Latinx students.

*These two factors played a significant role in what we will ultimately recommend.*

ASE 251-252 (emphasis added).

42.     School Committee Chair Loconto explained "it's equitable access across the city that I think is approached in a very elegant way through the 80 percent standard that's been created for admissions in this proposal...This is about leveling the playing field across the city." Exh. 5 ASE00303-04. *See* Exh. 5 ASE00319 (Going forward might use assessments "in concert with a number of these other socio-economic considerations that have passed legal muster in other jurisdictions and can be considered in a way that gives greater access, greater equity of access to our schools.").

**RESPONSE:**

AGREED IN PART.  To be clear, the statement attributed to Loconto "going forward" did not pertain to the Zip Code Quota Plan, but to future modifications that might be considered.  In addition, Defendants end the quotation too soon.  The final part actually reads:"… greater equity of access to our schools *for the kids that are in our schools."*  ASE 319 (emphasis added).  This was a suggestion that some future plan might involve favoring BPS students over private and parochial school students, but *that* discriminatory motive is not a part of the Zip Code Quota Plan. *See* ASE 1859 (noting that equal consideration is being given to Boston students from BPS and other schools).

43.     School Committee Member Rivera praised the work of the Working Group and "especially prioritizing zip codes" as an important way to address inequity in the city related to

"race and social class." Ms. Rivera did not think it was fair that non-BPS students got into BLS at twice the rate of BPS students and raised whether BPS students could be given priority over "wealthy families." It is in that context that she said that "the issue of just really naming it, you know, and really considering race and ethnicity. And I know that this is something...that is controversial. At least with our even presidential administration, but we do need to just,...be explicit about racial equity, we do need to figure out again how we could increase those admissions rates, especially for Latinx and black students." Exh. 5 ASE00268-71.

**RESPONSE:**

DISAGREED.  Defendants misrepresent Ms. Rivera's comments, and they do so in order to make it appear that the Zip Code Quota Plan is less racially motivated than it really is and more about socioeconomics instead.  When Ms. Rivera was talking about the admission rates of non-BPS students compared to BPS students, she was not talking about the proposal that was then before the School Committee, but about her "recommendation" for "the future working group."  ASE 270.  And she was not talking about giving BPS students priority over "wealthy families" (as Defendants contend) but about giving "priority weight to Boston Public School students that *have been in the system*."  *Id.* (emphasis added).  In other words, Ms. Rivera is suggesting that the *future* working group find a way to discriminate against parents and children who have exercised their constitutional right to choose parochial or private school over a BPS school.  That may be an issue for another day, but it is not part of the Zip Code Quota Plan. Changing topics, Ms. Rivera then states that she wishes to provide consideration to "race and ethnicity" and to "be explicit about racial equity" and increase admission rates, "especially for Latinix and black students." ASE 270-71. Ms. Rivera thereby reveals her racially preferential mindset.

Ms. Rivera further revealed her intention to engage in racial balancing when she told the School Committee on October 21, 2020 that she supported the plan because of its intended racial balancing outcome, and even suggested that the "projected shift" was insufficient because more white students would still be attending in the Exam Schools when compared to the population at large:

> I joined the Boston school committee in 2019, because I was deeply and am deeply committed to addressing the racial and ethnic disparities in educational achievement and to advance ethnic studies and racial equity in the school district. So, I strongly support the exam schools working proposal as a step in the right direction.
>
> ***I believe it doesn't go far enough because white students continue to benefit from 32 percent of the seats*** according to this plan, look at the data, it's not a huge change for Asian and white families. But it is a big change for the black and Latinx students.

ASE 777, 780 (emphasis added).

44.     School Committee member Robinson lamented that BPS has 25 high schools and all should be "excellent" but are not. She was particularly concerned about the disparity described in slide 13 of Exh. 18 that revealed that Black and Latinx children failed to meet or exceed MCAS results in ELA and Math at significantly lower rates than Asian or White students.  While she identified that Asian students "take education very differently and have a lot of support," she advocated for "better education literally from the first grade up," evaluation of the impact of programs addressing that issue, and "relooking at much more of the kind of education that we're offering Boston students." Exh. 5 ASE00289-91. She also raised concerns about the gentrification of her neighborhood. Exh. 5 ASE00291.

**RESPONSE:**

AGREED IN PART.  While Ms. Robinson made the comments that Defendants attribute to her, she also made other remarks that further show that her primary mindset is racial.  She said, for example: "[M]any of our white families' children are receiving extra tutoring from the day

they're born…." ASE 290.  And her full comment about Asian students was part of a racial comparison:  "[M]any Asian students also take education very differently and have a lot of support.  That's not true so often in our black and Latinx communities."  ASE 290.

45.     School Committee Member Oliver-Davila liked the Working Group's suggestion of additional supports for students from 4th to 6th grade and advocated giving all students the opportunities provided to those attending Exam Schools. It is in that context that her overarching goal was "at the end of the day...I want to see those schools reflect the District." Exh. 5 ASE00298-300. She also raised issues regarding the income differences within her Jamaica Plain neighborhood. Exh. 5 ASE00299.

**RESPONSE:**

DISAGREED.  Defendants presents Ms. Oliver-Davila's comments out of context, and they do so in order to make it appear that the Zip Code Quota Plan is not racially motivated but about socioeconomics instead.   In terms of wanting the Exam Schools to reflect the District, the point was not socioeconomics; it was race: "I want to see those schools reflect the District.  There's no excuse, you know, for why they shouldn't reflect the District, ***which has a larger Latino population and black African-American population.***"  ASE 299 (emphasis added).  Ms. Oliver-Davila's racial goal is not to be found in Defendants' proposed finding, but should be recognized by the Court.

In addition, Defendants' proposed finding does not fairly reflect the primary, racial thrust of Ms. Oliver-Davis' remarks to the School Committee.  On October 21, 2020, she said:

> I mean, we know that black and Latino youth are underrepresented, and they have been locked out of this opportunity. And for me, you know***, it's just criminal that the percentages have not increased***...

ASE 807 (emphasis added). And she further opined:

I think that all of our schools should **reflect the student body** that we have... it should not be acceptable to have schools that don't represent that, just not acceptable.

ASE 811 (emphasis added).

46.     Following the October 8th School Committee meeting, responses to questions raised by School Committee member Michael O'Neill were provided and posted. Exh. 20 ASE01337-40. Among the responses, BPS provided updated information regarding income and the ranking of the zip codes. In addition, a chart was provided with more detail regarding potential invitations by zip code based on SY 20-21, but made clear that final numbers would not be known until projections are finalized. ASF at ¶ 46.

**RESPONSE:**

AGREED IN PART.  Defendants' point that "final numbers would not be known until projections are finalized" had to do with how many seats would be allocated to each zip code.  The BPS statement cited by Defendants was made in October 2020.  ASF ¶ 46; ASE 1337.  The same October 2020 document said: "Final numbers become available in late November and early December."  ASE 1337.  Thus, there is no reason to suggest any current uncertainty on this point.

47.     Two changes were made to the plan presented to the School Committee for adoption on October 21st from the recommendation made on October 8th. The October 21st Recommendations replaced median household income with median family income with children under 18 for purposes of determining the order of the zip codes used to invite students for 80% of Exam School seats and added a special zip code for homeless students and those in DCF custody. ASF at ¶ 48; Exh. 65 ASE01785-87.

**RESPONSE:**

AGREED; however, Defendants grossly overstate the significance of the change to "median family income with children under 18" for purposes of determining the order of zip codes used.

24

The use of income to set the "order" of the zip code rounds has nothing to do with *how many* seats are assigned to any given zip code.  Income is only used to decide the *order* in which zip code seats are filled.  Zip code seats are filled in ten rounds, with one-tenth of each zip code's quota of seats being filled in each round.  The order in which the seats are filled will not make any difference in which students receive invitations to the Exam Schools.  Moreover, there is no evidence that the order of the rounds will make any difference in whether any students receive their first, second or third choices of Exam School.  In fact, Defendant have pointed to no evidence showing how changing from "median household income" to "median family income with children under 18" will actually change the order of filling seats.

48.     On October 21, 2020, the School Committee adopted the SY 21-22 Admissions Plan unanimously (hereinafter referred to as "Interim Plan"). Exh. 65 AS01778-01801. *See* Exh. 6  ASE00397-411;  Exh.  7  ASE00412-00959.  ASF  at  ¶  48.  It  also  adopted  additional

recommendations made by the Working Group on a vote of 6-1.[10] Exh. 6 ASE00411. The Interim

Plan was widely communicated.[11]

**RESPONSE:**

49.     The Interim Plan made changes to the admission process including the removal of

the admission test requirement because of cited the difficulties in administering the test amid the

then state of the COVID-19 pandemic. ASF at ¶¶ 49, 50. Exh. 10 ASE000971.

**RESPONSE:**

    AGREED.

---

[10]     The School Committee also voted to adopt the Working Group's additional
recommendations:

- To provide appropriate support for SY 21-22 admittees who may require
  more time to get acclimated to the pace of exam school study.
- To expand the Exam School Initiative (ESI) beginning as early as 4th grade
  and running through October of the 6th grade year, focused on academic
  acceleration in both ELA and math.
- To secure the appropriate additional funding required for student support and
  ESI as outlined above.
- To continue the Working Group to advise on permanent efforts to expand the
  applicant pool, considering use of the new NWEA test and other factors, based
  on what can be learned from applying the recommendations to this year's
  admissions and what the working group has learned in reviewing practices in
  other districts.
- To amend current policy to remove "non-traditional entry" and "deferment of
  acceptance provisions."

Exh. 6 ASE00406; Exh. 65 ASE01793.

[11]     BPS posted on its website:

- 2020-2021 BPS Exam Schools Admissions Process Exh. 66 ASE01803-01827;
- How to Apply to Exam Schools Exh. 67 ASE1829-01831 (a document
  prepared by Boston School Finders, a private organization);
- Exam Schools Frequently Asked Questions Exh. 68 ASE01834-01842;
- Exam School Admissions: Grade Point Average Fact Sheet, SY 21-22 Cycle
  Exh. 69 0184501846.
- Exam Schools Exh. 70 ASE01848-01853.

50.     Under the Interim Plan to be an eligible applicant for the 7th grade, the following

requirements must be met ("Eligibility Requirements"):[12]

- Reside in one of Boston's 29 zip codes or are in the "Zip Code 9999" for children who are homeless or in the custody of DCF ("Residency Requirement");

- Hold a minimum B average in ELA and Math during the fall and winter of SY 19-20 (5th grade) or have received a "Meets Expectations" or "Exceeds Expectations" score on the Spring 2019 (4th grade) Massachusetts Comprehensive Assessment System (MCAS) exams for ELA and Math[13] (collectively "Grade Requirement"); and

- Provide verification from the school district (or equivalent) that the student is performing at grade level based on the Massachusetts Curriculum standards.

Exh. 18 ASE01319; Exh. 65 ASE01782.[14]

**RESPONSE:**

AGREED.

### [Interim Plan Selection Process][15]

51.     First, 20% of seats in each Exam School will be filled through a citywide

competition using only the student's grade point average in English Language Arts and Math for

the first two grading periods of SY 19-20 (fall and winter) ("GPA"). If a student's first choice is

---

[12]     This illustration covers entry into the 7th grade, although students also enter in the 9th and 10th grades using a similar process.

[13]     The MCAS is administered to all students attending public schools (including public charter schools and students attending school in other districts through the METCO programs) in Massachusetts in grades 3-8 and in high school. It is not administered to students who reside in Boston but attend non-public schools. ASF at ¶ 52.

[14]     Students attending BPS schools were automatically informed of their eligibility and were required to submit their list of one or more of the Boston Exam Schools by order of preference. ASF at ¶ 54. Students attending non-BPS schools (i.e., parochial schools, private schools, METCO program schools, certain charter schools or home-school etc.) were required to verify their residency, submit a waiver for their grades, and submit their Exam School preferences. ASF at ¶ 55.

[15]     For reasons explained elsewhere herein, it is doubtful whether the School Committee considers this to be only a one-year plan.

full, he/she will be a part of the second process. ASF at ¶57; Exh. 18 ASE01321; Exh. 65 ASE01784; Exh. 66 ASE01823.

**RESPONSE:**

AGREED.

52.     Eligible Applicants that were not selected through the citywide competition move to the second round where Eligible Applicants are placed into applicant pools by GPA, again using the student's GPA in ELA and Math for the first two grading periods of SY 19-20 (fall and winter), within their zip code of residence. ASF at ¶ 58.

**RESPONSE:**

AGREED.

53.     For this remaining 80% of seats (*i.e.,* those not filled in the first round described above), each zip code is allocated a number of Exam School seats based on the proportion of school-aged children that reside in that zip code. ASF at ¶ 59. The number of seats allocated to each zip code under the SY 21-22 Admissions Plan is calculated by multiplying the percentage of school age children in a zip code by the number of seats available for distribution, with the product of that multiplication rounded to the nearest whole number, and with each zip code having at least one seat. ASF at ¶ 60. Within each zip code, over ten rounds, the highest-ranked Eligible Applicants will be selected to fill seats allocated to that zip code. If a student's first choice seat is not available when it is his/her turn to be assigned, then the student will be assigned to his/her next choice seat. ASF at ¶ 61. *See* Exh. 18 ASE01322; Exh. 65 ASE01785; Exh. 66 ASE01824.

**RESPONSE:**

AGREED.

54.    Invitations under the 20% and 80% processes will be issued at the same time. ASF at ¶ 61. Per agreement with the Court, no invitations under the SY 21-22 Admissions Plan have been sent to any applicant, and none will be sent before April 15, 2021. ASF at ¶ 62.

**RESPONSE:**

AGREED.

### [Addressing Grade Manipulation][16]

55.    Evidence of a great deal of variability of grades within and outside of BPS for the classes entering in the fall of 2020 was made available to the Working Group. ASF at ¶ 42. The grades for students admitted to Exam Schools for SY 20-21 show considerable variation depending on the sending school as demonstrated by a series of exhibits that lists the student's sending schools and zip codes.[17/] *See* Exh. 55 ASE01633; Exh. 56 ASE01635-45 (Sending School + GPA). Grades are converted from letter to number with 12 being A+, 11 A, 10 A-, 9 B+, 8 B, and so on. Exh. 69 ASE01845-46; Exh. 66 ASE01821.

**RESPONSE:**

DISAGREED IN PART.  It is AGREED that grades are converted from letters to numbers as described by Defendants.  It is DISAGREED that there is a "great deal of variability" in the grades to which Defendants refer, and that characterization is *not* part of the Joint Statement of Fact to which Defendants mistakenly attribute it.  *See* ASF ¶ 42.  It is also DISAGREED that any variability in grades by *school*  has any relevance to the allocation of seats by *zip code*.  The lack of any correlation between the two is especially acute in Boston,  where there are no school

---

[16]    Plaintiff objects to the allegation that there has been grade manipulation. The record does not support the claim.

[17]    This data is also broken down by zip code (Exh. 57 ASE01646-01666), by average exam score and GPA by school (Exh.58 ASE01667-1678) and by average exam score and GPA by zip code (Exh. 59 ASE01679-01683).

attendance zones, much less a requirement that students attend a school in their own zip code.  *See*

*Boston Public Schools, Student Assignment Policy*, www.bostonpublicschools.org/Page/6544.

56.     As the Superintendent explained, BPS does not have a grading policy across its

schools resulting in grading variations from school to school within the district and it needs to

create more coherence around grades and better guidance regarding expectations to private school

partners and schools. Exh. 7 ASE00502-03. *See* Exh. 5 ASE00316.

**RESPONSE:**

DISAGREED IN PART.  It is AGREED that Defendants' proposed finding of fact

characterizes a portion of the Superintendent's remarks on grading; however, it is DISAGREED

that Defendants have fully and fairly characterized her remarks.   The Superintendent also

explained that the decision to use pre-Covid grades meant that there would be no grade inflation

in the current admission cycle because "students did not know at that time that these [pre-Covid]

grades would be used for this purpose."  ASE 503.  "[W]hy would you inflate your grades back

then if you didn't know it was for that purpose[?]"  *Id.*  It is also DISAGREED that any variability

in grades by *school*  has any relevance to the allocation of seats by *zip code*.  *See* response to # 55.

57.     The Working Group was concerned about the manipulation of grades "especially

in the absence of a test or other admission criteria." Exh. 10 ASE00972.

**RESPONSE:**

DISAGREED IN PART.  It is AGREED that the Working Group expressed the concern

attributed to it by Defendants.  It is DISAGREED that any variability – of even manipulation – of

grades is a concern in the current admission cycle.  Foreshadowing the assurances expressed by

the Superintendent on this topic (*See* response to # 56), the Working Group stated: "The working

group determined that it would be best to use grades that have been given without the knowledge

that they would be the sole determinant of exam school admission." ASE 972. In other words, use of pre-Covid grades avoids the potential problem of grade "manipulation." In addition, it is DISAGREED that any potential problem with a school's grading system has any relevance to the allocation of seats by *zip code*. *See* response to # 55

58.     While some of the potential for grade manipulation was addressed by the use of pre-COVID grades, the use of zip codes also provided additional protection by limiting the ability of any one school to benefit unfairly due to its grading practices.


**RESPONSE:**

DISAGREED. Students are not assigned to BPS schools or to other schools based on the students' zip codes. Thus, the use of zip code quotas has no effect on the ability of any school to benefit unfairly due to its grading practices.

59.     An example is illustrated by Holy Name Parish School in West Roxbury. Ten percent of the BLS class in Fall of 2016 was from Holy Name and sixty-nine percent of the students applying to BLS from Holy Name had A+ averages. Exh. 61 ASE01697; Exh. 60 ASE01685-89. ASF at ¶ 43. Holy Name has had success gaining seats at the Exam Schools consistently. Exh. 61 ASE01698. *See* Exh. 15 ASE01300 (Holy Name School (73) invitations in 3 years).

**RESPONSE:**

DISAGREED. Holy Name Parish School in not an example of unfair grading practices. Although Holy Name enjoyed great success in sending students to Boston Latin in 2016, there is no evidence that this success in 2016 was the result of any unfair grading practices by Holy Name. The most recent data shows that, for the class entering in the Fall of 2020, five public schools sent more students to the Exam Schools than Holy Name. This is shown by the chart below which has

been compiled from data in the record at ASE 1633, 1635-45.  (Where the identity of the Exam School is "Suppressed," it means that BPS did not provide the name of the school because there were fewer than 10 students admitted there for the Fall of 2020.)

| School Type | School Name | BLS | BLA | OB | Suppressed | Total |
|---|---|---|---|---|---|---|
| BPS | Murphy K-8 | 44 | | | 19 | 63 |
| BPS | Eliot K-8 | 41 | | | 14 | 55 |
| BPS | Lyndon K-8 | 21 | | | 23 | 44 |
| BPS | Quincy Upper | 14 | 10 | | 16 | 40 |
| BPS | Ohrenberger | 24 | | | 15 | 39 |
| | Holy Name | 18 | | | 16 | 34 |
| BPS | Kilmer K-8 | 27 | | | | 27 |
| BPS | Curley K-8 | 12 | | | 8 | 20 |
| | Jackson/Mann K-8 | 12 | | | 5 | 17 |
| BPS | BTU K-8 Pilot | | | | 16 | 16 |
| BPS | Waren/Prescott K-8 | 14 | | | | 14 |
| | The Advent School | | | | 14 | 14 |
| | Kingsley | 13 | | | | 13 |
| | Park Street School | 13 | | | | 13 |
| Charter | Edward Brooke Charter | | | | 12 | 12 |
| | Pope JP II Neponset | | | | 12 | 12 |
| | Mt. Alvernia Elementary | 11 | | | 1 | 12 |
| BPS | Frederick Pilot | | | | 10 | 10 |
| BPS | Mario Umana Academy | | | | 10 | 10 |
| | | | | | | |

**[Addressing Income Disparities][18]**

60.     The Working Group reviewed the admissions criteria used by other cities. ASF at ¶ 38; Exh. 18 ASE01333; Exh. 37 ASE01564; Exh. 65 ASE01801. It reviewed the systems used

---

[18]     Plaintiffs do not agree that the Zip Code Quota Plan was intended to address income disparities.

by San Francisco (Exh 38 ASE01566), Detroit (Exh. 39 ASE01568) and Chicago (Exh. 40 ASE01570).

**RESPONSE:**

AGREED.

61.     In Chicago, students are admitted to a selective high school based on a combination of their application score, neighborhood socioeconomic status ("SES") classification, and the seats available at the school where the student applies. Under the Chicago system each applicant is assigned a SES "tier" which is based on census tracts that are divided into four tiers. Thirty percent of the seats at selective high schools are allocated to top-scoring applicants regardless of SES tier. The remaining seats are divided among the four SES tiers. Exh. 40 ASE01570.

**RESPONSE:**

AGREED; but the proposed finding should also state that the socioeconomic status ("SES") classification is based on five factors which are measured on a census tract level, not an individual level, and  none of which include race.  The five factors are: (1) median family income; (2) adult educational attainment; (3) home ownership rates; (4) prevalence of single-parent households; and, (5) non-native English speakers.   ASE01859

62.     The Working Group was "intrigued" by Chicago's methodology creating tiers with Census Tract Data. Exh. 10 ASE00973. It replicated Chicago's methodology using Census Tract Data. *See* Exh. 40 ASE01571-80.

**RESPONSE:**

AGREED; but the proposed finding should also state: The Working Group did not explain why it chose not the use the Chicago methodology.

63.     Borrowing from the Chicago methodology, the BPS looked at using Boston's 29 zip codes in place of Census Tract Data. ASF at ¶ 39.

**RESPONSE:**

DISAGREED IN PART.  It is AGREED that BPS looked at using Boston's 29 zip codes. However, the Zip Code Quota Plan does not "borrow[] from the Chicago methodology."  The Chicago methodology is based on census tracts not zip codes, and the two are not correlated in Boston.  For instance, some zip code include multiple census tracts, including census tracts of different tiers.  Some census tract overlap zip code boundaries.  The differences between Boston's census tracts and its zip codes are shown by the following chart that overlays the zip codes on a map showing the census tracts:



64.     The Working Group looked at the percentage of school age population in each zip code and median household income. Exh. 18 ASE01332, 00298-299; Exh. 41 ASE01582. It found

differences based on income. For example, 70% of the students living in the 3 zip codes with the highest median household income select BLS as first choice. By contrast, students from the 3 zip codes with the lowest median income select all three schools. Exh. 18 ASE01314. "This was important as we thought about socioeconomic and racial diversity of our exam schools." Exh. 15 ASE00246-47.

**RESPONSE:**

DISAGREED; except that it is AGREED that Working Group Member Tanisha Sullivan made these remarks in her presentation at the October 8, 2020, meeting of the School Committee,

65.     To address concerns regarding the economic disparities within zip codes, the initial recommendation of using median household income was changed to median family income with children under 18. Exh. 5 ASE00291-92; Exh. 7 ASE00474-75; Exh. 65 ASE01786; Exh. 41 ASE01583. Among the concerns were issues of class, wealth and economic disparities within zip codes. *See* Exh. 5 ASE000267-71, 00280-82.

**RESPONSE:**

DISAGREED.  Defendants grossly overstate the significance of this change.  The use of income to set the "order" of the zip code rounds has nothing to do with *how many* seats are assigned to any given zip code.  Income is only used to decide the <u>*order*</u> in which zip code seats are filled. Zip code seats are filled in ten rounds, with one-tenth of each zip code's quota of seats being filled in each round.  The order in which the seats are filled will not make any difference in which students receive invitations to the Exam Schools.  Moreover, there is no evidence that the order of the rounds will make any difference in whether any students receive their first, second or third choices of Exam School.  In fact, Defendant have pointed to no evidence showing how changing

from "median household income" to "median family income with children under 18" will actually change the order of filling seats.

66.     The use of family income with children under 18 provides some mitigation against the growing gentrification of a number of Boston's neighborhoods by professionals without children. *See* Exh. 65 ASE01800.

**RESPONSE:**

DISAGREED for the same reasons stated in response to #65.

67.     The importance of addressing income disparities was highlighted to the School Committee in a letter (read by Ms. Sullivan) from Dr. Ibram Kendi, Director of the Center for Antiracist Research at Boston University, who described the need to close racial and economic gaps by illustrating the impact of wealth and availability of educated parents on testing which he called "legal cheating." Exh. 6ASE00482-91.

**RESPONSE:**

DISAGREED IN PART:  It is AGREED that Ms. Sullivan read to the School Committee a letter from Dr. Ibram Kendri, Director of the Center for Antiracist Research at Boston University. In his letter Dr. Kendri expresses his personal opinion that using a test as part of the admissions criteria for the Exam School should be eliminated.  However, that portion of the letter is not relevant to the issues in this case because the Boston Parents are not challenging the suspension of the exam for one year due to COVID-19.

It is DISAGREED that preparing for an admissions test is "legal cheating" any more than it is "cheating" to study for any other test or to practice batting and catching before trying out for a high school baseball team.

In addition, in the same letter read by Ms. Sullivan, Dr. Kendri advocated "setting aside a number of seats from each zip code" in order to "allow our exam schools to more closely reflect the ***racial*** and economic makeup of Boston's kids." ASE 490 (emphasis added). Advocating the allocation of seats by zip code in order to advance racial balancing was not simply the idea of Dr. Kendri, a private citizen. For example, in a text message to Superintendent Cassellius, School Board Member Olivia-Davis texted her support for the letter. Superintendent Cassellius, then responded by claiming credit for the letter: "Yup, I asked him to write it and I asked Tanisha [Sullivan] to read it. Powerful." ASF ¶ 68, Ex. 73, ASE 1865.

68.     The use of zip codes addresses a finding by the Massachusetts Department of Elementary and Secondary Education ("DESE") that too few economically disadvantaged students were enrolled in the Exam Schools. Exh. 14 ASE01007-01207. That finding found that:

> [a]cross the district, significant racial and economic disparities persist. In grades 7 through 12, while 87.5 percent of district students are children of color, only 68.8 percent of students attending exam schools are students of color; this number drops to 55.2 percent at Boston Latin School. While 58.3 percent of the students meet the state's measure of economic disadvantage, only 29.3 percent of students meeting this criterion are enrolled in exam schools. This number drops to 16.3 percent at Boston Latin School.

ASE01012.

**RESPONSE:**

DISAGREED. The quoted passage shows that DESE was concerned about what it termed "racial and economic disparities" – not just economically disadvantaged students. Moreover, the Zip Code Quota Plan was not designed to address the differences between enrollment in the Exam Schools and grade 7-12 enrollment in *BPS schools* ("district schools"). It was principally designed to promote the racial balancing of the Exam Schools so that their racial composition mirrored that of the population of "all students (K-12) in the city of Boston." Exh. 18 ASE01310; Exh. 63 ASE01755

**Simulations**

69.     To assist the Working Group in its deliberations, simulations were prepared based on various assumptions and available data for various groups, including only BPS students and for BPS and non-BPS students, from SY 20-21 and earlier years. Exh. 44 ASE01591. The simulations were provided for discussion and did not predict actual results as the data was based on selection that had been made using the then existing method of selection criteria of GPA and exam score. Further, the simulations were at best an approximation of what might happen if certain assumptions were made. They did not, and could not, predict actual results. Exh. 44 ASE01591.

**RESPONSE:**

DISAGREED.  Defendants' proposed finding wrongly downplays the significance of the BPS analyses and projections as clearly reflected in the record.  The limitations that the Defendants attribute to the BSP simulations do not reflect what BPS said.   The things that BPS said "we can't simulate" involved "data outside of GPA and ISEE scores," "Exam scores if an exam was administered in Fall 2020" and "Student preferences for SY 21-22."  ASE 1591 (emphasis in original).  None of these limitations are relevant to the simulations that projected a racial shift under the Zip Code Quota Plan.  Moreover, the BPS analyses and projections were reliable enough for Defendants' decision-making, and they are reliable enough for the Court's fact finding.  Instead of the finding proposed by the Defendants, the Court should find as follows:

The Working Group relied upon various BPS analyses and projections when it recommended the Zip Code Quota Plan to the School Committee, and the School Committee relied on BPS' analyses and projections when it adopted the Zip Code Quota Plan.  Of particular importance are the following:

- ASE 1323, showing a projected 11-12 percent shift in the racial composition of the Fall 2021 entering class, compared to the Fall 2020 entering class; and

- ASE 1615, showing that the Zip Code Quota Plan will reduce Asian and White students by 65 combined admissions, compared to a citywide competition for the Fall of 2021 (using the same grades to rank students).

70.     For SY 20-21, the race/ethnicity of students in the applicant pool, invited and attending the Exam Schools was as follows:

| SY20-21 7th Grade Applicant Pool, Invitations and Enrollment | | | | | |
|---|---|---|---|---|---|
| | Applicant Pool* | | Invitations** | | Enrollment*** |
| Asian | 367 | 13% | 215 | 21% | 197 | 24% |
| Black | 757 | 27% | 144 | 14% | 114 | 14% |
| Latinx | 988 | 35% | 215 | 21% | 176 | 21% |
| Multi-Race / Other | 120 | 4% | 51 | 5% | 40 | 5% |
| White | 597 | 21% | 400 | 39% | 295 | 36% |
| Total | 2829 | 100% | 1025 | 100% | 822 | 100% |

* Applicant pool data compiled from Exhibit 51 ASE01624
** Invitation data compiled from Exhibit 18 ASE01323 & Exhibit 20 ASE01338
*** Enrollment data compiled from Exhibit 8 ASE00961

**RESPONSE:**

AGREED.

71.     Simulations described the possible impact of various alternative selection criteria on not only race, but also economic disadvantaged, English learner and disabled students on the first 500 invitations or the top 1100 invitations to Exam Schools. The simulations looked at 5th years grades (Fall, Winter and a combination of Fall and Winter grades) and attempted to discern the impact if grades were used on a straight ranking basis (Exh. 46 ASE01597); if seats at the

Exam Schools were equally distributed across zip codes and the grades were used within each zip codes (Exh. 46 ASE01598), or if the sending school, not zip codes were used (Exh. 46 ASE01599).

**RESPONSE:**

DISAGREED.  In this proposed finding, Defendants omit that the referenced simulations (ASE 1597, 1598 and 1599) involved *only* BPS students and, for that reason, were not relevant to the development of an admissions plan for which both BPS and non-BPS students would participate.

72.    Although each simulation looked at race, it also looked at the impact on economically disadvantaged students. Notably, a specific simulation addressed the impact if 80% of the class was comprised of economically disadvantaged students for each type of analysis BPS Only, BPS and non-BPS for applicant pool and for invitations. Exh. 46 ASE01600, ASE01605, ASE016095.

**RESPONSE:**

DISAGREED.  It is AGREED that "each simulation looked at race."  However, it is DISAGREED that the record shows that each one "also looked at the impact on economically disadvantaged students."  That is not accurate  The Court should reject the finding proposed by Defendants and should instead make the following finding:

Because the Exam Schools are open to Boston schoolchildren whether they attend a BPS school or some other school (*e.g.,* private or parochial schools), the *relevant* simulations were those involving both BPS and non-BPS students.  A set of eight such simulations is found at ASE 1601-1609.   All eight simulations considered race.   Only two simulations considered economic disadvantage.  ASE 1605 and 1609.  Moreover, the most important simulations – those using zip codes – considered only race, and did *not* consider economic disadvantage.  ASE 1603 and 1607.

73.     Using the SY 20-21 population, a number of simulations were prepared to analyze the impact of using various criteria for invitations to the Exam Schools for SY 21-22 including 100% GPA, 50% GPA/zip code; 30% GPA/70% zip, 20% GPA/80% zip, 10% GPA/zip code and 100% zip code. *See* Exh. 45 ASE01594; Exh. 47 ASE01611; Exh. 48 ASE01613-17.

**RESPONSE:**

AGREED IN PART.  This proposed finding should also include the following:  Each of these simulations (ASE 1613-1617) considered racial impact.  None considered economic disadvantage.  ASE 1615 shows the racial impact of allocating various percentages of seats by zip code versus a single, citywide competition.  Specifically, it shows that, under the plan that allocates 80% of Exam School seats by zip code, 9 fewer Asian students and 56 fewer White students will be admitted compared to a single, citywide competition.

74.     Using the SY 20-21 population, additional simulations were prepared reviewing invitations by GPA + zip code. Exh. 49 ASE01619; Exh. 50 ASE01621; Exh. 51 ASE01623-24.

**RESPONSE:**

AGREED IN PART.  This proposed finding should also include the following: Each of these simulations (ASE 1619, 1621, 1623-1624) considered racial impact.  None considered economic disadvantage.  One simulation (ASE 1624, lower chart) compares the percentages of applicants from each race who were *actually invited* in SY 20-21 with the percentages that *would have* been invited if the Zip Code Quota Plan had been in effect for that admissions cycle.  The chart shows that, under the Zip Code Quota Plan, there would have been significant losses by Asian and White students (-3% and -13% respectively) and significant gains by Black and Latino students (+9% and +4% respectively).  These percentages, when multiplied by the number of applicants of each race, show the following impact:  Asian students would have 11 fewer seats; White students would have 78

fewer seats; Black students would have 68 more seats; and Latino students would have 40 more seats.

75.     Simulations were also considered to help decide whether to use the population of BPS students for the allocation of seats to zip codes or to use both BPS and non-BPS statistics. Exh. 52 ASE01626-27. Because the Exam Schools are open to all Boston residents, city-wide statistics were used. Exh. 48 ASE01614-16. The selection of the city-wide population worked to benefit West Roxbury (02132) where many students attend private and parochial schools, and did not benefit Chinatown (02111) where more students attend BPS schools.

**RESPONSE:**

DISAGREED IN PART.  This proposed finding should say: BPS ran simulations using (i) only BPS students, and (ii) BPS students and non-BPS students.  However, there is no evidence as to what role the differences in the simulations may have made in the decision of whether to allocate seats based (i) only on  BPS student population, or (ii) on BPS plus non-BPS student population. There is no evidence that BPS ran simulations based on the number or projected number of qualified applications in each zip code, which would have been the rational way to allocate seats among zip codes (assuming that there is going to be some sort of zip code allocation).  Using total school age population to make the zip code allocation rather than the number of qualified applications, aggravated the loss of seats in zip codes that are predominantly Asian/White.  *See* discussion in Doc. 63, at 17 of 27 to 19 of 27.

**"BPS Racial Equity Planning Tool"**

76.     The Working Group completed an "Equity Impact Statement" (Exh. 63 ASE01755-60) using the "BPS Racial Equity Planning Tool" (Exh. 64 ASE01762-77).  ASF at ¶ 47.

**RESPONSE:**

DISAGREED IN PART.  This proposed finding is more accurately stated as follows: The Working Group completed the "Equity Impact Statement for School Committee Proposals."  (Exh. 63 ASE 1755-60) ("Equity Impact Statement").  In its Equity Impact Statement (at ASE 1755), the Working Group confirmed that it used the "BPS Equity Impact Planning Tool" in developing the Zip Code Quota Plan.

77.     Every major policy, program /initiative, process or budget decision is required to use the Racial Equity Planning Tool. The Tool is designed to ensure that BPS "take deliberate action to identify and dismantle cultural, structural, racial and social barriers that create opportunity gaps for students." Exh. 64 at ASE01767. It provides a structured way to "ensure the key people, relevant data and conducive conditions are present for a thoughtful, inclusive decision-making process. This will produce decisions that *move the needle on closing opportunity gaps and other racial disparities for historically marginalized populations in BPS*, including students, families, and employees." *Id*. at ASE01768 (emphasis added).

**RESPONSE:**

DISAGREED IN PART. Although the "BPS Racial Equity Planning Tool" contains the self-characterizations and statements that Defendants attribute to it, Defendants' proposed finding of fact does not fairly reflect the overall racial thrust of the "BPS Racial Equity Planning Tool", as Plaintiff explains below in its response to Defendants' proposed finding #78.

78.     As a strategy, the Planning Tool seeks to "make a hard pivot away from a core value of equality – everyone receives the same – to equity: those with the highest needs are prioritized" that focuses BPS's "finite resources...on *strategies that produce the best results for the most vulnerable.*" It uses the example of curb-cuts that were championed by the disability community but have benefited society more broadly, including those pushing strollers or making

deliveries. *Id.* at ASE01773 (emphasis added). The "pivot" requires consideration of the impact of proposals on *English Language ("EL"), Special Education, and economically disadvantaged students as well as racial and other marginalized communities*. *Id.* at ASE01776 (emphasis added).

**RESPONSE:**

DISAGREED IN PART.  It is AGREED that the "BPS Racial Equity Planning Tool" contains the statements that Defendants attribute to it.  However, Defendants' proposed finding of fact does not fairly and completely reflect the overall racial thrust of the Planning Tool.  The Court should also find as follows:

A.      The "BPS Racial Equity Planning Tool" makes occasional reference to socioeconomic and other concerns.  However, it is overwhelmingly focused on race and ethnicity.  This is not only shown in its title, but in the tool's repeated references to "race," "racial," "racism" and other similar terms/phrases without any commensurate references to any other particular concerns.  *See, e.g.,* 0172 (seven such references to race).

B.      In defining the BPS "Stakeholders," the document endorses racial preferences by saying:  "A commitment to ***racial equity*** requires BPS to center the voices and priorities of those whose lives are most impacted by the decision, ***namely Black/Latinx students and families***."  ASE 1766 (emphasis added).

79.     In keeping with its "Desired Outcome" of an admissions process that "better reflects the racial, socioeconomic and geographic diversity of all students (K-12) in the city of Boston." Exh. 18 ASE01310; Exh. 63 ASE01755. It considered "the impact of COVID-19 in Boston including the racial, socioeconomic and geographic disparities in infection rates, limited technology access, potential academic gaps and educational disparities" as well as the "racial, socioeconomic and geographic disparities between the school age population in Boston and

enrollment at Boston's exam schools." In making its recommendations, the Working Group reported that "[t]he proposal is projected to better reflect racial, socioeconomic, and geographic diversity during COVID-19, based on the data and simulations provided." Exh. 63 ASE01756-57.

**RESPONSE:**

DISAGREED IN PART. Defendants' proposed finding begins with a long clause that is not a complete sentence. It is AGREED that the Equity Impact Statement contains the statements that Defendants attribute to it.   However, Defendants' proposed finding does not fairly and completely reflect the overall thrust of the Working Group's actions.   With respect to the Equity Impact Statement, the Court should also find as follows:

A.      Section 3 of the Equity Impact Statement is entitled "Analysis of Data." ASE 1755.  In that section, the Working Group stated that it "Examined data, disaggregated by *race*." *Id.*  (emphasis added)  There is no comparable statement about examining socioeconomic or geographic data.  This supports the conclusion that racial considerations were the predominant factor in the Working Group's deliberations and recommendations.

B.      Section 4 of the Equity Impact Statement is entitled "Stakeholder Engagement." ASE 1756.  In that section, the Working Group stated that its stakeholder engagement included "Community meetings held across the city by *NAACP, Lawyers for Civil Rights* and others." *Id.*  (emphasis added) The NAACP is an Intervenor-Defendant in this case and is represented by Lawyers for Civil Rights, among others.  There is no similar report of stakeholder engagement with organizations representing Asian Americans in Boston.

C.      Section 5 of the Equity Impact Statement is entitled "Racial Equity Strategies." ASE 1756.   In that section, the Working Group explained the basis for

recommending the Zip Code Quota Plan: "[T]he working group recommends apportioning 80% of the seats for the 2021-22 qualified applicants by Boston zip code *so that Boston's exam schools can better reflect the racial*, socioeconomic and geographic *diversity of the City's school age population*."  ASE 1757 (emphasis added).  This statement shows that racial balancing was, at a minimum, a major goal of the Working Group in developing the proposal.

      **D.**      After four pages of text, there are two pages of charts that are part of the Equity Impact Statement.  ASE 1759-60.  The first page (Figure 1) states: "BPS Asian and White students are considered meeting or exceeding expectations at higher rates than Black and Latinx students on state exams and district report cards."  Below this statement are two sets of bar graphs comparing the academic performance of groups of students by race and showing significant discrepancies between (i) Asian and White students, and (ii) Black and Latino students.  There is no bar graph or other chart making any similar comparison based on socioeconomic factors.  The Court should draw two inferences from this: (1) The discrepancies in academic performance, as shown by the Working Group, likely explain much of the discrepancies between the racial composition of the Boston student population and the student bodies at the Boston Exam Schools; and, (2) Racial considerations were the predominant factor in the Working Group's deliberations and recommendations.

      **E.**      The second page (ASE 1760) contains two charts.  One is a chart that compares (i) the racial composition of students in Boston, (ii) the racial composition of Exam School invitees for SY 20-21, and (iii) the projected racial composition of Exam School invitees for SY 21-22, using the Zip Code Quota Plan.  This is the same bar graph that was presented to the School Committee on October 8, 2020 (ASE 1323; *see also*

Response to ¶ 40, *supra*), and it shows a projected increase of 11% in Black and Latino students and a 12% decrease in Asian and White students.  The second chart on ASE 1760 shows how Boston's zip codes compare SY 20-21 with projections for SY 21-22 under the Zip Code Quota Plan.  Again, there is no bar graph or other chart showing any socioeconomic factors.  Again, the Court should infer that racial considerations predominated over socioeconomic considerations in the Working Group's deliberations and recommendations.

### [Corrections of Misinformation and Communications][19]

80.    In making its recommendations to the School Committee, the Working Group emphasized that the recommendation will not reduce rigor at the exam schools as the Exam Schools currently admit students with A and B averages and that students with a "B" GPA persist and remain enrolled in an exam school at rates similar to those of students applying with "A+" or "A" GPA. Exh. 65 ASE01789.

**RESPONSE:**

DISAGREED IN PART.  It is AGREED that this proposed finding states the opinion expressed by the Working Group.  It is DISAGREED that the opinion is correct.  In previous years, students with a "B" average were only able to win admission to the Exam Schools if they scored very highly on the admissions exam.  Without being paired with a very high score on the admissions exam, a "B" average cannot be used as a reliable predictor of success.

81.    The Working Group also made clear that:

---

[19]    Plaintiff does not believe that Defendants' proposed findings of fact achieve the objective shown in the heading.

- This was a one-year plan for SY 2021-2022 admissions to the Exam Schools after which BPS would revert to its pre-COVID policy.
- All Boston residents can apply regardless of school attended (BPS, charter, home school, METCO, private or parochial).
- The Interim Plan was not a lottery system. Merit is incorporated throughout while increasing geographic distribution.
- MCAS and GPA are eligibility criteria. One is not weighted more heavily than the other and both are not required.
- Remote administration of the NWEA MAP exam for selective admissions was not allowed by the vendor.

Exh. 65 ASE01788.

**RESPONSE:**

DISAGREED IN PART. It is AGREED that this proposed finding accurately describes some of the representations of the Working Group. However, it is DISAGREED that it is credible for the Working Group to say: "This is a one-year plan for SY 2021-2011 admissions to the Exam Schools after which BPS would revert to its pre-COVID policy." The allocation of seats by zip code is not the result of COVID-19. As explained by the Working Group: "[T]he working group recommends apportioning 80% of the seats for the 2021-22 qualified applicants by Boston zip code *so that Boston's exam schools can better reflect the racial*, socioeconomic and geographic *diversity of the City's school age population*." ASE 1757 (emphasis added). The end of the COVID-19 pandemic will not affect either the racial diversity of the City's school age population nor the Working Group's (or School Committee's) desire to "better reflect" that racial composition in the Exam Schools.

## Impact of the 2021 Admission Plan

82. On January 13, 2021, the Superintendent issued the publication titled "Additional Background Information and Data Reviewed by the Boston Public Schools Exam Schools Admissions Criteria Working Group" which included a section entitled "Simulations" that included a "table" showing for each zip code "the projected number of invitations for next year

using the 20% - 80% approach," compared to the classes that entered in the fall of 2020. ASF at ¶ 65; Exh. 71 ASE01856-60. The table, however, did not include zip code 9999 for students that are homeless or in DCF custody.

**RESPONSE:**

AGREED; but this proposed finding should also include the following:  The losses in seats, as shown in the chart at ASE 1859, will likely be even greater once allocations are made for "zip code 999" (students that are homeless or in DCF custody).  In addition, when the losses in seats as shown in the chart on ASE 1859 are coupled with census data, the five zip codes with the highest Asian/White population lose large numbers of seats compared to the 2020-21 citywide competition, while the seven zip codes with the highest Black/Latino population gain large numbers of seats compared to the 2020-21 citywide competition.  Those losses and gains are shown on the following charts:[20]

| Zip Code | Name | Asian/White Population[1] | 2020-21 Seats (citywide competition)[2] | Loss of Seats under Zip Code Quota[3] | Percentage Change |
|---|---|---|---|---|---|
| 02111 | Chinatown | 87% | 24 | 14 | -58% |
| 02132 | West Roxbury | 84% | 133 | 57 | -43% |
| 02129 | Charlestown | 82% | 56 | 17 | -30% |
| 02135 | Brighton | 79% | 52 | 16 | -31% |
| 02130 | Jamaica Plain | 63% | 77 | 16 | -21% |

---

[20]    A further explanation of data sources can be found at Doc. 63-1, page 12 of 13 and 13 of 13.

49

| Zip·Code¤ | Name¤ | Latino/African-American·Population[4]¤ | 2020-21· Seats·(citywide·competition)[5]¤ | Gain·of·Seats·under·Zip·Code·Quota[6]¤ | Percentage·Change¶ ¤ |
|---|---|---|---|---|---|
| 02126¤ | Mattapan¤ | ···93%¤ | 20¤ | 38¤ | ····+190%¤ |
| 02121¤ | Roxbury¤ | 92%¤ | 27¤ | 51¤ | ····+188%¤ |
| 02119¤ | Roxbury¤ | 80%¤ | 27¤ | 29¤ | ····+107%¤ |
| 02124¤ | Dorchester¤ | 7%¤ | 84¤ | 39¤ | ····+46%¤ |
| 02136¤ | Hyde·Park¤ | 71%¤ | 68¤ | 12¤ | ····+18%¤ |
| 02128¤ | East·Boston¤ | 59%¤ | 57¤ | 24¤ | ····+42%¤ |
| 02125¤ | Dorchester¤ | 55%¤ | 47¤ | 19¤ | ····+40%¤ |

83.     Review of a simulation about possible invitations that would be available if 80% of the 1,000, 1050 or 1,100 seats were subject to invitation by zip code and allocated based on zip code's share of Boston's population aged 3 to 17. Exh. 41 ASE01584. A three-year (SY 1819, SY 19-20, SY 20-21) review of students who applied, were invited and enrolled in the Exam Schools from BPS and Non-BPS schools by race reveals that even if there is a cap on the number of seats allocated to any particular zip code, there were students of virtually all races in the eligibility pool of all but a few of the other zip codes. Exh. 42 ASE01586-87. For example, if there is a cap on seats based on the population of children aged 3-17 in zip code 02111 Chinatown and/or 02132 West Roxbury, there were a significant number of 6th grade Asian students in other zip codes, such as the Dorchester zip codes (02122, 02124 and 02125), who could have been invited if the zip code plan had been utilized. Exh. 42 ASE01586 (availability of eligible Asian candidates in the pool, but not invited). [21]/ *See* Exh. 41 ASE01584 (possible seat allocation without a

---

[21]     This is the difference between the numbers of Asians invited (ASE01587) and those who applied (ASE01586).

homeless/DCF allocation). Hence, any suggestion that the number of "Asian" seats would drop is entirely speculative and erroneous.

**RESPONSE:**

DISAGREED.  In this proposed finding, the Defendants present misleading and cherry-picked data to support their statement: "[A]ny suggestion that the number of 'Asian' seats would drop is entirely speculative and erroneous."   Plaintiff relies on the same BPS analysis and projections that the Working Group relied on when it recommended the Zip Code Quota Plan, and that the School Committee relied on when it adopted that plan.  The BPS analysis and projections show an overall loss of 12% of Exam School seats for Asian and White students (5% Asian and 7% White).  *See* ASE 1323; *see also* Response to ¶ 40, *supra*).  After the effects of suspending the exam are taken into account, the BPS analysis and projections show that 65 fewer Asian and White students (9 Asian and 56 White) will be admitted to the Exam Schools under the Zip Code Quota Plan as compared to admissions pursuant to a single, citywide competition for the Fall of 2021 (using the same grades to rank students).  The BPS analyses and projections were reliable enough for Defendants' decision-making, and they are reliable enough for the Court's fact finding.

84.    The population of BPS students currently in the 6th grade reveals that there are significantly more Asian students outside of Chinatown (02111) and West Roxbury (02132).[22] Exh. 43 ASE01589. The same is true for White students. Hence, while the number of Asian and White students from Chinatown and West Roxbury may drop, it would be error to assume that the total number of Asian or White students invited to the Exam Schools will drop as Asian or White students may be invited from other zip codes.

---

[22]     BPS can only provide data for its own students as data regarding students from non-BPS schools is not available.

**RESPONSE:**

DISAGREED.  Defendants' proposed finding only deals with Asian and White BPS 6th grade students in two zip codes.  It does not look at all 6th grade students – BPS and non-BPS – in all zip codes.  Moreover, contrary to Defendants' suggestion, the predicted drop in Asian and White students invited to the Exam Schools is not based on that limited data.  When the Working Group developed the Zip Code Quota Plan, it considered and relied on a BPS projection showing that the Zip Code Quota Plan will reduce Asian and White students by a combined 65 admissions, as compared to admissions pursuant to a single, citywide competition for the Fall of 2021 (using the same grades to rank students).

### [Plaintiffs' Data Is Speculative, Unreliable and Not Statistically Significant][23]

85.    A review of Exh. 48 ASE01613-17, the same data upon which the Plaintiffs rely for their Chart 2, provides several simulations based upon a hypothetical applicant pool of 2,257 students. Exh. 47ASE01611 (*Description of Applicant Pool*). The simulations review the potential impact of various potential admissions criteria from the use of GPA as 100% or the sole criteria on a City-wide basis to using GPA as a percentage of the selections on a City-wide basis with GPA by zip code as the remainder of the selections with 100% or all selections by GPA within zip codes. *See* Exh. 48 ASE01614 (percentages); ASE01615-16 (student numbers). The use of 100% GPA on a City-wide basis results in the highest number of Asian and White students being selected and concurrently, the lowest number of selections of Black and Latinx students. From the simulations, the model with selection by GPA 100% within zip codes, clearly favored Black and Latinx students and would have been the choice under Plaintiff's "discriminatory intent" argument. Instead, BPS chose the 20%-80% model.

---

[23]    This heading is simply wrong.  The data cited by Plaintiffs in this case is neither speculative, nor unreliable and nor statistically insignificant

**RESPONSE:**

DISAGREED.  The BPS documents referenced by Defendants (ASE 1613-17) show projections for several different admission plans (all using pre-COVID-19 GPAs, and none using any admission exam).  The key numbers are shown at the top of ASE 1615 and are reproduced here:

| race_label ▲ | 100% GPA | 50% GPA, 50% GPA+Zip | 30% GPA, 70% GPA+Zip | 20% GPA, 80% GPA+Zip | 10% GPA, 90% GPA+Zip | 100% GPA+Zip |
|---|---|---|---|---|---|---|
| Asian | 192 | 192 | 182 | 183 | 178 | 174 |
| Black | 203 | 222 | 238 | 237 | 245 | 258 |
| Latinx | 232 | 240 | 253 | 269 | 282 | 281 |
| Multi-Race/Other | 65 | 66 | 61 | 57 | 58 | 54 |
| White | 408 | 380 | 363 | 352 | 337 | 330 |

The plans vary in the percentage of seats awarded through a citywide competition versus allocation by zip code.  At the left end are the projected racial results with all seats awarded pursuant to a single, citywide competition, as has been the established approach for at least 20 years.  At the right end are the projected racial results with all seats allocated by zip code.  There are four intermediate positions shown: 50-50, 30-70, **20-80** and 10-90, each with a different set of racial results.

BPS chose the 20-80 split: 20% of seats allocated through a citywide competition, 80% of seats allocated through quotas assigned to each zip code. This plan reduces the total of Asian and White student admissions by 65, as compared to the result if a full citywide competition is maintained.  Defendants suggest that, because BPS could have adopted a plan that would have deprived Asian and White students of *even more* seats, that they could not have had an intent to disfavor Asian and White students.  The inference is very clearly unwarranted and incorrect.  As Plaintiff previously noted: "It should go without saying that the fact that BPS could have enacted its racially-motivated plan to inflict even more serious constitutional deprivations does not excuse the constitutional violation itself." Doc. 87 at 3 of 14.  Under Defendants' theory, governments

could engage in purposeful discrimination at will, so long as they covered themselves by sparing a few potential victims.  (That Defendants even suggest such an absurd and patently illogical position begs the question of when they came up with this notion and whether, perhaps, this was part of their strategy all along.).  Besides, the established approach for at least 20 years has been a single, citywide competition, and that is the baseline.  Defendants intentionally departed from the baseline in order to balance the racial composition of the student body at the Exam Schools.  That, more than anything else, establishes their racial motivation. Notably, this BPS chart does not show how the various plans would affect income.

86.     All simulations were based on data derived from prior admissions activity (e.g. Exh. 16 ASE01302; Exh. 42 ASE01586-87) or as in Exh. 48 ASE01613-17 on hypothetical data (Exh. 47 ASE01611; Exh. 48 ASE01613-17), and assumed the allocation of seats based only upon existing zip codes without consideration of the 9999 zip code for students who were homeless and in DCF custody.  *See* Exh. 6 ASE00406; Exh. 65 ASE01787.  Moreover, the total number of invitations/seats available for allocation would be determined through a projection process that was not completed by the time of this litigation. Exh. 20 ASE01337-38.  Therefore, without the precise number of seats/invitations available and the number of seats/invitations allocated to various zip codes, Plaintiff's calculations that are built upon hypothetical simulations are too speculative for any factual finding.

**RESPONSE:**

DISAGREED.  Defendants ask the Court to infer that "Plaintiff's calculations that are built upon hypothetical simulations are too speculative for any fact finding."  But, these are not "*Plaintiff's calculations.*"  They are *Defendants' calculations*, and they were used by Defendants in deciding which plan to adopt.  If they are reliable enough for Defendants' decision-making, they

are reliable enough for the Court's fact finding, especially when the issues are whether there will likely be an adverse effect of some sort on Asian and White students, and whether that was Defendants' motivation.

87.    Even if, as Plaintiffs attempt to show in Chart 2 and their Addendum, there is a loss of seats in a particular zip code does not mean that there will be fewer Asian or White students admitted to the Exam Schools in SY 21-22, as Asian and White students can, and likely will, receive invitations in their zip code of residence.

**RESPONSE:**

DISAGREED.  It is, of course, AGREED that some "Asian and White students can, and likely will, receive invitations in their zip code of residence."  But it is DISAGREED that this refutes the point that "there will be fewer Asian or White students admitted."  The conclusion about the drop in Asian and White students comes from Defendants' own analysis about the overall effects of the Zip Code Quota Plan.  *See* ASE 1615.  That analysis is consistent with, but independent of, Plaintiff's own analysis, which combines the BPS chart showing the projected losses and gains of Exam School admissions by zip code with census data showing the racial composition of each zip code.  *See* Response to Defendants' proposed finding #82, *supra*.

88.    There is considerable variation in the number of applicants by race to Exam Schools from year to year. A review of Exh. 16 ASE01302 reveals that the applicant pool of 4,057 in SY 20-21 was much larger than the applicant pool of 3,647 in SY 18-19 and 3,371 in SY 19-20. *See* Addendum A.[24/] Out of the pool of applicants, there was also considerable fluctuation in the number of Asian students invited for admission. In SY 18-19, 264 Asians were invited, while in SY 19-20, 310 Asian students were invited and in SY 2021 the number of Asian students was 300.

---

[24]    The charts contained in the Addendum are compilations of data on agreed upon exhibits.

Similarly, the number of White students also fluctuated with 428 being invited in SY 18-19, 504 in SY 19-20, and 464 in SY 20-21. The difference of 46 Asian students (from a high of 310 in SY 19-20 to a low of 264 in SY 18-19) and of 76 White students (from a high of 504 in SY 19-20 to a low of 428 in SY 18-19) demonstrates that the alleged loss of 9 seats for Asian and 56 seats for White students as a result of the use of zip codes described in Chart 2 of Plaintiffs' Memorandum at p. 10 is not statistically significant.

**RESPONSE:**

DISAGREED. Defendants ask the Court to conclude that, because of the fluctuation in the numbers of Asian and White students applying and admitted to the Exam Schools from year to year, the "loss of 9 seats for Asian and 56 seats for White students" under the Zip Code Quota Plan "is not statistically significant." But the fluctuations to which they refer were not the result of any policy changes in which Defendants actively sought those losses. In addition, Defendants are misusing the concept of statistical significance. That concept may be useful in trying to determine, retrospectively, whether an observed disparate impact is the result of random factors or implicates discrimination concerns when there is no other evidence of racial motive. It has no relevance when the projected disparate impact was known to the decision makers in advance and they proceeded to create that impact. This is especially true when the decisionmakers act not in spite of, but *because of*, that impact. Otherwise, decisionmakers would be authorized to engage in purposeful racial discrimination for long as they only harmed a few people.

89.     Fluctuations based on race are also apparent from a review of the composition of the current Exam School population. Exh. 19 ASE01335. A comparison of comparably sized classes reveals that in the 9th grade there are 209 Asians and in the 11th grade 238. The total number of students in each grade level by race reveals that in the 7th grade there are only 197

Asian and 295 White students, while in the 10th grade there are 278 Asian and 321 White students. These past fluctuations of 81 Asian and 26 White students between the 7th and 10th grades make clear that the differences relied upon by the Plaintiffs are not statistically significant.

**RESPONSE:**

DISAGREED. Again, the fluctuations to which Defendants refer were not the result of any policy changes in which Defendants sought those losses. Again, Defendants are misusing the concept of statistical significance. *See* Response to proposed finding #88, *supra.* The fact that some past fluctuations may have occurred naturally does not mean that Defendants can deliberately create future losses.

## **Benefits of Diversity**

90.     As a general proposition, students can benefit educationally when the student body of their school is diverse in terms of race, socioeconomic status, national origin, views and other factors. ASF at ¶ 69.

**RESPONSE:**

AGREED.

91.     At the School Committee meeting on October 21, 2020, the Co-Chair of the Working Group Michael Contompasis, who was also a former BPS Superintendent and former Head of BLS, stated that the Working Group "talked passionately about the need to reconsider how we're able to address the need and the value of having a diverse student population in all of the exam schools. That's a critical piece and it is critical in the sense that we have seen over the years that having students of different backgrounds interchanging on a daily basis far improves what we as educators are able to do strictly by presenting contents to these students....There are living examples of what has happened when students from differing backgrounds come together to present a point of view which one of the other may not have experienced." Exh. 7 ASE00496-97.

**RESPONSE:**

AGREED IN PART. Plaintiff AGREES only with the statement about the positions held by Michael Contompasis and with the fact that Michael Contompasis said the words attributed to him.

It is DISAGREED that the benefits of educational diversity described by Mr. Contompasis were a motivating factor in the decision of the Working Group to recommend the Zip Code Quota Plan.  Instead of Defendants' proposed finding, this Court should find as follows:

    **A.**    There is no discussion about educational diversity (as distinct from racial balancing) in the Working Group's Equity Impact Statement (ASE 1759-60), or in the Working Group's October 5, 2020, report to the Superintendent.  Exhibit 10 (ASE 967-74)

    **B.**    Based on all of the agreed upon evidence in the record, the Zip Code Quota Plan was not adopted to enhance the educational diversity of the Exam Schools, nor was it adopted with merely an "awareness" of race.  Rather, it was adopted with the intention and goal of increasing the overall number of Black students and Latino students attending the Exam Schools, while decreasing the overall number of Asian students and White students attending the Exam Schools.

### Statements

92.    During the October 21st meeting, Boston School Committee Chair Loconto made statements that were perceived as mocking the names of Asian members of the community who had come to the meeting to comment on the 2021 Admission Plan. ASF at ¶ 66. On October 22, 2020, School Committee Chair Loconto issued an apology and resigned based upon statements he made during the October 21, 2020, meeting. Thereafter, the Mayor of Boston appointed Ernani DeAraujo as a Boston School Committee member and Alexandra Oliver-Davila assumed the position of Acting Chairperson. In January 2021, Ms. Oliver-Davila became Chairperson and Michael O'Neill assumed the position of Vice-Chairperson.

**RESPONSE:**

    AGREED; but the proposed statement is incomplete.  The Court should adopt a finding that contains the following appropriately added context and implications:

115017342v2

A.      The Chinese individuals whose names were the subject of the foregoing statements by Mr. Loconto, Ms. Oliver-Davila, and Ms. Rivera had come to speak in opposition to the Zip Code Quota Plan.

B.      The vote on the Zip Code Quota Plan took place during same meeting as – and soon after – the foregoing statements by Mr. Loconto, Ms. Oliver-Davila, and Ms. Rivera.

C.      The foregoing statements by Mr. Loconto, Ms. Oliver-Davila, and Ms. Rivera reveal racial or ethnic animus, by each of those three School Committee members, in the sense of hostility or disrespect toward persons of Chinese ancestry.

93.      The statements made at the October 21st School Committee meeting were: "That was like Shania (phonetic). Shanene (phonetic) and Boo Boo (phonetic) cross talk." Exh. 7 ASE00730.

**RESPONSE:**

AGREED; but with appropriate context added.  *See* Response to proposed finding #93, *supra.*

94.      School Committee members Oliver-Davila ("AOD") and Rivera ("LR") exchanged the following text messages: AOD: "What did I just miss? Was that ML saying Shannana and booboo??? My ADD is killing me here!" LR: "I think he was making fun of the Chinese names! Hot mic!!!" AOD: "That's what I thought. Omfg he's gonna get killed someone is going to go back and capture that." LR: "I almost laughed out loud. Getting giddy here!"

**RESPONSE:**

AGREED; but with appropriate context added.  *See* Response to proposed finding #93, *supra.*

## <u>Demographics of Boston Public Schools</u>

95.     BPS student demographics are contained in Exh. 74 ASE01867-69.

**RESPONSE:**

AGREED IN PART.  Any finding should also state that this data only applies to students enrolled in the Boston Public Schools.  It does not include data for Boston school children who attend private or parochial schools, or who otherwise pursue their education outside of BPS schools.

115017342v2

Dated: April 8, 2021                                   Respectfully submitted:

                                            */s/ Callan G. Stein*
                                Callan G. Stein (BBO # 670569)
                                TROUTMAN PEPPER HAMILTON SANDERS LLP
                                125 High Street
                                Boston, MA 02110
                                Telephone: (617) 204-5100
                                callan.stein@troutman.com

                                William H. Hurd (Va. Bar # 16967)
                                Christopher W. Carlson, Jr. (Va. Bar # 93043)
                                TROUTMAN PEPPER HAMILTON SANDERS LLP
                                1001 Haxall Point
                                Richmond, Virginia 23219
                                Telephone: (804) 697-1490
                                william.hurd@troutman.com
                                chris.carlson@troutman.com
                                Admitted *pro hac vice*

                                Mary Grace W. Metcalfe (N.Y. Bar #5377932)
                                TROUTMAN PEPPER HAMILTON SANDERS LLP
                                875 Third Avenue
                                New York, NY 10022
                                Telephone: (212) 704-6000
                                marygrace.metcalfe@troutman.com
                                Admitted *pro hac vice*

                                *Counsel for Plaintiff*

### Certificate of Service

       I, Callan G. Stein, certify that the foregoing document was filed this date via the Court's

CM/ECF filing system and will be sent electronically to the registered participants in this action.

                                */s/ Callan G. Stein*