UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| **BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,**<br><br>                    **Plaintiff,**<br><br>**v.**<br><br>**THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEIL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS,**<br><br>                    **Defendants**<br><br>**and**<br><br>**THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTAL, and H.D.,**<br><br>                    **Defendants-Intervenors.** | **Civil Action No. 1:21-cv-10330-WGY** |

**PLAINTIFF'S RESPONSES TO DEFENDANTS'**
**PROPOSED CONCLUSIONS OF LAW**

Plaintiff, Boston Parent Coalition for Academic Excellence ("Plaintiff" of the "Boston Parents"), by and through its attorneys, respond to each of the proposed conclusions of law contained in Defendants' Proposed Findings of Facts and Conclusions of Law, filed as Doc. 77, in the above captioned case.

As with Plaintiff's Responses to Defendants Proposed Findings of Fact, Plaintiff has reproduced below each of the Defendants' Proposed Conclusions of Law for the convenience of

1

the Court and the parties, with Plaintiff's specific response set below each one.  For the convenience of the reader, Plaintiff is retaining the Defendant's headings.  Plaintiff notes, however, that it disagrees with the conclusion contained in each heading.

**The Interim Plan Is Race-Neutral And Subject To Rational Basis Review.**

1.     Race-neutral school selection policies, even undertaken with race-conscious considerations and goals, are constitutionally permissible and not subject to strict scrutiny. Parents Involved, 551 U.S. at 789 (Kennedy, J., concurring in part and concurring in judgment).

**RESPONSE:**

DISAGREED.  This is a misstatement of Justice Kennedy's position in *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ("*Parents Involved*").  Justice Kennedy joined the majority of the Court's opinion[1], including the portion in Section III-A that recognized the diversity interest outlined in *Grutter v. Bollinger*, 539 U.S. 306 (2003), and its need for strict scrutiny, but declined to extend the interest to elementary and secondary schools:

> In upholding the admissions plan in *Grutter*, though, this Court relied upon considerations unique to institutions of higher education, noting that in light of "the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." The Court explained that "[c]ontext matters" in applying strict scrutiny, and repeatedly noted that it was addressing the use of race "in the context of higher education." The Court in *Grutter* expressly articulated key limitations on its holding—defining a specific type of broad-based diversity and noting the unique context of higher education—but these limitations were largely disregarded by the lower courts in extending *Grutter* to uphold race-based assignments in elementary and secondary schools. The present cases are not governed by *Grutter*.

---

[1] *Parents Involved* at 789 (Kennedy, J., concurrence in part.) ("I… join Parts I and II of the Court's opinion. I also join Parts III–A and III–C for reasons provided below.").

115017372v3

*Id.* at 724–25 (Roberts, J., majority opinion III-A) (internal citations omitted, quoting *Grutter*).  In

his concurrence, Kennedy reiterated the reference to *Grutter* and elaborated further, opining that,

outside of admissions policies, as at issue in *Parents Involved* and here,

> School boards may pursue the goal of bringing together students of diverse
> backgrounds and races through other means, including strategic site selection of new
> schools; drawing attendance zones with general recognition of the demographics of
> neighborhoods; allocating resources for special programs; recruiting students and
> faculty in a targeted fashion; and tracking enrollments, performance, and other
> statistics by race. These mechanisms are race conscious but do not lead to different
> treatment based on a classification that tells each student he or she is to be defined by
> race, so it is unlikely any of them would demand strict scrutiny to be found
> permissible.

*Id.* at 789 (Kennedy, J., concurrence in part.).  None of these options identified by Justice Kennedy

constitute "school selection policies" and none was pursued by Defendants in this case.


2.      School-assignment policies based on geography are facially race-neutral and do

not employ racial classifications, despite the plaintiffs' claims that geography is a surrogate for

race. Lewis v. Ascension Parish School Bd., 806 F.3d 344, 356-58 (5th Cir. 2015), cert. denied,

136 S.Ct. 1662 (2016); Spurlock v. Fox, 716 F.3d 383, 394 (6th Cir. 2013), cert. denied, 571 U.S.

954 (2013); Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 545 (3d Cir. 2011), cert.

denied, 567 U.S. 916 (2012).

**RESPONSE:**

DISAGREED.  This conclusion is not supposed by the holdings of these cases.  Plaintiff

proposes the following finding of law that is supported by the cases: Where there is no evidence

of any disproportionate impact or racial motivation, facially neutral plans to determine attendance

zones for *comparable, non-selective* public schools are not subject to strict scrutiny.

3.      A school board's consideration of race in the development of race-neutral polices does not trigger strict scrutiny review. See Lewis, 806 F.3d at 357-58; Spurlock, 716 F.3d at 394; Lower Merion, 665 F.3d at 548.

**RESPONSE:**

DISAGREED.  While mere consideration alone may not trigger strict scrutiny, there is a marked difference between race being a mere consideration and being a motivating factor, as illustrated by the *Lewis v. Ascension Parish School Bd.* cases. In citing *Lewis II* (806 F.3d 344) in their proposed finding of law, Defendants ignore the holding in *Lewis I* (662 F.3d 343 (5th Cir. 2011)), in which the Fifth Circuit reversed the lower court's rational basis judgment, holding that

> Because factual questions exist as to whether [the redistricting plan] had both a racially discriminatory motive and a disparate impact, and the court misapprehended the significance of the evidence before it, the court erred in awarding summary judgment under a rational basis test.

*Id. at 352.*  In that case, similar to the record in this case, the school board calculated and predicted the number of students at each school based on race.  The Fifth Circuit  noted:

> Superintendent Songy compiled, and the School Board considered, documentation detailing the percentage of black students that would be enrolled at each East Bank school under Option 2f. The data were generated from software that coded each enrolled student in order to predict the "statistical effects" of Option 2f's boundary adjustments. Indeed, it is unclear how a student assignment plan could calculate the percentage of black students at each school without classifying individual students by race. The School Board insists that the Statistical Analysis underlying Option 2f—submitted by Lewis in opposition to summary judgment—does not constitute Option 2f itself. But to accept that self-serving, summary allegation would be to allow a school district to skew reality simply by selectively including documents in the record and labeling only those documents its "plan."

115017372v3

*Id.* at 350.  Combined with statements made by the decisions makers focusing on the percentage of students by race at the schools,[2] the Fifth Circuit rejected the application of the rational basis test, noting that under "*Parents Involved*, the Court required strict scrutiny review for a racially-based student assignment decision in a Kentucky school district that had been declared unitary", which applied even where the school board made "racially-based decisions for the 'benign' purpose of maintaining post-unitary "racial balance" among the schools in the system" *Id.* at 349.  Moreover, with regard to the impact, the Fifth Circuit noted that

> Lewis, however, also alleges a disparate impact upon the East Ascension feeder system. The evidence shows that Option 2f effected an increase from 46% to 49% in the East Ascension feeder system's percentage of the total number of minority students in the District, while the Dutchtown feeder system's percentage decreased from 37% to 33%, and the St. Amant feeder system's percentage remained at 18%. The East Ascension feeder system's percentage of the total number of at-risk students in the District rose from 40% to 43%, while the Dutchtown feeder system's percentage decreased from 27% to 25%, and the St. Amant feeder system's percentage remained at 32%.

and held that "[t]hese statistics provide some support for Lewis's contention that Option 2f disproportionately funneled minorities and at-risk students into the East Ascension feeder zone, thereby discriminating against minorities whose educational environments suffer from disadvantages allegedly attributable to high levels of at-risk children.  *Id.* at 351-52.

While a mere consideration of race may not trigger strict scrutiny, as discussed below, particularly in response to Paragraphs 5 and 17, strict scrutiny is necessary here.

---

[2] *Id.* at 350 (including "'We had to make sure that in doing this, we did not, by this move, increase the minority, the black percentage at East Ascension High School ... in all the plans we developed, we made sure that the move of the students did not increase that percentage'" and "'Q: Now, you said it's important for you to see the black, white minority ratios, yes? A: You have to try and— you have to try and consider those numbers when you make the move, yeah.'")

115017372v3

4.      A school district's stated goal of racial diversity will not subject a race-neutral policy to strict scrutiny. Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71, 87 (1st Cir. 2004) (internal footnote omitted); Raso v. Lago, 135 F.3d 11, 16 (1st Cir. 1998).

**RESPONSE:**

DISAGREED.  The Court in *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71 (1st Cir. 2004) held that strict scrutiny was not triggered by "the mere invocation of racial diversity as a goal". *Id.* at 87.  Because the record reflects that race was not merely invoked, but rather was an admittedly motivating factor behind the Zip Code Quota Plan, strict scrutiny applies for the reasons laid out below, particularly in response to Paragraphs 5 and 17.  .  In addition, what Defendants sought was not racial diversity in the sense of educational diversity for pedagogical purposes, as approved by the Supreme Court for institutions of higher education (with numerous caveats), but racial balancing, which is patently unconstitutional.

5.      BSC's Interim Plan for Exam School admissions is race neutral and therefore not subject to strict scrutiny.

**RESPONSE:**

DISAGREED.  The fact that the Zip Code Quota Plan is facially neutral does not allow it to escape strict scrutiny.  As noted in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977),

> **Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.** In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. **But racial discrimination is not just another competing consideration. When there is a**

> **proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified**.

*Id.* at 265–66 (emphasis added). Courts across the country have recognized that "[u]nder *Arlington Heights*, Plaintiffs need not show that the discriminatory purpose is the 'sole' or even a 'primary' motive for the action, just that it was 'a motivating factor'". *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325 (D. Md. 2018) (brackets omitted), *see also Ramos v. Wolf,* 975 F.3d 872, 896 (9th Cir. 2020) ("a plaintiff asserting an equal protection claim need not prove that the challenged action rested solely on racially discriminatory purposes or even that racial discrimination was the dominant or primary purpose. Rather, Plaintiffs need only show that racial discrimination was at least a motivating factor" (internal quotation marks and citation to *Arlington Heights* omitted); *Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1066 (4th Cir. 1982) ("It is not necessary, in proving a violation of the equal protection clause, to show that the challenged actions rested solely on a racially-discriminatory intent in order to demonstrate that the involved officials acted with an intent to illegally discriminate."); *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) ("Even if § 15–112 is not facially discriminatory, however, the statute and/or its subsequent enforcement against the MAS program would still be unconstitutional if its enactment or the manner in which it was enforced were motivated by a discriminatory purpose. A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" (citation to *Arlington Heights* omitted)); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216–17 (2d Cir. 1987) ("the plaintiff need not show that the decisionmaker was motivated solely, primarily, or even predominantly by concerns that were racial").

Consequently, strict scrutiny applies to *every* race-based policy, even in circumstances where the policy may have been valid absent the racial motivation or where the motivation was

benign. *Bos. Police Superior Officers Fed'n v. City of Bos.*, 147 F.3d 13, 19 (1st Cir. 1998) ("Just as 'any individual suffers an injury when he or she is disadvantaged because of his or her race, whatever that race may be,' it is well-settled that 'the Fourteenth Amendment requires strict scrutiny of *all race-based action by state and local governments.*'" (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995) (emphasis added)); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) ("Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*."), *see also Grutter v. Bollinger*, 539 U.S. 306, 326–27 (2003) (strict scrutiny applies where racial motivation was "benign" or "remedial"); *Stuart v. Roache*, 951 F.2d 446, 449 (1st Cir. 1991) (applying strict scrutiny because the program "provides benefits based upon race. The Supreme Court has made clear that any court, in deciding whether such a classification is lawful, must subject it to 'strict scrutiny'" and upholding program because the Supreme Court "has also accepted an equally important proposition, namely that a compelling state interest 'unquestionably' exists where a race-conscious employment program 'remed[ies] past and present discrimination by a state actor.'").

As detailed in Plaintiff's pleadings, though facially neutral, the Zip Code Quota Plan is subject to strict scrutiny.

6.      Strict scrutiny being inapplicable, the Court need only determine whether BSC's implementation of the Interim Plan rationally relates to a legitimate government interest. City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam).

8

**RESPONSE:**

DISAGREED.  The portion of the opinion in *City of New Orleans v. Dukes*, 427 U.S. 297

(1976) to which Defendants cite noted that

> Unless a classification trammels fundamental personal rights or is drawn upon
> inherently suspect distinctions such as race, religion, or alienage, our decisions
> presume the constitutionality of the statutory discriminations and require only that
> the classification challenged be rationally related to a legitimate state interest.

*Id.* at 303.  Because, as laid out below and in Plaintiff's pleadings, the Zip Code Quota Plan is,

in fact, "drawn upon inherently suspect distinctions", strict scrutiny applies.


7.      The Interim Plan is rationally related to BSC's need for an equitable, city-wide

means for selecting students for Exam Schools for the 2021-22 school year in the COVID-caused

absence of the city-wide exam it has historically used. The Plan, moreover, promotes BSC's

interest in assuring that students from certain private schools, who's GPAs have been historically

extraordinarily high, equal and fair access to all applicants regardless of their attendance at BPS

school and place of residence. And the Plan is related to BSC's stated interests in promoting

socioeconomic, geographic and racial diversity in its Exam Schools. FCC v. Beach

Communications Inc., 508 U.S. 307, 313 (1993); Heller v. Doe, 509 U.S. 312, 319-20 (1993);

Lewis, 662 F.3d at 348.

**RESPONSE:**

DISAGREED.  As noted in response to Paragraph 5, above, to the extent that the Zip

Code Quota Plan is motivated by a diversity interest that includes race, strict scrutiny still applies.

*See also Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978); *Grutter v. Bollinger*, 539

U.S. 306 (2003); *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016).  And the agreed

upon record reveals that the Zip Code Quota Plan is not related to the Covid-19 pandemic or

grade inflation. *See, e.g., Gill v. Off. of Pers. Mgmt.*, 699 F. Supp. 2d 374, 388–89 (D. Mass. 2010), *aff'd sub nom. Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1 (1st Cir. 2012) (examining and invalidating multiple proposed justifications because "even in the context of a deferential rational basis inquiry, the government 'may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.'" (quoting *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985))).

The Zip Code Quota Plan is not rationally related to the interests now advanced by Defendants.

## Plaintiff Has Not Shown Discriminatory Impact.

8.     An equal protection claim premised on an outwardly neutral policy can prevail with proof of both a discriminatory impact and an invidious discriminatory purpose. Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 272 (1979); Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977); see also Lewis, 806 F.3d at 359.

**RESPONSE:**

DISAGREED.  The actual holding of *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, (1979) is:

> Certain classifications, however, in themselves supply a reason to infer antipathy. Race is the paradigm. A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification. This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination. But, as was made clear in *Washington v. Davis* and *Arlington Heights v. Metropolitan Housing Dev. Corp.*, even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.

*Id.* at 272 (citations omitted) (collecting cases).

115017372v3

9.      The starting point for measuring discriminatory impact is always "the impact on the total group to which a policy or decision applies." Hallmark Developers, Inc. v. Fulton Cty. Ga., 466 F.3d 1276 (11th Cir. 2006); Carpenter v. Boeing Co., 456 F.3d 1183, 1188 (10th Cir. 2006). While the discriminatory impact element of an equal protection claim may be satisfied with statistical evidence, "'[t]he statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" Lewis, 806 F.3d at 360 (quoting Chavez v. Ill. State Police, 251 F.3d 612, 638 (7th Cir. 2001)).

**RESPONSE:**

DISAGREED.   This first sentence is a slight misstatement of the Supreme Court's reasoning in *Arlington Heights,* wherein it held that:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it "bears more heavily on one race than another," may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

*Arlington Heights*, at 266 (internal citations omitted) (quoting *Washington v. Davis*, 426 U.S., 229, 242 (1976) and collecting cases).

As the *Arlington Heights* Court noted, both *Yick Wo*[3] and *Gomillion* present stark examples of where a policy or change "bears more heavily on one race than another."   In *Gomillion*, the boundaries of the city of Tuskegee were redrawn (shifting the city shape from a simple square to an uneven 28-sided figure) with the result that 99% of black residents eligible

---

[3] Examining *Yick Wo*, among others, decades later, the Seventh Circuit noted in *Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001) that "[t]he Supreme Court has long noted the importance of statistical analysis "in cases in which the existence of discrimination is a disputed issue'" and "has repeatedly relied on statistics" in order "to prove discriminatory effect". *Id.*, 637–38.

to vote were removed from the city limits, but not a single white resident was.  *Gomillion v.*
*Lightfoot*, 364 U.S. 339 (1960).  Similarly, in *Yick Wo*, an ordinance in San Francisco concerning
the operation of laundries in wooden buildings was enforced such that all of the roughly 200
applications for exceptions filed by Chinese applicants were denied while all but one of the 80
petitions filed by non-Chinese applicants were granted.  *Yick Wo v. Hopkins*, 118 U.S. 356
(1886).  Per the Defendants own documents denoting Zip Codes in which at least one seat is
gained or lost, such a stark division is present here, as well, because under the Zip Code Quota
Plan:

- Seats are gained in **<u>every</u>** Zip Code in which Blacks and Latinos are the two most
  populous of the racial groups identified by Defendants,

- Seats are lost in **<u>every</u>** Zip Code in which Whites and Asians are the two most
  populous racial groups, and

- The only Zip Code in which Asians are the most populous group is the **<u>only</u>** Zip Code
  to lose more than half its seats.

*Compare* ASE01859 *with* ASE01342-1428.  *See also* Doc. 63-1.

The Zip Code Quota Plan has a stark disparate impact on predominantly Asian and White
zip codes.  Moreover, strict scrutiny cannot be avoided merely by targeting a few individuals for
unfavorable treatment based on race.


10.     Plaintiff's projections – if believed – show only that White and Asian applicants
will receive a total of 65 fewer Exam School seats (56 fewer seats for White applicants and nine
fewer for Asians) than they would receive under the city-wide ranking of GPA, and that Whites
and Asians would make up 32% and 16% of the entering Exam School classes, despite BPS
student populations of 14% and 9%, respectively. Plaintiff's projections, as a matter of law, are

not statistically significant and do not show discriminatory impact. See Anderson, 375 F.3d at 90.

**RESPONSE:**

DISAGREED.  As an initial matter, this "conclusion of law" is primarily a compilation of factual assumptions and misrepresentations that require correction.  First, it is Defendants' documents, presentations, and simulations shat show this "Projected Shift" in percentages. ASE01323, 01613, 00256:4-7.   Second, by focusing only on Defendants' projected, and expected, percentages, it does not actually reflect the drastic change that the Zip Code Quota Plan is intended to affect.  Under the Defendants' "Projected Shift", the number of Asian students at the Exam Schools drops 24% when compared to the prior year (under the single, citywide competition), while the number of White students drops by 18% when compared to the prior year (again, under the single, citywide competition).  ASE01323.  The inverse shift in seats is reflected in the 57% increase in Black students and 14% increase in Latino students, when compared to the prior year.  *Id.*  Moreover, the Defendants' commitment to racial balancing remains apparent, even here, in their implications that the racial composition of the student body at the Exam Schools should mirror that of either the City of Boston, the city's school children, or, most narrowly here, schoolchildren in the Boston Public Schools as a whole.

To the extent, however, that there is a legal conclusion in the above, Plaintiff refers the Court to the discussion of significant statistical disparity following Paragraph 12, *infra*, and the discussion of stark disparate impact address in Paragraph 9, *supra*.

11.     Plaintiff offers no legal basis to conclude that its preferred plan (city-wide GPA) must serve as the baseline from which its alleged equal protection violations are measured. See, e.g., Anderson, 375 F.3d at 88-89.

**RESPONSE:**

DISAGREED.  It is Defendants' responsibility to establish that their plan was narrowly tailored, which, under *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013) ("*Fisher I*"):

> requires that the reviewing court verify that it is "necessary" for a university to use race to achieve the educational benefits of diversity. This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications.

*Id.* at 311–12 (internal citations omitted).  Consequently "[n]arrow tailoring requires 'serious, good faith consideration of workable race-neutral alternatives,'" and a plan fails narrow tailoring where, as here, "alternative assignment plans—many of which would not have used express racial classifications—were rejected with little or no consideration."  *Parents Involved* at 735 (quoting *Grutter*, 539 U.S. at 339).  Defendants' attempt to put the burden of exploring alternatives on Plaintiff has no basis in law.

Moreover, the Parties have stipulated that, for decades, competition for admission to the Exam Schools has occurred on a citywide basis.  ASF ¶ 15.  Defendants now seek to reduce the number of students admitted through a citywide competition to 20% of available seats and to then allocate the remaining 80% through quotas assigned to zip codes, with a hard cap on how many students may be admitted from each zip code, regardless of merit.  ASE01321-22.  Plaintiff has moved for a preliminary injunction, the purpose of which "is 'to preserve the status quo so that upon full adjudication on the merits the district court can more effectively remedy any discerned wrongs.'"  *New England Biolabs, Inc. v. Miller*, No. 20-CV-11234-DJC, 2020 WL 6871015, at *1 (D. Mass. Nov. 23, 2020) (quoting *Chiara v. Dizoglio*, 59 F. Supp. 2d 193, 196

115017372v3

(D. Mass. 1999)).  Here, the status quo is the use of a *single, citywide competition* to determine

admission to the Boston Exam Schools – a competition based on the applicants' *academic*

*performance*.  There is a legal basis for Plaintiff's interest in preserving it.


12.     Courts generally look to a plaintiff's statistical analyses and expert assessments

to establish that state actions have led to a discriminatory impact. See, e.g., Lewis, 806 F.3d at

35962. A plaintiff's burden is one of "showing of a significant statistical disparity" with respect

to the challenged practice. Ricci v. DeStefano, 557 U.S. 557, 587 (2009).

**RESPONSE:**

DISAGREED.  In invoking the significant statistical standard, Defendants are seeking to

apply the test outside of the narrow subset of the Title VII employment discrimination cases to

which it belongs.  As explained in *Jones v. City of Bos.*, 752 F.3d 38 (1st Cir. 2014):

> **Title VII prohibits employers from utilizing employment practices that cause**
> **a disparate impact on the basis of race** unless those practices are justified by
> business necessity. Notably, a disparate impact claim can succeed even where the
> employer did not intend to discriminate. **This distinguishes the disparate impact**
> **cause of action from the more traditional disparate treatment approach to**
> **proving discrimination.** To make a prima facie showing of disparate impact, a
> plaintiff starts by isolating and identifying the employment practice being
> challenged. A plaintiff must then show that the identified practice causes a disparate
> impact on the basis of race. The Supreme Court has most recently described **a**
> **prima facie showing of disparate impact as essentially a threshold showing of**
> **a significant statistical disparity and nothing more**.

*Id.* at 46 (emphasis added) (citations, quotation marks, and punctuation omitted); *see also Young*

*v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015) ("We note that employment discrimination law

also creates what is called a 'disparate-impact' claim. In evaluating a disparate-impact claim,

courts focus on the effects of an employment practice, determining whether they are unlawful

irrespective of motivation or intent.") *and Connecticut v. Teal,* 457 U.S. 440, 447-48 (1982) ("A

disparate-impact claim reflects the language of § 703(a)(2) and Congress' basic objectives in enacting that statute" and "To establish a prima facie case of discrimination, a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact.").

By contrast, as laid out in *Arlington Heights*, the question of the "impact of the official action" is "whether it 'bears more heavily on one race than another'". *Arlington Heights* at 259; *see also Ramos v. Wolf*, 975 F.3d 872, 897 (9th Cir. 2020) (under *Arlington Heights* courts consider "the 'impact of the official action' and whether it "'bears more heavily on one race than another'"). While, as discussed above, *Yick Wo*, *Gomillion*, and the case at hand all have particularly stark impacts, there is no set level of statistical significance applicable here[4] and any impact that affects more race more than another is necessarily disparate. *See, e.g., Arlington Heights* at 269 ("The impact of the Village's decision does arguably bear more heavily on racial minorities. Minorities constitute 18% of the Chicago area population, and 40% of the income groups said to be eligible for Lincoln Green."); *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) ("With respect to the first *Arlington Heights* factor—the impact of the official action and whether that bears more heavily on one race than another—it is undisputed that the statute's enactment and enforcement has had a disparate impact on Mexican American students, such as plaintiff Maya Arce. Not only were sixty percent of all TUSD students of Mexican or other Hispanic descent, but also ninety percent of students in the MAS program were such."); *E. Bibb Twiggs Neighborhood Ass'n v. Macon-Bibb Cty. Plan. & Zoning Comm'n*, 706 F. Supp. 880, 884 (M.D. Ga.), *aff'd sub nom, E.-Bibb Twiggs Neighborhood Ass'n v. Macon Bibb Planning &*

---

[4] It is additionally worth noting that, in *Jones v. City of Boston*, which concerned a drug test administered to police officers, the First Circuit explicitly rejected the argument that "the one-percent difference in pass rates between white and black officers was so miniscule as to be of no practical significance" and held that "the difference in exam results by race was indisputably statistically significant." To the extent that the Defendants seek to imply that "statistically significant" requires a wide disparity, that conclusion is not supported by their case law.

*Zoning Comm'n*, 888 F.2d 1573 (11th Cir. 1989), *opinion amended and superseded on denial of rehʹg*, 896 F.2d 1264 (11th Cir. 1989) ("the court observes the obvious—a decision to approve a landfill in any particular census tract impacts more heavily upon that census tract than upon any other. Since census tract No. 133.02 contains a majority black population equalling roughly sixty percent (60%) of the total population, the decision to approve the landfill in census tract No. 133.02 of necessity impacts greater upon that majority population."); *Saget v. Trump*, 375 F. Supp. 3d 280, 367 (E.D.N.Y. 2019) ("Here, it is axiomatic the decision to terminate TPS for Haitians impacts one race, namely non-white Haitians, more than another").

Because this is not a Title VII employment discrimination suit, Plaintiff is not required to show significant statistical disparity, whether through experts or otherwise.  Moreover, strict scrutiny cannot be avoided merely by targeting a few individuals for unfavorable treatment based on race, and significant statistical disparity is not required where there is other evidence showing that the government action at issue is racially motivated.


13.     In the First Circuit, disparate impact must have "statistical significance," a conclusion drawn from an expert statistician's analysis of "whether the outcomes of a...practice are correlated with a specific characteristic, such as race, and, if so, whether the correlation can reasonably be attributed to random chance." Jones v. City of Boston, 752 F.3d 38, 43-44 (1st Cir. 2014). As Jones teaches, a probability value (or "p-value") for promotions by race is statistically significant only when the disparate impact measured is five percent (0.05) or less – that is, when there is a five percent or less chance that any measured disparate impact is merely random. Jones, 752 F.3d at 43-44; 46-47; n.9 (citing Castaneda v. Partida, 430 U.S. 482, 496 n. 17 (1977), the

Federal Judicial Center's <u>Reference Manual on Scientific Evidence</u> (2011), and other courts of appeals).

**RESPONSE:**

DISAGREED.  *See* Response to Paragraph 13, *supra,* particularly the footnote thereto.


14.     Plaintiff has failed, as a matter of law, to show that the statistics it uses to show discriminatory impact have statistical significance. <u>Lewis</u>, 806 F.3d at 362.

**RESPONSE:**

DISAGREED.  *See* Response to Paragraph 9, *supra,* (discussion of stark disparate impact).


**<u>Plaintiff Has Not Shown Discriminatory Purpose.</u>**

15.     "Proof of a racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." <u>Arlington Heights</u>, 429 U.S. at 266. "Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group." <u>Lower Merion</u>, 665 F.3d at 552.

**RESPONSE:**

AGREED.


16.     The decisionmaker's "awareness or consideration of racial demographics" is not enough. <u>Lewis</u>, 806 F.3d at 355. Rather, "the challenger must demonstrate that race was 'the predominant factor motivating [the body's] decision." <u>Miller</u>, 515 U.S. at 916. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry

into such circumstantial and direct evidence of intent as may be available." <u>Arlington Heights</u>, 429 U.S. at 266.

**RESPONSE:**

DISAGREED.  *See* Response to Paragraph 5 (To trigger strict scrutiny, race need not be a "primary", "dominate", "predominate",[5] or "sole" factor behind a decision, policy or plan.  It need only be "a motivating factor").  Also, the facts here show more than racial "awareness." They show racially motivated intent.


17.    Plaintiff's evidence of BPS's invidious discriminatory purpose, highlighting instances in the record where race is mentioned, does not establish that BPS implemented the Interim Plan with an invidious discriminatory purpose.

**RESPONSE:**

DISAGREED.  Plaintiff, throughout its briefs, has highlighted numerous documents, statements, presentations, and other evidence that establish that race was a motivating factor behind the Zip Code Quota Plan.  Defendants do not address a single piece of evidence in asserting this conclusion, nor do they cite any case law that would allow this Court to dismiss and disregard the evidence Plaintiff now places before it.

The Court in *Arlington Heights* outlined a variety of evidence, in addition to a policy's impact, that a court could consider in evaluating whether there was a racial motivation, including the "historical background of the decision", the "specific sequence of events leading up to the

---

[5] As laid out in *Miller* itself, the need to show that "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district" was based entirely on the unique concerns accompanying the redistricting of voters, specifically that the "evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race."  *Miller v. Johnson*, 515 U.S. 900, 916.

challenged decision", and "[d]epartures from the normal procedural sequence". *Arlington Heights* at 267. The Court further noted that "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.*

Plaintiff has provided multiple examples of each of these factors in its pleadings[6] and more are contained in the record. In the interest of space, Plaintiff will not repeat them here. Nor will Plaintiff restate the case law cited in these briefs in support of a finding of racial motivation. Rather, Plaintiff will attempt to provide some additional support for such a finding in light of the arguments made by opposing counsel at the hearing before this Court on April 6, 2021, regarding animus.

As laid out in Plaintiff's pleadings, above, and in argument before this Court, Plaintiff is only required to show that race was a motivating factor for Defendants; Plaintiff need not plead harmful stereotype or animus for strict scrutiny to apply to the Zip Code Quota Plan. This is, in part, because:

> Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this.

*Smith v. Town of Clarkton, N. C.,* 682 F.2d 1055, 1064 (4th Cir. 1982); *see also  Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016) ("Anti-discrimination laws and lawsuits have 'educated' would-be violators such that extreme manifestations of discrimination are thankfully rare. Regrettably, however, this in no way suggests that discrimination based upon an

---

[6] *See* Docs. 3, 63, 83, and 87.

individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life and is often simply masked in more subtle forms." (internal quotation marks and punctuation omitted)); *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) ("the legislative history contains only a few snippets of overtly discriminatory expression. However, given that 'officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority,' we look to whether they have 'camouflaged' their intent. Here, the legislative history of § 15–112 and the sequence of events (including the administrative history) leading to its enactment reasonably suggest an intent to discriminate" (applying *Arlington Heights* and quoting *Smith*, 682 F.2d at 1064) (internal citations omitted)). The examples that Plaintiff alleges clearly establish racial motivation underlying the Zip Code Quota Plan.

Where there is evidence of animus or racial stereotypes, such evidence clearly satisfies the requirements of *Arlington Heights.  See, recently, CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325–26 (D. Md. 2018) ("These final statements, in particular, are 'contemporary statements' by the President of the United States, who is alleged to have been involved in the decision to terminate TPS for El Salvador." (quoting *Arlington Heights*)); *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018) ("Plaintiffs have plausibly alleged an equal protection claim under the standard of *Arlington Heights*" because "Plaintiffs have alleged several instances of anti-Haitian and anti-immigrant comments made by President Trump."); *MARJAC, LLC v. Trenk*, 380 F. App'x 142, 147–48 (3d Cir. 2010) ("Although the Township Attorney's statements about the plaintiffs' purported Mafia connections, standing alone, are not per se evidence of ethnic bias, one witness testified that the Township Attorney made 'general comments that

Italians aren't the best of people, they're connected to the mob' in a conversation regarding the plaintiffs.  This testimony, if credible, creates an evidentiary connection between the Township Attorney's selective enforcement of the zoning laws and his antipathy toward the plaintiffs' Italian heritage." (record citation omitted)).

Whether privately held or shared by constituents, where racial biases and stereotypes are invoked by a decisionmaker, the requirements of *Arlington Heights* are met and strict scrutiny is required.  *CASA de Maryland*, 355 F. Supp. 3d at 325–26 (further noting "the discriminatory motivation cannot be laundered through the Secretary"); *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018).  *See also Palmore v. Sidoti*, 466 U.S. 429, 433–34 (1984) ("The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1223–24 (2d Cir. 1987) ("Finally, we reject the City's doctrinal contention that elected officials may lawfully act with the purpose of achieving or preserving racial segregation in response to the urgings of their constituents so long as race is 'only' a significant, but not a dominant, factor in the constituents' motivation").

Every single piece of evidence that the *Arlington Heights* Court contemplated could support a finding of racial motivation is present in this case.  Strict scrutiny is necessary.


18.    That BPS considered the potential racial impact of the Interim Plan and various School Committee members made various comments about a desire for, among other things, enhanced racial diversity at the Exam Schools, does not establish that BPS implemented the Interim Plan with an invidious discriminatory purpose.

**RESPONSE:**

DISAGREED.  There is neither fact nor law cited in support of this conclusion.  *See also* Response to Paragraph 17, *supra*.  Moreover, the facts here show more than racial "awareness." They show racially motivated intent.  A racial motivation is subject to strict scrutiny even when the purpose is benign, as the cases cited above confirm.

19.     The breadth and range of all the considerations the Working Group and BPS took into account in devising and selecting the Interim Plan establish that it did not act with an invidious discriminatory purpose.

**RESPONSE:**

DISAGREED.  There is neither fact nor law cited in support of this conclusion.  *See also* Response to Paragraph 17, *supra*.  Moreover, a racial motivation is subject to strict scrutiny even when the purpose is benign, as the cases cited above confirm.

20.     School Committee chair Michael Locanto's statement at the October 21, 2020 meeting, and two School Committee member texts about that statement, do not reflect race-based animus on their face, have no connection to the Interim Plan's terms or BPS's decision-making about the Plan and, therefore, do not show that the Plan was motivated by a purpose to discriminate Whites and Asians. See Allstate Ins. Co. v. Abbott, 495 F.3d 151, 161 (5th Cir. 2007).

**RESPONSE:**

DISAGREED.  There is neither fact nor law cited in support of this conclusion.  *See also* Response to Paragraph 17, *supra*.  Moreover, a racial motivation is subject to strict scrutiny even when the purpose is benign, as the cases cited above confirm.

**Plaintiff Lacks Article III Standing.**

21.     For Article III standing, plaintiffs must demonstrate (1) that they "have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized...and (b) actual or imminent, not conjectural or hypothetical;" (2) that "a causal connection [exists] between the injury and the conduct complained of;" and (3) that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted). All three elements – injury, causation, and redressability – must be met in order to establish standing. Id. at 561.

**RESPONSE:**

This proposed conclusion of law is moot.  The Court has already ruled that "the Boston Parent Coalition has organizational standing."  Doc. 90.  In addition, as *Bakke* makes clear, there is a constitutional injury when an individual must apply through an unconstitutional process, whether or not the individual would be admitted.

22.     The "party invoking federal jurisdiction bears the burden" of showing its standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Id. For this reason, "[i]t is a long-settled principle that standing cannot be inferred argumentatively from

averments in the pleadings but rather must affirmatively appear in the record." <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 231 (1990) (quotations and citations omitted)).

**RESPONSE:**

This proposed conclusion of law is moot. The Court has already ruled that "the Boston Parent Coalition has organizational standing." Doc. 90. In addition, as *Bakke* makes clear, there is a constitutional injury when an individual must apply through an unconstitutional process, whether or not the individual would be admitted.


23.     Plaintiff has failed to show that any of the students it represents will suffer actual injury as a result of the Interim Plan or that their prospect of being injured is anything but speculative. Plaintiff has failed to show that its members have been, or are genuinely threatened with the likelihood of being, subjected to such a barrier because of their races, that is, that the Interim Plan threatens to prevent the White and Asian students, because of their races, from applying to the Exam Schools on an equal basis with other students. <u>See Scott v. Pasadena Unified Sch. Dist.</u>, 306 F.3d 646, 657 (9th Cir. 2002).

**RESPONSE:**

This proposed conclusion of law is moot. The Court has already ruled that "the Boston Parent Coalition has organizational standing." Doc. 90. In addition, as *Bakke* makes clear, there is a constitutional injury when an individual must apply through an unconstitutional process, whether or not the individual would be admitted.

24.     Plaintiff has not shown that specific students are affected individually by the Interim Plan because of their races, Plaintiff has failed to show that it represents otherwise-qualified students who are likely to be excluded from Exam School admission because of the

Interim Plan and thus face injury that is "certainly impending" and not speculative or hypothetical. <u>See Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 409 (2013).

**RESPONSE:**

This proposed conclusion of law is moot. The Court has already ruled that "the Boston Parent Coalition has organizational standing." Doc. 90. In addition, as *Bakke* makes clear, there is a constitutional injury when an individual must apply through an unconstitutional process, whether or not the individual would be admitted.

25.    Because the Interim Plan has not yet yielded any admissions results, Plaintiffs have offered no factually concrete injury. <u>See</u>, <u>e.g.</u>, <u>Scott</u>, 306 F.3d at 661.

**RESPONSE:**

This proposed conclusion of law is moot. The Court has already ruled that "the Boston Parent Coalition has organizational standing." Doc. 90. In addition, as *Bakke* makes clear, there is a constitutional injury when an individual must apply through an unconstitutional process, whether or not the individual would be admitted.

26.    Plaintiff has failed to establish that it has Article III standing.

**RESPONSE:**

This proposed conclusion of law is moot. The Court has already ruled that "the Boston Parent Coalition has organizational standing." Doc. 90.

**<u>The Interim Plan Withstands Strict Scrutiny</u>.**

27.     BPS has a compelling interest in promoting diversity in Boston public schools. Brown v. Board of Educ., 347 U.S. 483, 493 (1954); Grutter v. Bollinger, 539 U.S. 306, 331 (2003) (quoting Plyler v. Doe, 457 U.S. 202, 221 (1982); Parents Involved, 551 U.S. at 782.

**RESPONSE:**

DISAGREED.  *See* Response to Paragraph 1 (discussing the actual majority opinion in *Parents Involved*).  Moreover, the record shows that what Defendants sought was not racial diversity in the sense of educational diversity for pedagogical purposes, as approved by the Supreme Court for institutions of higher education (with numerous caveats), but racial balancing, which is patently unconstitutional.  Thus, they have shown no compelling interest.


28.     Schools diverse in socioeconomic status, geographic communities, and race provide incalculable educational and civic benefits by promoting understanding, breaking down stereotypes, and eliminating bias and prejudice. Conversely, schools lacking a diverse student body are often isolated and fail to provide the full panoply of benefits that diverse schools can offer. The academic achievement of students at racially isolated schools often lags behind that of their peers at more diverse schools.

**RESPONSE:**

DISAGREED.  This proposed conclusion of law is actually an unsupported statement of fact.  To the extent that the facts contained herein are those stipulated to in ASF ¶ 69, Plaintiff is in agreement.  To the extent that Defendants seek to introduce facts not in the agreed upon record without support, and to the extent that Defendants seek to present these alleged facts as a legal conclusion, Plaintiff objects.

29.    The Interim Plan is narrowly tailored to achieve BPS's compelling interest. Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." Grutter, 539 U.S. at 339.

**RESPONSE:**

DISAGREED IN PART.  It is AGREED that the serious, good faith consideration of workable race-neutral alternatives is among the requirements of narrow tailoring. *See, e.g. Fisher I*, at 311–12.  Plaintiff, assuming *arguendo* that Defendants have such a compelling interest, notes that Defendants' marked lack of serious or good faith consideration of any workable alternatives is one of the reasons that it fails strict scrutiny. *Parents Involved* at 735 (Roberts, J., majority opinion III-C) (narrow tailoring, and thus strict scrutiny, failed where "several alternative assignment plans—many of which would not have used express racial classifications—were rejected with little or no consideration.")

It is DISAGREED that the Zip Code Quota Plan is "narrowly tailored to achieve BPS's compelling interest."  The Zip Code Quota Plan additionally fails for being too broad.  As the *Grutter* Court explained, in order to be narrowly tailored to meet the compelling interest of educational diversity, "an admissions program must be 'flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.'" *Grutter*. at 334 (quoting *Bakke*, 438 U.S. at 317)).  The admissions plan in Grutter – under which "admissions officials must consider the applicant's undergraduate grade point average (GPA) and Law School Admission Test (LSAT) score because they are important (if imperfect) predictors of academic success" and then "engage[] in a highly individualized, holistic

review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment" – was thus narrowly tailored. *Id.* at 315.

In *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016) (*Fisher II*), the Court invoked *Grutter* in upholding as narrowly tailored an admissions plan based on the combination of two scores:

1.    the first "combining an applicant's SAT score and academic performance in high school", and

2.    the second evaluating a broad range of subjective factors, including "the applicant's potential contributions to the University's student body based on the applicant's leadership experience, extracurricular activities, awards/honors, community service, and other 'special circumstances'" such as "the socioeconomic status of the applicant's family, the socioeconomic status of the applicant's school, the applicant's family responsibilities, whether the applicant lives in a single-parent home, the applicant's SAT score in relation to the average SAT score at the applicant's school, the language spoken at the applicant's home, and, finally, the applicant's race."

*Id.* at 2204 (emphasis added).   The Zip Code Quota Plan is not linked to any genuine interest in educational diversity, nor does it involve the holistic review of students as individuals.   Rather paints entire sections of the City of Boston with an impermissibly broad brush.   In that regard, it is remarkably like the plan struck down by the First Circuit in *Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998) over twenty years ago:

The School Committee has provided absolutely no competent evidence that the proportional representation promoted by the Policy is in any way tied to the vigorous exchange of ideas, let alone that, in such respects, it differs significantly in consequence from, say, a strict merit-selection process. Nor has the School Committee concretely demonstrated that the differences in the percentages of students resulting from the Policy and other, constitutionally acceptable alternatives are significant in any other way, such as students' capacity and willingness to learn.

*Id.* at 799–800.

The Zip Code Quota Plan is not narrowly tailored to achieve educational diversity.

30.     BPS exhaustively considered a wide variety of other alternatives that would have involved different selection criteria. There were alternatives that were projected to result in greater racial diversity than the adopted Interim Plan, yet BPS rejected those. Under these circumstances, the Interim Plan is narrowly tailored to further BPS's compelling interest in providing equitable access to the Exam Schools during the pandemic. See McAuliffe Intermed. Sch., 364 F.Supp.3d at 284.

**RESPONSE:**

DISAGREED.  *See* Response to Paragraph 29, *supra*.  Responding further, Plaintiff notes that the Zip Code Quota Plan bears no resemblance to the plan at issue in *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y. Mar. 4, 2019).  Therein, a certain number of seats for New York City's specialized high schools were reserved for "disadvantaged" students who:

1.      were "certified by [their] current school as being 'high potential'";

2.      had an entrance exam "score just below the lowest overall score of all admitted students"; and,

3.      were able to "successfully complete a summer preparatory program demonstrating [their] ability to 'cope with the special high school program.'"

*Id.* at 265.  Under the plan in *McAuliffe*:

to qualify as "disadvantaged," a student would have to attend a school with a 2017-18 Economic Need Index ("ENI") of 60% or higher, and have one of the following characteristics: (1) qualify for free or reduced-price lunch; (2) receive assistance from the New York City Human Resources Administration; (3) be a foster child, a ward of the state, or in temporary housing; or (4) have been an English Language Learner within the last two years and have enrolled in a DOE school for the first time within the last four years.

*Id.* at 267.   This highly individualized system considered a wide variety of targeted socioeconomic factors in addition to an applicant's comparative academic achievement and expected performance in the specialized schools.  The Zip Code Quota Plan does not.

31.     Accordingly, the Interim Plan is narrowly tailored to achieve compelling objectives and survives strict scrutiny.

**RESPONSE:**

DISAGREED.  *See* Response to Paragraph 29, *supra.*

**Judgment Should Enter For BPS.**

32.     Plaintiff's two claims – one for an equal protection violation via 42 U.S.C. § 1983, and another for discrimination in in education in violation of M.G.L. c. 76, § 5 – are properly analyzed together under equal protection law. *See* Students for Fair Admissions, Inc. v.  President & Fellows of Harvard Coll., 980 F.3d 157, 195-96 (1st Cir. 2020).

**RESPONSE:**

DISAGREED.  The case cited does not mention M.G.L. c. 76, § 5 or otherwise provide support for this proposition.

33.     Plaintiff having failed to show a violation of the Equal Protection Clause, judgment should enter in BPS's favor on both of Plaintiff's claims.

**RESPONSE:**

DISAGREED.  *See* Responses to Paragraphs 1-32, *supra*, and the other pleadings in this matter.

115017372v3

Dated: April 8, 2021

Respectfully submitted:

<u>     /s/ *Callan G. Stein*     </u>
Callan G. Stein (BBO # 670569)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com

William H. Hurd (Va. Bar # 16967)
Christopher W. Carlson, Jr. (Va. Bar # 93043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1490
william.hurd@troutman.com
chris.carlson@troutman.com
Admitted *pro hac vice*

Mary Grace W. Metcalfe (N.Y. Bar #5377932)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
marygrace.metcalfe@troutman.com
Admitted *pro hac vice*

*Counsel for Plaintiff*

115017372v3

**<u>Certificate of Service</u>**

I, Callan G. Stein, certify that the foregoing document was filed this date via the Court's

CM/ECF filing system and will be sent electronically to the registered participants in this action.


_____*/s/ Callan G. Stein*_____