UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP., <br><br> Plaintiff, <br><br> v. <br><br> THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEILL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS, <br><br> Defendants, <br><br> THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTEL, and H.D., <br><br> Defendants-Intervenors | Civil Action No. 1:21-cv-10330-WGY |

### INTERVENORS' POST-HEARING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT AND INJUNCTIVE RELIEF

As demonstrated in the briefs of Intervenors and Defendants, and as further explained during oral argument, BPS's consideration of the potential racial demographic impact of the Interim Plan, among other factors, including socioeconomic and geographic diversity, is the type of analysis that governmental bodies undertake all the time – and is fully constitutional.[1] The United States Supreme Court, the First Circuit, and district courts across the country have repeatedly made clear that the government's awareness of the racial impact of its policies, and

---

[1] It is our understanding that Defendants will similarly be filing a post-hearing brief on Friday.

consideration of those impacts, does not trigger strict scrutiny. In light of this precedent, Plaintiff's allegations in its brief and during oral argument that the Defendants participated in impermissible "racial balancing" cannot be sustained; that term denotes fixed, mechanical quotas, and reliance on race and nothing else, to achieve a pre-ordained racial result. As demonstrated by the record before this Court, Defendants engaged in nothing of the sort here.

Intervenors do not dispute that rigid racial balancing is constitutionally impermissible in the context of education. *See Gratz v. Bollinger*, 539 U.S. 244, 276, 280 (2003) (O'Connor, J. concurring) (rejecting undergraduate plan that did not "provide for a meaningful individualized review of applicants" but rather relied on racial classifications in a "nonindividualized, mechanical" way); *Wessman v. Gittens*, 160 F.3d 790, 794, 798 (1st Cir. 1998) (rejecting as impermissible racial balancing school board's rigid formula that relied "on race and ethnicity, and nothing else to select a subset of entrants" under a quota system that narrowed the scope of racial and ethnic diversity to five groups "without recognizing that none is monolithic"); *see also Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 23–24 (1971). Starting with the desegregation context, courts have rejected the remedy of "fixed mathematical racial balance" to ensure "that every school in every community must always reflect the racial composition of the school system as a whole." *Id*.

The Interim Plan bears no resemblance to the racial balancing formulae rejected in the above cases. There is no support in the record for the proposition that the Interim Plan is a type of racial balancing plan the Supreme Court and lower courts have prohibited. Unlike the student assignment plans at issue in *Parents Involved in Community Schools v. Seattle School District No. 1*, the Interim Plan is devoid of any mathematical formula that favors race in any way. 551. U.S. 701, 793 (2007) (Kennedy, J., concurring in part). In *Parents Involved*, Seattle public school

parents challenged a student assignment plan that relied on overt, individual racial classifications to allocate spaces in oversubscribed high schools, while Louisville parents challenged a plan that similarly utilized racial classifications for elementary school assignments and transfers. *Id.* at 785-86 (Kennedy, J. concurring in part). Importantly, in finding both plans unconstitutional, Justice Kennedy concentrated on the districts' use of "official labels proclaiming the race" of elementary and high school children, as well as the clumsy and imprecise way in which they were utilized. *Id.* at 782, 784-86 (Kennedy, J., concurring in part) (noting Seattle school district could not explain why, in a district composed of a "diversity of races," it employed the "crude racial categories of 'white' and 'non-white' as the basis for its assignment decisions.").

However, Justice Kennedy emphasized that the Court's decision should not be read to stop school districts from reviewing the racial makeup of schools and adopting "general policies to encourage a diverse student body." *Id.* at 788 (Kennedy, J., concurring in part). These policies typically take one of two forms. First, schools may employ "nuanced, individual evaluation[s] of school needs and student characteristics that might include race as a component." *Id*. at 789. These evaluations parallel those upheld in *Grutter v. Bollinger*, 539 U.S. 306 (2003), *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016), and *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 980 F.3d 157 (1st Cir. 2020); they are subject to strict scrutiny and must comply with the requirements for narrow tailoring described in the Court's opinion. *Id*. at 789.  Second, school districts can achieve diversity through more generalized approaches that are "race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race." *Id*. These more generalized approaches, that are cognizant of race but are still facially neutral and do not identify, separate, or assign children based on race, are "unlikely" to "demand strict scrutiny." *Id*.

The Interim Plan stands in stark contrast to the plans at issue in *Parents Involved*, which employed "racial tiebreakers" when "nonwhite enrollment" exceeded specific amounts, thus preventing a student from attending the school of their choice and assigning them on the basis of their race. *Parents Involved*, 551 U.S. at 728. The Interim Plan must also be contrasted to the admissions methods for the exam schools challenged in *McLaughlin v. Boston School Committee*, 938 F.Supp 1001 (D. Mass. 1996), which employed a 35% minority set-aside, and *Wessmann*, 160 F.3d at 800, which explicitly classified individual students by race and "effectively foreclose[d] some candidates from all consideration for a seat at an examination school simply because of the racial or ethnic category in which they fall," the Interim Plan is unquestionably race-neutral. *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 76 (1st Cir. 2004). An aspirational statement that Boston's highly selective public schools "better reflect" the city's diversity is hardly equivalent to establishing the fixed, race-based, mathematical ratios necessary for achieving the racial balancing that Plaintiff claims is afoot.[2] *See* ASE01310. Such aspirational considerations of diversity, unaccompanied by rigid ratios for racial balancing, have been consistently recognized and validated by courts. *See Anderson*, 375 F.3d at 85-88 ("To the extent that the School Committee's adoption of the New Plan promoted choice and equitable access to BPS resources for all students in the BPS system, as well as diversity, there is nothing in that mix of goals or in the means of achieving them that triggered strict scrutiny."); *accord Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 282 (S.D.N.Y. 2019) (stating it is simply "not

---

[2] Moreover, Plaintiff ignores the explanation offered by Michael Contompasis, longtime Head of School at Boston Latin School, former Boston Public Schools Superintendent, and Co-Chair of the Exam School Admissions Criteria Working Group, as to the motivation behind the Interim Plan: "[the Working Group] talked passionately about the need to reconsider how we're able to address the need and the value of having a diverse student population in all of the exam schools. That's a critical piece and it is critical in the sense that we have seen over the years that having students of different backgrounds interchanging on a daily basis far improves what we as educators are able to do strictly by presenting contents [sic] to these students….There are living examples of what has happened when students from differing backgrounds come together to present a point of view which one of the other may not have experienced." Ex. 7 ASE00496-97.

4

the law" that facially neutral policy "seeking to improve racial diversity necessarily carries with it a discriminatory intent" necessitating strict scrutiny).

The Interim Plan does not set any racial quotas for any of Boston's three highly selective public schools, nor does the Interim Plan include any sort of process or mechanism that guarantees that racial quotas are met. The Interim Plan does not consider the races of individual students or even the predominant racial or ethnic groups in the zip codes from which the students hail. Instead, the Interim Plan allows all students to compete for the first 20% of seats in each school and then treats **all** students within each zip code equally, regardless of race, in applying for the remainder the seats. In that regard, the Supreme Court's treatment of the Top 10% program employed by the University of Texas at Austin, wherein the top 10% of every public high school's graduating class receives automatic acceptance to the university, is instructive. That plan was described as "facially neutral," and served the "basic purpose" of "boost[ing] minority enrollment," yet was not subject to a strict scrutiny challenge. *See Fisher II*, 136 S.Ct. at 2213 (reserving strict scrutiny only for the component of the plan that specifically considered individual students' race). Even the projections that Plaintiff describes as "smoking guns" (ECF 63 at 17) are just that: projections of what may be shifts in the demographics of admittees. Here, there are no racial classifications, and the Interim Plan that Plaintiff claims provides a proxy for race is fundamentally incapable of "working backward to achieve a particular type of racial balance." *Parents Involved*, 551 U.S. at 729. It is uncertain whether the Interim Plan will actually result in increased diversity at the highly selective public schools, as the projections simply cannot account for student choice.

For these reasons, and for those articulated by the Defendants and the Intervenors in their prior briefs and at oral argument, the Intervenors respectfully request that the Court deny the Plaintiff's claims and uphold the Interim Plan under rational basis review.

Respectfully submitted,

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
BOSTON BRANCH AND OTHER
INTERVENORS

By their attorneys,

/s/ *Doreen M. Rachal*
Doreen M. Rachal (BBO # 667837)
Drew A. Domina (BBO# 703375)
SIDLEY AUSTIN LLP
69 State Street, 36th Floor
Boston, Massachusetts 02109
Tel: (617) 223-0300
drachal@sidley.com
ddomina@sidley.com

/s/ *Susan M. Finegan*
Susan M. Finegan (BBO # 559156)
Mathilda S. McGee-Tubb (BBO # 687434)
Jason Burrell (BBO # 705180)
Laura Martin (BBO # 705617)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
Tel: (617) 542-6000
smfinegan@mintz.com
msmcgee-tubb@mintz.com
jlburrell@mintz.com
lemartin@mintz.com

/s/ *Bethany Li*
Bethany Li (BBO # 673383)
Alex Milvae (BBO # 705668)
Jodie Ng, Law Student Intern
Henry Zhu, Law Student Intern
GREATER BOSTON LEGAL SERVICES
197 Friend Street
Boston, Massachusetts 02114
Tel: (617) 371-1234
bli@gbls.org
amilvae@gbls.org

/s/ *Lauren Sampson*
Lauren Sampson (BBO # 704319)
Janelle Dempsey (BBO # 699379)
Oren Sellstrom (BBO # 569045)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: (617) 988-0609
lsampson@lawyersforcivilrights.org
jdempsey@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org

Dated: April 8, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on April 8, 2021.

      /s/ *Doreen M. Rachal*
      Doreen M. Rachal

Case 1:21-cv-10330-WGY   Document 95   Filed 04/08/21   Page 7 of 7