UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
BOSTON PARENT COALITION FOR   )
ACADEMIC EXCELLENCE CORP.,    )
                              )
            Plaintiff,        )
                              )
        v.                    )        CIVIL ACTION
                              )        NO. 21-10330-WGY
THE SCHOOL COMMITTEE OF THE   )
CITY OF BOSTON,               )
ALEXANDRA OLIVER-DAVILA,      )
MICHAEL O'NEILL,              )
HARDIN COLEMAN,               )
LORNA RIVERA,                 )
JERI ROBINSON,                )
QUOC TRAN,                    )
ERNANI DEARAUJO,              )
BRENDA CASSELLIUS,            )
SUPERINTENDENT OF THE         )
BOSTON PUBLIC SCHOOLS,        )
                              )
            Defendants,       )
AND                           )
                              )
THE BOSTON BRANCH OF THE      )
NAACP, THE GREATER BOSTON     )
LATINO NETWORK, ASIAN PACIFIC )
ISLANDER CIVIC ACTION NETWORK,)
ASIAN AMERICAN RESOURCE       )
WORKSHOP, MAIRENY PIMENTAL,   )
AND H.D.,                     )
                              )
            Defendants-Intervenors.  )
_____)
```

YOUNG, D.J.                                          April 15, 2021

**FINDINGS OF FACT, RULINGS OF
LAW, AND ORDER FOR JUDGMENT**

Acting on behalf of fourteen White and Asian American

parents and children resident in Boston, the plaintiff

corporation sues the Boston School Committee (the "School Committee") charging racial discrimination and seeking to enjoin an interim plan governing admission to Boston's three "exam" schools for the 2021-2022 school year (the "Plan").  This is a serious charge.

The material facts are undisputed.  On their face, the criteria employed for admission are completely race neutral -- and yet, it is transparent that the School Committee, and the Exam School Admissions Criteria Working Group (the "Working Group") which advised it, were acutely aware of the racial composition of the classes expected to be admitted under the Plan.

Thus, the key legal question is the mode of analysis this Court will employ in evaluating the undisputed facts.  Is it enough to establish that the race neutral criteria are rationally based upon appropriate educational goals -- and stop?  Or ought this Court go further and require the School Committee to prove a compelling governmental interest in these criteria and this particular plan before allowing it to proceed?  For answer, this Court turns -- as it must -- to the decisions of the Supreme Court of the United States.

## I.   PRESENT PROCEDURAL POSTURE

The School Committee consists of seven persons appointed by the Mayor of Boston and is responsible for managing the Boston

Public Schools.   Joint Agreed Statement Facts ("Joint
Statement") ¶¶ 1-2, ECF No. 38.   During the COVID-19 pandemic,
the School Committee has made many decisions regarding education
in the Boston Public Schools, one of which pertains to the
application process for three of Boston's public schools, Boston
Latin School, Boston Latin Academy, and the John D. O'Bryant
School of Mathematics and Science ("O'Bryant") (collectively,
the "Exam Schools").   Unable to host a standardized test safely,
the School Committee developed the Plan, which deviated from the
Exam Schools' past admissions process.   After public meetings on
the Plan, the School Committee formally adopted it on October
21, 2020.   Joint Statement ¶¶ 3-48.

On February 26, 2021, the Boston Parent Coalition for
Academic Excellence Corp. (the "Coalition") brought this action
against the School Committee, its members, and the
Superintendent of the Boston Public Schools, Dr. Brenda
Cassellius.   See generally Compl., ECF No. 1.   The Coalition
brings this action on behalf of its members and seeks
preliminary and permanent injunctions for alleged violations of
the Equal Protection Clause of the Fourteenth Amendment and
Massachusetts General Laws chapter 76, section 5.   See generally
Am. Compl., ECF No. 96.

This Court promptly scheduled a hearing upon the
Coalition's request for a preliminary injunction.   Elec. Notice

(Feb. 26, 2021), ECF No. 9.  At that hearing, this Court -- as is its wont -- collapsed the further hearing on the preliminary injunction with trial on the merits pursuant to Federal Rule of Civil Procedure 65(a), but see Nwaubani v. Grossman, 806 F.3d 677, 679 (1st Cir. 2015) (Thompson, J.) (cautioning against overuse of this procedural device), allowed the intervention of various interest groups, and urged the parties to agree upon all undisputed facts, Elec. Clerk's Notes (Mar. 3, 2021), ECF No. 27.

The parties turned to with a will and on March 15, 2021 filed a quite comprehensive joint agreed statement of facts (the "Joint Statement").  The Coalition pronounced itself satisfied with the Joint Statement as a basis for judgment in its favor or, at the very least, under the strict scrutiny test, for shifting to the School Committee the burden of proving a compelling governmental interest warranted upholding the Plan. Tr. Status Conference 24:11-19, ECF No. 100.  The School Committee maintained the Joint Statement supported judgment in its favor under the rational basis test but, cautiously, reserved its right to proffer evidence should that be necessary. Id. 34:9-35:22.

Accordingly, the arguments held on April 6, 2021, are analogous to arguments for and against judgment at the close of the plaintiff's case in chief in a jury waived trial.  Fed. R.

Civ. P. 52.  In such a situation, before judgment can enter, this Court must provide findings of fact and rulings of law. Id.

## II.  FINDINGS OF FACT

The Joint Statement, as stipulated by the parties, is substantially reproduced below.

### A.    The Boston Public Schools

Approximately 80,000 K-12 students live in Boston.  Joint Statement, Ex. 11, City Enrollment by Race (SY 18-19), ECF No. 38-11.  Almost seventy percent of them attend Boston Public Schools, and the quality of education among the schools is anything but equivalent.  Id.; id., Ex. 14, Massachusetts Department of Elementary and Secondary Education Report ("MDESE Report") 2, ECF No. 38-14.  The home of the oldest and most prestigious public schools in the country is also home to thirty-four schools "among the lowest performing [ten percent] of schools in the state."[1]  MDESE Report 2; Joint Statement ¶¶ 8-11.

---

[1] Most of the 17,000 students attending these thirty-four low-performing schools "come from historically underserved student groups."  MDESE Report 2.

The Exam Schools are the Boston Public Schools system's highest performing and most prestigious schools.[2]  Joint Statement ¶ 7.  These schools serve seventh through twelfth-grade students, and there are generally two opportunities for students to apply.  Id. ¶¶ 7, 13.  Students apply while in sixth grade for admission into seventh grade or in eighth grade for admission into ninth grade.[3]  Id.

Although any resident-student in Boston is eligible to apply for admission, only a fraction of students is admitted to these schools, making application a highly competitive process.  Id. ¶¶ 7, 11.  For reference, over 4,000 students attending public, private, charter, and METCO schools applied for admission to the Exam Schools for the 2020-2021 school year.  Id. ¶ 18; id., Ex. 15, Historical Applicant Pool by Race & School Type, ECF No. 38-15; id., Ex. 16, Exam School 3-Year Invitation Data by Race ("Invitation Data"), ECF No. 38-16.

---

[2] The parties stipulate to the prestige of these schools and the respective ranking assigned to each school by U.S. News & World Report in 2020.  Joint Statement ¶ 11.  As of the 2020-2021 school year, 5,859 students are enrolled at the Exam Schools: 2,472 are enrolled at Boston Latin School, 1,771 are enrolled at Boston Latin Academy, and 1,616 are enrolled at O'Bryant.  Id. ¶ 12.

[3] The School Committee allots most available seats in these schools for sixth-grade applicants.  Id. ¶ 13.

Only thirty-five percent of applicants were invited to attend.[4]
Compare Invitation Data, with Joint Statement ¶ 20.

**B.    The Old Admissions Process**

The Boston Public Schools system uses a unified application
process for admission to the Exam Schools.   Joint Statement
¶ 15.   For many years, this process remained relatively
unchanged and involved three factors, a GPA score, a
standardized test score, and the applicant's school preference.
Id.   Each applicant ranked the Exam Schools by preference when
he or she sat for the standardized admissions test.[5]   Id. ¶ 14.
Administrators at the Boston Public Schools would average and
assign a numeric value to the applicant's grades in English
Language Arts and Math.   Id. ¶ 15.   This GPA numeric value was
added to the applicant's standardized test score creating a

---

[4] Of the 1,432 students invited to attend the Exam Schools,
1,025 were admitted to the seventh grade and 408 were admitted
to the ninth grade.   Joint Statement, Ex. 20, Questions from
Michael O'Neill ("Admissions Chart"), ECF No. 38-20.   Boston
Latin School invited 540 students (484 to seventh grade and 58
to ninth grade), Boston Latin Academy invited 424 students (336
to seventh grade and 89 to ninth grade), and O'Bryant invited
568 students (205 to seventh grade and 261 to ninth grade).
Invitation Data; Admissions Chart.

[5] For the 2020-2021 school year, thirty-five percent of
applicants ranked Boston Latin School as their first choice,
thirty-seven percent of applicants ranked Boston Latin Academy
as their second choice, and thirty-five percent of applicants
ranked O'Bryant as their third choice.   Joint Statement, Ex. 17,
Exam School Ranks by School/Race for SY 20-21 Enrollment ("Exam
School Ranks"), ECF No. 38-17.

composite score, by which applicants were ranked.  Id.  Starting
with the student with the highest composite score, each student
received an invitation to his or her first choice of the Exam
Schools.  Id.  If the student's first choice was full, the
student was placed in his or her next choice.  Id.  This process
continued until all seats in the three Exam Schools were filled.
Id.

   C.   **The Procedure to Change the Admissions Process**

   In the summer of 2019, the Boston Public Schools' Office of
Data and Accountability conducted several analyses to determine
how potential changes to the Exam School admissions criteria
would affect diversity at the Exam Schools.  Id. ¶ 27 (citing
id., Ex. 31, Analysis Possible Admissions Criteria Changes, ECF
No. 38-31).  In the fall of 2019, the Superintendent established
a Review Committee to solicit and evaluate responses to a
request for proposal for a new examination to be administered to
Exam School applicants.  Id. ¶ 28.

   On March 10, 2020, Governor Charles Baker declared a state
of emergency because of the COVID-19 pandemic.  Id. ¶ 22.  Since
March 10, 2020, the Governor has limited the size of gatherings
according to the pandemic's fluctuations within the
Commonwealth.  Id. ¶ 23.  On March 15, 2020, the Governor
suspended all normal in-person instruction and educational
operations of K-12 public schools through the end of the 2019-

2020 school year.  Id. ¶ 22.  Accordingly, Boston Public Schools were fully remote from March 17, 2020 until October 1, 2020 and remain remote at least three days every week.  Id. ¶ 24. Shifting from conventional schooling to remote learning brought with it challenges for the School Committee to address.  Id. ¶ 25.  "The COVID pandemic has had significant impacts on [students of Boston Public Schools] and [was] a regular topic of discussion at School Committee meetings."  Id.  The School Committee provided laptops and internet access to students and implemented remote learning guidelines.  Id.

By July 2, 2020, the Review Committee had finished its evaluation.  Id. ¶ 29.  The Superintendent announced that the new plan for Exam School admissions would use the Measures of Academic Progress Growth Test for the 2021-2022 school year. Id.; see id., Ex. 1, Official Minutes Remote Boston School Committee Meeting on July 22, 2020, ECF No. 38-1.  Later that month, the School Committee adopted the Superintendent's recommendation to establish the Working Group.[6]  Joint Statement

---

[6] Nine members sat on the Working Group: (1) Samuel Acevedo, Boston Public School Opportunity and Achievement Gap Task Force Co-Chair; (2) Acacia Aguirre, parent of an O'Bryant student; (3) Michael Contompasis, Former Boston Latin School Headmaster and Boston Public School Superintendent; (4) Matt Cregor, Staff Attorney, Mental Health Legal Advisors Committee; (5) Tanya Freeman-Wisdom, O'Bryant Head of School; (6) Katherine Grassa, Curley K-8 School Principal; (7) Zena Lum, parent of a Boston Latin Academy student; (8) Rachel Skerritt, current Boston Latin

¶ 31.  The Working Group was to "[d]evelop and submit a recommendation to the Superintendent on revised exam school admissions criteria for [the 2021-2022 school year] entrance in light of the potential impact of the COVID-19 pandemic on the prospective applicants during the latter half of the [2019-2020 school year] and potential impact on [the 2020-2021 school year]."  Id.; see id., Ex. 32, Exam School Admissions Criteria Working Group Charter, ECF No. 38-32.  From August 2020 through October 2020, the Working Group met weekly or bi-weekly in meetings closed to the public.  Joint Statement ¶¶ 34, 35.

    The Working Group studied a wide range of information including the admissions criteria used by other cities, the results of the existing admission criteria, the use of test scores, the population of eligible students in Boston, median family income by zip code, application and admissions data by race, the population of the Exam Schools, and the feasibility, equity, and impacts of potential changes to the admission criteria.  Id. ¶¶ 34, 37-41, 44; see id., Exs. 31, 34-36, ECF Nos. 38-31, 38-34, 38-35, 38-36.  It used simulations to understand how various admission criteria would affect the socioeconomic, racial, and geographic representation of sixth-

_____

School Head of School; and (9) Tanisha Sullivan, President of the NAACP's Boston Branch.  Joint Statement ¶ 32; see id., Ex. 2, Official Minutes of the Remote Boston School Committee Meeting on August 5, 2020, ECF No. 38-2.

grade students admitted to the Exam Schools.  Joint Statement ¶¶ 40-41; see id., Exs. 44-54, ECF Nos. 38-44, 38-45, 38-46, 38-47, 38-49, 38-50, 38-51, 38-52, 38-53, 38-44, 38-55.  The Working Group also analyzed administrative and operational issues with the use of each criterion, such as the feasibility of using prior exam scores, the variability of grades within and outside the Boston Public School system, and schools practicing grade inflation.[7]  Joint Statement ¶¶ 37, 42-43; see id., Exs. 35, 55-58, 60-61, ECF Nos. 38-35, 38-55, 38-56, 38-57, 38-58, 38-60, 38-61.

At its meeting on September 29, 2020, the Working Group made its Admissions Recommendation to the Superintendent, and, with the Superintendent's support, the Working Group presented its initial recommendation to the School Committee on October 8, 2020.  Joint Statement ¶¶ 45-46.  After this meeting, the Working Group responded to questions by the School Committee members and completed an Equity Impact Statement using the Boston Public Schools' Equity Impact Planning Tool.  Id. ¶ 47.

---

[7] For example, in 2016, sixty-nine percent of applicants to Boston Latin School from one private parochial school in West Roxbury had A+ GPA averages.  Joint Statement ¶ 43; see id., Ex. 61, Exam School Admissions Working Group Data Summary at 4, ECF No. 38-61.  For reference, between ten and twenty-two percent of applicants from other schools had A+ GPA averages.  Exam School Admissions Working Group Data Summary at 4.

The Equity Impact Planning Tool is a district mandated six-step process for every major policy program, initiative, and budget decision.  Id., Ex. 64, BPS Racial Equity Planning Tool at 3, ECF No. 38-64.  The tool acknowledges that the Boston Public School system "does not consistently provide authentic learning opportunities for [its] students who are most marginalized to develop into self-determined, independent learners, able to pursue their aspirations," and that these "failures lead to disengaged students and significant achievement gaps."  Id.  To rectify this, the six-step process focuses the policy proponents on racial and ethnic inequalities to consider whether and how their proposal aligns with the district's broader goals.  Id. at 1; id., Ex. 63, Equity Impact Statement for School Committee Proposals ("Equity Impact Statement") at 2, ECF No. 38-63.  The Equity Impact Planning Tool explains the difference between equity and equality and how the two "can in fact stand in opposition to each other."  BPS Racial Equity Planning Tool at 12.  It further explains that "[t]o eliminate opportunity gaps persistent for Black and Latinx communities in Boston Public Schools, we must make a hard pivot away from a core value of equality -- everyone receives the same -- to equity: those with the highest needs are prioritized."  Id.  The Working Group completed the Equity Impact Statement for

its Admissions Recommendation and stated the following as its

desired outcome:

> Ensure that students will be enrolled (in the three
> exam high schools) though a clear and fair process for
> admissions in the [2021-2022] school year that takes
> into account the circumstances of the COVID-19 global
> pandemic that disproportionately affected families in
> the city of Boston.

> Work towards an admissions process that will support
> student enrollment at each of the exam schools such
> that it better reflects the racial, socioeconomic and
> geographic diversity of all students (K-12) in the
> city of Boston.

Equity Impact Statement at 1.

Members of the School Committee and Working Group made

various remarks during the October 8, 2020 meeting.  These

remarks included acknowledging the desire to "rectify[] historic

racial inequities" at the Exam Schools, Joint Statement, Ex. 5,

Remote Boston School Committee Meeting Thursday, Oct. 8, 2020

("Oct. 8 Tr."), 173:9-14, ECF No. 38-5, court decisions

involving race in Boston Public Schools, see id. 158:16-159:19,

performance and admission disparities among different

demographics, see id. 165:10-166:5; Joint Statement, Ex. 18,

Recommendation of Exam Schools Admissions Criteria for SY21-22

("Recommendation") at 8, 13, ECF No. 38-18, disappointment about

such disparities and the desire to have the Exam Schools better

reflect Boston's diversity, see Oct. 8 Tr. 213:8-1, and the

merits of considering racial and ethnic equality during the
process, see id. 184:17-185:3.

On October 21, 2020, the School Committee adopted the
Working Group's 2021-2022 Admissions Plan (i.e., the Plan),
which included some changes from the Working Group's original
Admissions Recommendation.  Joint Statement ¶ 48.  During this
meeting, the School Committee Chairperson "made statements that
were perceived as mocking the names of Asian members of the
community who had come to the meeting to comment on the 2021
Admission Plan."  Id. ¶ 66.  The Vice-Chairperson and a voting
member exchanged text messages recounting what had transpired,
offering their sympathies before the inevitable backlash,
stating that it was hard not to laugh, and generally not knowing
what to do with themselves.  Id., Ex. 72, Transcription of Oct.
21, 2020 Text Messages at 1-2, ECF No. 38-72.  The Vice-
Chairperson also exchanged text messages with the
Superintendent, in which the Vice-Chairperson called the meeting
the "[b]est meeting ever."  Id. at 2.

Members of the School Committee and Working Group also
acknowledged the Plan's potential to advance racial equality,
see Remote Boston School Committee Meeting Wednesday, Oct. 21,
2020 ("Oct. 21 Tr.") 365:18-366:2, ECF No. 38-7, their desire
for all Boston Public Schools to reflect the student population
as a whole, see id. 397:19-398:2, 399:5-8, and the limitations

of the Plan to achieve a student body that more closely reflects the demographics of Boston's school-age children, see id. 368:5-14.

### D.   The New Admissions Process[8]

The Plan opened admissions for the Exam Schools on November 23, 2020 and closed admissions on January 15, 2021.  Joint Statement ¶ 53.  No invitations for admission have been sent. Id. ¶ 62.  Under the Plan, applicants were not required to take an admissions exam.[9]  Id. ¶ 50.  Instead, applicants had to satisfy three criteria to be eligible for admission.  Id. ¶ 51. First, the student must be a resident of one of Boston's twenty-nine zip codes.  Id.  Students who were homeless or in the custody of the Department of Children and Families qualified for a special "zip code" created for them to participate in the Plan.  Id.  Next, the student must hold a minimum B average in English Language Arts and Math during the fall and winter of the 2019-2020 school year or have received a "Meets Expectations" or "Exceeds Expectations" score in English Language Arts and Math

---

[8] The parties only stipulated to the mechanisms of the seventh-grade admissions process in detail.  The parties, however, stipulate that "students also enter into the ninth and tenth grades using a similar process."  Joint Statement ¶ 51 n.5.

[9] In recommending this change, the Superintendent and the Working Group cited the difficulties of administering a test during the pandemic.  Id. ¶ 50.

on the Massachusetts Comprehensive Assessment System administered in the spring of 2019.  Id.  Finally, the student must "[p]rovide verification from the school district (or equivalent) that the student is performing at grade level based on the Massachusetts Curriculum standards."[10]  Id.

The Plan also required eligible students to submit a list of the Exam Schools according to his or her preference.  Id. ¶¶ 54-55.  For students attending Boston Public Schools, these eligibility criteria were self-certified by the district, and eligible students were asked to submit their Exam School preferences by January 29, 2021.[11]  Id. ¶ 54.  Non-Boston Public School students were required to submit their proof of eligibility and Exam School preferences by December 31, 2020.[12] Id. ¶ 55.

The Plan has two rounds through which applicants are invited to the Exam Schools.  Id. ¶¶ 57-63.  Using the eligible

---

[10] For students attending Boston Public Schools, these criteria were self-certified by the district.  Id. ¶ 54.  Non-Boston Public School students were required to submit their proof of eligibility by January 15, 2021, and information was communicated to the students through their respective schools. Id. ¶ 55.

[11] This deadline was later extended to March 5, 2021.  Id. ¶ 54.

[12] This deadline was later extended to January 15, 2021, and information was communicated to the non-Boston Public School students through their respective schools.  Id. ¶ 55.

applicants' English Language Arts and Math GPAs for the first
two grading periods of the 2019-2020 school year, students in
the first round are invited to the first twenty percent of seats
in each Exam School.  Id. ¶ 57.  Each student within this top
twenty percent of GPAs is invited to his or her first-choice
Exam School.  Id.  If, however, twenty percent of that student's
first-choice Exam School is filled, that student moves to the
second round of the Plan.  Id.

The second round again ranks eligible applicants by their
English Language Arts and Math GPAs for the first two grading
periods of the 2019-2020 school year.  Id. ¶ 58.  In this round,
however, the students are ranked within their zip code according
to their GPA.  Id.  Each zip code is allocated a percentage of
the remaining eighty percent of seats at the Exam Schools
according to the proportion of school-age children residing in
that zip code.  Id. ¶ 59.

Students are then assigned to the Exam Schools over ten
rounds until each Exam School is filled.  Id., Ex. 66, 2020-2021
BPS Exam Schools Admissions Process at 23, ECF No. 38-66.  Ten
percent of the Exam Schools' seats allocated to each zip code
are assigned per round.  Id.  Starting with the zip code with
the lowest median household income with children under the age
of eighteen according to the American Community Survey, the
highest ranked applicants are assigned to his or her first-

choice Exam School until ten percent of that zip code's allocated seats are filled.  Id.  If an applicant's first-choice Exam School is filled, the applicant is assigned to his or her next choice.  Id.  Once a zip code fills its ten percent of seats, the next zip code's applicants are assigned.  Id. Invitations under both processes will be issued at the same time.  Id. ¶ 62.

### E.  Demographics and the Impact of the Plan

The City of Boston has 29 zip codes.  Id. ¶ 39.  According to the 2019 edition of the United States Census Bureau's American Community Survey of Demographic and Housing Estimates, the racial and ethnic demographics of Boston were as follows: 44.9 percent White, 22.2 percent Black, 19.7 percent Hispanic or Latinx, 9.6 percent Asian, and 2.6 percent two or more races, not including Hispanic or Latinx.  Id. ¶ 21 (citing id., Ex. 21, ACS Demographic and Housing Estimates, ECF No. 38-21).

The demographics of the school-age population in Boston, however, is significantly more diverse than the City's general population, compare id., with Recommendation at 18, and for the 2020-2021 school year, the racial and ethnic demographics of Boston's school-age population were sixteen percent White, seven percent Asian, thirty-five percent Black, thirty-six percent Latinx, and five percent mixed race, Recommendation at 18.

Historically, the student body of the Exam Schools has not represented the same level of diversity.  Recommendation at 8.  According to simulations by the Working Group, had the initial version of the Plan been applied during the 2020-2021 admissions cycle it would have impacted the number of admitted students within virtually every zip code when compared to the number of admitted students under the old, exam-based admissions process used for the 2020-2021 school year.  Id., Ex. 71, Additional Background Information & Data Reviewed by the Boston Public Schools Exam Schools Admissions Criteria Working Group at 5, ECF. 38-71.  Similarly, the Working Group's simulations demonstrated that had the initial version of the Plan been applied during the 2020-2021 admissions cycle the racial make-up of the incoming class would have changed.  Recommendation at 18.  Under the old plan, the racial and ethnic demographics of the incoming class were the following: thirty-nine percent White, twenty-one percent Asian, fourteen percent Black, twenty-one percent Latinx, and five percent "Multi-Race/Other."  Id.  Had the Plan been applied, the class would have been thirty-two percent White, sixteen percent Asian, twenty-two percent Black, twenty-four percent Latinx, and five percent "Multi-Race/Other."  Id.

**F.    The Parties**

The Coalition is a Massachusetts not-for-profit organization.  Suppl. Statement Agreed Facts ("Suppl. Statement") ¶ 1, ECF No. 78.  The Coalition's stated purposes include "promoting merit-based admissions to Boston Exam Schools (including Boston Latin School, Boston Latin Academy and O'Bryant School of Science and Math) and promoting diversity in Boston high schools by enhancing K-6 education across all schools in Boston."  Id. ¶ 2 (brackets and quotations omitted). The Coalition's membership is open to any student, alumni, applicant, or future applicant of the Boston Exam Schools, as well as their family members.  Id. ¶ 3.  The Coalition brings this action "on behalf of [its] members whose children are students applying for one or more of the Boston Exam Schools for the classes entering in the fall of 2021."  Id. ¶ 4. Specifically, the Coalition represents the interests of fourteen students of Asian or White ethnicity and their member-parents. Id.  The students reside in four of Boston's twenty-nine zip codes: Chinatown (zip code 02111), Beacon Hill/West End (zip code 02114), Brighton (zip code 02135), and West Roxbury (zip code 02132).  Id.  Each student "is a sixth-grade student . . . and an applicant to one or more of the Boston Exam Schools for the class entering in the fall of 2021," and each member-parent

supports his or her child's application to the Exam Schools.
Id.

The School Committee is the governing body of the Boston
Public Schools.  Joint Statement ¶ 1.  During the meetings when
the Plan was discussed and developed, the School Committee had
three types of members: one Chairperson, Michael Loconto, one
Vice-Chairperson, Alexandra Oliver-Davila, five voting members,
Michael O'Neill, Dr. Hardin Coleman, Dr. Lorna Rivera, Jeri
Robinson, and Qouc Tran, and one non-voting member, Khymani
James.  Id. ¶ 4.  After Chairperson Loconto resigned, the Mayor
appointed Ernani DeAraujo to the School Committee as a voting
member, Oliver-Davila became the Chairperson, and O'Neill became
the Vice-Chairperson.  Id. ¶ 5.  Oliver-Davila, O'Neill,
Coleman, Rivera, Robinson, Tran, and DeAraujo are named
defendants in this action.  Id. ¶¶ 4-5.  Defendant Brenda
Cassellius is the Superintendent of Boston Public Schools.  Id.
¶ 6.

Several organizations and individuals moved to intervene in
this matter.  Mot. Boston Branch NAACP, Greater Boston Latino
Network, Asian Pacific Islander Civic Action Network, Asian
American Resource Workshop, Maireny Pimentel, & H.D. Leave
Intervene Defs., ECF No. 20.  Organizational intervenor Boston
Branch of the NAACP sought "intervention on behalf of both
itself as well as its members whose children have currently

pending applications to the [Exam Schools], including but not
limited to" an NAACP member and their child, who have a pending
application to the Exam Schools and who live in zip code 02119.
Mem. Law. Supp. Mot. Boston Branch NAACP, Greater Boston Latino
Network, Asian Pacific Islander Civic Action Network, Asian
American Resource Workshop, Maireny Pimentel, & H.D. Leave
Intervene Defs. 4, ECF No. 21.  The "mission" of organizational
intervenor Greater Boston Latino Network "centers on educational
equity -- especially ending segregation and promoting equal
access and opportunity."  Id.  Organizational intervenor Asian
Pacific Islander Civic Action Network seeks to "advance[] the
interests of Massachusetts' Asian and Pacific Islander American
communities with a shared agenda to further equity and oppose
discrimination through year-round civic action."  Id. 5.
Dorchester-based organizational intervenor Asian American
Resource Workshop "is a grassroots, member-led group organizing
Asian American communities throughout Greater Boston through
political education, creative expression, and both issue- and
neighborhood-based organizing."  Id.  Individual intervenor
Maireny Pimentel resides in Boston's South End (zip code 02118)
with her older eighth-grade son, who has a pending application
at Boston Latin Academy, and with her younger sixth-grade son,
who "intends to apply to the [Boston Exam Schools] in fall
2021."  Id. 6.  Individual intervenor H.D., a sixth-grade

student who resides in Dorchester (zip code 02122), "is currently waiting to hear about admission decisions from [the Exam Schools]." Id.[13]

## III. RULINGS OF LAW

The Coalition argues that the Plan violates the Equal Protection Clause of the Fourteenth Amendment because strict scrutiny ought apply, and diversity is not a compelling interest in public schools. See Pl.'s Post Hearing Brief 1-5, 11-14, ECF No. 97. The Coalition arrives at this conclusion by arguing, contrary to controlling precedent, that any consideration of race by the School Committee and Working Group makes race an impermissible motivating factor.[14] See generally Anderson ex

---

[13] This Court also acknowledges and expresses its thanks for the briefs amici curiae from the Anti-Defamation League, the Massachusetts Law Reform Institute, the Asian American Coalition for Education, the Asian American Legal Foundation, and the Center for Law and Education, Inc.

[14] When this Court pressed the Coalition at the hearing on its position, the following exchange took place:

THE COURT: I just want to be clear on your argument. So long as race was one of the things considered, albeit the others are all legitimate, your contention is that this plan fails constitutionally?

MR. HURD: Your Honor, our position is that, yes . . . .

THE COURT: [A]ll right, your argument is -- in deciding what the level of scrutiny is, because race was one factor that they considered, it must be subject to strict scrutiny.

rel. Dowd v. City of Bos., 375 F.3d 71 (1st Cir. 2004); Parents
Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S.
701, 788 (2007) (Kennedy, J.) (concurring in part and concurring
in judgment) (accepting diversity as a compelling governmental
interest along with the four dissenters).  The School Committee
counters that the Coalition lacks Article III standing to
challenge the Plan because the injury to the Coalition's members
is speculative.  See Defs.' Brief J. ("Defs.' Brief") 16-18, ECF
No. 76; Intervenors' Brief Opp'n Pl.'s Mot. J. & Inj. Relief
("Intervenors' Brief") 2 n.2, ECF No. 72.  Alternatively, the
School Committee argues that rational basis review ought apply
because the Plan is race-neutral, and the Coalition failed to
demonstrate both a disparate impact and invidious discriminatory
animus.  See Defs.' Brief 3-15; Intervenors' Brief 2-14.

### A.    Standing

To satisfy the standing requirements imposed by the case or
controversy provision of Article III, Section II of the U.S.
Constitution, a plaintiff must establish an injury in fact that
is concrete, particularized, and actual or imminent, traceable
to the challenged action of the defendant, and redressable by a
favorable ruling.  See U.S. Const. art. III, § 2; Lujan v. Defs.

---

MR. HURD: Yes, your Honor.

Tr. Hearing 15:24-16:3, 16:13-17, ECF No. 101.

of Wildlife, 504 U.S. 555, 560-61 (1992).  The parties principally dispute the Coalition's standing as to the first and third prongs.  Defs.' Brief 16-18; Intervenors' Brief 2 n.2.

The School Committee's argument that the Coalition lacks standing is meritless.  Defs.' Brief 16-18; Intervenors' Brief 2 n.2.  The Coalition demonstrates its standing; however, it does not have standing on its stated basis -- race.

### 1.  Legal Standard

To satisfy the first prong of Article III standing, the plaintiff must show that "he personally has suffered some actual or threatened injury . . . ."  Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 472 (1982) (quotations omitted).  "Concreteness and particularity are two separate requirements."  Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020) (citing Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1545 (2016)).  An injury is "concrete" when it "actually exist[s]," id. (quotations omitted), it is "particularized" when it "affect[s] the plaintiff in a personal and individual way," Lujan, 504 U.S. at 560 n.1, that goes beyond widely shared "generalized grievances about the conduct of the government," Lyman, 954 F.3d at 361 (citing Becker v. Fed. Election Comm'n, 230 F.3d 381, 390 (1st Cir. 2000)), and it is imminent when the threatened harm is "certainly impending" rather than a mere "allegation[] of possible future injury," Clapper v. Amnesty

Int'l USA, 568 U.S. 398, 409 (2013) (brackets and emphasis
omitted); Lujan, 504 U.S. at 564 n.2.  Conversely, allegations
of future harm absent any demonstration that said future harm is
"certainly impending" are too speculative to satisfy Article
III.  Clapper, 568 U.S. at 401, 409.

To satisfy the third prong of Article III standing, the
plaintiff must demonstrate that the injury is redressable by a
favorable ruling.  Lujan, 504 U.S. at 561-62.  A favorable
ruling need not redress the entire injury, but the plaintiff
must demonstrate that a favorable ruling will at least lessen
the injury.  See Antilles Cement Corp. v. Fortuño, 670 F.3d 310,
318 (1st Cir. 2012).

The type of injury is integral to what the plaintiff must
demonstrate to satisfy Article III standing.  See Northeastern
Fla. Chapter of Associated Gen. Contractors of Am. v. City of
Jacksonville, 508 U.S. 656, 666 (1993); Regents of the Univ. of
Cal. v. Bakke, 438 U.S. 265, 319-20 (1978).  Where the plaintiff
alleges a denial of equal protection, the injury is the denial
of the ability to compete equally -- not the denial of the
benefit.  See Northeastern Fla., 508 U.S. at 666; Bakke, 438
U.S. at 319-20.

> When the government erects a barrier that makes it
> more difficult for members of one group to obtain a
> benefit than it is for members of another group, a
> member of the former group seeking to challenge the
> barrier need not allege that he would have obtained

the benefit but for the barrier in order to establish
standing. . . . [The injury] is the denial of equal
treatment resulting from the imposition of the
barrier, not the ultimate inability to obtain the
benefit.

Northeastern Fla., 508 U.S. at 666.

For example, in Regents of the University of California v.
Bakke, a White applicant challenged a medical school's
admissions policy that set aside sixteen of 100 available seats
for minority students.  438 U.S. at 278, 319-20.  The Supreme
Court held that the applicant's injury was his inability to
compete for all 100 seats because only those who fell within a
particular racial classification had "the opportunity to compete
for every seat in the class."  Id. at 320.  The race not allowed
to apply for those sixteen seats was the burdened group.  Id. at
319-20.  Accordingly, the injury could be remedied by a judicial
decision declaring the admissions policy unconstitutional, which
would allow the applicant, and others of his race, to compete
for all 100 seats.  Id.

### 2.   The Coalition Has Standing

The School Committee argues that the Coalition's members
have not demonstrated that they will suffer an injury.  See
Defs.' Brief 17; Intervenors' Brief 2 n.2.  The Coalition argues
that it has standing because the Plan uses geography as a proxy
for race to impose a racial barrier to Exam School admission for

White and Asian students.[15]   See Pl.'s Mem. Supp. Prelim. Inj.
("Pl.'s Mem.") 8-14, ECF No. 63.   Both parties' arguments miss
the mark.

First, the barrier erected by the Plan for applicants to
the Exam Schools principally concerns the second round of
invitations.   Pl.'s Mem. 2-3.   Therein applicants compete only
against others within their zip code for the fraction of seats
apportioned to the zip code based upon its percentage of
Boston's school-age children.   See Joint Statement ¶¶ 57-63.
Consequently, applicants in a number of groups will be
disadvantaged, such as those from zip codes with higher median
family incomes who are assigned last each round, those from zip
codes with a high number of applicants but a low percentage of
the City's school-age population, and those from zip codes with
higher-than-average median GPAs.   Such applicants are
disadvantaged because the Plan makes it more difficult for them
to be admitted when compared to applicants from other zip codes.
Were this Court to find the Plan unconstitutional, this unequal
treatment could be redressed because one remedy could allow for

---

[15] The Coalition argues that they have standing on the basis
of race because the Plan will result in fewer Asian and White
applicants admitted to the Exam Schools.   Reply Mem. Addressing
Intervenors' Opp'n & Supp. J. & Inj. Relief 2-3, ECF No. 87.
The Coalition fails to satisfy standing on the basis of race
because, on its face, the Plan does not erect racial barriers
and the Coalition even admits that the Plan is facially race-
neutral.   Tr. Hearing 24:4-5.

these applicants to compete for all the available seats at the
Exam Schools.  See Northeastern Fla., 508 U.S. at 666; Bakke,
438 U.S. at 319-20.

Moreover, the Coalition has demonstrated that its members
are eligible to apply to the Exam Schools, that they did in fact
apply, and that they reside in zip codes 02111, 02114, 02135,
and 02132, all of which sent more students to the Exam Schools
under the old plan than are presently likely under the Plan for
school year 2021-2022.  Suppl. Statement ¶ 4.  It is reasonable
to infer from this reduction in invitations that these zip codes
will have either higher competition among their residents for
their apportioned seats or pick later in the rounds.  This Court
therefore finds and rules that the Coalition has Article III
standing.

**B.   Count I: Equal Protection**

Disadvantaging the aforementioned groups warrants rational
basis review under the Fourteenth Amendment's Equal Protection
Clause because geography, wealth, and academic success are not
suspect classes.  Despite conceding that the Plan is facially
race neutral, the Coalition attempts to trigger strict scrutiny
by claiming that (1) the Plan uses proxies for race and that any
proxy for race automatically triggers strict scrutiny and (2)
that the Plan was motivated by interests in racial diversity and

that this automatically triggers strict scrutiny.  Pl.'s Mem.
14-15.  This plainly is not the law.

### 1.    Level of Scrutiny to Apply

The Equal Protection Clause of the Fourteenth Amendment
protects against discrimination on the basis of race.  Anderson,
375 F.3d at 82.  "When the government uses explicit racial
classifications for the distribution of benefits, discriminatory
intent is presumed, and those policies are always subjected to
strict scrutiny."  Id. (citing Personnel Adm'r of Mass. v.
Feeney, 442 U.S. 256, 272 (1979); Grutter v. Bollinger, 539 U.S.
306, 326 (2003)); see also Parents Involved, 551 U.S. at 720;
Johnson v. California, 543 U.S. 499, 505-06 (2005); Adarand
Constructors, Inc. v. Pena, 515 U.S. 200, 204 (1995).

The Plan considered here, however, does not employ explicit
racial classifications, and the Coalition concedes that the Plan
is facially race neutral.  See Tr. Hearing 24:4-5, ECF No. 101;
supra Section II.D.  Where the government action is facially
race neutral and uniformly applied, "good faith [is] presumed in
the absence of a showing to the contrary" that the action has a
disparate impact, the spawn of an invidious discriminatory
purpose.  Bakke, 438 U.S. at 318-19.  "Determining whether
invidious discriminatory purpose was a motivating factor demands
a sensitive inquiry into such circumstantial and direct evidence
of intent as may be available."  Village of Arlington Heights v.

[30]

Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977).  "The Supreme
Court non-exhaustively enumerated several factors relevant to
the inquiry: the degree of disproportionate racial effect, if
any, of the policy; the justification, or lack thereof, for any
disproportionate racial effect that may exist; and the
legislative or administrative historical background of the
decision."  Anderson, 375 F.3d at 83.

### 2. Rational Basis Review Applies

There is no question but that the School Committee and the
Working Group were keenly aware of the Plan's effect on
diversity and interested in increasing the Exam Schools'
"racial, socioeconomic and geographic diversity [better to
reflect the diversity of] all students (K-12) in the city of
Boston."  Equity Impact Statement at 1; see supra Section II.C.
This does not, however, subject the Plan to strict scrutiny.  In
the words of the First Circuit,

> the mere invocation of racial diversity as a goal is
> insufficient to subject [an otherwise race-neutral
> plan] to strict scrutiny.  In those cases where the
> Supreme Court inquired whether diversity is a
> compelling state interest and whether the program at
> issue could survive strict scrutiny, the programs were
> all subjected to strict scrutiny because they used
> explicit racial classifications to achieve the goal of
> diversity.  None of these cases, nor any other case to
> which our attention has been drawn, has subjected a
> governmental program to strict scrutiny simply because
> the state mentioned diversity as a goal.

Anderson, 375 F.3d at 87.  Furthermore, "[t]he Supreme Court has explained that the motive of increasing minority participation and access is not suspect."  Id. (citing City of Richmond v. JA Croson Co., 488 U.S. 469, 507 (1989) (approving the use of race-neutral means to increase minority participation in governmental programs)).  In Parents Involved in Community Schools v. Seattle School District Number 1, Justice Kennedy not only ruled this motive permissible, but fortified its use through race-neutral proxies aimed at accomplishing its end:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race.

551 U.S. at 789 (Kennedy, J.) (concurring in part and concurring in judgment) (emphasis added).  Although these proxies are race-conscious, it is "unlikely any of them would demand strict scrutiny to be found permissible" because they do not define students by their race in violation of the Equal Protection Clause of the Fourteenth Amendment.  Id. (citing Bush v. Vera, 517 U.S. 952, 958 (1996) (plurality opinion) ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. . . .  Electoral district lines are facially race neutral, so a more searching inquiry is

necessary before strict scrutiny can be found applicable in redistricting cases than in cases of classifications based explicitly on race." (quotations omitted))).

Similarly, the Third, Fifth, and Sixth Circuits have held that considering racial data is not a racial classification and does not trigger strict scrutiny.  See Spurlock v. Fox, 716 F.3d 383, 394 (6th Cir. 2013) ("Racial classification requires more than the consideration of racial data.  If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions."); Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 547-48 (3d Cir. 2011) ("Appellants also conflate a school assignment policy that explicitly classifies based on race with the consideration or awareness of neighborhood racial demographics during the development and selection of a policy. . . .  The consideration or awareness of race while developing or selecting a policy, however, is not in and of itself a racial classification.  Thus, a decisionmaker's awareness or consideration of race is not racial classification. Designing a policy 'with racial factors in mind' does not constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion." (quoting

Hayden v. Cnty. of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)));

Lewis v. Ascension Par. Sch. Bd., 806 F.3d 344, 358 (5th Cir.

2015) ("[T]he district court's legal conclusion that the Board's

consideration of demographic data in formulating [the plan at

issue] 'does not amount to [adopting] a rezoning plan that

assigns students on the basis of race' conforms to Supreme Court

case law . . . and is in accord with the decisions of this

Court's sister circuits, see Spurlock, 716 F.3d at 394; Lower

Merion, 665 F.3d at 548.  Accordingly, we hold that the district

court did not err in concluding that [the plan at issue] does

not make express racial classifications and so is not subject to

strict scrutiny on that basis."); see also United States v.

Hays, 515 U.S. 737, 745 (1995) ("[T]he legislature always

is aware of race when it draws district lines, just as it is

aware of age, economic status, religious and political

persuasion, and a variety of other demographic factors.  That

sort of race consciousness does not lead inevitably to

impermissible race discrimination." (quotations omitted)).

The Coalition, unwilling or unable to distinguish precedent

concerning explicit racial classifications from precedent

concerning race-neutral classifications, repeatedly urged this

Court to apply inapposite precedent to conclude that strict

scrutiny applies.  Pl.'s Mem. 14-20 (citing Johnson, 543 U.S. at

505-06 (applying strict scrutiny to explicit racial

classifications); <u>Adarand</u>, 515 U.S. at 204 (same); <u>Miller</u> v. <u>Johnson</u>, 515 U.S. 900, 916-17 (1995) (invalidating racial gerrymandering where the legislature blatantly subordinated all other bases for redistricting to race)).  In so doing, the Coalition conjured the proverbial third rail of equal protection doctrine -- racial balancing.  Reply Mem. Addressing Defs.' Brief & Supp. J. & Inj. Relief ("Pl.'s Reply") 2, 5-9, 12-14, ECF No. 83.

To support its assertion factually, the Coalition points to statements concerning race by members of the School Committee,[16]

---

[16] The Coalition points to School Committee Member Rivera's statement at meetings, such as the need to "be explicit about racial equity," "need[ing] to figure out again how we could increase those admissions rates, especially for Latinx and [B]lack students," Oct. 8 Tr. 184:17-185:3, the Plan being a "step in the right direction" for "addressing racial and ethnic disparities in educational achievement and to advance ethnic studies and racial equity in the school district," Oct. 21 Tr. 365:18-366:2, and the Plan not going "far enough because White students continue to benefit from thirty-two percent of the seats," <u>id.</u> 368:5-14.

The Coalition also points to School Committee Vice-Chairperson Oliver-Davila's statements, such as "I want to see those schools reflect the District.  There's no excuse, you know, for why they shouldn't reflect the District, which has a larger Latino population and black African-American population." Oct. 8 Tr. 213:8-1.  "I mean, we know that Black and Latino youth are underrepresented, and they have been locked out of this opportunity.  And for me, you know, it's just criminal that the percentages have not increased."  Oct. 21 Tr. 397:19-398:2. "I think that all of our schools should reflect the student body that we have.  We should not -- it should not be acceptable to have schools that don't represent that, just not acceptable." <u>Id.</u> 399:5-8.

members of the Working Group,[17] and within the Equity Planning

Tool.  Setting aside, for a moment, the Coalition's cavalier

interpretations of the Fourteenth Amendment's Equal Protection

doctrine, this Court does not take lightly the statements made

by the School Committee and the Working Group.  Without

question, some statements raise cause for concern.  The

statement within the Equity Planning Tool, for example, about a

hard pivot away from equality and towards equity simply has no

support in the Equal Protection jurisprudence of the Supreme

Court.  See, e.g., Feeney, 442 U.S. at 273 ("[T]he Fourteenth

---

[17] Working Group member Tanisha Sullivan stated: "This
proposal will allow our exam schools to more closely reflect the
racial and economic makeup of Boston's kids."  Oct. 21 Tr.
78:18-20.  She also stated the following: "When reviewing
available assessment and report card grades, the working group
saw persistent opportunity and achievement gaps reflected in the
data.  I want to say that this was one of -- this was a defining
moment in our process.  Well over half of the White and Asian
fourth grade students met or exceeded expectations in both ELA
and math in the '18-'19 -- fourth grade '18-'19 MCAS scores.
Less than 15 percent of Latinx students and less than 13 percent
of Black students received the same scores.  Additionally, when
looking at fifth grade GPA from the same year, what we saw is
that all -- across all racial demographic groups there is an
increase in fifth grade GPA from fall to spring.  However, the
rate of increase is higher for White and Asian students than it
is for Black and Latinx students.  These two factors played a
significant role in what we will ultimately recommend."  Oct. 8
Tr. 165:10-166:5.

Working Group member Samuel Acevedo stated: "The working
group faces two imperatives determining the most equitable
admissions policy to the Boston's -- to Boston's elite schools
in the limited context of this mid-COVID-19 year, but also long-
term rectifying historic racial inequities afflicting exam
school admissions for generations."  Oct. 8 Tr. at 173:9-14.

Amendment guarantees equal laws, not equal results."). Had this
Plan unconstitutionally substituted equality of result for
equality of opportunity along racial lines, this Court would not
hesitate to strike it down.

But that is not what happened here.

Apparently well counseled, the School Committee considered
diversity and developed its Plan within the permissible
framework of the Supreme Court precedent. Despite its goal of
greater "racial, socioeconomic and geographic diversity [better
to reflect the diversity of] all students (K-12)," the Plan
principally anchors itself to geographic diversity by equally
apportioning seats to the City's zip codes according to the
criterion of the zip code's percentage of the City's school-age
children. See supra Section II.D. The Plan similarly anchors
itself to socioeconomic diversity by ordering the zip codes
within each round by their median family income. See supra
Section II.D. The Plan is devoid, however, of any anchor to
race. See supra Section II.D.

Viewing everything through the prism of race is both myopic
and endlessly divisive. Geographic and socioeconomic diversity
are appropriate educational goals in their own right, regardless
of race. See Parents Involved, 551 U.S. at 722 (discussing
cases involving the interest of diversity and how it encompasses
"a far broader array of qualifications and characteristics of

which racial or ethnic origin is but a single though important element" (quoting Grutter, 539 U.S. at 325)).  They are not mere shibboleths or surrogates for racial balancing.  Indeed, Boston's richly varied cultural heritage, see, e.g., Mark Peterson, The City-State of Boston (Princeton Univ. Press 2019), makes it all the more appropriate to draw the Exam Schools' entering class from every corner of the City.  Likewise, putting the poorest neighborhoods first in the draw is a bold attempt to address America's caste system.  See, e.g., Isabel Wilkerson, Caste (Penguin Books Ltd. 2020).  Indeed, a respected legal philosophy adopts this same approach.  See generally John Rawls, A Theory of Justice (Belknap Press 1971).

The School Committee's goal of a more racially representative student body, although more often discussed and analyzed, did not commandeer the Plan, and it in fact necessarily took a back seat to the Plan's other goals, which the Plan more aptly achieved.  Consequently, any effect on the racial diversity of the Exam Schools is merely derivative of the Plan's effect on geographic and socioeconomic diversity -- not the reverse.

This Court finds and rules that the Plan is race-neutral, and that neither the factors used nor the goal of greater diversity qualify as a racial classification.  See Parents Involved, 551 U.S. at 789 (Kennedy, J.) (concurring in judgment

and concurring in part); Anderson, 375 F.3d at 87; see also
Spurlock, 716 F.3d at 394; Lower Merion, 665 F.3d at 548; Lewis,
806 F.3d at 358.  Accordingly, rational basis review applies.

"The general rule is that legislation is presumed to be
valid and will be sustained if the classification drawn by the
statute is rationally related to a legitimate state interest."
City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440
(1985).  "[A] classification neither involving fundamental
rights nor proceeding along suspect lines is accorded a strong
presumption of validity."  Heller v. Doe ex rel. Doe, 509 U.S.
312, 319 (1993); see also id. at 320 (noting that the race-
neutral classification "must be upheld against equal protection
challenge if there is any reasonably conceivable state of facts
that could provide a rational basis for the classification"
(quotations omitted)).

Here, the School Committee was tasked with developing an
admissions plan amid a pandemic which affected some students
more significantly than others to admit applicants from schools
with different grading practices, including grade inflation, all
without the benefit of a standardized test.  See supra Section
II.D.  The School Committee settled on socioeconomic, racial,
and geographic diversity as interests to help guide its
legitimate endeavor of creating a new admissions process for the
2021-2022 school year.  See supra Section II.D; Parents

Involved, 551 U.S. at 789 (Kennedy, J.) (concurring in judgment
and concurring in part); City of Cleburne, 473 U.S. at 440;
Anderson, 375 F.3d at 87; see also Spurlock, 716 F.3d at 394;
Lower Merion, 665 F.3d at 548; Lewis, 806 F.3d at 358.

Therefore, the Court finds and rules that the Plan is
rationally related to the School Committee's legitimate
interest.

### 3.   The Coalition Has Failed to Prove Disparate Impact and an Invidious Discriminatory Purpose

The Coalition would have this Court believe that the School
Committee's interest in socioeconomic diversity is a "sham"[18] and
that the scheme was aimed at harming White and Asian students.
Tr. Hearing 15:10-14; Pl.'s Reply 2-4.  The Supreme Court has
developed standards for uncovering such intent -- precedent that
the Coalition repeatedly denied it must satisfy.  Tr. Status

---

[18] This Court appreciates the obvious frustration and
anxiety from having an admission plan changed the year one
applies and see data to suggest that fewer applicants from your
area code will be allowed to attend a prestigious institution
than the year before.  Nevertheless, the Fourteenth Amendment's
Equal Protection Clause is not a bulwark for the status quo.
The aim of the doctrine is to avoid racial classifications
wherever possible because of their invidious use in the past but
still allow laudable endeavors.  One may not simply bootstrap
any neutral classification arguably correlated with race and,
claiming that it is an impermissible proxy therefor, strip away
all forms of diversity.  That is neither the spirit nor the
letter of the doctrine, and to allow such efforts to succeed by
delegitimizing other forms of diversity will be the undoing of
the doctrine.

Conference 23:2-5 ("We don't have to show racial animus."); Tr. Hearing 15:24-16:3, 16:13-17; Pl.'s Brief 7.

The Plan is race-neutral, see supra Section III.B.2, and thus "good faith [is] presumed in the absence of a showing to the contrary" that the action has a disparate impact, the spawn of an invidious discriminatory purpose, Bakke, 438 U.S. at 318-19. See also United States v. Armstrong, 517 U.S. 456, 465-69 (1996) (requiring the plaintiff to prove both discriminatory purpose and discriminatory effect).

### a.   Disparate Impact

The Coalition alleges that White and Asian students will suffer a disparate impact under the Plan because White students will make up thirty-two instead of thirty-nine percent of seats at the Exam Schools, and Asian students will make up sixteen instead of twenty-one percent of seats at the Exam Schools.[19]

---

[19] For reference, White and Asian students combined comprise twenty-three percent of school-age children in Boston but represented fifty percent of incoming students at the Exam Schools.  Recommendation at 18.  Under the new plan, White students will go from representing 243 percent of their share of the school-age population in Boston to 200 percent.  Id. Similarly, Asian students will go from representing 300 percent of their share of the school-age population in Boston to 228 percent.  Id.  This Court does not suggest that remaining overrepresented alone disproves disparate impact.  It simply notes that when a group is as overrepresented as White and Asian students at the Exam Schools, it would appear that nearly any changes to the admissions process would have resulted in some reduction, if only from the law of averages.  See supra note 18 ("[The] Equal Protection Clause is not a bulwark for the status quo.").

Recommendation at 18.  This is a sixteen percent decrease for White students and a twenty-four percent decrease for Asian students.  Id.

This, however, is not what the Supreme Court considers a disparate impact.  See generally, e.g., McCleskey v. Kemp, 481 U.S. 279 (1987); Washington v. Davis, 426 U.S. 229 (1976); Village of Arlington Heights, 429 U.S. at 266; Yick Wo v. Hopkins, 118 U.S. 356 (1886); see also generally Anderson, 375 F.3d at 87-90 (holding that the results were not "stark" and did not qualify as a disparate impact under Arlington Heights).

The Coalition has not met its burden of proof.  It failed to proffer any expert testimony or statistical analysis of the Plan.  Moreover, at this juncture, the Coalition cannot even demonstrate the final demographic effects of the Plan.  The Coalition relies on the information the Working Group presented to the School Committee at the October 8, 2020 meeting, but the Plan was amended after that meeting by changing the rank of zip codes within each round from median income to median family income.  Recommendation at 18; Joint Statement ¶¶ 45-46. Therefore, the Coalition has not presented any statistical evidence as to what the effect of the Plan in its final form will be on Boston's ethnic communities.

Moreover, even if these numbers did represent the Plan's effect in its final form, the Coalition's argument is still

unavailing.  The racial demographics of the Exam Schools under the old plan were a disjunctive consequence year to year -- there was no guarantee that any White or Asian student would even be admitted.  To use a variable consequence as the baseline upon which all future plans must comport is erroneous.[20]

Accordingly, this Court finds and rules that the Coalition failed to demonstrate that the Plan has a disparate racial impact.

### b.   Invidious Discriminatory Purpose

Finally, the Coalition alleges that the School Committee had animus towards Asians and White applicants.  Pl.'s Mem. 7. Whether the Board harbored an invidious discriminatory purpose as a motivating factor behind the Plan "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Village of Arlington Heights, 429 U.S. at 266; see Davis, 426 U.S. at 242 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."); see also Anderson, 375

---

[20] It goes without saying that White and Asian students are not "losing" seats simply because last year different White and Asian students were exceedingly privileged to win a high number of seats without any evidence that this years' students would have fared the same.  No such evidence was presented, and this Court rejects the use of stereotypes to that effect.  See Brief Amici Curiae the Asian American Coalition for Education and the Asian American Legal Foundation Supp. Pl. 5, ECF No. 88.

F.3d at 87-89 (upholding a plan that would "preserve racial and
ethnic diversity and reduce the likelihood of racial isolation
with its schools").

The first two criteria that the Supreme Court has
enumerated, the degree of any disproportionate racial effect and
the justification therefor, do not demonstrate discriminatory
animus for the reasons articulated above, see supra Sections
III.B.2 & III.B.3.a, leaving the Plan's legislative and
administrative historical background and its adoption for this
Court's inquiry, see Anderson, 375 F.3d at 83.

Turning first to the administrative history of the Plan's
adoption, the School Committee and Working Group did not deviate
from their normal procedures, and the Coalition does not suggest
otherwise.  See generally Yick Wo, 118 U.S. at 374; Joint
Statement.  As for the Plan's legislative history, however, the
Coalition points to statements made by members of the School
Committee as evidence of a discriminatory purpose.  See Pl.'s
Mem. 3-8.

First, the Coalition points to statements made during the
October 21, 2020 meeting, at which the School Committee adopted
the Plan.  Joint Statement ¶¶ 48-68.  The Chairperson "made
statements that were perceived as mocking the names of Asian
members of the community who had come to the meeting to comment
on the 2021 Admission Plan."  Id. ¶ 66.  School Committee

counsel concedes that these statements were "stupid" and "should
not have been made," Tr. Hearing 48:14-19, but argued that the
insensitive behavior had nothing to do with the Plan, its
purpose, or its adoption, see id.  These were racist comments
directed at the City's Asian American community.  This Court
takes them seriously but finds no persuasive evidence that any
other voting member had such animus.  This is conclusive.

The Coalition points to statements about racial diversity
and text messages about the Chairperson's racist remarks as
evidence that other members of the School Committee expressed
their discriminatory motivations.  Pl.'s Mem. 7.  This Court
finds that these statements do not evidence an invidious
discriminatory purpose.  See Anderson, 375 F.3d at 87-90; see
also Village of Arlington Heights, 429 U.S. at 266.  The text
messages evidence concern about the remarks and speculation
about the backlash from the comments.  Transcription of Oct. 21,
2020 Text Messages at 1-2.  They do not demonstrate that the
members of the School Committee supported the Chairperson's
racist mocking.  Similarly, the remarks about diversity made
during the October 8 and October 21 meetings evidence diversity
as a motivating factor, but not a discriminatory purpose, as
discussed in depth above.  See supra Section II.B.2.; see also
Anderson, 375 F.3d at 87-90; Lower Merion, 665 F.3d at 547-48
("Neither Pryor nor Arlington Heights stands for the proposition

that strict scrutiny must be applied when race, but not a discriminatory purpose, was a motivating factor.").

Accordingly, this Court finds and rules that the Plan was not motivated by an invidious discriminatory purpose.

### C.    Count II: Mass. Gen. Laws Chapter 76, Section 5

Notwithstanding the parties' underdeveloped arguments on the point, count II alleges violation of Massachusetts General Law chapter 76, section 5.  See Am. Compl. ¶¶ 65-69.  In relevant part, this statute provides that "[n]o person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation."  Mass. Gen. Laws ch. 76, § 5.  Under the Massachusetts Department of Elementary and Secondary Education's implementing regulation, "Public schools shall not use admission criteria that have the effect of subjecting students to discrimination because of their race, color, sex, gender identity, religion, national origin or sexual orientation."  603 Mass. Code Regs. § 26.02(5).

This Court finds and rules in favor of the School Committee on count II.  As explained above, the Plan does not have the effect of subjecting students to discrimination because of their race.  See supra Sections III.B.2 & III.B.3.

## IV.   CONCLUSION

It comes down to this:  This year, the best way for a rising seventh or ninth-grader to get into one of Boston's three prestigious exam schools is (1) get excellent grades all around (the GPA Criterion), (2) attend a school with a high level of grade inflation, (3) live in a Boston zip code heavily populated with school-age children (geographic diversity) -- but hopefully not too many rising seventh or ninth-graders (your direct competition), but (4) a zip code encompassing the poorest residential area of the city (socioeconomic diversity).  No one quarrels with the first criterion.  The second, while unpalatable, could hardly be avoided since the pandemic and other factors made it impossible to administer a standardized test.  Only the third and fourth criteria bear any correlation to racial demographics at all,[21] and both have been approved by the Supreme Court.  See Parents Involved, 551 U.S. at 722; id. at 789 (Kennedy, J.) (concurring in part and concurring in judgment).  The fact that the policymakers appreciated the correlation does not render these diversity criteria unworthy of consideration as rationally advancing proper educational goals for Boston's children.

---

[21] Indeed, the very fact of the correlation speaks to a host of factors that may be capable of historical proof but which go well beyond the agreed upon record here.  A number of the amici briefs delve into these matters.

The education of one's children is a matter of prime concern to any parent.  Thus it is worthy of remark that the Plan the Court today upholds applies **only** to the 2021-2022 school year.  All parties here concede there may be better race-neutral ways to handle Exam School admissions.  Tr. Hearing 19:18-20:8; id. 33:17-34:6.  This is also the year of a mayoral election.  As the mayor appoints the School Committee, these matters are sure to be, and of right ought be, the subject of lively civic debate.  As Justice Scalia sagely observed, "[There is] the need for continuing democratic debate and democratic decision-making, on an ever-increasing list of social issues."  Antonin Scalia, Scalia Speaks 199 (Christopher J. Scalia & Edward Whelan eds., 2017).  Here, this Court rules only that this one year Plan has a rational basis and denies none of Boston's citizens the equal protection of the laws.  Nor does it violate Massachusetts General Laws chapter 76 section 5.  Judgment shall enter for the School Committee defendants.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE