# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

| | |
|---|---|
| **BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEILL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS,**<br><br>**Defendants**<br><br>**and**<br><br>**THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTAL, and H.D.,**<br><br>**Defendants-Intervenors.** | **Civil Action No. 1:21-cv-10330-WGY** |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION PURSUANT TO RULE 60(b)

Callan G. Stein (BBO # 670569)
Mary Grace W. Metcalfe (N.Y. Bar #5377932)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com
marygrace.metcalfe@troutman.com
Admitted *pro hac vice*

William H. Hurd (Va. Bar # 16967)
Christopher W. Carlson, Jr. (Va. Bar # 93043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1335
william.hurd@troutman.com
chris.carlson@troutman.com
Admitted *pro hac vice*
*Counsel for Plaintiff*

## Table of Contents

I.   It is undisputed that the City deliberately withheld text messages that show clear racial animus on the part of two more School Committee Members. That alone is sufficient to grant the present motion. ................................................... 3

II.  Defendants offer so-called "explanations" for the concealment of the racist text messages that are untrue and defy logic. They are nothing more than a clumsy attempt to cover-up the cover-up. ................................................... 6

III. Based on what we know now, there is much more to this story, and the only way to get to the bottom of it, and ensure a fair process, is to grant the requested relief. ................................................... 11

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson v. Cryovac, Inc.*,
    862 F.2d 910 (1st Cir. 1988) ................................................................................................. 3, 4

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989) ................................................................................................... 6

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ..................................................................................................... 6

*Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*,
    771 F.2d 5 (1st Cir. 1985) .......................................................................................................... 7

*CASA de Maryland, Inc. v. Trump*,
    355 F. Supp. 3d 307 (D. Md. 2018) .......................................................................................... 5

*Com. Ins. Co., of Newark, N. J. v. Gonzalez*,
    512 F.2d 1307, 1314 (1st Cir. 1975) ......................................................................................... 8

*Giroux v. Fed. Nat. Mortg. Ass'n*,
    810 F.3d 103 (1st Cir. 2016) ...................................................................................................... 4

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
    322 U.S. 238, 64 S. Ct. 997, 88 L. Ed. 1250 (1944) ................................................................. 6

*Kettenbach v. Demoulas,*
    901 F. Supp. 486, 494 (D. Mass. 1995) .................................................................................... 6

*Lopez v. Wall*,
    No. CA 09-578-S, 2011 WL 3667592 (D.R.I. Aug. 22, 2011) ................................................. 6

*Langadinos v. Pezza Law, P.C.*,
    2014 WL 7406008 (Mass.Super. Apr. 25, 2014) ..................................................................... 8

*MARJAC, LLC v. Trenk*,
    380 F. App'x 142 (3d Cir. 2010) ............................................................................................... 5

*Mitchell v. United States*,
    141 F.3d 8 (1st Cir. 1998) ...................................................................................................... 5, 6

*Moron-Barradas v. Dep't of Educ. of Com. of Puerto Rico*,
    488 F.3d 472 (1st Cir. 2007) ..................................................................................................... 4

*Mullins v. Dep't of Lab. of Puerto Rico*
    (D.P.R. Sept. 7, 2012) ............................................................................................................ 6

*Pearson v. First NH Mortg. Corp.*,
    200 F.3d 30 (1st Cir. 1999) ..................................................................................................... 6

*Rosebud Sioux Tribe v. A & P Steel, Inc.*,
    733 F.2d 509 (8th Cir. 1984) ................................................................................................... 6

*Saget v. Trump*,
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) ..................................................................................... 5

*Situation Mgmt. Sys., Inc. v. Lamoco Consulting, LLC*,
    No. 06-11557-RGS, 2011 WL 1226114 (D. Mass. Mar. 30, 2011) ........................................ 8

*In re Tri-Cran, Inc.*,
    98 B.R. 609 (Bankr. D. Mass. 1989) .................................................................................. 4, 6

*In re Webster*,
    No. 11-11077, 2013 WL 145581 (Bankr. D.R.I. Jan. 14, 2013) ............................................. 8

*United States v. Adcox,*
    19 F.3d 290, 292 n1 (7th Cir. 1994) ....................................................................................... 8

*United States v. Boskic,*
    545 F.3d 69, 87 (1st Cir. 2008) ............................................................................................... 8

*United States v. 6 Fox Street*,
    480 F.3d 38 (1st Cir.2007) ...................................................................................................... 6

*United States ex rel. Worthy v. E. Maine Healthcare Sys.*,
    No. 2:14-CV-00184-JAW, 2017 WL 211609 (D. Me. Jan. 18, 2017) .................................... 8

*Van Eperen v. Mass. Mut. Life Ins., Co.*,
    No. 3:14-CV-13008-MAP, 2017 WL 9249439 (D. Mass. Feb. 28, 2017) .............................. 8

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................................................ 5, 6

**Other Authorities**

Federal Rule of Civil Procedure 60(b) ............................................................................................ 2

Federal Rule of Civil Procedure 60(b)(2) ............................................................................... 4, 5, 6

Federal Rule of Civil Procedure 60(b)(3) .................................................................................. 3, 4

Federal Rule of Civil Procedure 60(b)(6) ...................................................................................... 6

> *Let me start at the outset by saying how pleased I am by the cooperation of skilled counsel and the number of things that you have been able to agree, that's a great help in the management of this case…I am most pleased that you cooperated so well to agree on things that are generally undisputed. There are disputes, I'm not surprised at that, but this is lawyering of a high order and I appreciate it.*

The Honorable Robert Young, March 16, 2021, Hearing (Tr. 5:6-16).

Exiting the March 2021 virtual hearing, the Boston Parents were also "pleased" that the parties were able to negotiate what appeared to be a robust joint statement of undisputed facts that included relevant documents obtained from the City of Boston through public records requests. The documents produced by the City included what the Boston Parents were led to believe were complete transcripts of requested text messages between School Committee Members, including Vice-Chairperson Alexandra Oliver-Davila and Member Lorna Rivera. Exhibit 72. On that basis, the Boston Parents were pleased to proceed on the closed, agreed-upon record with no further discovery. Had the Boston Parents known then what we all know now, namely that, in creating those transcripts, the City of Boston intentionally omitted racist text messages, they never would have so agreed. Instead, the Boston Parents would have insisted on conducting discovery, not only to obtain the full text message records but, perhaps more importantly, to discover why the City's officials were motivated to cover up these racist messages and what else they may be hiding.

Even now, when the existence of these racist messages and their concealment from the Boston Parents and this Court are matters of undisputed fact, Defendants' response leaves much unknown. What other evidence of discriminatory motive and racial animus exists? Who was responsible for transcribing these text messages? Who actually made the ultimate decision to transcribe the text messages – rather than produce the screenshots – while omitting the racist messages? Who decided to produce only the altered version to the Boston Parents while this case was pending? And, if the motivation behind the Zip Code Quota Plan was truly based on

something other than race (as Defendants and Intervenors have repeatedly claimed), why cover up these racially motivated messages?

But putting aside all that remains unclear about this unseemly episode, there are two things above all else that are, in fact, crystal clear. First, the Boston Parents have been harmed immensely by the cover up. Intending to comply with the Court's direction to work cooperatively to agree on facts, the Boston Parents were deceived by Defendants and deprived of clearly relevant evidence and the opportunity in discovery to explore further the many critical questions that the Defendants' conduct raises.

Second, it is not too late for this Court to put things right – at least partially. Rule 60(b) allows the Court to revisit its judgment in precisely these circumstances and to direct additional discovery to give the Boston Parents the fair opportunities that Defendants' scurrilous conduct to date has deprived them. Any result short of that would be patently unfair to the Boston Parents and would reward Defendants for their concealment of clear evidence of racial motivation. Moreover, while it is too late to rescind the Exam School invitations sent to students under the Zip Code Quota Plan, that does not justify the Intervenors' plea that the Court should only sanction Defendants but leave its ill-gotten verdict undisturbed. Doc. 117 at 10-11. Other relief on the merits is still available, including nominal damages, an injunction against future use of the Zip Code Quota Plan, and an injunction requiring Defendants to fill the *scores* of empty seats in the fall 2021 entering classes with an *equivalent* number of students who would have been admitted under a single, citywide competition.[1]

---

[1] When compared to the invitations sent for school years 2018-19 and 2019-20, 103 fewer invitations were extended for the upcoming school year for the entering 7th grade class and 113 fewer invitations were extended for the incoming 9th grade.

**I.     It is undisputed that the City deliberately withheld text messages that show clear racial animus on the part of two more School Committee Members. That alone is sufficient to grant the present motion.**

Both Defendants' and Intervenors' briefs attempt to explain and excuse "how" the City concealed the text messages. But any inquiry into *how* this occurred is secondary and subordinate to the fact of *what* occurred. *That* question is not in dispute. Neither the Defendants nor the Intervenors dispute *what* happened, namely, that the decision was made to conceal racist text messages from two School Committee members by omitting them from a transcript, that the altered version of those texts were provided to the Boston Parents without disclosing the doctoring, and that the transcript was certified as a "true and accurate" copy of those text messages. Putting aside for a moment Defendants' scattershot attempts to explain *how* all this occurred, the Court need go no farther than these obvious, undisputed facts of *what* occurred to grant this Motion.

The case law cited by the Boston Parents confirms that Defendants' conduct meets the requirements of Rule 60(b)(3), *see* Doc. 113, VI.A, and Defendants have made no effort to rebut the presumption, applicable here, that deliberately suppressed evidence and information substantially interferes with an aggrieved party's ability to prepare and present its case.[2] To the contrary, it is undisputed that the Boston Parents would not have proceeded on a record they knew was incomplete, much less doctored. *Id.* Relief is appropriate under Rule 60(b)(3).[3]

---

[2] *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir. 1988).

[3] Defendants' arguments against Rule 60(b)(3) are misplaced. First, Defendants conflate fraud under Rule 60(b)(3) with "fraud on the court". The two are separate issues and fraud upon the court is appropriately addressed under Rule 60(b)(6). *In re Tri-Cran, Inc.*, 98 B.R. 609, 616–17 (Bankr. D. Mass. 1989) ("Fraud on the court is thus distinguished from the fraud, misrepresentation, and other misconduct that is the subject of F.R.Civ.P. 60(b)(3)…"). Similarly, Defendants argue that the concealed and withheld evidence would "have no effect on the [] theory of liability." Doc. 118 at 15. However, under 60(b)(3) "a party still need not prove that the concealed material would likely have turned the tide at trial"; it need only establish, including "by presumption or inference" that the conduct interfered with its preparation and presentation. *Anderson*, 862 F.2d at 925. Finally, while Defendants attempt to distinguish the cases cited by the Boston Parents on the basis of the type or information and documents withheld, or the submission

3

The case law previously cited by the Boston Parents similarly establishes that relief is appropriate under Rule 60(b)(2). Doc. 113, VI.B. Defendants attempt to avoid this by arguing that the previously withheld evidence is "merely cumulative". But evidence is "merely cumulative" for the purposes of Rule 60(b)(2) if it only reiterates or restates documents or testimony *already* in evidence.[4] The withheld texts do far more, providing direct evidence of racial animus held by additional School Committee members (Oliver-Davila and Rivera), direct evidence of racial animus specifically against white community members, and direct evidence of the explicit link between the races and Zip Codes most impacted by the Plan. Doc. 113-1, Att. I-2 at 15, 19. They do not duplicate existing evidence and thus are not cumulative.

In arguing that the racist text messages are cumulative Defendants also incorrectly conflate racial animus with racial motivation. Racial animus (hostility toward another race) is a distinct and malignant subset of racial motivation. While racial motivation can sometimes reflect intentions that are benign (albeit unconstitutional), racial animus is never benign. Thus, while the Boston Parents previously argued that the public comments of Oliver-Davila and Rivera showed definite racial *motivation* in supporting the Zip Code Quota Plan and that their text message conversation inappropriately sympathized with former Chair Loconto, (*e.g.* Doc. 62 at 5-8), those comments stopped short of the racial *animus* now on full display. The unrestrained, now-revealed text messages demonstrate actual hostility, which is undoubtedly why they were hidden.

Defendants next argue that the Boston Parents must "prove the evidence would cause a

---

in which the misrepresentations were made, they offer no legal support for their argument that relief is not appropriate under Rule 60(b)(3).

[4] *Moron-Barradas v. Dep't of Educ. of Com. of Puerto Rico*, 488 F.3d 472, 482 (1st Cir. 2007) (new evidence cumulative where it "reiterates the contents of" already submitted documents); *Giroux v. Fed. Nat. Mortg. Ass'n*, 810 F.3d 103, 107 (1st Cir. 2016) (no Rule 60(b)(2) relief where new evidence only further corroborated existing testimony and documents).

change in result at a new trial". Doc. 118 at 17. This misstates the standard under Rule 60(b)(2), which is why Defendants offer no legal support for it. The correct standard is not nearly as strict. Rule 60(b)(2) relief is warranted if the new "evidence is *of such nature* that it would *probably change the result* if a new trial is granted." *Mitchell v. United States*, 141 F.3d 8, 18 (1st Cir. 1998) (emphasis added). The Boston Parents satisfy this, correct, standard here. Indeed, the Court specifically relied on the number of members openly expressing actual animus in reaching the judgment at issue,[5] and that number has risen from a single bad actor (Chair Loconto) to now permeating *at least* 43% of the Committee, including Chair Loconto, Vice-Chairperson Oliver-Dávila, and Member Rivera. Moreover, as recent case law has confirmed, such expressions of racial animus by decision makers trigger the application of strict scrutiny.[6] The withheld text messages are exactly the type of evidence that satisfies Rule 60(b)(2).[7]

Finally, Defendants' submission likewise confirms that relief is also appropriate under

---

[5] Doc. 104 at 45 ("These were racist comments directed at the City's Asian American community. This Court takes them seriously but finds no persuasive evidence that any other voting member had such animus. This is conclusive.")

[6] *See, recently, CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325–26 (D. Md. 2018) ("These final statements, in particular, are 'contemporary statements' by the President of the United States, who is alleged to have been involved in the decision to terminate TPS for El Salvador." (quoting *Arlington Heights*)); *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018) ("Plaintiffs have plausibly alleged an equal protection claim under the standard of *Arlington Heights*" because "Plaintiffs have alleged several instances of anti-Haitian and anti-immigrant comments made by President Trump."); *MARJAC, LLC v. Trenk*, 380 F. App'x 142, 147–48 (3d Cir. 2010); *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) (strict scrutiny triggered even where "the legislative history contains only a few snippets of overtly discriminatory expression."). *See also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

[7] Intervenors contest the Boston Parents' reliance upon certain out of Circuit cases, including *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir. 1984), for their holdings that that new discovered evidence satisfies the fourth Mitchell prong where it undermines or rebuts the opposing party's position. Doc. 117 at 7-8. In addition to trying to distinguish the cases based on the facts that undermined the opposing arguments in question – rather than the applicable legal holdings – Intervenors argue that the case law "is not the law in the First Circuit". *Id.* In doing so, they ignore the case law embracing these decisions, finding them "persuasive and entirely consistent with First Circuit case law." *Kettenbach v. Demoulas*, 901 F. Supp. 486, 494 (D. Mass. 1995).

Rule 60(b)(6).[8] In the First Circuit, "fraud on the court can take many forms" including presenting the court with "fabricated" or "bogus" documents. *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (noting creation of false document was "a near-classic example of the genre").[9] Similarly, fraud upon the court exists where an attorney makes "an affirmative misrepresentation to the court", including by means of a "'failure to make a disclosure'". *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999) (quoting NHRPC 3.3(a)(1)).[10] Defendants' submission admits that both occurred, necessitating relief under Rule 60(b)(6)[11].

## II. Defendants offer so-called "explanations" for the concealment of the racist text messages that are untrue and defy logic. They are nothing more than a clumsy attempt to cover-up the cover-up.

Although, as explained above, answering the question of *how* this occurred is not necessary for the Court to grant this Motion, the Boston Parents would be remiss to not address the Defendants' desperate efforts to explain away their concealment of these clearly relevant and damaging text messages. That is because these "explanations" range from stretching the truth to

---

[8] *Mullins v. Dep't of Lab. of Puerto Rico* (D.P.R. Sept. 7, 2012) ("alleging fraud on the court is considered an extraordinary circumstance meriting relief under Rule 60(b)(6)"); *Lopez v. Wall*, No. CA 09-578-S, 2011 WL 3667592, at *2 (D.R.I. Aug. 22, 2011) ("Grounds sufficient to grant relief from judgment under Rule 60(b)(6) include 'fraud on the court'") (quoting *United States v. 6 Fox Street*, 480 F.3d 38, 46–47 (1st Cir.2007)).

[9] *See also Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001, 88 L. Ed. 1250 (1944) (finding fraud upon the court where party and attorney presented fabricated evidence).

[10] *See also In re Tri-Cran, Inc.*, 98 B.R. at 624 ("The concealment took two forms: nondisclosure and misrepresentation").

[11] *Pearson*, 200 F.3d at 38 (affirmative misrepresentation, and thus fraud, where "Attorney Gannon … submitted [documents] which failed to list [relevant information]"); *In re Tri-Cran*, Inc., 98 B.R. 609, 624 (Bankr. D. Mass. 1989) ("fraud on the court" found where "[party] and [counsel] all concealed [relevant information] from the Court and from the interested parties" and "[counsel] compounded the wrong by affirmatively misrepresenting to the Court the nature of [the relevant information]" resulting in "order that the [final order] be vacated"); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11 (1st Cir. 1985) ("where fraud has been perpetrated on the court", "the relief given is the vacation of a judgment" even "long after it has become final").

outright misrepresenting it.  There is no other way to say it.  Despite this Court's Order requiring "a detailed written explanation" (Doc 116), Defendants do not offer genuine explanations so much as they offer a clumsy cover-up, which only serves to underscore the need for relief under Rule 60(b).  And because the scope and process by which the documents were concealed will necessarily determine the discovery that should be ordered as relief, the "detailed explanation" the Court requested is necessary.

First, Defendants brazenly defend what we now know to be a clear misrepresentation that the transcripts of text messages were "true and accurate" on the grounds that they never actually certified to the Boston Parents that the messages were "complete." Doc. 118 at 13-14.  Defendants offer no legal support for this distinction. Indeed, there is none; the argument that "true and accurate" does not mean "complete" and in fact permits the secret and selective omission of damaging evidence borders on the absurd.  Conversely, the Boston Parents have cited case law that a transcription cannot be "true and accurate" when it is incomplete.[12]  Though one would think it goes without saying, the case law is also clear that, by representing the transcripts were "true and accurate" when they knew full well they were incomplete, the Defendants made false statements and committed fraud.[13]  That the removed text messages are so clearly relevant and damaging to the Defendants' position on a dispositive issue in this litigation only serves to

---

[12] *U.S. v. Boskic*, 545 F.3d 69, 87 (1st Cir. 2008); *U.S. v. Adcox*, 19 F.3d 290, 292 n1 (7th Cir. 1994)

[13] *In re Webster*, No. 11-11077, 2013 WL 145581, at *4 (Bankr. D.R.I. Jan. 14, 2013) (certification that document was "true and accurate" when it omitted relevant information was fraudulent); *United States ex rel. Worthy v. E. Maine Healthcare Sys.*, No. 2:14-CV-00184-JAW, 2017 WL 211609, at *15 (D. Me. Jan. 18, 2017) ("Instead of identifying the [information], [party] improperly omitted [the information] and unlawfully certified that the information in the reports was true and accurate"); *Langadinos v. Pezza Law, P.C.*, 2014 WL 7406008, at *4 (Mass.Super. Apr. 25, 2014); *Van Eperen v. Mass. Mut. Life Ins., Co.*, No. 3:14-CV-13008-MAP, 2017 WL 9249439, at *4 (D. Mass. Feb. 28, 2017).

highlight the willful nature of the misconduct.[14]  Moreover, Defendants are also being disingenuous when they say that they would have searched for additional text messages if only the Boston Parents had said something suggesting that such a search was needed. Doc. 118 at 13. The fact is that at least one of Defendants' counsel of record, Cathy Lizotte, knew all along that there were additional, directly relevant text messages that had been withheld, because she was the same counsel who, by her own admission, participated in withholding them.[15]  *See* Doc. 118-1, ¶¶4-6, 16-17 ("Lizotte Affidavit").

Second, recognizing that they were only able to conceal the racist texts because they chose to transcribe the messages (as opposed to simply producing the screenshots), the Defendants desperately try to justify the decision to transcribe them by citing "legibility issues." Doc. 118 at 10 (citing Lizotte Aff. ¶6). This is simply not true. But the Court need not take the Boston Parents' word. The screenshots, which have now been made available, are attached to Ms. Murphy's declaration filed with the original Motion. *See* Murphy Decl., Atts. I-1 through I-5. The Court can see for itself that the screenshots are, in fact, quite legible. This reveals Defendants' "explanation" for what it is: a flimsy attempt to cover-up the fact that the real motivation for transcribing the text messages was to create a mechanism for surreptitiously removing and concealing the racist texts.

---

[14] *Com. Ins. Co., of Newark, N. J. v. Gonzalez.*, 512 F.2d 1307, 1314 (1st Cir. 1975) ("It is elementary that if a party has evidence, here, allegedly, a document, in its control and fails to produce it, an inference may be warranted that the document would have been unfavorable."); *Situation Mgmt. Sys., Inc. v. Lamoco Consulting, LLC*, No. 06-11557-RGS, 2011 WL 1226114, at *5 (D. Mass. Mar. 30, 2011) ("The court also notes Judge Young's observation that [the] failure to cooperate with inspection and discovery invited an inference of willfulness").

[15] Cathy Lizotte's affidavit confirms that she saw the need to confer with her superiors, Corporation Counsel, Eugene O'Flaherty and First Assistant Corporation Counsel for Government Services, Henry Luthin, before withholding the racist text messages from the Boston Globe. Lizotte Affidavit, ¶6. It does not however explain why these text messages were not produced to Darragh Murphy despite an explicit request for "ALL text messages" during the October 21, 2020 meeting. *See* Doc. 113-1, ¶8, Att. D ("Murphy Decl.").

Third and fourth, in what is a truly remarkable attempt to shift blame, the Defendants twice try to pass the buck for their own misconduct to Darragh Murphy. The first attempt is to argue, in effect, that it was okay to have misled Ms. Murphy by concealing the racist texts on the theory that Defendants, including Cathy Lizotte, did not know of her connection to the Boston Parents. Doc. 116-1 at 6; Lizotte Aff. ¶24 ("I was not aware that Darragh Murphy was associated with the plaintiff [until] June 16, 2021"). Putting aside the notion that they would have been justified in deceiving Ms. Murphy if she had no such connection (a suggestion that is, at best, highly dubious), it is simply untrue that they did not know Ms. Murphy was acting on behalf of the Boston Parents. On March 6, 2021, in response to the Court's direction that the parties work cooperatively to prepare a joint statement of facts, the Boston Parents proposed their list of Exhibits to the Defendants and Intervenors. The Boston Parents emailed an index of these exhibits, *see* Exhibit A, which explicitly listed the very documents that one of Defendants' counsel of record, Cathy Lizotte, had produced to Ms. Murphy on January 13, 2021, in response to Murphy's public records requests. *See* Lizotte Aff. ¶13, Att. I. They were even listed below a heading that read: "Documents Prepared by Boston Public Schools and Obtained Through Public Records Requests." Exhibit A, Attachment. Then, as if this were not enough, the Boston Parents requested to supplement their initial proposed exhibit list on March 12, 2021, to include text message excerpts of text messages that Ms. Murphy had received *three days earlier* on March 9, 2021, and where Cathy Lizotte again had signed the response. *See* Exhibit B; Lizotte Aff. ¶16 (Att. M (cover letter signed by Lizotte); Att. N (transcribed text messages)). All the while, Ms. Lizotte was contemporaneously present as Defendants' counsel during virtual negotiations over the agreed statement of facts and accompanying exhibits.

Defendants' likewise try to blame Ms. Murphy for failing to appeal the decision to withhold

9

text messages from the public records production.  Doc. 118 at 11-12.  This ignores the obvious: there was nothing in the public records response that would have led Ms. Murphy or anyone else to suspect that documents had been withheld, thereby necessitating an appeal.  Indeed, the City's whole point of producing the texts in (doctored) transcript format was to eliminate any such doubt about the completeness or veracity of its response.  The response, itself, actually goes to great lengths to eliminate such doubts.  It stated "Records responsive…may be found here" with a link to the eight (8) pages of transcribed text messages.  *See* Lizotte Aff. Att. M.  And Ms. Lizotte admits that the response "inadvertently" failed to note that certain information had been withheld.  Opp. at 11; Lizotte Aff. ¶16.  There is no doubt that there were things that *could* have (and should have) appeared in the City's response to signal documents had been withheld.  But they did not. The text message transcripts did not show redactions on their face. There was no stamp of "redacted," or some other marking to show where it had made the decision to rip text messages out from the very conversation being transcribed.  The below screenshots demonstrate that the statements "Wait til the white racists start yelling st [sic] us! And "Whatever . . . they are delusional" were omitted *without any marking whatsoever*:

| Transcript Produced | Screenshot |
|---|---|
| AOD - Best sc meeting ever I am trying not to cry<br><br>LR - Me too!<br><br>LR - Why can't we get interpretation/translation right? | [Screenshot of iMessage conversation with "Alex" showing:<br>Wednesday 6:34 PM — "Best sc mtg ever I am trying not to cry"<br>"Me too!! Wait til the white racists start yelling st us!"<br>"Whatever... they are delusional"<br>Wednesday 7:49 PM — "Why cant we get interpretation/translation right? Why"] |

10

*Compare* Murphy Decl., Att. E at 1 *with* Att. I-2 at 15.  Elsewhere, Defendants claim that what they say was an "ellipsis" in another text string "suggest[ed] that the transcript was not complete." Doc. 118 at 11-12 (referring to deleted texts: "I hate WR", "Sick of westie whites", and "Me too I really feel Like saying that!!!!").  But, as explained above, the City gave no indication that texts were withheld and even more, the eight (8) page transcript includes 20 strings of asterisks (of various lengths) without an apparent consistency located at the beginning, middle, and end of text message transcriptions.  *See* Murphy Decl., Att. E.[16]

### III. Based on what we know now, there is much more to this story, and the only way to get to the bottom of it, and ensure a fair process, is to grant the requested relief.

Defendants now suggest that the Boston Parents have all the text messages.  But a review of the recently produced, screenshots strongly suggests *other communications* responsive to the public records requests are still being withheld. For example:

- There are no text messages from the phones of Superintendent Cassellius or former Chairperson Loconto.  When the City prepared the transcript of text messages, it did so in a way that suggested text messages from the phones of both individuals had been produced. *See* Murphy Decl., Att. E.  But the recently released text message screenshots make clear that texts from these individuals were only gathered from the phones of *other Boston School Committee members*.  *See* Murphy Decl. Att. pp. 39-41, 53-56, 81 (Cassellius); pp. 42-43, 48-52, 73, 80, 84-86 (Loconto).  Thus, it is likely both Cassellius and Loconto sent additional text messages on October 21 that were not produced.

- There has been no production of *any* text messages from the October 8, 2020, meeting, i.e. the meeting where the Zip Code Quota Plan was introduced.  Since at least 5 of the 7 School Committee members, the non-voting member Khymani James, and

---

[16] Moreover, what Defendants claim was an "ellipsis" was actually a long unbroken line of asterisks "*******************", which does not convey deleted tax so much as it suggests the end of one message and the start of another, later message.

> Superintendent Cassellius all sent text messages during the October 21, 2020, meeting, (*see* Murphy Decl. Att. I-1 through I-5), it stands to reason that they likewise communicated during the almost 5-hour October 8 meeting. And to be clear, the November 19, 2020, public record request was not limited to the School Committee meetings but expressly sought "all communications," not just text messages, including from the Superintendent, her staff, the Exam Working Group, and the Boston School Committee, from January 1, 2018 to November 19, 2020. *See* Murphy Decl. ¶8, Att. C.[17] There are certain to be more documents responsive to this request that have not been produced.[18]

- For key text messages between School Committee members, copies have been produced from only one of the member's phones. For example, screenshots of the racist text messages were only received from Lorna Rivera's phone. *See* Murphy Decl. Att. pp. 60, 64. The corresponding text messages from Oliver-Davila's phone were not produced. *Compare id.* at pp. 38-46. This is important because screen shots from Oliver-Davila's phone could reveal relevant, but withheld communications with individuals other than Rivera.

All of this only serves to raise more questions, not only about the impropriety of the City's actions but about the scope of that impropriety. What else was hidden from the Boston Parents?

---

[17] Darragh Murphy's November 19, 2020 public records request sought:

> Copies of all electronic communications, including emails, text messages, voicemails, social media messages, tweets, etc, to and from Superintendent Cassellius, her staff and/or assistants, and all members of the Boston School Committee, and all members of the Exam School Working Group regarding the Exam School Working Group, including electronic attachments to all electronic communications. Please limit your search of the above item(s) to the period from January 1, 2018 to November 19, 2020.

Darragh Murphy Decl. Att. C.

[18] The June 18, 2021 belated response included not only the 51 pages of text message screenshots but also 156 pages of email communications – of which 154 were not produced in the City's initial response to Murphy's November 19, 2020 request. These 156 pages of emails were all written or received by Boston School Committee members between 5:00 p.m. and 8:25 p.m. on October 21, 2020. This latest production included extensive communications between constituents and Boston School Committee members, and internal communications among Committee members pertaining to the proposal. Given that 156 pages of relevant email correspondence occurred in less than 2.5 hours, additional responsive emails likely exist.

What other information ought to have been placed before the Court? What would discovery reveal? The Boston Parents and the Court are entitled to know the answers to those questions, and the only way to answer them is to grant the requested relief and allow the Boston Parents to take discovery.

Dated: July 8, 2021

                                            Respectfully submitted:

                                            */s/ Callan G. Stein*

Callan G. Stein (BBO # 670569)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com

William H. Hurd (Va. Bar # 16967) (*pro hac vice*)
Christopher W. Carlson, Jr. (Va. Bar # 93043) (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1490
william.hurd@troutman.com
chris.carlson@troutman.com

Mary Grace W. Metcalfe (N.Y. Bar #5377932) (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
marygrace.metcalfe@troutman.com (*pro hac vice*)

*Counsel for Plaintiff*

**Certificate of Service**

I, Callan G. Stein, certify that the foregoing document was filed this date via the Court's CM/ECF filing system and will be sent electronically to the registered participants in this action.

*/s/ Callan G. Stein*