## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| **BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEILL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS,**<br><br>**Defendants**<br><br>**and**<br><br>**THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTAL, and H.D.,**<br><br>**Defendants-Intervenors.** | **Civil Action No. 1:21-cv-10330-WGY** |

## MEMORANDUM PURSUANT TO COURT ORDER AND IN FURTHER SUPPORT RELIEF FROM JUDGMENT UNDER RULE 60(B)

Callan G. Stein (BBO # 670569)
Mary Grace W. Metcalfe (N.Y. Bar #5377932)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com
marygrace.metcalfe@troutman.com
Admitted *pro hac vice*

William H. Hurd (Va. Bar # 16967)
Christopher W. Carlson, Jr. (Va. Bar # 93043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1335
william.hurd@troutman.com
chris.carlson@troutman.com
Admitted *pro hac vice*
*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.      UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND ............................ 2

II.     ARGUMENT ............................................................................................................ 7

    A.      Defendants' Counsel Misled Counsel for the Boston Parents and This
        Court. ................................................................................................................ 8

    B.      Defendants' Counsel's Conduct Mandates Relief Under Rule 60(b)(2) and
        60(b)(3). ......................................................................................................... 11

    C.      The Misrepresentations and Misconduct of Defendants' Counsel
        Continued after the Entry of Judgment. ........................................................ 14

    D.      Discovery Is Necessary, Especially Given the Attempts to Stonewall the
        Boston Parents from Relevant Evidence ........................................................ 17

    E.      The Conduct of Defendants' Counsel Provides Grounds for Further Relief,
        Including under Rule 60(b)(6). ...................................................................... 18

    F.      The Boston Parents Have Standing ............................................................... 19

III.    REQUEST FOR ORAL ARGUMENT ....................................................................... 25

IV.     CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Mass. v. U.S. Conference of Catholic Bishops*,
    705 F.3d 44 (1st Cir. 2013) ...................................................................24

*Alpine v. Friend Bros.*,
    244 Mass. 164 (1923) ...........................................................................12

*Anderson v. Cryovac, Inc.*,
    862 F.2d 910 (1st Cir. 1988) .....................................................11, 12, 13

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989) ...............................................................19

*Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*,
    No. CV 11-10230-MLW, 2020 WL 949885 (D. Mass. Feb. 27, 2020) .......................9, 14, 19

*Becker v. Fed. Election Comm'n*,
    230 F.3d 381 (1st Cir. 2000) ...................................................................24

*Bougas v. Chief of Police of Lexington*,
    371 Mass. 59, 354 N.E.2d 872 (1976) .......................................................8

*Bros Inc. v. W. E. Grace Mfg. Co.*,
    351 F.2d 208 (5th Cir. 1965) ..................................................................11

*Catskill Dev., L.L.C. v. Park Place Ent. Corp.*,
    286 F. Supp. 2d 309 (S.D.N.Y. 2003) ......................................................11

*Churchill Downs, Inc. v. NLR Ent., LLC*,
    No. CV143342KMMAH, 2018 WL 4589992 (D.N.J. Sept. 25, 2018) ..................................12

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................24, 25

*Corcoran v. McCarthy*,
    2010 S.D. 7, 778 N.W.2d 141 .................................................................11

*Cruz v. Savage*,
    896 F.2d 626 (1st Cir. 1990) ...............................................................9, 19

*Del Rosario v. Nashoba Reg'l Sch. Dist.*,
    No. MICV20181899D, 2020 WL 8919067 (Mass. Super. Feb. 12, 2020) ..............................9

*Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos*,

i

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

S.A., 728 F.2d 572 (1st Cir. 1984)........................................................................13

*Lonsdorf v. Seefeldt,*
    47 F.3d 893 (7th Cir. 1995) ......................................................................12

*Lopez v. Wall,*
    No. CA 09-578-S, 2011 WL 3667592 (D.R.I. Aug. 22, 2011)................................19

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)................................................................................19

*In re M/V Peacock on Complaint of Edwards,*
    809 F.2d 1403 (9th Cir. 1987) ...................................................................11

*Mitchell v. United States,*
    141 F.3d 8 (1st Cir. 1998).........................................................................14

*Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.,*
    692 F.2d 214 (1st Cir. 1982).....................................................................13

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of*
    *Jacksonville,*
    508 U.S. 656 (1993)................................................................................20

*Pearson v. First NH Mortg. Corp.,*
    200 F.3d 30 (1st Cir. 1999)....................................................................9, 19

*Phillips v. Stear,*
    236 W. Va. 702, 783 S.E.2d 567 (2016)........................................................11

*Regents of the University of California v. Bakke,*
    438 U.S. 265 (1978)................................................................................20

*Schultz v. Butcher,*
    24 F.3d 626 (4th Cir. 1994) ......................................................................11

*Scott v. United States,*
    81 F. Supp. 3d 1326 (M.D. Fla. 2015)...........................................................12

*Suffolk Const. Co. v. Div. of Cap. Asset Mgmt.,*
    449 Mass. 444 (2007) ...............................................................................8

*U.S. v. Boskic,*
    545 F.3d 69 (1st Cir. 2008).......................................................................12

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*United States v. 6 Fox Street*,
    480 F.3d 38 (1st Cir.2007) ................................................................19

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) ................................................................23

*West v. Bell Helicopter Textron, Inc.*,
    803 F.3d 56 (1st Cir. 2015) ................................................................11

**Statutes**

28 U.S.C. § 1927 ................................................................19

M.G. L. C. 4, § 7(26) ................................................................13

M.G.L. c. 4, § 7(26)(c) ................................................................14

M.G.L. c. 66, § 10 ................................................................9

**Other Authorities**

Fed. R. Civ. Proc. 11 ................................................................9, 14, 19

Fed. R. Civ. Proc. 60(b) ................................................ *passim*

Fed. R. Civ. Proc. 60(b)(2) ................................................................7, 11, 13, 14

Fed. R. Civ. Proc. 60(b)(3) ................................................................7, 11, 12, 13

Fed. R. Civ. Proc. 60(b)(6) ................................................................8, 18, 19

Local Rule 83.6.1 ................................................................9

The Court was misled.  So were we.  If we had known then what we know now, we would have prepared our case differently in at least two material ways.

First, while racially-motivated decision making was a central element of the case we presented, racial *animosity* was not. But it would have been.  There was, of course, the anti-Asian animus displayed by School Committee Chair Michael Loconto, but that was a secondary argument, in large part because based on the information given to us, Loconto appeared to be an outlier.  We now know that he was not.  We have seen evidence from two more School Committee members, that we know of, displaying racial *animus*.

Second, we would never have agreed to forego discovery if we had known about either Vice-Chairperson Oliver-Davila's and Member Rivera's racist text messages *or* BPS's efforts to cover them up.  The casual yet emphatic racial animus shown by two leading School Committee members reveals an environment in which racial animus was the norm – at least behind closed doors. Discovery would have enabled us to look behind those doors and see what other indicia of racial animus are hidden.  Similarly, the ease with which BPS flouted the state public records law illustrates an institutional culture of cover-ups and misrepresentations that necessitates the use of discovery to ensure that we – and this Court – have confidence that all facts are brought to light.

These conclusions are reinforced by BPS's actions in the wake of the *Boston Globe* breaking the news of the text message cover-up. BPS has attempted to cover-up the cover-up, and in doing so has continued to mislead this Court.  *See infra* at III.C. BPS has continued to refuse to provide relevant documents. *See infra* at III.D. And in addition, we have seen *further* racial animus in a recent public rant by one former School Committee member, boasting of his racial hatred. *Id*.

The Boston Parents filed their Rule 60(b) Motion based on the information available at the time. But from Defendants' response to the motion and its counsel's statements during the July 9

hearing (the "July Hearing"), we now have additional insight into who concealed and doctored the text messages and how Defendants' counsel came to certify that the transcript they knew to be incomplete was "true and accurate." Many questions remain unanswered. And even more relevant documents remain unproduced. But the little information Defendants have provided serves only to confirm that the cover-up remains ongoing and that relief is necessary under Rule 60(b).[1]

## I.       UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND

Defendants' response in opposition to the Rule 60(b) Motion was accompanied by over one hundred pages of affidavits and exhibits. Docs. 118-1 – 118-4. Those documents confirm that there is little dispute over facts and procedural history, which are briefly summarized here.

1.       On October 22, 2020, BPS received a public records request from the *Boston Globe* seeking "text messages and emails related to BPS issues that were sent and received by each Boston School Committee member" during the October 21, 2020 School Committee Meeting ("October 21st Meeting"). Doc. 118-1, ¶ 3 (Lizotte Aff.).

2.       Over the next two weeks, BPS collected responsive text messages from the School Committee members, including the racist texts between Oliver-Davila and Rivera. *Id.* at ¶ 4.

3.       In what was surely a departure from the routine, four Boston officials – all lawyers – met to decide what to do with the racist messages: Corporation Counsel, Eugene O'Flaherty; First Assistant Corporation Counsel, Henry Luthin; Director of Public Records, Shawn Williams; and BPS Legal Advisor, Catherine Lizotte (collectively "In-House Counsel"). *Id.* at ¶ 6.

4.       In-House Counsel made two decisions: (1) to prepare a transcript of the text messages rather than produce them in their native format (*e.g.,* screenshots); and (2) to remove the

---

[1]       As recently noted by the First Circuit, this Court may act upon the Rule 60(b) Motion "either by denying it or by entering an 'indicative ruling' in accordance with Fed. R. App. P. 12.1." Doc. 125. In such an indicative ruling, "the district court states either that it would grant the motion or that the motion raises a substantial issue". FRAP 12.1(a). Per the Appellate Rules, the Boston Parents would then notify the appellate court of the ruling. *Id.*

racist messages from the transcripts.  *Id.*  On November 5, BPS then produced the transcripts of the doctored text messages to the *Boston Globe*.  *Id., see also id.* at Att. C.

5.       Two weeks later, on November 19, future Boston Parents[2] member Darragh Murphy submitted her own public records request seeking: "all electronic communications, including emails, ***text messages***, voicemails, social media messages, tweets, etc., to and from Superintendent Cassellius, her staff and/or assistants, and all members of the Boston School Committee, and all members of the Exam School Working Group", including during the October 21st Meeting.  *Id.* at ¶ 9 (emphasis added).

6.       BPS did not respond for almost two months.  On January 13, 2021, it produced "213 emails and other related documents, but no text messages", accompanied by a letter from Lizotte.  *Id.* at ¶ 13; *id.* at Att. J.  Lizotte's letter did not indicate that BPS had omitted any documents, rather it stated that BPS had redacted "student record information and personal emails, phone numbers, and addresses".  *Id.* at Att. J.  On February 23, Murphy made a second record request, specifically identifying "***text messages***, instant messages, and any other form of electronic communication" sent or received by the School Committee members and Superintendent Cassellius during the October 21st Meeting.  *Id.* at ¶ 15 (emphasis added).

7.       On February 26, the Boston Parents filed their Verified Complaint and Motion for Preliminary Injunction (Docs. 1-2), and sent a courtesy copy to Lizotte, with whom their counsel had been communicating in an effort to resolve the matter without litigation.

8.       Lizotte accepted service on behalf of Defendants and made her appearance as counsel of record the following day.  Doc. 10.  Attorneys Kay Hodge and John Simon ("Outside Counsel") entered their appearances on behalf of all Defendants on March 1.  Docs. 11-12.

---

[2]       The Boston Parents organization was formed the same day but did not yet have members.  Doc. 118-4 at 4.

9.       On March 3, the Court held a hearing during which it instructed the Boston Parents, Defendants, and Intervenors (the "Parties") to confer and submit a statement of agreed facts and exhibits by March 15.  Doc. 27.

10.      Three days later, on March 6, counsel for the Boston Parents proposed to Defendants and Intervenors a list of documents it received from the public record requests as exhibits, entitled "Documents Prepared by Boston Public Schools and Obtained Through Public Records Requests."  Doc. 119-1 at 5.  Because BPS had not yet produced the transcript of doctored text messages, that transcript was not included in this list.

11.      On March 9, In-House Counsel produced to Murphy the transcript containing the doctored text messages that BPS had previously sent to the *Boston Globe*.  Lizotte Aff. at ⁋16. Lizotte's accompanying letter once again did not indicate that any documents had been withheld but, unlike in her letter to the *Boston Globe,* also did not mention any redactions.  *Id.* at Att. M

12.      Based on this chronology, by the time Lizotte produced the transcript that concealed the racist texts by Rivera and Oliver-Davila, she knew that the Boston Parents had sued BPS claiming that the Zip Code Quota Plan was racially motivated, indeed she was counsel of record.

13.      On March 12, after receiving the transcript of the doctored text messages, counsel for the Boston Parents supplemented its proposed exhibits to include material portions of the transcript.  Doc. 119-2.

14.      Thereafter, counsel for the Boston Parents had multiple phone calls and Zoom meetings with Hodge, Simon, and Lizotte to discuss the exhibits and the agreed statement of facts. At no time did any of them disclose that the transcript contained doctored text messages or was otherwise incomplete or inaccurate.  July 9, 2021 Tr., 11:4-9, 12:3-9.  Hodge, Simon, and Lizotte failed to disclose this information even though:

a.      Lizotte personally participated in the decisions to create the doctored transcript and withhold the racist text messages from production (Lizotte Aff. at ⁋6);

b.      Lizotte informed Hodge and Simon that she recognized "those particular documents had in fact been turned over, in a public records situation, [] to a Boston resident", that is, Murphy (July Tr., 10:24-11:3); and

c.      Lizotte, Hodge, and Simon discussed with counsel for the Boston Parents each potential exhibit to the proposed statement of facts, including the transcript.

15.     On March 15, the Parties submitted and filed the Joint Agreed Statement of Facts and Exhibits ("ASE"), which included the transcript of text messages which, unbeknownst to the Boston Parents or the Court, had been doctored, as Exhibit 72 or ASE01862.

16.     In so filing the ASE, the Parties all represented that:

The parties, by their undersigned counsel, hereby stipulate and agree to the facts set forth herein and to the authenticity of the documents attached hereto. To the extent the statements below cite to documents, the documents are true and accurate copies and the parties refer the Court to those documents for a more thorough discussion of the facts.  (Doc. 38 at 1.)

17.     With regard to the texts specifically, *Defendants* represented that:

A true and accurate transcription of text messages between Boston School Committee Members, Vice-Chairperson Alexandra Oliver Davila and Lorna Rivera during the October 21, 2020 Boston School Committee meeting is attached as Exhibit 72. (*Id.*, ⁋ 67.)

18.     Hodge, Simon, and Lizotte all appear in the ASE signature block and all appeared before this Court on March 16 to discuss the ASE.  *Id.* at 20; March 16, 2021 Tr., 4:14-16.

19.     At no point in agreeing to, signing, or submitting the ASE – or during the hearing that followed – did any of Defendants' counsel indicate that the transcript of doctored text messages was incomplete or that In-House Counsel had deliberately removed text messages that, certainly by this time, every single person would have identified as highly relevant to the constitutional issues being briefed and argued before this Court.

20.     Relying on the representations of Defendants' counsel, the Boston Parents agreed to forego discovery and proceed on the existing record.  Doc. 113 at 10, 20.  Had the Boston

Parents known the facts they know today – *i.e.*, that there was written confirmation of additional overt racial animus, that the documents previously produced had been doctored, and that the cover-up was ongoing – they never would have proceeded in this manner.  *Id.*

21.     On April 15, the Court, also relying on Defendants' representations, entered an Opinion denying the Boston Parents' Motion.  Doc. 104.  In so ruling, the Court specifically held that the lack of "persuasive evidence that *any other voting member* had such animus" as demonstrated by Loconto towards the Asian-American community was "conclusive."  *Id.* at 45. Of course, there was such "persuasive evidence", it had just been concealed.

22.     Nearly two months later, on June 7, the *Boston Globe* published its exposé revealing the existence of the concealed racist text messages.  Doc. 113-1, 37-43 ("Darragh Murphy Decl.").

23.     On June 9, Murphy requested a complete response to her prior public record requests as well as an explanation for why the racist texts were withheld.  *Id.* at ⁋ 13.

24.     That same day, In-House Counsel Williams indicated that the requests would be reopened.  *Id.* at ⁋ 14.

25.     On June 16, having received nothing further from Williams, counsel for the Boston Parents requested from Outside Counsel an explanation and the production of the text messages. Lizotte Aff. at Att. U. Counsel was also emphatic in asking Defendants and their counsel to immediately "correct its ***deliberate misrepresentation to the District Court*" *Id.* (emphasis added).

26.     Outside Counsel responded on June 18, but did *not* produce the text messages nor explain the withholding, and did *not* correct the record as counsel had requested.  Exh. A.

27.     Later that day, counsel for the Boston Parents informed Defendant's counsel that they intended to file a Rule 60(b) motion.  *Id.*  Notably, it was only *after* this mention of a Rule 60(b) motion that In-House Counsel finally produced the concealed text messages.

28.     On June 22, the Boston Parents filed their Rule 60(b) Motion.  This was more than two weeks after the *Boston Globe's* exposé, yet Defendants' counsel made no effort to correct the record, despite being called upon to do so by counsel for the Boston Parents.  *Supra* at ¶ 25.

29.     On July 6, Defendants filed their Opposition to the Rule 60(b) Motion, accompanied by affidavits of counsel.  Doc. 118; Docs. 118-1 – 118-4.

30.     On July 9, the Court held a hearing on the Rule 60(b) Motion. During this hearing, the Court questioned Defendants' counsel about their conduct. Even though counsel for the Boston Parents had explicitly asked Outside Counsel to correct the record, Outside Counsel represented to the Court that correcting the record "didn't occur to [them]." July Tr., 16:21-17:7; 18:15-18. Outside Counsel also said she did not know about the text message revelation because she was behind in reading the *Boston Globe*, despite having read – and responded to – the June 16 email from the Boston Parent's counsel, which told her about those texts.

31.     At the conclusion of the hearing, the Court directed the Parties to provide additional briefing for which the Boston Parents now submit this memorandum.  *See* Doc. 121.

## II.     ARGUMENT

The Court directed the Parties to brief three issues: (1) the conduct of counsel for Defendants; (2) the Boston Parents' pending motion for relief pursuant to Rule 60(b); and (3) the Boston Parents' standing.  This memorandum addresses all three topics.

Though many questions remain unanswered in this case, there are things that we do know, and those things more than justify relief under Rule 60(b).  We know that both In-House Counsel's and Outside Counsel's conduct prior to the Court's April 15 opinion warrants relief under Rule 60(b)(3).  We know that the text messages themselves, and Defendants' withholding of them, warrant relief under Rule 60(b)(2).  We know that, in addition to their earlier conduct, counsel's

conduct *after* the concealed racist text message came to light in early June, further warrants relief under Rule 60(b)(6).  And finally, we know that should the case be reopened, the Boston Parents still have ample standing as a matter of law to seek relief from this Court.  The Rule 60(b) Motion should be granted and the case, including discovery, should be reopened before this Court.

## A.      Defendants' Counsel Misled Counsel for the Boston Parents and This Court.

There is no other way to say it: Defendants' counsel misled counsel for the Boston Parents (Doc. 113 at 10, 20), misled this Court (July Tr., 22:2-8), and misled the public.  That misleading conduct began in November 2020, when In-House Counsel decided to conceal the racist text messages from the *Boston Globe,* and it was repeated when they likewise concealed them from Murphy in January 2021.[3]  In both instances, In-House Counsel violated the Massachusetts Public Record Law ("MPRL") by failing to include, and indeed *intentionally concealed*, the responsive racist text messages.  *Suffolk Const. Co. v. Div. of Cap. Asset Mgmt.*, 449 Mass. 444, 453–54 (2007) (the MPRL requires the government "to produce *all* public records for inspection, examination, and copying" (internal quotation marks omitted)); Elizabeth B. Valerio, Powers and Responsibilities of the School Committee, SL MA-CLE 2-1 (3d Ed. 2016) ("School committees are subject to the Massachusetts Public Records Law" and "e-mail and *text messages* are public records and may be obtained") (emphasis added).

The law is clear that the School Committee texts had to be produced.  But even if In-House Counsel felt withholding them was somehow permissible, they would still have been obligated to:

> identify any records, categories of records or portions of records that the agency or municipality intends to withhold, and provide the specific reasons for such withholding, including the specific exemption or exemptions upon which the withholding is based

---

[3]      It does not matter, as has been suggested, that Murphy did not formally make her public records request on behalf of the Boston Parents. Defendants' responsibilities under the public records laws were identical whether Murphy made the request on behalf of herself or on behalf of the Boston Parents. *See Bougas v. Chief of Police of Lexington*, 371 Mass. 59, 64, 354 N.E.2d 872, 877 (1976).

M.G.L. c. 66, § 10; *see also Dist. Attorney for the Norfolk Dist v. Flatley*, 419 Mass 507, 511

(1995) (custodian must state why an exemption applies to withheld or redacted portion). They did

no such thing. The letter from Lizotte did not indicate that *any* documents had been omitted, only

that certain "student record information" had been redacted. Lizzote Aff. at Att. J. This constituted

yet *another* violation of the MPRL by In-House Counsel.[4]

It goes without saying that "'[e]very lawyer is an officer of the court [and] has a duty of

candor to the tribunal.'" *Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, No. CV 11-10230-

MLW, 2020 WL 949885, at *2 (D. Mass. Feb. 27, 2020) (quoting *Pearson v. First NH Mortg.

Corp.*, 200 F.3d 30, 38 (1st Cir. 1999)). In Massachusetts, the duty of candor requires that an

attorney not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false

statement of material fact or law previously made to the tribunal by the lawyer." Mass. R. Prof.

C. 3.3(a)(1).[5] Under the Federal Rules, "Rule 11 requires attorneys to take responsibility for the

claims and defenses they represent; attorneys must make reasonable inquiry to assure that the

claims, defenses and positions represented by them are well-grounded in both law and fact". *Cruz

v. Savage*, 896 F.2d 626, 630 (1st Cir. 1990). Simply put:

> Judges trust lawyers. They expect that lawyers will provide the court the accurate
> and complete information that is necessary to decide matters properly. The Federal
> Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct
> make these expectations legal obligations.

*Arkansas Tchr. Ret. Sys.*, *supra*, at *1.

Defendants' counsel betrayed these duties. And they did so by their own admission. First,

---

[4]     *Del Rosario v. Nashoba Reg'l Sch. Dist.*, No. MICV20181899D, 2020 WL 8919067, at *2 (Mass. Super. Feb.
12, 2020) ("response to plaintiff's public records request did not comply with the Public Records Law" where
"response failed to identify any records the District intended to produce [and] failed to identify a reasonable timeframe
for it to produce any such records"; government entity directed to "a proper written response in compliance with the
Public Records Law" including "which requested records exist, which will be produced, which can be produced in
redacted form, and whether any exemptions apply to justify withholding certain records from production").

[5]     The Massachusetts Rules of Professional Conduct are incorporated into this court's rules. Local Rule 83.6.1.

Defendants' counsel misrepresented that the transcript of the text messages was "true and accurate".[6]  We now know it was not. But Defendants' counsel knew all along. Lizotte, testified that she: (1) *participated* in deciding which text messages to remove and in preparing the doctored transcript (Lizotte Aff., ⁋ 6); (2) *provided* the transcript of doctored text messages to Murphy without disclosing that texts had been concealed (*id.*, ⁋16); (3) *recognized* the transcript that was presented to the Court as the one she knew had been doctored (July Tr.,10:24-11:3); (4) despite all of that, still *misrepresented* to counsel and the Court that the transcript of doctored evidence was "true and accurate" (Doc 38 at 20); and then (5) *never* corrected that misrepresentation.

Second, Outside Counsel also misled the Boston Parents and the Court.  During the July Hearing, Outside Counsel represented that they did not know the transcript of the text messages was doctored.  *See* July Tr., 13:19-24 ("[COURT:] You're telling me you did not know, in good faith, and nobody on the trial team, your team defending the lawsuit, you didn't know that they were in fact not true and accurate, did you? MS. HODGE: Um, no…").  This may well be true as, unlike Lizotte and In-House Counsel, Outside Counsel did not participate in the doctoring.  Nonetheless, Outside Counsel admitted they compiled the ASE and certified the transcript's accuracy without consulting the original text messages.  *Id.* at 11:15-18 ("COURT: So did anyone on your team or you try to go back to the original [] messages at that time? MS. HODGE: No, no one thought to do that.").  Nor did they do so even after it was clear that the text messages had factored so prominently into this Court's Opinion.  *Id.* at 16:6-10 ("COURT: Now when you saw that and you saw the prominence that I had given to the text messages, did anyone then think to go back and actually try and look at the original messages? MS. HODGE: No.").  Rather, Outside Counsel claimed they only sought to determine that the text messages were "an accurate statement

---

[6]      Defendants' counsel argued this misrepresentation is excused because they did not represent that the Exhibit was a "complete" transcription.  Doc 118 at 13.  This Court rejected that argument.  July Tr., 12:14-15:8.

of what was turned over" to the Boston Parents.  Of course, as this Court has already noted, "an

'accurate statement of what was turned over,' [was] not what was stipulated to." *Id.*, 13:8-12.

## B.   Defendants' Counsel's Conduct Mandates Relief Under Rule 60(b)(2) and 60(b)(3).

These misrepresentations, as well as the initial concealing and doctoring of the text

messages, mandate relief under Rule 60(b)(3), whether they were intentional or not.  *See, e.g.,*

*Phillips v. Stear*, 236 W. Va. 702, 712, 783 S.E.2d 567, 577 (2016) ("Rule 60(b)(3) applies to

unintentional, accidental and careless misconduct or misrepresentations as well as intentional

ones") (collecting cases).[7]  Under that Rule, the Court can and should grant relief in the event of

misconduct *or* misrepresentation *or* fraud.  As laid out in the Boston Parents' Rule 60(b) Motion,

one would suffice but all three are present here.[8]

First, there is no genuine dispute that the racist text messages were responsive to the public

record requests and should have been produced.  Whether that failure was intentional or accidental

is immaterial; standing on its own that act constitutes "misconduct."  *Anderson v. Cryovac, Inc.*,

862 F.2d 910, 924 n.10 (1st Cir. 1988) ("[f]ailure to disclose or produce", even if "accidental" or

"lackadaisical", qualifies as misconduct under Rule 60(b)(3)).[9]

Second, there is no dispute that Defendants' counsel failed to disclose to counsel and to the

---

[7]       *See also In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir. 1987) (discussing procedural requirements "[w]hen a motion under Rule 60(b)(3) is based on negligent misrepresentation"); *Bros Inc. v. W. E. Grace Mfg. Co.*, 351 F.2d 208, 211 (5th Cir. 1965) (misrepresentation Rule 60(b) does not require "deliberate evil purpose to misstate or conceal or thereafter engage in foot-dragging lest the truth might be uncovered").

[8]       Doc. 113.IV.A. The Boston Parent refer to their earlier briefs for a complete discussion of Rule 60(b)(3).

[9]       *See also West v. Bell Helicopter Textron, Inc.,* 803 F.3d 56, 67 (1st Cir. 2015) (courts are required "to take an expansive view of 'misconduct'" under Rule 60(b)(3)"); *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) (finding misconduct under Rule 60(b)(3) where a report was withheld unintentionally and noting "the failure to produce such an important report which contained information helpful to an adversary's position is not easily excused") (citing *Anderson*, 862 F.2d at 924 n.10); *Corcoran v. McCarthy*, 2010 S.D. 7, ¶ 19, 778 N.W.2d 141, 148 ("a majority of courts have concluded that misconduct in failing to disclose or produce may be careless, accidental, or even innocent under Rule 60(b)(3)" (citing *Anderson*, 862 F.2d at 923)); *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 286 F. Supp. 2d 309, 314 (S.D.N.Y. 2003) ("even an accidental failure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of Rule 60(b)(3)") (collecting cases).

Court, at *any* time, that the transcript of text messages was doctored and highly relevant messages were removed, instead certifying them as "true and accurate". This repeated failure constitutes a "misrepresentation." *See, e.g., U.S. v. Boskic*, 545 F.3d 69, 87 (1st Cir. 2008) (it is proper to infer that a "defendant made a false statement by swearing that the incomplete answers to questions on a form are truthful even if the defendant does not also swear that the responses to the questions on the form are complete"); *Alpine v. Friend Bros.,* 244 Mass. 164, 167 (1923) ("failure to disclose known facts when there was a duty" qualifies as a misrepresentation). Once again, this mandates relief under Rule 60(b)(3) whether the misrepresentation was intentional or unintentional. *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995).[10]

Rule 60(b)(3) also mandates relief because Defendants' counsel substantially interfered with the Boston Parents' preparation and presentation of their case. First, and as detailed more thoroughly in the Rule 60(b) Motion (Doc 113 at IV.A.2), there is a presumption of substantial interference because Defendants concealed relevant evidence. *Anderson*, 862 F.2d at 925 (collecting cases) (where documents are "deliberately suppressed, [their] absence can be presumed to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is, to have substantially interfered with the aggrieved party's trial preparation.").

Second, the Boston Parents never would have agreed to proceed on the ASE and forgo taking discovery had they known that text messages had been withheld, especially ones that so clearly supported their claims, or that they had been provided with a transcript reflecting doctored evidence. Indeed, the mere fact that these racist text messages were concealed is persuasive evidence that supports the Boston Parents' case that the Zip Code Quota Plan was racially

---

[10]    *See also Churchill Downs, Inc. v. NLR Ent., LLC*, No. CV143342KMMAH, 2018 WL 4589992, at *4 (D.N.J. Sept. 25, 2018) (unknowingly inaccurate statements are misrepresentations under Rule 60(b)(3) because a party and counsel must "ascertain [the facts] before making representations to the Court"); *Scott v. U.S.*, 81 F. Supp. 3d 1326, 1339 (M.D. Fla. 2015) ("negligent misrepresentations to the court can satisfy the requirements of Rule 60(b)(3)").

motivated.  *See Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217 (1st Cir. 1982) ("the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him"); *Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*, 728 F.2d 572, 575 (1st Cir. 1984) (same).  At the absolute least, the Boston Parents would have insisted on exploring in discovery the motivations for concealing them (as they should now be given the opportunity to do).  Due to the Defendants' concealment of the texts, the Boston Parents were denied the chance to "inquir[e] into a plausible theory of liability," (*i.e.,* racial animus of the Boston School Committee), were denied "access to evidence that could well have been probative on an important issue," and were "closed off of a potentially fruitful avenue of direct or cross examination."  *Anderson*, 862 F.2d at 925.  All warrant relief under Rule 60(b)(3).

The Boston Parents are independently entitled to relief under Rule 60(b)(2) because the text messages constitute "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)".  The concealment of the texts is no mere technicality; they are materially relevant to the issues of this case.  At a minimum, the text messages provide direct evidence of: (1) racial animus by two *additional* School Committee members (in addition to Loconto's own animus); (2) racial animus specifically against white community members who stood to be harmed by the Zip Code Quota Plan; and, (3) an explicit link between one of the disparaged races and the Zip Codes most impacted by the Plan.  Doc. 113-1 at 77 and 81.  As detailed in the Rule 60(b) Motion (Section IV.B.), the concealed text messages, combined with the anti-Asian comments by then-Chair Loconto, establish overt racial animus on the part of 43% of the voting members and alone necessitate the application of strict scrutiny – an argument that re-opening the case will allow the Boston Parents to brief fully.

Indeed, during the July Hearing the Court acknowledged the critical significance of evidence of overt racial animus in the form of text messages:

> it's very clear that I've wrestled with these text messages, they're not some peripheral footnote in the opinion…

July Tr., 16:7-8. The Court has also acknowledged just how significant it is that we now have evidence of racial animus from two *additional* School Committee members:

> These were racist comments directed at the City's Asian American community. This Court takes them seriously but finds no persuasive evidence that any other voting member had such animus. This is conclusive.

*Id.* at 15:23-25. In short, these text messages are exactly the type of new evidence that necessitates relief under Rule 60(b)(2). *See Mitchell v. United States*, 141 F.3d 8, 18 (1st Cir. 1998).

## C. The Misrepresentations and Misconduct of Defendants' Counsel Continued after the Entry of Judgment.

The obfuscating conduct of Defendants' counsel continued after the entry of the Opinion and Judgment. At the *absolute latest*, In-House Counsel *and* Outside Counsel had actual knowledge of their misrepresentations once the *Boston Globe* published the concealed texts on June 7. Indeed, that leak led to the resignations of Oliver-Davila (June 7) and Rivera (June 4), who are named Defendants. Yet none of In-House Counsel or Outside Counsel *ever* made *any* attempt to correct the misrepresentation, in clear violation of both Mass. Rule of Professional Conduct 3.3(a)(1) and Rule 11 of the Federal Rules. *Arkansas Tchr. Ret. Sys.*, *supra*, at *7 (upon learning that a declaration contained false statements, an attorney did not "inform the court and correct them" as was "required by Rule 11 and the Massachusetts Rules of Professional Conduct.").

When questioned by the Court about these failures, Outside Counsel insisted that correcting the record had not occurred to them:

> THE COURT: All right, and that of course is out. But what did you do with respect to this lawsuit, anything?

MS. HODGE: No.

THE COURT: Did it occur to you that, perhaps innocently, that the Court had been misled here?

MS. HODGE: Your Honor, at that point … No, I actually was unaware of this particular problem, [] I was behind on my reading of the Globe so I was totally unaware of this particular issue.

\*\*\*

THE COURT: Okay. It didn't occur to you to bring the matter to the Court's attention?

MS. HODGE: No.

July Tr., 16:21-17:7; 18:15-18.   This explanation is dubious on its face, and it is outright contradicted by Defendants' own submissions to this Court, which make clear that even if it truly never occurred to Defendants' counsel to correct a clearly erroneous record it *did* occur to counsel for the Boston Parents who, in turn, brought it to their attention.   Specifically, Defendants' submission includes the June 16 email from Boston Parents' counsel raising the fact that the record was incorrect and explicitly requesting that Outside Counsel "correct its **deliberate misrepresentation to the District Court**" and *"do so immediately*."   Lizotte Aff. at Att. U (emphasis added).   Counsel for the Boston Parents even reminded Outside Counsel that "[t]his is something that your client should have done without our requesting it." *Id.*   Outside Counsel flat out *ignored* this request.   They failed to provide a response, and they, obviously, failed to notify the Court of its misrepresentations.   Notably, counsel for the Boston Parents sent this email six days *before* filing the Rule 60(b) Motion.   Thus, even if it "didn't occur" to counsel to correct the record initially, they still had ample time to do so but chose not to.

The inconsistency between Defendants' counsel's explanation for not correcting the record (it "didn't occur" to them) and what actually occurred (they ignored Boston Parents' request for such a correction) is most glaring, but it does not stand alone. There are several other contradictions between what Defendants' counsel told this Court and what the written documents reveal to be the

truth.  For example, Defendants' counsel told this Court that it was necessary to transcribe the text messages because the screenshots were "impossible to read."  July Tr., 8:8.  But a cursory review of the text messages reveals this is not the case.  *See* Doc. 113-1 at 53-87.  Similarly, Outside Counsel represented to the Court that the four In-House Counsel attorneys decided to "not include certain texts that were deemed to be of a personal nature and not in the individual member's professional or public capacity" because personal communications are exempt under the MPRL. July Tr., 8:8-11. But Lizotte, *one of those four In-House attorneys*, said the exact opposite in her affidavit, where she represented that the *Boston Globe* was informed that "[w]hile no portions of texts were redacted based on statutory exemptions to the public records law, BPS did omit portions deemed not 'related to BPS issues.'"  Lizotte Aff. at ¶6.  These contradictions create a credibility problem which is exacerbated by other of Defendants' counsel's responses that now ring hollow. For example, Defendants' submissions establish that In-House Counsel have extensive experience responding to public records requests, *see* Doc. 118-3 at ¶11 (BPS received "approximately 60" public records requests in 2020, and the City received over 3,250 through its website), including some that request text messages, *see id.* at ¶ 12.  Yet despite this experience, they still decided to conceal relevant text messages and doctor a transcript in a manner wholly contrary to the MPRL and the concurrent treatment of other electronic communications.[11] There is no explanation for these inconsistencies other than a continued effort to conceal evidence and cover-up the cover-up.

---

[11]     The Defendants clearly know that text messages are subject to the MPRL because the document to which they cite, the Guide published by the Massachusetts Inspector General in 2017, confirms as much. *See* Lizotte Aff., Att. B at 24-25.  *See also* VALERIO, *supra*. Thus, while Defendants' counsel represented that the *Boston Globe's* public record request was "the first time that Cathy Lizotte had ever received, as the Legal Advisor for the Boston Public Schools, a request for text messages", the three other In-House Counsel – all of whom were high ranking, experienced attorneys and one of whom had extensive experience with public records requests (*see, e.g.,* Doc. 118-3, ¶¶ 11-12) – do not have this excuse to "justify" their decision to withhold and doctor public records.  July Tr., 7:25-8:3.

**D.      Discovery Is Necessary, Especially Given the Attempts to Stonewall the Boston Parents from Relevant Evidence**

As previously noted, knowing what they now know, the Boston Parents would never had agreed to forego discovery in this case.  The concealed text messages show stunning evidence of racial animus.  But even more important than what they say is what was done to keep them from ever seeing the light of day.  Put simply, BPS cannot be trusted.  It proved itself untrustworthy by concealing the racist texts, and then confirmed that untrustworthiness by continuing to stonewall the Boston Parents and this Court throughout this Rule 60(b) process.  Discovery is needed to ensure both the Boston Parents and this Court that all the relevant facts have been produced.

BPS's conduct to date, as discussed above, more than justifies this Court reopening discovery.  But the *need* for discovery is amplified by BPS's more recent conduct, which demonstrates its intention to stonewall the Boston Parents.

The day after the Boston Parents filed their Rule 60(b) Motion, they submitted a public records request for the text messages from two key School Committee meetings occurring on October 8 and 21, 2020.  Exh. B, Requests ¶¶ 9-13.  These texts, of course, were responsive to the earlier requests, but were nonetheless withheld.  The City asserted its need for the maximum 25 business days to respond, (Exh. C at 3), but that date passed on July 29 without a response.  BPS seems intent on stonewalling that request.

In a separate attempt to obtain relevant records, counsel for the Boston Parents wrote to the City on July 15 outlining the many specific deficiencies in its responses to its prior November 19, 2020 and February 23, 2021 public records requests.  Exh. D; *see also* Murphy Decl. at ¶¶ 5-8 (identifying information requested).  On July 23, the City advised that it would "reopen" those two requests to "determine whether any other public records exist that are responsive to the requests", and advised that it intended to provide "an update within the next five business days" (i.e., July

17

30). Exh. E. Of course, no additional correspondence has been forthcoming.

Unfortunately, the consequences of these stonewalling tactics may be permanent. Even if the City were to have a change of heart (and even if such change were at the Court's direction), it may be too late. If the City did not collect the text messages when they were originally requested, it is likely that they have by now been deleted or that the four now-resigned members[12] will refuse to make their texts available. Thus, discovery would then be the *only* option available, for example, to subpoena records from third-parties such as cell phone companies.

Finally, discovery is necessary because recent events have all but confirmed there is even *more* evidence of racial animosity on the Boston School Committee out there to be found (and which would have been found already but for Defendants' conduct). This conclusion is not theoretical. We have already seen in it in the form of recent comments made by Khymani James, the student member of the School Committee at the time the Zip Code Quota Plan was adopted. (James later resigned.) Although he did not have a vote, he did have influence. Recently, on June 16, James came before the committee to comment on the racist text messages of his two former colleagues. He concluded those comments with the declaration: "**I, *too*, hate white people!**" *See* Exh. G at 3 (emphasis added). Such a declaration, made unhesitatingly to a committee on which he recently served, confirms that other evidence of racial animus exists. This is but one example of what the Boston Parents surely *would* have learned had it known about the racist texts and not agreed to forgo discovery. BPS should not be rewarded now for its treachery then.

### E. The Conduct of Defendants' Counsel Provides Grounds for Further Relief, Including under Rule 60(b)(6).

---

[12]     Chairperson Loconto, Vice Chairperson Oliver-Davila, and Member Rivera all resigned over their racist text messages/statements during the October 21 School Committee meeting, and Student Representative Khymani James resigned due to alleged institutional racism on the Committee and Student Advisory Council. Exh. F.

Defendants' counsel's conduct, discussed above, runs afoul of the applicable Rules and may provide the basis for a motion for sanctions under Rule 11 and 28 U.S.C. § 1927. *See Cruz*, 896 F.2d at 630; *Arkansas Tchr. Ret. Sys.*, *supra*, at *1, 7, 25-52. The Boston Parents make no such request now, but they reserve all rights to do so. However, at least two categories of that conduct constitute fraud on the Court: (1) the withheld and doctored evidence, *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) ("fraud on the court can take many forms" and creation of false document was "a near-classic example of the genre"); and, (2) the lack of disclosure and affirmative misrepresentations, *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999) ("an affirmative misrepresentation to the court", such as a "'failure to make a disclosure'" amounts to fraud on the court (quoting NHRPC 3.3(a)(1)). This conduct mandates relief under Rule 60(b)(6)   *Lopez v. Wall*, No. CA 09-578-S, 2011 WL 3667592, at *2 (D.R.I. Aug. 22, 2011) ("Grounds sufficient to grant relief from judgment under Rule 60(b)(6) include 'fraud on the court'" (quoting *U.S. v. 6 Fox Street*, 480 F.3d 38, 46–47 (1st Cir. 2007))).

## F.     The Boston Parents Have Standing

During the July Hearing, the Court asked whether the Boston Parents still have standing now that admission decisions have been sent out and the school year is only weeks away. July Tr., 22:18-27:25. As explained below, the Boston Parents' standing is undiminished.

As the First Circuit has recognized, Article III standing has three components:

A plaintiff must demonstrate (1) an injury in fact which is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) that the injury is "fairly traceable to the challenged action," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision."

*Mass. v. U.S. HHS*, 923 F.3d 209, 221-22 (1st Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560 (1992)).  All three components are met here.[13]

**Injury in Fact:** There are now two types of injury in fact.  *First*, there is injury to the members of the Boston Parents (and their children) from having been forced to participate in an unconstitutional admission process.  *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 319-320 (1978); *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  This injury was sufficient for the Court to previously find standing, and this injury persists. *Second*, there is injury from having been denied admission to the Exam Schools.  Of the 14 students listed in the Amended Complaint, six (6) were denied admission to *any* of the Exam Schools, while two (2) were granted admission but not to their first choice.[14]

**Traceable:** Both types of injury are the result of the Zip Code Quota Plan.  The Plan abandoned Boston's long-standing *citywide* competition, using that approach for only 20% of the seats. Under the Plan, BPS offered admission to 974 students.  In a citywide competition, these would have been the *top* 974 students, regardless of where they lived, but due to the allocation of 80% of the seats by zip code, many students ranked in the top 974 were denied admission.  Because BPS provided each applicant with their citywide ranking (among all 1666 applicants), we know that at least five of the six Plaintiff students who were denied admission[15] would have been admitted under a citywide competition.  Not surprisingly, these students come from **Chinatown**, home to many Asians disparaged by Loconto's racist comments, and **West Roxbury,** the zip code that was the focus of the anti-White texts by Oliver-Davila and Rivera.  These five students, all

---

[13]    The Boston Parents continue to have associational standing because they can show that at least one of their members continues to have standing in his/her own right.  Doc. 104 at 29.

[14]    Of the other Students listed in the Amended Complaint, one withdrew his/her application and five were admitted to their top choice. All still suffered constitutional injury from the racially discriminatory admissions process.

[15]    The last student is appealing BPS' grading conversion method, which calculated his/her grades while attending a private school to be a "B" average despite being ranked in the top 20% of his/her class.

applicants for seventh grade, are described below and in the supporting Affidavit.  Exh. H.

| Student # | Ethnicity | Zip Code | GPA | Rank (out of 1,666 Applicants[16]) |
|---|---|---|---|---|
| 1 | Asian | Chinatown (02111) | 9.5 | Below 974 |
| 6 | White | West Roxbury (02132) | 10 | Below 974 |
| 8 | Asian | West Roxbury (02132) | 9.5 | Below 974 |
| 10 | Asian | West Roxbury (02132) | 10.5 | Below 974 |
| 13 | White | West Roxbury (02132) | 9.75 | Below 974 |

These denials are directly attributable to the Plan.  The traceability component of standing is met.[17]

| Zip Code | Neighborhood | Number of Students | B- 7-7.9 | B 8-8.9 | B+ 9-9.9 | A- 10-10.9 | A 11-11.9 | A+ 12 | Average GPA |
|---|---|---|---|---|---|---|---|---|---|
| 02115 | Longwood/Fenway | 10 | 0% | 0% | 20% | 50% | 30% | 0% | 10.38 |
| 02116 | Back Bay | 13 | 0% | 0% | 0% | 46% | 31% | 23% | 11.1 |
| 02118 | South End | 27 | 0% | 0% | 0% | 48% | 44% | 7% | 10.92 |
| 02119 | Roxbury | 50 | 0% | 34% | 32% | 16% | 14% | 4% | 9.51 |
| 02120 | Roxbury | 11 | 0% | 9% | 45% | 36% | 9% | 0% | 9.89 |
| 02121 | Roxbury | 67 | 0% | 21% | 40% | 18% | 12% | 9% | 9.79 |
| 02122 | Dorchester | 48 | 0% | 0% | 0% | 42% | 48% | 10% | 11.04 |
| 02124 | Dorchester | 109 | 0% | 0% | 30% | 27% | 40% | 3% | 10.53 |
| 02125 | Dorchester | 59 | 0% | 0% | 31% | 24% | 34% | 12% | 10.67 |
| 02126 | Mattapan | 51 | 2% | 37% | 24% | 18% | 18% | 2% | 9.57 |
| 02127 | South Boston | 35 | 0% | 3% | 31% | 23% | 37% | 6% | 10.48 |
| 02128 | East Boston | 75 | 0% | 0% | 37% | 39% | 23% | 1% | 10.25 |
| 02129 | Charlestown | 35 | 0% | 0% | 0% | 3% | 74% | 23% | 11.56 |
| 02130 | Jamaica Plain | 54 | 0% | 0% | 0% | 37% | 41% | 22% | 11.19 |
| 02131 | Roslindale | 67 | 0% | 0% | 0% | 49% | 43% | 7% | 10.94 |
| 02132 | West Roxbury | 69 | 0% | 0% | 0% | 10% | 51% | 39% | 11.51 |
| 02134 | Allston | 11 | 0% | 9% | 18% | 45% | 27% | 0% | 10.32 |
| 02135 | Brighton | 29 | 0% | 0% | 24% | 48% | 28% | 0% | 10.36 |
| 02136 | Hyde Park | 67 | 0% | 0% | 37% | 30% | 30% | 3% | 10.32 |
| 99999 | Homeless / DCF | 53 | 0% | 42% | 34% | 9% | 8% | 8% | 9.31 |
| | Total[18] | 974 | 0% | 8% | 22% | 27% | 33% | 10% | 10.49 |

The above chart, prepared by BPS and attached as Exhibit I, shows, for each zip code: (1)

---

[16]     As noted above, BPS provided each student his/her individual ranking from 1 to 1666 (with random numbers being used to break ties). Here, specific individuals rankings have been withheld to protect the students' anonymity.

[17]     For the three students who did not receive their first choice, it is not yet known whether they would have if the Plan was not in place. Such a showing is not necessary given their constitutional injury of being forced to compete in an unconstitutional process. *Washington Legal Foundation v. Mass. Bar Foundation*, 993 F.2d 962, 972 (1st. Cir. 1993) (court "need not address the standing of all plaintiffs" if standing is established with respect to another plaintiff).

[18]     Total includes information for zip codes with fewer than 10 invitations.

the number of students admitted (row 3); (2) the percentage of admitted students at each GPA level (rows 4-9); and, (3) the average GPA for each zip code (row 10).[19]  For each zip code, the green and pink blocks indicate, respectively, the GPA levels from which students were or were not admitted.[20]  The chart shows that in some zip codes students were admitted with either a "B" or "B-" average, but in other zip codes *no one* with lower than an "A-" average was admitted.[21]  The favored zip codes (*i.e.*, those from which students were admitted with lower grades) are closely correlated with predominantly Black/Latino populations, while the disfavored zip codes are closely correlated with predominantly Asian/White populations.[22]  Indeed, in the predominantly Asian/White zip codes the average GPAs for admitted students ran from a high of 11.56 (Charlestown) to a low of 10.38 (Longwood/Fenway).   In the predominantly Black/Latino zip codes, the average GPAs ran from a high of 10.67 (Dorchester – 02125) to a low of 9.51 (Roxbury – 02119).[23]

In sum, based on information drawn from Defendants' own records, the discriminatory effects of the Zip Code Quota Plan are systemic.  The injuries and their traceability are systemic. None of this should be surprising.  Allocating seats by zip codes – with different admission "cut off" scores for each – is the mechanism by which Defendants planned to achieve their racial re-

---

[19]    Defendants have not provided data for the fourteen zip codes where fewer than ten students were admitted, including Chinatown (02111) where only seven students received invitations (down from 24 in the previous year).

[20]    Not every student in the lowest green GPA blocks were admitted. Ties were broken by random selection.

[21]    As explained at footnote 18, BPS did not provide data for Chinatown. But, we know that *at least* one student from Chinatown was not admitted despite a "B+" average. *See supra* at 21 (Student 1 rejected despite having a GPA of 9.5, squarely in the "B-plus" range).  It is likely that the GPA cut-off for Chinatown was "A-" or higher.

[22]    Zip codes where the Asian/White populations predominate (*i.e.* 55 percent or more) are shaded in orange, while zip codes where the Black/Latino populations predominate are shaded in blue. Population percentages are based on the chart "Census Data by Race" found at Doc. 63-1, page 10 of 13.

[23]    To the extent that a comparison with random selection may be relevant, significant Asian/White zip codes lost seats (and Black/Latino zip codes gained) compared to a random selection of 974 students out of 1,666 applicants (58.5%). *See* Exh. J. For example, with 33 applicants, Chinatown would have expected 19 seats, but received 7.  With 52 applicants, Mattapan would have expected 30 seats, but received 51.   *See* Exh. K; *see also* Exhs. L and M (source data for applicants and invitations by zip code).

balancing of the Exam Schools.  And they were highly successful, as depicted by this BPS chart, which shows a decrease in Asian and White student admissions from 61% to 49%, and an increase in Black and Latino student admissions from 33% to 46%.  *See* Exh. N (chart in top left corner; addition of White/Asian and Black/Latino percentages and comparing rows 2 and 4).  Comparing rows 3 and 4 confirms that the October 2020 simulation correctly predicted the results of the Plan. Moreover, the now notorious "Projected Shift Chart" (Exhibit 38) anticipated an 11% decrease in Asian/ White invitees to the Exam Schools.  We now know that decrease was actually 12% and resulted in ***117 seats lost*** by Asian/White students and ***126 seats gained*** by Black/ Latino students compared to a hypothetical citywide competition. *See id.*

These results belie Defendants emphatic representations that "there is no real evidence that White or Asians will decrease overall" and that BPS simulations were "necessarily speculative." Doc. 76 at 9.  Indeed, when they filed their brief making those representations (on April 2, 2021), Defendants already *had in their hands* the student applicant information that proves that very statement false.  *See* ASE, ¶ 54 (noting March 5, 2021 as application deadline).

**Redressability:** The Boston Parents do not seek to revoke the admissions of students admitted under the Zip Code Quota Plan.  Such action is not necessary to provide relief.  There are, of course, nominal damages, which would avoid mootness even if no form of injunctive relief were available. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ("for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right.").  But injunctive relief is available, as the Court may use its broad equitable powers to craft a remedy that would allow the named Students, and many other wrongfully excluded students, to attend Exam Schools.  This is so for three broad reasons.

First, the Exam Schools are not at their maximum capacity.  Thus, seats can be readily

found for many students wrongfully denied admission under the Zip Code Quota Plan.

- For the **seventh** grade entering class, Defendants invited only **974** students.  This is **51 fewer** than the 1025 invited last year, and **103 fewer** than the 1077 invited in 2019 and 2018.  Exh. O.

- For the **ninth** grade entering class, Defendants invited a total of **340** students, far fewer than the 408 invited in 2020, the 454 invited in 2019, and the 453 invited in 2018.  *Id.*

- Defendants have a history of finding room for more students at the last minute.  In August 2020, after a last-minute re-calculation and correction of grade point averages, Defendants invited to the Exam Schools a total of 62 students who had been originally rejected.[24]

Second, some seats that are now filled will become vacant.  There are always students whose plans change, and either do show up when fall classes begin or who start at an Exam School but then transfer out.  The Court could order Defendants to create a waiting list of students wrongfully denied admission and then use that list to fill vacancies as they occur.

Third, there are two routine Exam School entry points: seventh and ninth grade.  *See* ASE, ¶ 7.  If no earlier remedy is sufficient, the Court could order that students wrongfully denied seventh grade admission be granted priority for admission in the ninth grade.

In short, there are a variety of remedies that the Court could use to remediate the use of the unconstitutional Zip Code Quota Plan.  *See Morgan v. Kerrigan,* 530 F.2d 431, 432 (1st Cir. 1976) ("[T]he court's equitable power to fashion a remedy is both broad and flexible.") (citing *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15 (1971)).  While those remedies may not be as fulsome as they could have been if Plaintiff had prevailed at the beginning, they are nevertheless substantial.  Obviously, the precise parameters of injunctive relief must await the presentation of evidence, but this case is by no means moot.  Indeed, "a case is moot when the court cannot give *any* effectual relief to the potentially prevailing party." *ACLU of Mass. v. U.S.*

---

[24]    *See Dozens of Students Were Not Admitted to Boston Exam Schools Because of an Error*, Boston Globe (Updated August 31, 2020), available at https://bit.ly/2VnJHDX.

*Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) (emphasis added) (internal quotations and citations omitted). That is certainly not the case here.

Finally, during the July Hearing, the Court queried whether the Boston Parents still have standing under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983),[25] which held that the claim for injunctive relief was moot because plaintiff was not "realistically threatened by a repetition" of the action at issue (a police chokehold). *Id.* at 105. The cases are not analogous. In *Lyons*, no form of injunction could remedy the injury that the chokehold caused. Here, there is an array of injunctive remedies that can ameliorate the injury caused by the Zip Code Quota Plan.[26] Besides, the same plan could be repeated in the future (perhaps when rejected students apply for entry in the ninth grade). *See U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (noting that defendants have the burden to "demonstrate that there is no reasonable expectation that the wrong will be repeated. The burden is a heavy one.") (quotation marks and citation omitted). The case is not moot.

### III.   REQUEST FOR ORAL ARGUMENT

The Boston Parents respectfully request a hearing on the issues presented herein.

### IV.   CONCLUSION

For the foregoing reasons this Court should grant the Boston Parents' Rule 60(b) Motion, vacate the Court's the April 15, 2021 judgment, allow discovery moving forward, and take such further action as may be appropriate given the conduct of Defendants and their counsel.

---

[25]     Technically, when the complaint is filed *before* the action sought to be enjoined, "[the] subsequent redressability problem is one of mootness, not standing." *Becker v. FEC*, 230 F.3d 381, 389 (1st Cir. 2000). The difference affects who has the burden. Plaintiffs have the initial burden of showing standing. Once this is done, defendants have the burden of showing the case has become moot.

[26]     In *Lyons*, the plaintiff was still allowed to pursue his claim for monetary damages. Similarly, the Boston Parents must be allowed to continue their claim for nominal damages.

Dated: August 9, 2021

Respectfully submitted:

       */s/ Callan G. Stein*

Callan G. Stein (BBO # 670569)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com

William H. Hurd (Va. Bar # 16967) (*pro hac vice*)
Christopher W. Carlson, Jr. (Va. Bar # 93043) (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1490
william.hurd@troutman.com
chris.carlson@troutman.com

Mary Grace W. Metcalfe (N.Y. Bar #5377932) (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
marygrace.metcalfe@troutman.com (*pro hac vice*)

*Counsel for Plaintiff*

## <u>Certificate of Service</u>

I, Callan G. Stein, certify that the foregoing document was filed this date via the Court's

CM/ECF filing system and will be sent electronically to the registered participants in this action.


_____ */s/ Callan G. Stein*_____