## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| **BOSTON PARENT COALITION FOR ACADEMIC EXCELLENCE CORP.,** | |
| **Plaintiff,** | |
| **v.** | |
| **THE SCHOOL COMMITTEE OF THE CITY OF BOSTON, ALEXANDRA OLIVER-DAVILA, MICHAEL O'NEILL, HARDIN COLEMAN, LORNA RIVERA, JERI ROBINSON, QUOC TRAN, ERNANI DeARAUJO, and BRENDA CASSELLIUS,** | **Civil Action No. 1:21-cv-10330-WGY** |
| **Defendants** | |
| **and** | |
| **THE BOSTON BRANCH OF THE NAACP, THE GREATER BOSTON LATINO NETWORK, ASIAN PACIFIC ISLANDER CIVIC ACTION NETWORK, ASIAN AMERICAN RESOURCE WORKSHOP, MAIRENY PIMENTAL, and H.D.,** | |
| **Defendants-Intervenors.** | |

## MEMORANDUM PURSUANT TO COURT ORDER AND IN FURTHER SUPPORT RELIEF FROM JUDGMENT UNDER RULE 60(B)[1]

Callan G. Stein (BBO # 670569)
Mary Grace W. Metcalfe (N.Y. Bar #5377932)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com
marygrace.metcalfe@troutman.com
Admitted *pro hac vice*

William H. Hurd (Va. Bar # 16967)
Christopher W. Carlson, Jr. (Va. Bar # 93043)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1335
william.hurd@troutman.com
chris.carlson@troutman.com
Admitted *pro hac vice*
*Counsel for Plaintiff*

---

[1] Plaintiff submits this Memorandum following the August 26 posting on ECF of the Court's order denying the request for a five-page expansion of the usual briefing limit, and replaces Plaintiff's August 9 Memorandum.

# TABLE OF CONTENTS

**Page**

I.     UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND ........................... 2

II.    ARGUMENT ....................................................................................... 6

    A.    Defendants' Counsel Misled Counsel for the Boston Parents and This Court ............................................................................................ 6

    B.    Defendants' Counsel's Conduct Mandates Relief Under Rule 60(b)(2) and 60(b)(3) .................................................................................. 9

    C.    The Misrepresentations and Misconduct of Defendants' Counsel Continued after the Entry of Judgment ........................................... 12

    D.    Discovery Is Necessary, Especially Given the Attempts to Stonewall the Boston Parents from Relevant Evidence ........................................ 14

    E.    The Conduct of Defendants' Counsel Provides Grounds for Further Relief, Including under Rule 60(b)(6). ................................................ 15

    F.    The Boston Parents Have Standing ................................................. 16

III.   REQUEST FOR ORAL ARGUMENT ....................................................... 20

118897254v1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACLU of Mass. v. U.S. Conference of Catholic Bishops*,
  705 F.3d 44 (1st Cir. 2013) ..........................................................................................20

*Alpine v. Friend Bros.*,
  244 Mass. 164 (1923) ....................................................................................................10

*Anderson v. Cryovac, Inc.*,
  862 F.2d 910 (1st Cir. 1988) .....................................................................................10, 11

*Aoude v. Mobil Oil Corp.*,
  892 F.2d 1115 (1st Cir. 1989) .......................................................................................15

*Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*,
  No. CV 11-10230-MLW, 2020 WL 949885 (D. Mass. Feb. 27, 2020) ...................7, 8, 12, 15

*Becker v. FEC*,
  230 F.3d 381 (1st Cir. 2000) .........................................................................................20

*Bougas v. Chief of Police of Lexington*,
  371 Mass. 59, 354 N.E.2d 872 (1976) .............................................................................7

*Bros Inc. v. W. E. Grace Mfg. Co.*,
  351 F.2d 208 (5th Cir. 1965) ...........................................................................................9

*Catskill Dev., L.L.C. v. Park Place Ent. Corp.*,
  286 F. Supp. 2d 309 (S.D.N.Y. 2003) .............................................................................10

*Churchill Downs, Inc. v. NLR Ent., LLC*,
  No. CV143342KMMAH, 2018 WL 4589992 (D.N.J. Sept. 25, 2018) .................................10

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................................................20

*Corcoran v. McCarthy*,
  2010 S.D. 7, 778 N.W.2d 141 .........................................................................................10

*Cruz v. Savage*,
  896 F.2d 626 (1st Cir. 1990) ......................................................................................8, 15

*Del Rosario v. Nashoba Reg'l Sch. Dist.*,
  No. MICV20181899D, 2020 WL 8919067 (Mass. Super. Feb. 12, 2020)...............................7

118897254v1

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Dist. Attorney for the Norfolk Dist v. Flatley*,
   419 Mass 507 (1995) ............................................................................7

*Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*,
   728 F.2d 572 (1st Cir. 1984)...............................................................11

*Lonsdorf v. Seefeldt*,
   47 F.3d 893 (7th Cir. 1995) ................................................................10

*Lopez v. Wall*,
   No. CA 09-578-S, 2011 WL 3667592 (D.R.I. Aug. 22, 2011)..............16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................16

*In re M/V Peacock on Complaint of Edwards*,
   809 F.2d 1403 (9th Cir. 1987) ..............................................................9

*Mass. v. U.S. HHS*,
   923 F.3d 209 (1st Cir. 2019)...............................................................16

*Mitchell v. United States*,
   141 F.3d 8 (1st Cir. 1998) ..................................................................12

*Morgan v. Kerrigan*,
   530 F.2d 431 (1st Cir. 1976)...............................................................20

*Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*,
   692 F.2d 214 (1st Cir. 1982)...............................................................11

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of
   Jacksonville*,
   508 U.S. 656 (1993)............................................................................16

*Pearson v. First NH Mortg. Corp.*,
   200 F.3d 30 (1st Cir. 1999)........................................................8, 15, 16

*Phillips v. Stear*,
   236 W. Va. 702, 783 S.E.2d 567 (2016)................................................9

*Regents of the Univ. of California v. Bakke*,
   438 U.S. 265 (1978)............................................................................16

*Schultz v. Butcher*,
   24 F.3d 626 (4th Cir. 1994) ................................................................10

118897254v1

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Scott v. U.S.*,
  81 F. Supp. 3d 1326 (M.D. Fla. 2015) ...................................................................10

*Suffolk Const. Co. v. Div. of Cap. Asset Mgmt.*,
  449 Mass. 444 (2007) .............................................................................................7

*Swann v. Charlotte-Mecklenburg Board of Education*,
  402 U.S. 1 (1971) ..................................................................................................20

*U.S. v. 6 Fox Street*,
  480 F.3d 38 (1st Cir. 2007) ...................................................................................16

*U.S. v. Boskic*,
  545 F.3d 69 (1st Cir. 2008) ...................................................................................10

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021) .............................................................................................19

*Washington Legal Foundation v. Mass. Bar Foundation*,
  993 F.2d 962 (1st. Cir. 1993) ................................................................................17

*West v. Bell Helicopter Textron, Inc.*,
  803 F.3d 56 (1st Cir. 2015) ...................................................................................10

**Statutes**

28 U.S.C. § 1927 ..........................................................................................................15

M.G.L. c. 66, § 10 ..........................................................................................................7

Massachusetts Public Record Law ................................................................................7

Massachusetts Public Record Law ..............................................................................14

Massachusetts Public Records Law ...............................................................................7

MPRL ..............................................................................................................................7

Public Records Law ........................................................................................................7

**Other Authorities**

*Boston Globe* ........................................................................................................1, 5, 6, 12

*Dozens of Students Were Not Admitted to Boston Exam Schools Because of an
  Error*, Boston Globe (Updated August 31, 2020), available at
  https://bit.ly/2VnJHDX ...........................................................................................19

118897254v1

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

Fed. R. Civ. Proc. 11 .................................................................................................12, 15

Fed. R. Civ. Proc. 59(b) .....................................................................................................11

Fed. R. Civ. Proc. 60(b) .............................................................................................. *passim*

Fed. R. Civ. Proc. 60(b)(3) ........................................................................6, 9, 10, 11

Federal Rule 11 ...................................................................................................................8

Mass. Rule of Professional Conduct 3.3(a)(1) ..............................................................12

Rule 60(b)(2) ...................................................................................................6, 11, 12

Rule 60(b)(2) and 60(b)(3) ...............................................................................................9

Rule 60(b)(6) ..................................................................................................6, 15, 16

118897254v1

The Court was misled. So were we. If we had known then what we know now, we would have prepared our case differently in at least two material ways. First, while racially-motivated decision making was a central element of the case we presented, racial *animosity* was not. But it would have been. We, of course, addressed the anti-Asian animus of School Committee Chair Michael Loconto, but that was a secondary argument largely because, based on the information given to us, Loconto appeared to be an outlier. We now know that he was not; at least two more School Committee members displayed racial animus. Second, we would never have agreed to forego discovery if we had known about either Oliver-Davila's and Rivera's racist text messages *or* BPS's efforts to cover them up. The casually emphatic racial animus they showed reveals an environment in which racial animus was the norm – at least behind closed doors. In discovery, we would have looked behind those doors to see what other racial animus was hidden.

These conclusions are reinforced by BPS's actions in the wake of the *Boston Globe* breaking the news of the text message cover-up. BPS has attempted to cover-up the cover-up, and in doing so has continued to mislead this Court. *See infra* at III.C. BPS has continued to refuse to provide relevant documents. *See infra* at III.D. And in addition, we have seen *further* racial animus in a recent public rant by one former School Committee member, boasting of his racial hatred. *Id*.

The Boston Parents filed their Rule 60(b) Motion based on the information available at the time. But from the Defendants' response and its counsel's statements during the July 9 hearing (the "July Hearing"), we now have additional insight into who concealed and doctored the text messages and how Defendants' counsel came to certify that the transcript they knew to be incomplete was "true and accurate." Many questions remain unanswered. And additional relevant documents remain unproduced. But the little information Defendants have provided serves only to confirm that the cover-up remains ongoing and that relief is necessary under Rule 60(b).

1

## I.      UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND

Defendants' response confirms that there is little dispute over facts and procedural history.

1.      On October 22, 2020, BPS received a public records request from the *Boston Globe* seeking "text messages and emails related to BPS issues that were sent and received by each Boston School Committee member" during the October 21, 2020 School Committee Meeting ("October 21st Meeting"). Doc. 118-1, ⁋ 3 (Lizotte Aff.).

2.      Over the next two weeks, BPS collected responsive text messages from the School Committee members, including the racist texts between Oliver-Davila and Rivera. *Id.* at ⁋ 4.

3.      In what was surely a departure from the routine, four Boston officials – all lawyers – met to decide what to do with the racist messages: Attorneys O'Flaherty, Luthin, Williams, and Lizotte (collectively "In-House Counsel"). *Id.* at ⁋ 6.

4.      In-House Counsel made two decisions: (1) to prepare a transcript of the text messages rather than produce native screenshots; and (2) to omit the racist messages. *Id.* On November 5, BPS produced the transcripts of the doctored text messages to the *Boston Globe*. *Id.*

5.      On November 19, future Boston Parents[2] member Darragh Murphy submitted a public records request seeking: "all electronic communications, including emails, ***text messages***, voicemails, social media messages, tweets, etc., to and from Superintendent Cassellius, her staff and/or assistants, and all members of the Boston School Committee, and all members of the Exam School Working Group", including during the October 21st Meeting. *Id.* at ⁋ 9 (emphasis added).

6.      BPS did not respond for almost two months. On January 13, 2021, it produced "213 emails and other related documents, but no text messages", accompanied by a letter from Lizotte. *Id.* at ⁋ 13; *id.* at Att. J. Lizotte's letter did not indicate that BPS had omitted any documents, rather

---

[2]      The Boston Parents organization was formed the same day but did not yet have members. Doc. 118-4 at 4.

that BPS had redacted "student record information and personal emails, phone numbers, and addresses". *Id.* at Att. J. On February 23, Murphy made a second record request, specifically identifying "***text messages***, instant messages, and any other form of electronic communication" sent or received by the School Committee members and Superintendent Cassellius during the October 21st Meeting. *Id.* at ₱ 15 (emphasis added).

7.      On February 26, the Boston Parents filed their Verified Complaint and Motion for Preliminary Injunction, and sent a copy to Lizotte, with whom counsel had been communicating.

8.      Lizotte accepted service on behalf of Defendants and made her appearance as counsel of record the following day. Doc. 10. Attorneys Kay Hodge and John Simon ("Outside Counsel") entered their appearances on behalf of all Defendants on March 1. Docs. 11-12.

9.      On March 3, the Court held a hearing during which it instructed the Parties to confer and submit a statement of agreed facts and exhibits by March 15. Doc. 27.

10.     Three days later, on March 6, counsel for the Boston Parents proposed a list of documents from the public record requests as exhibits, entitled "Documents Prepared by Boston Public Schools and Obtained Through Public Records Requests." Doc. 119-1 at 5. Because BPS had not yet produced the transcript of doctored text messages, that transcript was not yet included.

11.     On March 9, In-House Counsel produced to Murphy the transcript containing the doctored text messages. Lizotte Aff. at ₱16. Lizotte's accompanying letter did not indicate that any documents had been withheld and did not mention any redactions. *Id.* at Att. M.

12.     Thus, by the time Lizotte produced the transcript that concealed the racist texts, she knew the Boston Parents had filed a suit claiming the Zip Code Quota Plan was unconstitutional.

13.     On March 12, after receiving the transcript of the doctored text messages, counsel for the Boston Parents supplemented its proposed exhibits to include material texts. Doc. 119-2.

14.     Thereafter, counsel for the Boston Parents had multiple phone calls and Zoom meetings with Hodge, Simon, and Lizotte to discuss the exhibits and the agreed statement of facts. At no time did any of them disclose that the transcript contained doctored text messages or was otherwise incomplete or inaccurate, *see* July Tr., 11:4-9, 12:3-9, even though:

   a.     Lizotte participated in the decisions to create the doctored transcript and withhold the racist text messages from production (Lizotte Aff. at ¶6);

   b.     Lizotte informed Hodge and Simon that she recognized "those particular documents had in fact been turned over, in a public records situation, [] to a Boston resident", that is, Murphy (July Tr., 10:24-11:3); and

   c.     Lizotte, Hodge, and Simon discussed with counsel for the Boston Parents each potential exhibit to the proposed statement of facts, including the transcript.

15.     On March 15, the Parties submitted and filed the Joint Agreed Statement of Facts and Exhibits ("ASE"), which included the transcript of text messages which, unbeknownst to the Boston Parents or the Court, had been doctored, as Exhibit 72 or ASE01862.

16.     In so filing the ASE, the Parties all represented that:

   The parties, by their undersigned counsel, hereby stipulate and agree to the facts set forth herein and to the authenticity of the documents attached hereto. To the extent the statements below cite to documents, the documents are true and accurate copies and the parties refer the Court to those documents for a more thorough discussion of the facts. (Doc. 38 at 1.)

17.     With regard to the texts specifically, *Defendants* represented that:

   A true and accurate transcription of text messages between Boston School Committee Members, Vice-Chairperson Alexandra Oliver Davila and Lorna Rivera during the October 21, 2020 Boston School Committee meeting is attached as Exhibit 72. (*Id.*, ¶ 67.)

18.     Hodge, Simon, and Lizotte all appear in the ASE signature block and all appeared before this Court on March 16 to discuss the ASE. *Id.* at 20; March 16, 2021 Tr., 4:14-16.

19.     At no point did any of Defendants' counsel indicate that the transcript of doctored text messages was incomplete or that In-House Counsel had deliberately removed text messages

118897254v1

that, by this time, everyone would have identified as highly relevant to the constitutional issues.

20.     Relying on defense counsel's representations, the Boston Parents agreed to forego discovery and proceed on the record. Doc. 113 at 10, 20. Had the Boston Parents known there was written confirmation of additional overt racial animus, that the documents previously produced had been doctored, and that the cover-up was ongoing – they would not have done so. *Id.*

21.     On April 15, the Court, also relying on Defendants' representations, entered an Opinion denying the Boston Parents' Motion. Doc. 104. In so ruling, the Court specifically held that the lack of "persuasive evidence that *any other voting member* had such animus" as demonstrated by Loconto towards the Asian-American community was "*conclusive*." *Id.* at 45 (emphasis added). Of course, there was such "persuasive evidence", it had just been concealed.

22.     Nearly two months later, on June 7, the *Boston Globe* published its exposé revealing the existence of the concealed racist text messages. Doc. 113-1, 37-43 ("Darragh Murphy Decl.").

23.     On June 9, Murphy requested a complete response to her prior public record requests as well as an explanation for why the racist texts were withheld. *Id.* at ⊩ 13. That same day, In-House Counsel, Shawn Williams stated that the requests would be reopened. *Id.* at ⊩ 14.

24.     On June 16, having received nothing further from Williams, counsel for the Boston Parents requested from Outside Counsel an explanation and the production of the text messages. Lizotte Aff. at Att. U. Counsel was also emphatic in asking Defendants and their counsel to immediately "correct its ***deliberate misrepresentation to the District Court*** *Id.* (emphasis added).

25.     Outside Counsel responded on June 18, but did *not* produce the text messages nor explain the withholding, and did *not* correct the record as counsel had requested. Exh. A.

26.     Later that day, counsel for the Boston Parents stated that they intended to file a Rule 60(b) motion. *Id.* Only *after* this did In-House Counsel produce the concealed text messages.

27.     On June 22, the Boston Parents filed their Rule 60(b) Motion. This was more than two weeks after the *Boston Globe's* exposé, yet Defendants' counsel made no effort to correct the record, despite being called upon to do so by counsel for the Boston Parents. *Supra* at ¶ 24.

28.     On July 6, Defendants filed their Opposition. Doc. 118; Docs. 118-1 – 118-4.

29.     On July 9, the Court held a hearing, during which the Court questioned Defendants' counsel about their conduct. Even though counsel for the Boston Parents had explicitly asked Outside Counsel to correct the record, Outside Counsel represented to the Court that correcting the record "didn't occur to [them]." July Tr., 16:21-17:7; 18:15-18. Outside Counsel also said she did not know about the text message revelation because she was behind in reading the *Boston Globe*, despite having read – and responded to – the June 16 email from counsel.

30.     At the conclusion of the hearing, the Court directed the Parties to provide additional briefing for which the Boston Parents now submit this memorandum. *See* Doc. 121.

## II.     ARGUMENT

Though many questions remain unanswered, what we do know justifies relief under Rule 60(b). We know that both In-House Counsel's and Outside Counsel's conduct prior to the Court's opinion warrants relief under Rule 60(b)(3). We know that the text messages themselves, and Defendants' withholding of them, warrant relief under Rule 60(b)(2). We know that counsel's conduct *after* the racist text message came to light further warrants relief under Rule 60(b)(6). And finally, we know that the Boston Parents still have standing as a matter of law. The Court should grant the Rule 60(b) Motion and reopen discovery.

## A.     Defendants' Counsel Misled Counsel for the Boston Parents and This Court

There is no other way to say it: Defendants' counsel misled counsel for the Boston Parents (Doc. 113 at 10, 20), misled this Court (July Tr., 22:2-8), and misled the public. That misleading conduct began in November 2020, when In-House Counsel concealed the racist text messages

from the *Boston Globe,* and it was repeated when they likewise concealed them from Murphy in

January 2021.[3] Both times, In-House Counsel violated the Massachusetts Public Record Law

("MPRL") by failing to include and *intentionally concealing* the responsive racist text messages.

*Suffolk Const. Co. v. Div. of Cap. Asset Mgmt.*, 449 Mass. 444, 453–54 (2007) (under MPRL the

government must "produce *all* public records for inspection, examination, and copying" (internal

quotation marks omitted)); ELIZABETH B. VALERIO, POWERS AND RESPONSIBILITIES OF THE

SCHOOL COMMITTEE, SL MA-CLE 2-1 (3d Ed. 2016) ("School committees are subject to the

Massachusetts Public Records Law" and "*text messages* are public records") (emphasis added).

The law is clear that the School Committee texts had to be produced. But even if In-House

Counsel felt withholding them was somehow permissible, they would still have been obligated to:

> identify any records, categories of records or portions of records that the agency or
> municipality intends to withhold, and provide the specific reasons for such withholding,
> including the specific exemption or exemptions upon which the withholding is based

M.G.L. c. 66, § 10; *see also Dist. Attorney for the Norfolk Dist v. Flatley*, 419 Mass 507, 511

(1995) (custodian must state why an exemption applies to withheld or redacted portion). They did

no such thing. The letter from Lizotte did not indicate that *any* documents had been omitted, only

that certain "student record information" had been redacted. Lizotte Aff. at Att. J. This constituted

yet *another* violation of the MPRL by In-House Counsel.[4]

"Every lawyer is an officer of the court [and] has a duty of candor to the tribunal."

---

[3]   It does not matter, as has been suggested, that Murphy did not formally make her public records request on behalf of the Boston Parents. Defendants' responsibilities under the public records laws were identical whether Murphy made the request on behalf of herself or on behalf of the Boston Parents. *See Bougas v. Chief of Police of Lexington*, 371 Mass. 59, 64, 354 N.E.2d 872, 877 (1976).

[4]   *Del Rosario v. Nashoba Reg'l Sch. Dist.*, No. MICV20181899D, 2020 WL 8919067, at *2 (Mass. Super. Feb. 12, 2020) ("response to plaintiff's public records request did not comply with the Public Records Law" where "response failed to identify any records the District intended to produce [and] failed to identify a reasonable timeframe for it to produce any such records"; government entity directed to "a proper written response in compliance with the Public Records Law" including "which requested records exist, which will be produced, which can be produced in redacted form, and whether any exemptions apply to justify withholding certain records from production").

*Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, No. CV 11-10230-MLW, 2020 WL 949885, at *2 (D. Mass. Feb. 27, 2020) (quoting *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999)). In Massachusetts, the duty of candor requires that an attorney not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Mass. R. Prof. C. 3.3(a)(1). Under Federal Rule 11, attorneys must take "responsibility for the claims and defenses they represent…must make reasonable inquiry to assure that the claims, defenses and positions represented by them are well-grounded in both law and fact". *Cruz v. Savage*, 896 F.2d 626, 630 (1st Cir. 1990). Simply put:

> Judges trust lawyers. They expect that lawyers will provide the court the accurate and complete information that is necessary to decide matters properly. The Federal Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct make these expectations legal obligations. *Arkansas Tchr. Ret. Sys.*, *supra*, at *1.

Defendants' counsel betrayed these duties. First, they misrepresented that the transcript of the text messages was "true and accurate".[5] We now know it was not. But Defendants' counsel knew all along. Lizotte, testified that she: (1) *participated* in deciding which text messages to remove and in preparing the doctored transcript (Lizotte Aff., ⁋ 6); (2) *provided* the transcript of doctored text messages to Murphy without disclosing that texts had been concealed (*id.*, ⁋16); (3) *recognized* the transcript that was presented to the Court as the one she knew had been doctored (July Tr.,10:24-11:3); (4) despite all of that, still *misrepresented* to counsel and the Court that the transcript was "true and accurate" (Doc 38 at 20); and, (5) *never* corrected that misrepresentation.

Second, Outside Counsel also misled the Boston Parents and the Court when, during the July Hearing, they represented that they did not know the transcript of the text messages was doctored. *See* July Tr., 13:19-24 ("[COURT:] You're telling me you did not know, in good faith,

---

[5]     Defendants' counsel argued this misrepresentation is excused because they did not represent that the Exhibit was a "complete" transcription. Doc 118 at 13. This Court rejected that argument. July Tr., 12:14-15:8.

and nobody on the trial team, your team defending the lawsuit, you didn't know that they were in fact not true and accurate, did you? MS. HODGE: Um, no…"). This may well be true as, unlike Lizotte, Outside Counsel did not participate in the doctoring. Nonetheless, Outside Counsel admitted they compiled the ASE and certified the transcript's accuracy without consulting the original text messages. *Id.* at 11:15-18 ("COURT: So did anyone on your team or you try to go back to the original [] messages at that time? MS. HODGE: No, no one thought to do that."). Nor did they do so even after it was clear that the text messages had factored so prominently into this Court's Opinion. *Id.* at 16:6-10 ("COURT: Now when you saw that and you saw the prominence that I had given to the text messages, did anyone then think to go back and actually try and look at the original messages? MS. HODGE: No."). Rather, Outside Counsel only sought to determine that the text messages were "an accurate statement of what was turned over" to the Boston Parents. Of course, as the Court appropriately noted, that was "not what was stipulated to." *Id.*, 13:8-12.

## B.    Defendants' Counsel's Conduct Mandates Relief Under Rule 60(b)(2) and 60(b)(3)

These misrepresentations, as well as the initial concealing and doctoring of the text messages, mandate relief under Rule 60(b)(3), whether they were intentional or not. *See, e.g., Phillips v. Stear*, 236 W. Va. 702, 712, 783 S.E.2d 567, 577 (2016) ("Rule 60(b)(3) applies to unintentional, accidental and careless misconduct or misrepresentations as well as intentional ones") (collecting cases).[6] This Court can and should grant relief in the event of misconduct *or* misrepresentation *or* fraud. One would suffice but all three are present here.[7]

First, there is no genuine dispute that the racist text messages were responsive to the public

---

[6]    *See also In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir. 1987) (discussing procedural requirements "[w]hen a motion under Rule 60(b)(3) is based on negligent misrepresentation"); *Bros Inc. v. W. E. Grace Mfg. Co.*, 351 F.2d 208, 211 (5th Cir. 1965) (misrepresentation Rule 60(b) does not require "deliberate evil purpose to misstate or conceal or thereafter engage in foot-dragging lest the truth might be uncovered").

[7]    Doc. 113.IV.A. The Boston Parent refer to their earlier briefs for a complete discussion of Rule 60(b)(3).

record requests and should have been produced. Whether that failure was intentional or accidental is immaterial; standing on its own that act constitutes "misconduct." *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988) ("[f]ailure to disclose or produce", even if "accidental" or "lackadaisical", qualifies as misconduct under Rule 60(b)(3)).[8]

Second, there is no dispute that Defendants' counsel failed to disclose to *anyone,* at *any* time that the transcript of text messages was doctored to remove highly relevant messages, instead certifying them as "true and accurate". This constitutes a "misrepresentation." *See, e.g., U.S. v. Boskic*, 545 F.3d 69, 87 (1st Cir. 2008) ("defendant made a false statement by swearing that the incomplete answers to questions on a form are truthful even if the defendant does not also swear that the responses to the questions on the form are complete"); *Alpine v. Friend Bros.,* 244 Mass. 164, 167 (1923) ("failure to disclose known facts when there was a duty" is a misrepresentation). Once again, this mandates relief under Rule 60(b)(3) whether the misrepresentation was intentional or unintentional. *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995).[9]

Rule 60(b)(3) also mandates relief because Defendants' counsel substantially interfered with the Boston Parents' preparation and presentation of their case. As detailed in the Rule 60(b) Motion (Doc 113 at IV.A.2), there is a presumption of substantial interference because Defendants concealed relevant evidence. *Anderson*, 862 F.2d at 925 (collecting cases) (where documents are

---

[8]      *See also West v. Bell Helicopter Textron, Inc.,* 803 F.3d 56, 67 (1st Cir. 2015) (courts are required "to take an expansive view of 'misconduct'" under Rule 60(b)(3)"); *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) (finding misconduct under Rule 60(b)(3) where a report was withheld unintentionally and noting "the failure to produce such an important report which contained information helpful to an adversary's position is not easily excused") (citing *Anderson*, 862 F.2d at 924 n.10); *Corcoran v. McCarthy*, 2010 S.D. 7, ¶ 19, 778 N.W.2d 141, 148 ("a majority of courts have concluded that misconduct in failing to disclose or produce may be careless, accidental, or even innocent under Rule 60(b)(3)" (citing *Anderson*, 862 F.2d at 923)); *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 286 F. Supp. 2d 309, 314 (S.D.N.Y. 2003) ("even an accidental failure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of Rule 60(b)(3)") (collecting cases).

[9]      *See also Churchill Downs, Inc. v. NLR Ent., LLC*, No. CV143342KMMAH, 2018 WL 4589992, at *4 (D.N.J. Sept. 25, 2018) (unknowingly inaccurate statements are misrepresentations under Rule 60(b)(3) because a party and counsel must "ascertain [the facts] before making representations to the Court"); *Scott v. U.S.*, 81 F. Supp. 3d 1326, 1339 (M.D. Fla. 2015) ("negligent misrepresentations to the court can satisfy the requirements of Rule 60(b)(3)").

"deliberately suppressed, [their] absence can be presumed to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is, to have substantially interfered").

Additionally, the Boston Parents never would have agreed to forgo taking discovery had they known that text messages had been withheld, especially ones that so clearly supported their claims. Indeed, evidence that these racist text messages were concealed *in the first place* supports the claim that the Zip Code Quota Plan was racially motivated. *See Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217 (1st Cir. 1982) ("the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him"); *Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*, 728 F.2d 572, 575 (1st Cir. 1984). At the absolute least, the Boston Parents would have insisted on exploring in discovery the motivations for concealing them (as they should now be given the opportunity to do). But Defendants' concealment of the texts denied the Boston Parents the chance to "inquir[e] into a plausible theory of liability," (*i.e.,* racial animus of the School Committee) and "access to evidence that could well have been probative on an important issue," and "closed off of a potentially fruitful avenue of direct or cross examination." *Anderson*, 862 F.2d at 925. All warrant Rule 60(b) relief.

The Boston Parents are independently entitled to relief under Rule 60(b)(2) because the text messages constitute "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)". The concealment of the texts is no mere technicality; they are materially relevant. At a minimum, they provide direct evidence of (1) racial animus by two *additional* School Committee members (in addition to Loconto's); (2) racial animus specifically against white community members who stood to be harmed by the Zip Code Quota Plan; and, (3) an explicit link between one of the disparaged races

and the Zip Codes most impacted by the Plan. Doc. 113-1 at 77 and 81. As detailed in the Rule

60(b) Motion (Section IV.B.), the concealed text messages and the anti-Asian comments by

Loconto, establish overt racial animus by 43% of the members and necessitate the application of

strict scrutiny – an argument that re-opening the case will allow the Boston Parents to brief fully.

Indeed, during the July Hearing the Court acknowledged the critical significance of

evidence of overt racial animus in the form of text messages:

> it's very clear that I've wrestled with these text messages, they're not some
> peripheral footnote in the opinion…

July Tr., 16:7-8. The Court has also acknowledged just how significant it is that we now have

evidence of racial animus from two *additional* School Committee members:

> These were racist comments directed at the City's Asian American community.
> This Court takes them seriously but finds no persuasive evidence that any other
> voting member had such animus. This is conclusive.

*Id.* at 15:23-25. In short, these text messages are exactly the type of new evidence that necessitates

relief under Rule 60(b)(2). *See Mitchell v. United States*, 141 F.3d 8, 18 (1st Cir. 1998).

## C.   The Misrepresentations and Misconduct of Defendants' Counsel Continued after the Entry of Judgment

The obfuscating conduct of Defendants' counsel continued after the entry of the Opinion

and Judgment. At the *absolute latest*, In-House Counsel *and* Outside Counsel had actual

knowledge of their misrepresentations once the *Boston Globe* published the concealed texts on

June 7. Indeed, that leak led to the resignations of Oliver-Davila (June 7) and Rivera (June 4), who

are named Defendants. Yet none of In-House Counsel or Outside Counsel *ever* made *any* attempt

to correct the misrepresentation, in clear violation of both Mass. Rule of Professional Conduct

3.3(a)(1) and Rule 11 of the Federal Rules. *Arkansas Tchr. Ret. Sys.*, *supra*, at *7 (upon learning

that a declaration contained false statements, an attorney did not "inform the court and correct

them" as was "required by Rule 11 and the Massachusetts Rules of Professional Conduct.").

12

When questioned by the Court about these failures, Outside Counsel insisted that correcting the record had not occurred to them:

> THE COURT: All right, and that of course is out. But what did you do with respect to this lawsuit, anything?
>
> MS. HODGE: No.
>
> THE COURT: Did it occur to you that, perhaps innocently, that the Court had been misled here?
>
> MS. HODGE: Your Honor, at that point … No, I actually was unaware of this particular problem, [] I was behind on my reading of the Globe so I was totally unaware of this particular issue.
>
> ***
>
> THE COURT: Okay. It didn't occur to you to bring the matter to the Court's attention?
>
> MS. HODGE: No.

July Tr., 16:21-17:7; 18:15-18. This explanation is outright contradicted because counsel for the Boston Parents emailed Outside Counsel on June 16 raising the fact that the record was incorrect and explicitly requesting that Outside Counsel "correct its ***deliberate misrepresentation to the District Court*** and ***"do so immediately*****." Lizotte Aff. at Att. U (emphasis added). Counsel for the Boston Parents even reminded Outside Counsel that "[t]his is something that your client should have done without our requesting it." *Id.* Outside Counsel *ignored* this request. They failed to provide a response or notify the Court of its misrepresentations. Notably, counsel for the Boston Parents sent this email six days *before* filing the Rule 60(b) Motion. Even if it did not "occur" to counsel initially, they still had ample time to correct things.

This inconsistency is most glaring, but it does not stand alone. Defendants' counsel also told this Court that it was necessary to transcribe the text messages because the screenshots were "impossible to read." July Tr., 8:8. But a cursory review of the text messages reveals this is not the case. *See* Doc. 113-1 at 53-87. Defendants' submissions establish that In-House Counsel have extensive experience responding to public records requests, *see* Doc. 118-3 at ¶11, including some

13

that request text messages, *see id.* at ¶ 12. Yet despite this experience, they still decided to conceal relevant text messages and doctor a transcript in a manner wholly contrary to the MPRL and the concurrent treatment of other electronic communications. There is no explanation for these inconsistencies other than a continued effort to conceal evidence and cover-up the cover-up.

**D.      Discovery Is Necessary, Especially Given the Attempts to Stonewall the Boston Parents from Relevant Evidence**

The concealed text messages show stunning evidence of racial animus. But even more important than what they say is what was done to keep them from ever seeing the light of day. Put simply, BPS has proven itself untrustworthy by concealing the racist texts and then stonewalling the Boston Parents and this Court throughout this Rule 60(b) process. Discovery is needed to ensure both the Boston Parents and this Court that all the relevant facts have been produced.

BPS's conduct more than justifies the Court reopening discovery. But the *need* for discovery is amplified by BPS's more recent conduct, which demonstrates its intention to stonewall the Boston Parents. The day after the Boston Parents filed their Rule 60(b) Motion, they submitted a public records request for the text messages from two key School Committee meetings occurring on October 8 and 21, 2020. Exh. B, Requests ¶¶ 9-13. These texts, of course, were responsive to the earlier requests, but were nonetheless withheld. The City asserted its need for the maximum 25 business days to respond, (Exh. C at 3), but that date passed on July 29 without a response. BPS seems intent on stonewalling that request.

In a separate attempt to obtain relevant records, counsel for the Boston Parents wrote to the City on July 15 outlining specific deficiencies in its responses to its two prior public records requests. Exh. D; *see also* Murphy Decl. at ¶¶ 5-8. On July 23, the City advised that it would "reopen" those two requests to "determine whether any other public records exist that are responsive to the requests", and advised that it intended to provide "an update within the next five

14

business days". Exh. E. Of course, no additional correspondence has been forthcoming.

Unfortunately, the consequences of this stonewalling may be permanent. Even if the City were to have a change of heart (or the Court so directed it), it may be too late. If the City did not collect the text messages when they were requested, it is likely that they have by now been deleted or that the four now-resigned members will not make their texts available. Thus, discovery would then be the *only* option available (e.g. subpoenas to the phone company).

Finally, discovery is necessary because recent events have all but confirmed there is even *more* evidence of racial animosity on the Boston School Committee out there to be found (and which would have been found already but for Defendants' conduct). For example, recent comments made by Khymani James, the student member of the School Committee at the time the Zip Code Quota Plan was adopted but has since resigned (Exh. F), addressed the racist text messages of his two former colleagues. He concluded those comments with the declaration: "**I, too, hate white people!**" *See* Exh. G at 3 (emphasis added). Such a declaration, made unhesitatingly to a committee on which he recently served, confirms that other evidence of racial animus exists.

**E.     The Conduct of Defendants' Counsel Provides Grounds for Further Relief, Including under Rule 60(b)(6).**

Defendants' counsel's conduct runs afoul of the applicable Rules and may provide the basis for a motion for sanctions under Rule 11 and 28 U.S.C. § 1927. *See Cruz*, 896 F.2d at 630; *Arkansas Tchr. Ret. Sys.*, *supra*, at *1, 7, 25-52. The Boston Parents make no such request now, but they reserve all rights to do so. However, at least two categories of that conduct constitute fraud on the Court: (1) the withheld and doctored evidence, *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) ("fraud on the court can take many forms" and creation of a false document was "a near-classic example of the genre"); and, (2) the lack of disclosure and

affirmative misrepresentations, *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999) ("an affirmative misrepresentation to the court", such as a "'failure to make a disclosure'" amounts to fraud on the court (quoting NHRPC 3.3(a)(1)). This conduct mandates relief under Rule 60(b)(6) *Lopez v. Wall*, No. CA 09-578-S, 2011 WL 3667592, at *2 (D.R.I. Aug. 22, 2011) ("Grounds sufficient to grant relief from judgment under Rule 60(b)(6) include 'fraud on the court'" (quoting *U.S. v. 6 Fox Street*, 480 F.3d 38, 46–47 (1st Cir. 2007))).

## F.     The Boston Parents Have Standing

The Court has asked whether the Boston Parents still have standing now that admission decisions have been sent out and the school year is only weeks away. July Tr., 22:18-27:25. The Boston Parents' standing is undiminished. Article III standing has three components:

> A plaintiff must demonstrate (1) an injury in fact which is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) that the injury is "fairly traceable to the challenged action," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision."

*Mass. v. U.S. HHS*, 923 F.3d 209, 221-22 (1st Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). All three components are met here.[10]

**Injury in Fact:** There are now two types of injury in fact. *First*, there is injury to the members of the Boston Parents (and their children) from having been forced to participate in an unconstitutional admission process. *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 319-320 (1978); *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). This injury was sufficient for the Court to previously find standing, and this injury persists. *Second*, there is injury from having been denied admission to the Exam Schools. Of the 14 students listed in the Amended Complaint, six (6) were denied admission

---

[10]     The Boston Parents continue to have associational standing because they can show that at least one of their members continues to have standing in his/her own right. Doc. 104 at 29.

to *any* of the Exam Schools, while two (2) were granted admission but not to their first choice.[11]

**Traceable:** Both types of injury are the result of the Zip Code Quota Plan, under which BPS offered admission to 974 students. In a citywide competition, these would have been the *top* 974 students, regardless of where they lived. But by allocating 80% of the seats by zip code, many students ranked in the top 974 were denied admission. BPS provided each applicant with their citywide ranking, so we know that at least five Plaintiff students who were denied admission would have been admitted under a citywide competition. Not surprisingly, these students come from **Chinatown**, home to many Asians disparaged by Loconto, and **West Roxbury,** the zip code on which the anti-White texts by Oliver-Davila and Rivera focused. These five students, all seventh grade applicants, are described in the supporting Affidavit. Exh. H; *see also* Exh. P (chart of student application information).

These denials are directly attributable to the Plan. The traceability component of standing is met.[12] Exhibit Q was prepared by BPS (attached in its original form as Exhibit I) shows, for each zip code: (1) the number of students admitted (row 3); (2) the percentage of admitted students at each GPA level (rows 4-9); and, (3) the average GPA for each zip code (row 10).[13] For each zip code, the green and pink blocks indicate, respectively, the GPA levels from which students were or were not admitted. The chart shows that in some zip codes students were admitted with either a

---

[11]     Of the other Students listed in the Amended Complaint, one withdrew his/her application and five were admitted to their top choice. All still suffered constitutional injury from the racially discriminatory admissions process.

[12]     For the three students who did not receive their first choice, it is not yet known whether they would have if the Plan was not in place. Such a showing is not necessary given their constitutional injury of being forced to compete in an unconstitutional process. *Washington Legal Foundation v. Mass. Bar Foundation*, 993 F.2d 962, 972 (1st. Cir. 1993) (court "need not address the standing of all plaintiffs" if standing is established with respect to another plaintiff).

[13]     Defendants have not provided data for the fourteen zip codes where fewer than ten students were admitted, including Chinatown (02111) where only seven students received invitations (down from 24 in the previous year).

"B" or "B-" average, but in other zip codes *no one* with lower than an "A-" average was admitted.[14] The favored zip codes are closely correlated with predominantly Black/Latino populations, while the disfavored zip codes are closely correlated with predominantly Asian/White populations.[15] In the predominantly Asian/White zip codes the average GPAs for admitted students ran from 11.56 (Charlestown) to 10.38 (Longwood/Fenway). In the predominantly Black/Latino zip codes, the average GPAs ran from 10.67 (Dorchester – 02125) to 9.51 (Roxbury – 02119).

Based on information drawn from Defendants' own records, the discriminatory effects of the Zip Code Quota Plan are systemic and easily traceable. This is not surprising. Allocating seats by zip codes – with different admission "cut off" scores for each – is the mechanism by which Defendants planned to achieve their racial re-balancing. And they were highly successful, as depicted by this BPS chart, which shows a decrease in Asian and White student admissions (61% to 49%), and an increase in Black and Latino student admissions (33% to 46%). *See* Exh. N (chart in top left corner; addition of White/Asian and Black/Latino percentages and comparing rows 2 and 4). Comparing rows 3 and 4 confirms that the October 2020 simulation correctly predicted the results of the Plan. Moreover, the now-notorious "Projected Shift Chart" (Exhibit 38) anticipated an 11% decrease in Asian/ White invitees to the Exam Schools. We now know that decrease was actually 12% and resulted in *117 seats lost* by Asian/White students and *126 seats gained* by Black/ Latino students compared to a hypothetical citywide competition. *See id.* These results belie Defendants claim that "there is no real evidence that White or Asians will decrease overall" and

---

[14]     BPS did not provide data for Chinatown. But, we know that *at least* one student from Chinatown was not admitted despite a "B+" average. *See supra* at 21 (Student 1 rejected despite having a GPA of 9.5, squarely in the "B-plus" range). It is likely that the GPA cut-off for Chinatown was "A-" or higher.

[15]     Zip codes where the Asian/White populations predominate (*i.e.* 55 percent or more) are shaded in orange, while zip codes where the Black/Latino populations predominate are shaded in blue. Population percentages are based on the chart "Census Data by Race" found at Doc. 63-1, page 10 of 13.

that BPS simulations were "necessarily speculative." Doc. 76 at 9. Indeed, when they filed their brief making those representations, Defendants already *had in their hands* the information that proves that very statement false. *See* ASE, ¶ 54 (noting March 5, 2021 as application deadline).

**Redressability:** The Boston Parents do not seek to revoke the admissions of students admitted under the Zip Code Quota Plan. Such action is not necessary to provide relief. There are, of course, nominal damages, which standing alone avoid mootness. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ("for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right."). But injunctive relief is also available. The Court may use its broad equitable powers to craft a remedy that would allow the named Students, and other wrongfully excluded students, to attend Exam Schools for three broad reasons.

First, the Exam Schools are not at their maximum capacity. Thus, seats can be readily found for many students wrongfully denied admission under the Zip Code Quota Plan.

- For the **seventh** grade class, Defendants invited only **974** students. This is **51 fewer than** the 1025 invited last year, and **103 fewer** than the 1077 invited in 2019 and 2018. Exh. O.

- For the **ninth** grade entering class, Defendants invited a total of **340** students, far fewer than the 408 invited in 2020, the 454 invited in 2019, and the 453 invited in 2018. *Id.*

- Defendants have a history of finding room for more students at the last minute. In August 2020, after a last-minute re-calculation and correction of grade point averages, Defendants invited to the Exam Schools a total of 62 students who had been originally rejected.[16]

Second, some seats that are now filled will become vacant. There are always students whose plans change and either do not show up or transfer out. The Court could order Defendants to create a waiting list of students wrongfully denied admission to fill vacancies as they occur.

Third, there are two routine Exam School entry points: seventh and ninth grade. *See* ASE,

---

[16]     *See Dozens of Students Were Not Admitted to Boston Exam Schools Because of an Error*, Boston Globe (Updated August 31, 2020), available at https://bit.ly/2VnJHDX.

¶ 7. If no earlier remedy is sufficient, the Court could order that students wrongfully denied seventh grade admission be granted priority for admission in the ninth grade.

There are a variety of remedies the Court could order to remediate the use of the unconstitutional Zip Code Quota Plan. *See Morgan v. Kerrigan,* 530 F.2d 431, 432 (1st Cir. 1976) ("[T]he court's equitable power to fashion a remedy is both broad and flexible.") (citing *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15 (1971)). While those remedies may not be as fulsome as they could have been if Plaintiff had prevailed at the beginning, they are nevertheless substantial. This case is by no means moot. Indeed, "a case is moot when the court cannot give *any* effectual relief to the potentially prevailing party." *ACLU of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) (emphasis added).

Finally, during the July Hearing, the Court queried whether the Boston Parents still have standing under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983),[17] which held that the claim for injunctive relief was moot because plaintiff was not "realistically threatened by a repetition" of the action at issue (a police chokehold). *Id.* at 105. The cases are not analogous. In *Lyons*, no form of injunction could remedy the injury that the chokehold caused. Here, there is an array of injunctive remedies that can ameliorate the injury caused by the Zip Code Quota Plan.[18]  The case is not moot.

### III.    REQUEST FOR ORAL ARGUMENT

The Boston Parents respectfully request a hearing on the issues presented herein.

---

[17]     Technically, when the complaint is filed *before* the action sought to be enjoined, "[the] subsequent redressability problem is one of mootness, not standing." *Becker v. FEC*, 230 F.3d 381, 389 (1st Cir. 2000). Plaintiff has the initial burden of showing standing. Once this is done, defendant has the burden of showing the case is moot.

[18]     In *Lyons*, the plaintiff was still allowed to pursue his claim for monetary damages. Similarly, the Boston Parents must be allowed to continue their claim for nominal damages.

Dated: August 27, 2021

Respectfully submitted:

_____*/s/ Callan G. Stein*_____
Callan G. Stein (BBO # 670569)
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street
Boston, MA 02110
Telephone: (617) 204-5100
callan.stein@troutman.com

William H. Hurd (Va. Bar # 16967) (*pro hac vice*)
Christopher W. Carlson, Jr. (Va. Bar # 93043) (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1490
william.hurd@troutman.com
chris.carlson@troutman.com

Mary Grace W. Metcalfe (N.Y. Bar #5377932) (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
marygrace.metcalfe@troutman.com (*pro hac vice*)

*Counsel for Plaintiff*

21

**<u>Certificate of Service</u>**

I, Callan G. Stein, certify that the foregoing document was filed this date via the Court's

CM/ECF filing system and will be sent electronically to the registered participants in this action.


_____*/s/ Callan G. Stein*_____

118897254v1