UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
BOSTON PARENT COALITION FOR   )
ACADEMIC EXCELLENCE CORP.     )
                              )
             Plaintiff,       )
                              )
        v.                    )          CIVIL ACTION
                              )          NO. 21-10330-WGY
THE SCHOOL COMMITTEE OF THE   )
CITY OF BOSTON,               )
ALEXANDRA OLIVER-DAVILA,      )
MICHAEL O'NEILL,              )
HARDIN COLEMAN,               )
LORNA RIVERA,                 )
JERI ROBINSON,                )
QUOC TRAN,                    )
ERNANI DEARAUJO, and          )
BRENDA CASSELLIUS,            )
SUPERINTENDENT OF THE         )
BOSTON PUBLIC SCHOOLS,        )
                              )
             Defendants,      )
AND                           )
                              )
THE BOSTON BRANCH OF THE      )
NAACP, THE GREATER BOSTON     )
LATINO NETWORK, ASIAN PACIFIC )
ISLANDER CIVIC ACTION NETWORK,)
ASIAN AMERICAN RESOURCE       )
WORKSHOP, MAIRENY PIMENTEL,   )
and H.D.,                     )
                              )
        Defendants-Intervenors. )
_____)
```

YOUNG, D.J.                                    October 1, 2021

**INDICATIVE RULE 60(b) RULING**

**I.  PROCEDURAL BACKGROUND**

The Boston School Committee (the "School Committee")

consists of seven persons appointed by the Mayor of Boston and

is responsible for managing the Boston Public Schools.  Joint
Agreed Statement Facts ("Joint Statement") ¶¶ 1-2, ECF No. 38.
During the COVID-19 pandemic, the School Committee has made many
decisions regarding education in the Boston Public Schools, one
of which pertains to the application process for three of
Boston's public schools: Boston Latin School, Boston Latin
Academy, and the John D. O'Bryant School of Mathematics and
Science ("O'Bryant") (collectively, the "Exam Schools").  Unable
to host a standardized test safely, the School Committee
developed an interim admissions plan (the "Plan"), which
deviated from the Exam Schools' past admissions process.  After
public meetings on the Plan, the School Committee formally
adopted it on October 21, 2020.  Joint Statement ¶¶ 3-48.

On February 26, 2021, the Boston Parent Coalition for
Academic Excellence Corp. (the "Coalition") brought this action
against the School Committee, its members, and the
Superintendent of the Boston Public Schools, Dr. Brenda
Cassellius.  See generally Verified Compl. ("Compl."), ECF No.
1.  The Coalition sought preliminary and permanent injunctions
for alleged violations of the Equal Protection Clause of the
Fourteenth Amendment and Massachusetts General Laws chapter 76,
section 5.  See generally Am. Compl., ECF No. 96.

This Court promptly scheduled a hearing upon the
Coalition's request for a preliminary injunction.  Electronic

Notice (Feb. 26, 2021), ECF No. 9.  At that hearing, this Court
-- as is its wont -- collapsed the further hearing on the
preliminary injunction with trial on the merits pursuant to
Federal Rule of Civil Procedure 65(a), but see Nwaubani v.
Grossman, 806 F.3d 677, 680-81 & n.7  (1st Cir. 2015) (Thompson,
J.) (cautioning against overuse of this procedural device),
allowed the intervention of various interest groups, and urged
the parties to agree upon all undisputed facts, Electronic
Clerk's Notes (Mar. 3, 2021), ECF No. 27.

The parties turned to with a will and on March 15, 2021
filed a quite comprehensive joint agreed statement of facts (the
"Joint Statement") -- or so I thought.  The Coalition pronounced
itself satisfied with the Joint Statement as a basis for
judgment in its favor or, at the very least, under the strict
scrutiny test, for shifting to the School Committee the burden
of proving that a compelling governmental interest warranted
upholding the Plan.  Tr. Status Conference 24:11-19, ECF No.
100.  The School Committee maintained that the Joint Statement
supported judgment in its favor under the rational basis test
but, cautiously, reserved its right to proffer evidence should
that be necessary.  Id. 34:9-35:22.

Accordingly, the arguments held on April 6, 2021 were
analogous to arguments for and against judgment at the close of
the plaintiff's case in chief in a jury-waived trial.  See Fed.

R. Civ. P. 52.  In such a situation, before judgment can enter, this Court must provide findings of fact and rulings of law. Id.

On April 15, 2021, this Court entered its findings of fact, rulings of law, and order for judgment.  See generally Boston Parent Coal. for Acad. Excellence Corp. v. City of Bos. ("Boston Parent I"), Civil Action No. 21-10330-WGY, 2021 WL 1422827 (D. Mass. Apr. 15, 2021), opinion withdrawn sub nom. Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos. ("Boston Parent III"), CIVIL ACTION NO. 21-10330-WGY, 2021 WL 3012618 (D. Mass. July 9, 2021).  In Boston Parent I this Court found and ruled that the Plan governing admission to Boston's three Exam Schools for the 2021-2022 school year (and only the 2021-2022 school year) had a rational basis furthering a legitimate governmental interest, comported with the Fourteenth Amendment's Equal Protection Clause, and did not violate Massachusetts General Laws chapter 76, section 5.  Id. at *17.  This Court subsequently entered judgment for the School Committee.  Judgment, ECF No. 105.

The Coalition appealed the judgment to the First Circuit and moved to enjoin the Plan's implementation pending resolution of the appeal.  See generally Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos. ("Boston Parent

[4]

II"), 996 F.3d 37 (1st Cir. 2021).  The First Circuit denied the Coalition's motion.  Id. at 51.

The matter seemed to be resolved -- until a newspaper published discriminatory text messages between two School Committee members sent during the board meeting in which the School Committee adopted the Plan.  The Coalition moved for relief from judgment under Rule 60(b), Mot. Pursuant Fed. R. 60(b), ECF No. 112, and on July 9 this Court heard argument on the motion, withdrew its opinion in Boston Parent I, and took the matter under advisement, Electronic Clerk's Notes (July 9, 2021), ECF No. 121.  On July 23, the First Circuit suspended the appellate briefing schedule until such time as this Court has addressed the Rule 60(b) motion.  Order Court, ECF No. 125.

For the reasons developed below, if granted jurisdiction, this Court would **DENY** the motion.

## II.  FACTUAL BACKGROUND[1]

### A. The Boston Public Schools

Approximately 80,000 K-12 students live in Boston.  Joint Statement, Ex. 11, City Enrollment by Race (SY 18-19), ECF No. 38-11.  Almost seventy percent of them attend Boston Public Schools, and the quality of education among the schools is

---

[1] The Joint Statement, as stipulated by the parties, is substantially reproduced below and supplemented with the information that subsequently came to light.

anything but equivalent.  Id.; id. Ex. 14, Massachusetts Department of Elementary and Secondary Education Report ("MDESE Report") 2, ECF No. 38-14.  The home of the oldest and most prestigious public schools in the country is also home to thirty-four schools "among the lowest performing [ten percent] of schools in the state."[2]  MDESE Report 2; Joint Statement ¶¶ 8-11.

The Exam Schools are the Boston Public Schools system's highest performing and most prestigious schools.[3]  Joint Statement ¶ 11.  These schools serve seventh through twelfth-grade students, and there are generally two opportunities for students to apply.  Id. ¶¶ 7, 13.  Students apply while in sixth grade for admission into seventh grade or in eighth grade for admission into ninth grade.[4]  Id.

---

[2] Most of the 17,000 students attending these thirty-four low-performing schools "come from historically underserved student groups."  MDESE Report 2.

[3] The parties stipulate to the prestige of these schools and the respective ranking assigned to each school by U.S. News & World Report in 2020.  Joint Statement ¶ 11.  As of the 2020-2021 school year, 5,859 students were enrolled at the Exam Schools: 2,472 were enrolled at Boston Latin School, 1,771 were enrolled at Boston Latin Academy, and 1,616 were enrolled at O'Bryant.  Id. ¶ 12.

[4] The School Committee allots most available seats in these schools for sixth-grade applicants.  Joint Statement ¶ 13.

Although any resident-student in Boston is eligible to apply, only a fraction is admitted.  Id. ¶¶ 7, 11.  For reference, over 4,000 students attending public, private, charter, and Metropolitan Council for Educational Opportunity schools applied for admission to the Exam Schools for the 2020-2021 school year.  Id. ¶ 18; id. Ex. 15, Historical Applicant Pool by Race & School Type, ECF No. 38-15; id. Ex. 16, Exam School 3-Year Invitation Data by Race ("Invitation Data"), ECF No. 38-16.  Only thirty-five percent of applicants were invited to attend.[5]  Compare Invitation Data, with Joint Statement ¶ 20.

**B. The Old Admissions Process**

The Boston Public Schools system uses a unified application process for admission to the Exam Schools.  Joint Statement ¶ 15.  For many years, this process remained relatively unchanged and involved three factors: a GPA score, a standardized test score, and the applicant's school preference.  Id.  Each applicant ranked the Exam Schools by preference when

---

[5] Of the 1,433 students invited to attend the Exam Schools, 1,025 were admitted to the seventh grade and 408 were admitted to the ninth grade.  Joint Statement, Ex. 20, Questions from Michael O'Neill ("Admissions Chart") 3, ECF No. 38-20.  Boston Latin School invited 542 students (484 to seventh grade and 58 to ninth grade), Boston Latin Academy invited 425 students (336 to seventh grade and 89 to ninth grade), and O'Bryant invited 466 students (205 to seventh grade and 261 to ninth grade). Admissions Chart.

he or she sat for the standardized test.[6]  Id. ¶ 14.
Administrators at the Boston Public Schools would average and
assign a numeric value to the applicant's grades in English
Language Arts and Math.  Id. ¶ 15.  This GPA numeric value was
added to the applicant's standardized test score to create a
composite score, by which applicants were ranked.  Id.  Starting
with the student with the highest composite score, each student
received an invitation to his or her first choice of the Exam
Schools.  Id.  If the student's first choice was full, the
student was invited to his or her next choice.  Id.  This
process continued until all seats in the three Exam Schools were
filled.  Id.

### C. The Procedure to Change the Admissions Process

In the summer of 2019, the Boston Public Schools' Office of
Data and Accountability conducted several analyses to determine
how potential changes to the Exam School admissions criteria
would affect diversity at the Exam Schools.  Id. ¶ 27 (citing
id. Ex. 31, Analysis Possible Admissions Criteria Changes, ECF
No. 38-31).  In the fall of 2019, the Superintendent established

---

[6] For the 2020-2021 school year, thirty-five percent of
applicants ranked Boston Latin School as their first choice,
thirty-seven percent of applicants ranked Boston Latin Academy
as their second choice, and thirty-five percent of applicants
ranked O'Bryant as their third choice.  Joint Statement, Ex. 17,
Exam School Ranks School/Race SY 20-21 Enrollment ("Exam School
Ranks"), ECF No. 38-17.

a Review Committee to solicit and evaluate responses to a request for proposal for a new examination to be administered to Exam School applicants.  Id. ¶ 28.

On March 10, 2020, Governor Charles Baker declared a state of emergency because of the COVID-19 pandemic.  Id. ¶ 22.  Since March 10, 2020, the Governor has occasionally limited the size of gatherings according to the pandemic's fluctuations within the Commonwealth.  Id. ¶ 23.  On March 15, 2020, the Governor suspended all normal in-person instruction and educational operations of K-12 public schools through the end of the 2019-2020 school year.  Id. ¶ 22.  Accordingly, the Boston Public Schools were fully remote from March 17, 2020, until October 1, 2020, and remained partially remote thereafter.  Id. ¶ 24. Shifting from conventional schooling to remote learning brought with it challenges for the School Committee to address.  Id. ¶ 25.  "The COVID pandemic has had significant impacts on [Boston Public School students] and [was] a regular topic of discussion at School Committee meetings."  Id.  The School Committee provided laptops and internet access to students and implemented remote learning guidelines.  Id.

By July 2, 2020, the Review Committee had finished its evaluation.  Id. ¶ 29.  The Superintendent announced that the new plan for Exam School admissions would use the Measures of Academic Progress Growth Test for the 2021-2022 school year.

Id.; see id. Ex. 1, Official Minutes Remote Boston School
Committee Meeting (July 22, 2020), ECF No. 38-1.  Later that
month, the School Committee adopted the Superintendent's
recommendation to establish the Working Group.[7]  Joint Statement
¶ 31.  The Working Group was to

> [d]evelop and submit a recommendation to the Superintendent
> on revised exam school admissions criteria for [the 2021-
> 2022 school year] entrance in light of the potential impact
> of the COVID-19 pandemic on the prospective applicants
> during the latter half of the [2019-2020 school year] and
> potential impact on [the 2020-2021 school year].

Id.; see id. Ex. 32, Exam School Admissions Criteria Working
Group Charter, ECF No. 38-32.  From August 2020 through October
2020, the Working Group met weekly or bi-weekly in meetings
closed to the public.  Joint Statement ¶¶ 34, 35.

The Working Group studied a wide range of information,
including the admissions criteria used by other cities, the
results of the existing admission criteria, the use of test
scores, the population of eligible students in Boston, median

---

[7] Nine members sat on the Working Group: (1) Samuel Acevedo,
Boston Public School Opportunity and Achievement Gap Task Force
Co-Chair; (2) Acacia Aguirre, parent of an O'Bryant student; (3)
Michael Contompasis, Former Boston Latin School Headmaster and
Boston Public School Superintendent; (4) Matt Cregor, Staff
Attorney, Mental Health Legal Advisors Committee; (5) Tanya
Freeman-Wisdom, O'Bryant Head of School; (6) Katherine Grassa,
Curley K-8 School Principal; (7) Zena Lum, parent of a Boston
Latin Academy student; (8) Rachel Skerritt, Boston Latin School
Head of School; and (9) Tanisha Sullivan, President of the
NAACP's Boston Branch.  Joint Statement ¶ 32; see id. Ex. 2,
Official Minutes Remote Boston School Committee Meeting (Aug. 5,
2020), ECF No. 38-2.

family income by zip code, application and admissions data by
race, the population of the Exam Schools, and the feasibility,
equity, and impacts of potential changes to the admission
criteria.  Id. ¶¶ 34, 37-41, 44; see id. Exs. 31, 34-36, ECF
Nos. 38-31, 38-34, 38-35, 38-36.  It used simulations to
understand how various admission criteria would affect the
socioeconomic, racial, and geographic representation of sixth-
grade students admitted to the Exam Schools.  Joint Statement
¶¶ 40-41; see id. Exs. 44-54, ECF Nos. 38-44, 38-45, 38-46, 38-
47, 38-49, 38-50, 38-51, 38-52, 38-53, 38-54, 38-55.  The
Working Group also analyzed administrative and operational
issues with the use of each criterion, such as the feasibility
of using prior exam scores, the variability of grades within and
outside the Boston Public School system, and schools practicing
grade inflation.[8]  Joint Statement ¶¶ 37, 42-43; see id. Exs. 35,
55-58, 60-61, ECF Nos. 38-35, 38-55, 38-56, 38-57, 38-58, 38-60,
38-61.

At its meeting on September 29, 2020, the Working Group
made its Admissions Recommendation to the Superintendent, and,

---

[8] In 2016, for example, sixty-nine percent of applicants to
Boston Latin School from one private parochial school in West
Roxbury had A+ GPA averages.  Joint Statement ¶ 43; see id. Ex.
61, Exam School Admissions Working Group Data Summary 4, ECF No.
38-61.  For reference, between ten and twenty-two percent of
applicants from other schools had A+ GPA averages.  Exam School
Admissions Working Group Data Summary 4.

with the Superintendent's support, the Working Group presented
its initial recommendation to the School Committee on October 8,
2020.  Joint Statement ¶¶ 45-46.  After this meeting, the
Working Group responded to questions by the School Committee
members and completed an Equity Impact Statement using the
Boston Public Schools' Equity Impact Planning Tool.  Id. ¶ 47.

The Equity Impact Planning Tool is a district-mandated six-
step process for every major policy program, initiative, and
budget decision.  Id. Ex. 64, BPS Racial Equity Planning Tool 3,
ECF No. 38-64.  The tool acknowledges that the Boston Public
School system "does not consistently provide authentic learning
opportunities for [its] students who are most marginalized to
develop into self-determined, independent learners, able to
pursue their aspirations," and that these "failures lead to
disengaged students and significant achievement gaps."  Id.  To
rectify this, the six-step process focuses the policy proponents
on racial and ethnic inequalities so that the proponents
consider whether and how their proposal aligns with the
district's broader goals.  Id. 1; id. Ex. 63, Equity Impact
Statement School Committee Proposals ("Equity Impact Statement")
2, ECF No. 38-63.  The Equity Impact Planning Tool explains the
difference between equity and equality and how the two "can in
fact stand in opposition to each other."  BPS Racial Equity
Planning Tool 12.  It further explains that "[t]o eliminate

opportunity gaps persistent for Black and Latinx communities in Boston Public Schools, we must make a hard pivot away from a core value of equality -- everyone receives the same -- to equity: those with the highest needs are prioritized." Id.  The Working Group completed the Equity Impact Statement for its Admissions Recommendation and stated the following as its desired outcome:

> Ensure that students will be enrolled (in the three exam high schools) though a clear and fair process for admissions in the [2021-2022] school year that takes into account the circumstances of the COVID-19 global pandemic that disproportionately affected families in the city of Boston.

> Work towards an admissions process that will support student enrollment at each of the exam schools such that it better reflects the racial, socioeconomic and geographic diversity of all students (K-12) in the city of Boston.

Equity Impact Statement 1.

Members of the School Committee and Working Group made various remarks during the October 8, 2020 meeting.  These remarks included acknowledging the desire to "rectify[] historic racial inequities" at the Exam Schools, Joint Statement, Ex. 5, Remote Boston School Committee Meeting (Oct. 8, 2020) ("Oct. 8 Tr."), 173:9-14, ECF No. 38-5, court decisions involving race in Boston Public Schools, see id. 158:16-159:19, performance and admission disparities among different demographics, see id. 165:10-166:5; Joint Statement, Ex. 18, Recommendation Exam

Schools Admissions Criteria SY21-22 ("Recommendation") 8, 13,
ECF No. 38-18, disappointment about such disparities and the
desire to have the Exam Schools better reflect Boston's
diversity, see Oct. 8 Tr. 213:8-1, and the merits of considering
race and ethnicity during the process, see id. 184:17-185:3.

On October 21, 2020, the School Committee adopted the
Working Group's 2021-2022 Admissions Plan (i.e., the Plan),
which included some changes from the Working Group's original
Admissions Recommendation.  Joint Statement ¶ 48.  During this
meeting, the School Committee Chairperson "made statements that
were perceived as mocking the names of Asian members of the
community who had come to the meeting to comment on the 2021
Admission Plan."  Id. ¶ 66.  Vice-Chairperson Alexandra Oliver-
Davila ("Oliver-Davila") and a voting member, Dr. Lorna Rivera
("Rivera"), exchanged text messages recounting what had
transpired, offering their sympathies before the inevitable
backlash, stating that it was hard not to laugh, and generally
not knowing what to do with themselves.  Id. Ex. 72,
Transcription Oct. 21, 2020 Text Messages 1-2, ECF No. 38-72.
Oliver-Davila also exchanged text messages with the
Superintendent, in which the Oliver-Davila called the meeting
the "[b]est meeting ever."  Id. 2.

Members of the School Committee and Working Group also
acknowledged the Plan's potential to advance racial equality,

see Remote Boston School Committee Meeting (Oct. 21, 2020)

("Oct. 21 Tr.") 365:18-366:2, ECF No. 38-7, their desire for all

Boston Public Schools to reflect the student population as a

whole, see id. 397:19-398:2, 399:5-8, and the limitations of the

Plan to achieve a student body that more closely reflects the

demographics of Boston's school-age children, see id. 368:5-14.

### D. The New Admissions Process[9]

The Plan opened admissions for the Exam Schools on November

23, 2020, and closed admissions on January 15, 2021.  Joint

Statement ¶ 53.  Under the Plan, applicants were not required to

take an admissions exam.[10]  Id. ¶ 50.  Instead, applicants had to

satisfy three criteria to be eligible for admission.  Id. ¶ 51.

First, the student must be a resident of one of Boston's twenty-

nine zip codes.  Id.  Students who were homeless or in the

custody of the Massachusetts Department of Children and Families

qualified for a special "zip code" created for them to

participate in the Plan.  Id.  Second, the student must hold a

minimum B average in English Language Arts and Math during the

---

[9] The parties only stipulated to the mechanisms of the
seventh-grade admissions process in detail.  The parties did,
however, stipulate that "students also enter in[to] the ninth
and tenth grades using a similar process."  Joint Statement ¶ 51
n.5.

[10] In recommending this change, the Superintendent and the
Working Group cited the difficulties of administering a test
during the pandemic.  Joint Statement ¶ 50.

fall and winter of the 2019-2020 school year or have received a "Meets Expectations" or "Exceeds Expectations" score in English Language Arts and Math on the Massachusetts Comprehensive Assessment System administered in the spring of 2019.  Id. Finally, the student must "[p]rovide verification from the school district (or equivalent) that the student is performing at grade level based on the Massachusetts Curriculum standards." Id.

The Plan also required eligible students to submit a list of the Exam Schools according to his or her preference.  Id. ¶¶ 54-55.  For students attending Boston Public Schools, these eligibility criteria were self-certified by the district, and eligible students were asked to submit their Exam School preferences by January 29, 2021.[11]  Id. ¶ 54.  Non-Boston Public School students were required to submit their proof of eligibility and Exam School preferences by December 31, 2020.[12] Id. ¶ 55.

The Plan had two rounds through which applicants were invited to the Exam Schools.  Id. ¶¶ 57-63.  Using the eligible

_____

[11] This deadline was later extended to March 5, 2021.  Joint Statement ¶ 54.

[12] This deadline was later extended to January 15, 2021, and information was communicated to the non-Boston Public School students through their respective schools.  Joint Statement ¶ 55.

applicants' English Language Arts and Math GPAs for the first
two grading periods of the 2019-2020 school year, the highest
graded students in the first round were invited to the first
twenty percent of seats in each Exam School.  Id. ¶ 57.  Each
student within this top twenty percent of GPAs was invited to
his or her first-choice Exam School.  Id.  If, however, twenty
percent of that student's first-choice Exam School was filled,
that student moved to the second round of the Plan.  Id.

     The second round again ranked eligible applicants by their
English Language Arts and Math GPAs for the first two grading
periods of the 2019-2020 school year.  Id. ¶ 58.  In this round,
however, the students were ranked within their zip code
according to their GPA.  Id.  Each zip code was allocated a
percentage of the remaining eighty percent of seats at the Exam
Schools according to the proportion of school-age children
residing in that zip code.  Id. ¶ 59.

     Students were then assigned to the Exam Schools over ten
rounds until each Exam School was filled.  Id. Ex. 66, 2020-2021
BPS Exam Schools Admissions Process 23, ECF No. 38-66.  Ten
percent of the Exam Schools' seats allocated to each zip code
were assigned each round.  Id.  Starting with the zip code with
the lowest median household income with children under the age
of eighteen according to the American Community Survey, the
highest ranked applicants were assigned to his or her first-

[17]

choice Exam School until ten percent of that zip code's allocated seats were filled.  Id.  If an applicant's first-choice Exam School was filled, the applicant was assigned to his or her next choice.  Id.  Once a zip code filled its ten percent of seats, the next zip code's applicants were assigned.  Id. Invitations under both processes were issued at the same time, and the school year began on September 9, 2021.

**E. Demographics and the Impact of the Plan**

The City of Boston has twenty-nine zip codes.  Id. ¶ 39. According to the 2019 edition of the United States Census Bureau's American Community Survey of Demographic and Housing Estimates, the racial and ethnic demographics of Boston were as follows: 44.9 percent White, 22.2 percent Black, 19.7 percent Hispanic or Latinx, 9.6 percent Asian, and 2.6 percent two or more races, not including Hispanic or Latinx.  Id. ¶ 21 (citing id. Ex. 21, ACS Demographic & Housing Estimates, ECF No. 38-21).

The demographics of the school-age population in Boston, however, is significantly more diverse than the City's general population, compare id., with Recommendation 18, and for the 2020-2021 school year, the racial and ethnic demographics of Boston's school-age population were sixteen percent White, seven percent Asian, thirty-five percent Black, thirty-six percent Latinx, and five percent mixed race, Recommendation 18.

Historically, the student body of the Exam Schools has not reflected the same level of diversity.  Recommendation 8. According to simulations by the Working Group, had the initial version of the Plan been applied during the 2020-2021 admissions cycle, it would have impacted the number of admitted students within virtually every zip code when compared to the number of admitted students under the old, exam-based admissions process used for the 2020-2021 school year.  Id. Ex. 71, Additional Background Information & Data Reviewed Boston Public Schools Exam Schools Admissions Criteria Working Group 5, ECF No. 38-71. Similarly, the Working Group's simulations demonstrated that had the initial version of the Plan been applied during the 2020-2021 admissions cycle, the racial make-up of the incoming class would have changed.  Recommendation 18.  Under the old plan, the racial and ethnic demographics of the incoming class were the following: thirty-nine percent White, twenty-one percent Asian, fourteen percent Black, twenty-one percent Latinx, and five percent "Multi-Race/Other."  Id.  The new Plan resulted in a class make up that was thirty-one percent White, eighteen percent Asian, twenty-three percent Black, twenty-three percent Latinx, and six percent "Multi-Race/Other."  See Mem. Pursuant Court Order & Further Supp. Relief J. Rule 60(b), Ex. N, Simulation Comparison, ECF No. 134-14.

[19]

**F. The Parties**

The Coalition is a Massachusetts not-for-profit organization.  Suppl. Statement Agreed Facts ("Suppl. Statement") ¶ 1, ECF No. 78.  The Coalition's stated purposes include "promoting merit-based admissions to Boston Exam Schools (including Boston Latin School, Boston Latin Academy and O'Bryant School of Science and Math) and promoting diversity in Boston high schools by enhancing K-6 education across all schools in Boston."  Id. ¶ 2 (brackets and quotations omitted). The Coalition's membership is open to any student, alumni, applicant, or future applicant of the Boston Exam Schools, as well as their family members.  Id. ¶ 3.  The Coalition brings this action "on behalf of [its] members whose children are students applying for one or more of the Boston Exam Schools for the classes entering in the fall of 2021."  Id. ¶ 4. Specifically, the Coalition represents the interests of fourteen students of Asian or White ethnicity and their member-parents. Id.  The students reside in four of Boston's twenty-nine zip codes: Chinatown (zip code 02111), Beacon Hill/West End (zip code 02114), Brighton (zip code 02135), and West Roxbury (zip code 02132).  Id.  Each student "is a sixth-grade student . . . and an applicant to one or more of the Boston Exam Schools for the class entering in the fall of 2021," and each member-parent

supports his or her child's application to the Exam Schools.
Id.

The School Committee is the governing body of the Boston
Public Schools.  Joint Statement ¶ 1.  During the meetings when
the Plan was discussed and developed, the School Committee had
three types of members: one Chairperson, Michael Loconto, one
Vice-Chairperson, Alexandra Oliver-Davila, five voting members,
Michael O'Neill, Dr. Hardin Coleman, Dr. Lorna Rivera, Jeri
Robinson, and Quoc Tran, and one non-voting member, Khymani
James.  Id. ¶ 4.  After Chairperson Loconto resigned, the Mayor
appointed Ernani DeAraujo to the School Committee as a voting
member, Oliver-Davila became the Chairperson, and O'Neill became
the Vice-Chairperson.  Id. ¶ 5.  Oliver-Davila, O'Neill,
Coleman, Rivera, Robinson, Tran, and DeAraujo are named
defendants in this action.  Id. ¶¶ 4-5.  Defendant Brenda
Cassellius is the Superintendent of the Boston Public Schools.
Id. ¶ 6.

Several organizations and individuals moved to intervene in
this matter.  Mot. Boston Branch NAACP, Greater Boston Latino
Network, Asian Pacific Islander Civic Action Network, Asian
American Resource Workshop, Maireny Pimentel, & H.D. Leave
Intervene Defs., ECF No. 20.  Organizational intervenor Boston
Branch of the NAACP sought "intervention on behalf of both
itself as well as its members whose children have currently

pending applications to the [Exam Schools], including but not
limited to" an NAACP member and their child, who have a pending
application to the Exam Schools and who live in zip code 02119.
Mem. Law. Supp. Mot. Boston Branch NAACP, Greater Boston Latino
Network, Asian Pacific Islander Civic Action Network, Asian
American Resource Workshop, Maireny Pimentel, & H.D. Leave
Intervene Defs. 4, ECF No. 21.  The mission of organizational
intervenor Greater Boston Latino Network "centers on educational
equity -- especially ending segregation and promoting equal
access and opportunity."  Id.  Organizational intervenor Asian
Pacific Islander Civic Action Network seeks to "advance[] the
interests of Massachusetts' Asian and Pacific Islander American
communities with a shared agenda to further equity and oppose
discrimination through year-round civic action."  Id. 5.
Dorchester-based organizational intervenor Asian American
Resource Workshop "is a grassroots, member-led group organizing
Asian American communities throughout Greater Boston through
political education, creative expression, and both issue- and
neighborhood-based organizing."  Id.  Individual intervenor
Maireny Pimentel resides in Boston's South End (zip code 02118)
with her older eighth-grade son, who has a pending application
at Boston Latin Academy, and with her younger sixth-grade son,
who "intends to apply to the [Boston Exam Schools] in fall
2021."  Id. 6.  Individual intervenor H.D., a sixth-grade

student who resides in Dorchester (zip code 02122), "is currently waiting to hear about admission decisions from [the Exam Schools]." <u>Id.</u>

## III. SUBSEQUENT REVELATION

The day after the October 21, 2020 meeting, during which the School Committee adopted the Plan, the Boston Globe submitted a public records request for all communications by and between the School Committee members.  Mem. Law Behalf City Boston Att'ys Catherine Lizotte & Henry C. Luthin, Ex. B, Second Aff. Catherine Lizotte ¶ 6, ECF No. 137-2.  This request was assigned to Catherine Lizotte, the Legal Advisor to the Boston Public Schools.  <u>Id.</u> ¶¶ 3-5.  Among the communication Lizotte collected was an exchange between Olivia-Davila and Rivera.  <u>See generally</u> Mem. Supp. Mot. Pursuant Fed. R. 60(b), Ex. A, Decl. Darragh Murphy ("Murphy Decl."), Attach. I-2, Text Message Screenshots, ECF No. 113-1.  These text messages included the following:

> Rivera: "Best s[chool] c[ommittee] m[ee]t[in]g ever I am trying not to cry"

> Oliver-Davila: "Me too!! Wait [un]til the white racists start yelling [a]t us!"

> Rivera: "Whatever . . . they are delusional"

> . . . .

> Rivera: "Ouch I guess that was for me!"

> Rivera: "I still stand by my statement"

Oliver-Davila: "I said [Boston Public Schools] students should get preference and stand by this."

Rivera: "Oh then it was both of us!"

Oliver-Davila: "This guy wrote to me twice"

Rivera: "Me too"

Oliver-Davila: "White guy who is silent majority.  He writes for [B]oston [H]erald"

Rivera: "Not good"

Oliver-Davila: "He complains becaise [sic] he wants to have a vote. I do think the students should vote.  But his tweets are excessive"

Rivera: "Agree"

Rivera: "I hate W[est] R[oxbury]"

Oliver-Davila: "Sick of westie whites"

Rivera: "Me too I really feel [l]ike saying that!!!!"

Id. 77, 79-82.

In responding to the Boston Globe's public records request, Lizotte consulted with the corporation counsel, the first assistant corporation counsel, and the director of public records to determine which records were responsive to the request.  Second Aff. Catherine Lizotte ¶ 9.  The messages reproduced above were omitted, the messages deemed responsive were transcribed, and the City's response to the records request included a disclosure that read as follows:

With respect to the text messages, it is important to note that none of the members possess a mobile phone that is

owned by [Boston Public Schools] or the City of Boston.
Each member was contacted and asked to provide text message
records from the respective personal devices that are
responsive to your request.  While no portions of texts
were redacted based on statutory exemptions to the public
records law, [Boston Public Schools] did omit portions
deemed not "related to [Boston Public Schools] issues."

Id. ¶¶ 9-12.

A few weeks later, on November 19, 2020, the Coalition

filed its articles of organization with the Secretary of the

Commonwealth.  See Mass. Sec'y of Commonwealth, Boston Parent

Coalition for Academic Excellence Corp., Articles of

Organization, Filing No. 202014808120 ("Coalition Articles of

Organization"),

https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx

?sysvalue=7CRKuYbTPkRPyuWnn71TU66SrAk8ygttTnL67y84NkY-.  The

same day, Darragh Murphy, a member of the Coalition, filed six

public records requests.  Murphy Decl. ¶ 5.  The six requests

asked for following information:

> ISEE exam scores and Grade Point Average (GPA's) for school
> year 2019/2020 of all 6th grade students who did NOT
> receive invitations for School Year 2020/2021 to Boston
> Latin Academy, the O'Bryant School, and Boston Latin
> School, de-identified with the name of the exam school to
> which each applicant was NOT invited to attend, the sending
> school name, and the ZIP code of each applicant.

Second Aff. Catherine Lizotte, Ex. 12, Murphy Public Records

Request No. 1, ECF No. 137-2.

> ISEE exam scores and Grade Point Averages (GPA's) for
> school year 2019/2020 of all 6th grade students admitted
> for School Year 2020/2021 to Boston Latin Academy, the

> O'Bryant School, and Boston Latin School, de-identified, with the name of the exam school to which each applicant was invited to attend, and the sending school name, and the ZIP code of each applicant.

Id. Ex. 13, Murphy Public Records Request No. 2, ECF No. 137-2.

> Grade Point Averages (GPA's) for school year 2019/2020 of all 6th grade students admitted for School Year 2020/2021 to Boston Latin Academy, the O'Bryant School, and Boston Latin School, de-identified, with sending school name and ZIP code of each applicant.

Id. Ex. 14, Murphy Public Records Request No. 3, ECF No. 137-2.

> Copies of all electronic communications, including emails, text messages, voicemails, social media messages, tweets, etc, to and from Superintendent Cassellius, her staff and/or assistants, and all members of the Boston School committee, and all members of the Exam School Working Group **regarding the Exam School Working Group**, including, electronic attachments to all electronic communications.

Id. Ex. 15, Murphy Public Records Request No. 4, ECF No. 137-2

(emphasis added).

> Copies of all formulas, algorithms, calculations, instructions, rubrics, and guidelines used by Boston Public Schools to convert, analyze, and standardize Grade Point Averages (GPA's) for all 6th grade applications to Boston Latin Academy, the O'Bryant School, and Boston Latin School.

Id. Ex. 16, Murphy Public Records Request No. 5, ECF No. 137-2.

> Copies of all data sets, spreadsheets, formulas, algorithms, calculations, instructions, rubrics, and guidelines used by the Superintendent's Exam School Working Group to identify the number of school aged children in each Boston ZIP code, the median income of each Boston ZIP code, and the allocation of exam school seats per Boston ZIP code, including copies of all simulations run by the Exam School Working Group, the Superintendent's Office, the Boston Public School department, and the Boston School Committee, and all electronic communication to and from all members of the Exam School Working Group, the Superintendent, the Boston School Committee, the Mayor's

Office, the Boston City Council, and the Boston Public
Schools offices, **regarding the work of the Exam School
Working group**, its data and findings, and the simulations.

Id. Ex. 17, Murphy Public Records Request No. 6, ECF No. 137-2
(emphasis added).  The requests did not include any indicia of
membership in the newly formed Coalition, and Murphy was not a
registered agent of the Coalition.  See Second Aff. Catherine
Lizotte ¶ 17; see generally Coalition Articles of Organization.
On November 20, 2020, the Coalition made fifteen requests for
information and data sets regarding the October 21, 2020 exam
school admissions presentation to the School Committee.  Second
Aff. Catherine Lizotte ¶ 18.  Lizotte responded to both Murphy's
requests and the Coalition's requests on January 13, 2021.  Id.
¶ 19.  Lizotte, however, did not produce the same text messages
to Murphy's requests as she had to the Boston Globe's requests
because Murphy's requests specifically asked for information
regarding the Exam School Working Group.  Id.  Murphy made
subsequent records requests, including one on February 23, 2021
for

> Copies of ALL electronic text messages, instant messages,
> and any other form of electronic communication sent and/or
> received, including any and all "group" messages sent
> and/or received by more than one of the following listed
> individuals, during the School Committee meeting scheduled
> for October 21, 2020, from the time the meeting started on
> 10/21/2020 until it was officially adjourned on Thursday,
> October 22, 2020, between and among each and all of the
> following: Superintendent Brenda Cassellius, SC Chair
> Michael Loconto[,] SC Members: Lora Rivera[,] Jeri

Robinson[,] Michael O'Neil[l][,] Alexandra Oliver-Davila[,]
Hardin LK Coleman[,] [and] Quoc Tran[.]

Id. Ex. 22, City Public Records Request / R000337-022321, ECF
No. 137-2.  On March 9, 2021, Lizotte responded to Murphy's
February 23 request by forwarding the transcribed text messages
that she had previously provided in response to the Boston
Globe's records request.  Second Aff. Catherine Lizotte ¶ 28.
Murphy never appealed or objected to the March 9 response (or
indeed to any of the responses she had received).  Id. ¶ 29.  On
February 26, 2021, the Coalition filed the present action.  See
generally Compl.

Lizotte filed her appearance in this present action
before the School Committee hired outside counsel.  Thereafter
Lizotte had minimal involvement in any trial-related matters.
See generally id.

In March 2021 the present action was in full swing, this
Court having collapsed the request for preliminary injunction
with trial on the merits and exhorted the parties to agree upon
the relevant facts.  The parties, through counsel, were busily
engaged in the process of stipulating to a joint statement of
facts.  Although the first draft statement sent by the Coalition
did not include the transcribed text messages, subsequent
attachments included excerpts from the transcribed text
messages.  Id. ¶¶ 30-31.  No party made any reference to or

mention of the omitted text messages during the revisions of the joint statement, and all parties confirmed that the text message excerpts produced were true and accurate.  On June 7, 2021, the Boston Globe, having apparently been tipped off, published a story revealing the omitted text messages.  Bianca Vázquez Toness & Felicia Gans, <u>After Sharing Racially Charged Texts About West Roxbury Families in October, a Boston School Official Has Resigned</u>, Bos. Globe, June 7, 2021, https://www.bostonglobe.com /2021/06/07/metro/boston-appears-have-illegally-withheld-inappropriate-texts-after-career-ending-school-committee-meeting/.

## IV.  LEGAL ANALYSIS

Throughout this action, the Coalition has maintained two arguments despite conceding that the Plan is facially race neutral: (1) that the Plan uses proxies for race and that any proxy for race automatically triggers strict scrutiny, and (2) that the Plan was motivated by interests in racial diversity and that this automatically triggers strict scrutiny because any consideration of race is impermissible.[13]  <u>See, e.g.</u>, Mem. Supp.

---

[13] When this Court pressed the Coalition at the hearing on its position, the following exchange took place:

THE COURT: I just want to be clear on your argument. So long as race was one of the things considered, albeit the others are all legitimate, your contention is that this plan fails constitutionally?

J. & Inj. Relief 14-15, ECF No. 63; Pl.'s Post Hr'g Br. 1-5, 11-
14, ECF No. 97.  Remarkably, the Coalition maintained this
erroneous position despite explicit contrary law within this
Circuit, this Court pressing the Coalition on the legal
foundation for its position, this Court's prior withdrawn order
plainly rejecting it, and the First Circuit's denial of the
motion for injunctive relief on the same grounds as this Court's
prior order.  See generally Anderson ex rel. Dowd v. City of
Bos., 375 F.3d 71 (1st Cir. 2004); Parents Involved in Cmty.
Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 788 (2007)
(Kennedy, J.) (concurring in part and concurring in judgment)
(accepting diversity as a compelling governmental interest along
with the four dissenters); Boston Parent I, 2021 WL 1422827, at
*10; Boston Parent II, 996 F.3d at 46.

     The law here has been and remains clear: where the
governmental action is facially race neutral and uniformly
applied, "good faith [is] presumed in the absence of a showing

───────────────

     MR. HURD: Your Honor, our position is that, yes . . . .

     THE COURT: [A]ll right, your argument is -- in deciding
     what the level of scrutiny is, because race was one factor
     that they considered, it must be subject to strict
     scrutiny.

     MR. HURD: Yes, your Honor.

Tr. Case-Stated Hr'g 15:24-16:3, 16:13-17, ECF No. 101.

to the contrary" that the action has a disparate impact, the
spawn of an invidious discriminatory purpose.  Regents of the
Univ. of Cal. v. Bakke, 438 U.S. 268, 318-19 (1978).
"Determining whether invidious discriminatory purpose was a
motivating factor demands a sensitive inquiry into such
circumstantial and direct evidence of intent as may be
available."  Village of Arlington Heights v. Metro. Hous. Dev.
Corp., 429 U.S. 252, 266 (1977).  "The Supreme Court non-
exhaustively enumerated several factors relevant to the inquiry:
the degree of disproportionate racial effect, if any, of the
policy; the justification, or lack thereof, for any
disproportionate racial effect that may exist; and the
legislative or administrative historical background of the
decision."  Anderson, 375 F.3d at 83.

     In the words of the First Circuit,

     the mere invocation of racial diversity as a goal is
     insufficient to subject [an otherwise race-neutral
     plan] to strict scrutiny.  In those cases where the
     Supreme Court inquired whether diversity is a
     compelling state interest and whether the program at
     issue could survive strict scrutiny, the programs were
     all subjected to strict scrutiny because they used
     explicit racial classifications to achieve the goal of
     diversity.  None of these cases, nor any other case to
     which our attention has been drawn, has subjected a
     governmental program to strict scrutiny simply because
     the state mentioned diversity as a goal.

Id. at 87.  Furthermore, "[t]he Supreme Court has explained that
the motive of increasing minority participation and access is

not suspect." Id. (citing City of Richmond v. JA Croson

Co., 488 U.S. 469, 507 (1989) (approving the use of race-neutral

means to increase minority participation in governmental

programs)).  In Parents Involved in Community Schools v. Seattle

School District Number 1, Justice Kennedy not only ruled this

motive permissible, but fortified its use through race-neutral

proxies aimed at accomplishing its end:

> School boards may pursue the goal of bringing together
> students of diverse backgrounds and races through
> other means, including strategic site selection of new
> schools; drawing attendance zones with general
> recognition of the demographics of neighborhoods;
> allocating resources for special programs; recruiting
> students and faculty in a targeted fashion; and
> tracking enrollments, performance, and other
> statistics by race.

551 U.S. at 789 (Kennedy, J.) (concurring in part and concurring

in judgment) (emphasis added).  Although these proxies are race-

conscious, it is "unlikely any of them would demand strict

scrutiny to be found permissible" because they do not define

students by their race in violation of the Equal Protection

Clause of the Fourteenth Amendment.  Id. (citing Bush v.

Vera, 517 U.S. 952, 958 (1996) (plurality opinion) ("Strict

scrutiny does not apply merely because redistricting is

performed with consciousness of race. . . .  Electoral district

lines are facially race neutral, so a more searching inquiry is

necessary before strict scrutiny can be found applicable in

redistricting cases than in cases of classifications based explicitly on race." (quotations omitted))).

Similarly, the Third, Fifth, and Sixth Circuits have held that considering racial data is not a racial classification and does not trigger strict scrutiny. See Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 548 (3d Cir. 2011) ("Appellants also conflate a school assignment policy that explicitly classifies based on race with the consideration or awareness of neighborhood racial demographics during the development and selection of a policy. . . . The consideration or awareness of race while developing or selecting a policy, however, is not in and of itself a racial classification. Thus, a decisionmaker's awareness or consideration of race is not racial classification. Designing a policy 'with racial factors in mind' does not constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion." (quoting Hayden v. Cnty. of Nassau, 180 F.3d 42, 48 (2d Cir. 1999))); Lewis v. Ascension Par. Sch. Bd., 806 F.3d 344, 358 (5th Cir. 2015) ("[T]he district court's legal conclusion that the Board's consideration of demographic data in formulating [the plan at issue] 'does not amount to adopting a rezoning plan that assigns students on the basis of race' conforms to Supreme Court case law and is in accord with the decisions of this Court's sister circuits. Accordingly, we hold that the district court did not

err in concluding that [the plan at issue] does not make express racial classifications and so is not subject to strict scrutiny on that basis." (brackets and citations omitted)); Spurlock v. Fox, 716 F.3d 383, 394 (6th Cir. 2013) ("Racial classification requires more than the consideration of racial data.  If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions."); see also United States v. Hays, 515 U.S. 737, 745 (1995) ("[T]he legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors.  That sort of race consciousness does not lead inevitably to impermissible race discrimination." (quotations omitted)).

There has never been a question but that the School Committee and the Working Group were keenly aware of the Plan's effect on diversity and interested in increasing the Exam Schools' "racial, socioeconomic and geographic diversity [better to reflect the diversity of] all students (K-12) in the city of Boston."  Equity Impact Statement 1; see supra Section II.C. Similarly, it is beyond question that at least one member of the School Committee harbored animus toward groups that allegedly

suffered disparate impacts.  The School Committee Chairperson
made racist comments publicly during the October 21, 2020
meeting directed at Boston's Asian American communities, which
led to his resignation.  See Joint Statement ¶¶ 48-68.
Nevertheless, the Coalition was so certain that its specious
approach to the Equal Protection doctrine was ironclad that it
never sought additional discovery and discouraged any further
development of the record[14] -- essentially stopping at the

---

[14] The following occurred at trial:

MR. HURD: [W]e don't have to show that kind of hostility
and disrespect for Asians or whites in order to prevail,
all we have to show in order to get to strict scrutiny is
that the zip code quota plan was racially motivated.

Tr. Case-Stated Hr'g 10:15-19.

THE COURT: And you say -- and I'm following your argument,
you say, based upon this record, that's so clear that . . .
the duty of the Court under the Constitution is so to
declare and to enter a permanent injunction at this
juncture in the proceedings?

MR. HURD: Yes, your Honor, that is our position.

THE COURT: All right.

MR. HURD: And as we note in our briefs, alternatively if
there is to be some continuation of these proceedings so
that they may somehow bolster their position, then we are
entitled at least to a preliminary injunction. But let me
go back and --

THE COURT: And at least as a matter of logic, I follow
that. Now you've made that clear, so let's go on. Well just
so I understand, and you''re making it clear, you say you
win today, but if you don't win today, you at least get an

threshold of the doctrine and forgoing any serious development

of evidence necessary to advance a theory under <u>Arlington</u>

<u>Heights</u>.  <u>See</u> <u>Arlington Heights</u>, 429 U.S. at 266; <u>Boston Parent</u>

<u>II</u>, 996 F.3d at 46 (noting that the Coalition "for[went] any

serious engagement" with statistically analyzing the Plan's

alleged disparate impact); <u>see generally</u> Joint Statement.

Now, having lost unequivocally on the theory it advanced at

trial, but armed with the serendipitous revelation that the

School Committee improperly responded to prior, independent

public records requests, the Coalition advances a new theory

under the guise of Rule 60(b).  The Coalition argues that it is

entitled to relief from judgment under Rule 60(b) because (1)

new evidence has come to light that the Coalition could not have

discovered with reasonable diligence, and (2) the School

Committee's fraud, misrepresentation, or misconduct

substantially interfered with the Coalition's ability to prepare

for trial.  <u>See</u> Mem. Supp. Mot. Pursuant Fed. Rule 60(b) 9-14.

---

<u>injunction -- and I don't mean today, but when, in the very</u>
<u>near future, I enter an order, you're entitled to an</u>
<u>injunction to hold things as we go forward to expand the</u>
<u>record?</u>

MR. HURD: <u>Yes, your Honor, that's correct. And let me point</u>
<u>out why we believe the record does not need and should not</u>
<u>be expanded . . . .</u>

<u>Id.</u> 21:4-22:3 (emphasis added).

### A. Rule 60(b) Legal Standard

Federal Rule of Civil Procedure 60(b) enumerates six reasons upon which a "court may relieve a party or its legal representative from a final judgment, order, or proceeding . . . ." Fed. R. Civ. P. 60(b). "[R]elief under Rule 60(b) is extraordinary in nature," and "motions invoking that rule should be granted sparingly." Karak v. Bursaw Oil Corp., 288 F.3d 15, 19 (1st Cir. 2002). To prevail, the movant must establish "that his motion is timely; that exceptional circumstances exist, favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted." Id. In assessing the motion, this Court "may assume the truth of fact-specific statements proffered by the movant," but "it need not credit bald assertions, unsubstantiated conclusions, periphrastic circumlocutions, or hyperbolic rodomontade." See id. at 20 n.3 (quotations omitted).

The Coalition moves under Rule 60(b)(2) in response to "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)," and under Rule 60(b)(3) in response to "fraud (whether previously called intrinsic or extrinsic),

[37]

misrepresentation, or misconduct by an opposing party . . . ."

Mem. Supp. Mot. Pursuant Fed. Rule 60(b) 7-8; see id. 9-14.

A party who moves under Rule 60(b)(2) must demonstrate that

> (1) the evidence has been discovered since the trial; (2) the evidence could not by due diligence have been discovered earlier by the movant; (3) the evidence is not merely cumulative or impeaching; and (4) the evidence is of such a nature that it would probably change the result were a new trial to be granted.

González-Piña v. Rodríguez, 407 F.3d 425, 433 (1st Cir. 2005);

see Karak, 288 F.3d at 19-20 ("[A] party who seeks relief from a

judgment based on newly discovered evidence must, at the very

least, offer a convincing explanation as to why he could not

have proffered the crucial evidence at an earlier stage of the

proceedings.").

A party who moves under Rule 60(b)(3) must show (1) "the

opponent's misconduct by clear and convincing evidence" and (2)

"that the misconduct substantially interfered with its ability

fully and fairly to prepare for, and proceed at, trial."

Anderson v. Cryovac, Inc., 862 F.2d 910, 926 (1st Cir. 1988).

"Failure to disclose or produce materials requested in discovery

can constitute 'misconduct' within the purview of this

subsection." Id. at 923. Proof of "'[m]isconduct' does not

demand proof of nefarious intent or purpose as a prerequisite to

redress" -- misconduct "can cover even accidental

omissions . . . ." Id. "By definition, lack of access to any

discoverable material forecloses 'full' preparation for trial since the material in question will be missing.  Yet concealed evidence may turn out to be cumulative, insignificant, or of marginal relevance.  If that be the case, retrial would needlessly squander judicial resources."  Id. at 924.

Nevertheless, because "[v]erdicts ought not lightly to be disturbed . . . complainants [must] demonstrate convincingly that they have been victimized by an adversary's misconduct." Id.  "[A]s with other defects in the course of litigation, the error, to warrant relief, must have been harmful -- it must have 'affect[ed] the substantial rights' of the movant."  Id. (citing Fed. R. Civ. P. 61).  Such substantial impairment may exist where "a party shows that the concealment precluded inquiry into a plausible theory of liability, denied it access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination."  Id. at 925.  "Moreover, since parties ought not to benefit from their own mis-, mal-, or nonfeasance, uncertainties attending the application of hindsight in this area should redound to the movant's benefit."  Id. at 924. Consequently, "[s]ubstantial interference may also be established by presumption or inference" when the nondisclosure was knowing or purposeful rather than accidental.  See id. at 926.

[39]

**B. Under These Circumstances, Relief from Judgment Is Inappropriate.**

Despite the School Committee's best efforts to justify its actions,[15] there is no question that the School Committee mishandled the public records requests from Murphy and the Boston Globe.  The omitted, racially charged text messages were being sent even as the School Committee adopted the Plan affecting the groups disparaged in those text messages.  See Murphy Decl., Attach. I-2, Text Message Screenshots 77, 79-82. How and why Lizotte and company did not disclose these pertinent messages is suspect and indicative of an effort by the School Committee to keep them hidden, perhaps because they were so embarrassingly racially charged.[16]  Indeed, the disclaimer

---

[15] These included a stunningly hapless brief that sought to equate the improperly withheld, racially charged texts with an aside by a committee member that "I love Kit Kats" (the candy bar) and an unethical suggestion that, having stipulated that the texts produced were "true and accurate" a reader ought not conclude they were "complete" absent specific stipulation.  See Defs.' Opp'n Pl.'s Mot. Pursuant Federal Rule 60(b) 10, 14, ECF No. 118.

[16] A NOTE ON RACISM: Racism is the syphilis of American public discourse and civic engagement.  It is embarrassing, ugly, deeply humiliating, oppressive, and infuriating, all five.  We wish it were gone but don't know how to get there.  So, mostly, we don't talk about it, since to do so we necessarily acknowledge how deeply it affects (or infects) all of us, some more than others.

No discussion of prejudice would be complete without an acknowledgment of the racist history of our nation.  Much as we may wish it were not so, racism is a significant part of our

national heritage.  After all, our very Constitution originally embraced human slavery as a pragmatic matter.  See U.S. Const. art. I, § 2, cl. 3 (the Three-fifths clause); id. art. I, § 9, cl. 1 (the 1808 clause); id. art. IV, § 2 (the Fugitive Slave clause); id. art. V (prohibiting any amendment affecting the 1808 clause).  Only in the wake of "a great civil war, testing whether [our] nation, or any nation so conceived and so dedicated can long endure," Abraham Lincoln, Gettysburg Address, Nov. 19, 1863, were the legal constraints of slavery struck down.  Yet today, more than 150 years later, on January 6th of this very year, an apparent White supremacist dragged a Confederate flag through the rotunda of our nation's Capitol -- something a genuine army, the Army of Northern Virginia, could not accomplish in four years of hard-fought battles.

We ought not be surprised.  As my classmate Howard Gray brilliantly paraphrased Faulkner's famous dictum: "History isn't dead.  Hell, it isn't even past."  See William Faulkner, Requiem for a Nun 92 (1951) ("The past is never dead. It's not even past.").

Today, racism in America demeans and degrades the very fiber of our nation.  Like cancer, when it appears it metastasizes, spreading hate to recipients with all too predictable consequences.

We must each recognize the racism within us. We each must acknowledge it.  We must own it -- and we must transcend it.

And we can.  We are not born racist.  Oscar Hammerstein had it right:

> You've got to be taught to hate and fear.
>     You've got to be taught from year to year
>                     * * *
> Before you are six or seven or eight
>     To hate all the people your relatives hate.
> You've got to be carefully taught.

Rodgers & Hammerstein, You've Got to Be Carefully Taught, on South Pacific (1949).

We can transcend the evil we have learned.  We must, lest racism, like syphilis, drive us mad.

attached to the School Committee's response acknowledged that
the decision to omit certain text messages lay outside any
statutory exemption.  Second Aff. Catherine Lizotte ¶¶ 9-12.
Lizotte, however, failed to attach this disclaimer when she
provided the partial transcript in response to Murphy's request,
despite the plain language of Murphy's February 23 request that
she wanted a copy of <u>all</u> the text messages sent during the
School Committee hearing.[17]  <u>See</u> City Public Records Request /
R000337-022321.  The question, therefore, is not whether a wrong
occurred -- the question is whether the circumstances of the
wrong warrants relief under Rule 60(b).  <u>See</u> <u>Karak</u>, 288 F.3d at
19; <u>Anderson</u>, 862 F.2d at 924-26.  This Court concludes it does
not.

First, it is simply inapposite to conflate shoddy handling
of public records requests with conduct during adversarial
litigation.  What happened here is a world apart from the
responsibilities and duties owed during the judicially imposed
discovery process.  The controlling precedent cited above
involves misconduct during judicially imposed discovery.  <u>See,</u>
<u>e.g.,</u> <u>Anderson</u>, 862 F.2d at 924 ("[A]s with other defects in the
course of litigation, the error, to warrant relief, must have

---

[17] An interpretation that is even more obvious when compared
with Murphy's prior requests.  <u>Compare</u> City Public Records
Request / R000337-022321, <u>with</u> Murphy Public Records Request
Nos. 1-6.

been harmful -- it must have 'affect[ed] the substantial rights'
of the movant.").  To conflate the Commonwealth's records
request process with judicially imposed discovery and equate
misconduct in the former with misconduct in the latter finds no
support in precedent.  Moreover, extending the law to equate the
two would compel public entities to treat all requesters as
adverse litigants.  Absent some Massachusetts legislative or
judicial intimation that its statutes are to be so enforced,
this Court declines to make such an extension.

Moreover, Lizotte, in answering records requests on behalf
of the School Committee, had no way of knowing that the
Coalition meant to rely on the records requests of a third
party.  There is no evidence that Lizotte had any idea that
Murphy was a member of the Coalition, particularly when the
Coalition filed fifteen public records requests on its own
behalf.  Second Aff. Catherine Lizotte ¶ 18.  The Coalition used
but an excerpt of the transcript Lizotte sent to Murphy -- a
transcript that had been previously sent to the Boston Globe --
so the mere appearance of an excerpt from the transcript is not
enough reasonably to put Lizotte or trial counsel on notice that
Murphy was working on the Coalition's behalf.

Second, while it is true that trial counsel were less
diligent than one would have expected in reviewing and producing
the client School Committee's own records, this was not fraud

but inadvertence stemming from the burden of operating at flank

speed to prepare for what it very much wanted to be a timely,

dispositive hearing[18] -- as events so proved. While this Court

---

[18] A NOTE ON SPEED:

> The two great "enemies" of our American system of justice
> are **cost** and **delay** . . . .  [O]ur [civil justice] system is
> so unwieldy, so stunningly expensive, and so ponderously
> slow that only corporate America, the very rich, and those
> so crippled that the contingent fee is attractive to the
> bar stand a realistic chance of having a jury of their
> peers.

Hon. William G. Young, Engage the Enemy More Closely, Forum,
Conn. Trial Laws. Mag. (forthcoming Nov. 2021).

Everyone agrees that an early firm trial date is the best
way to resolve cases and, after 43 years of judicial service, I
have come to believe that almost anything that will speed
matters up furthers the ends of justice.

One such technique is found in Fed. R. Civ. P. 65(a) -- the
judicial power to collapse further hearing on a preliminary
injunction with trial on the merits.  I do this in every
appropriate case.  Usually it works well, see, e.g., Victim
Rights Law Ctr. v. Cardona, CIVIL ACTION NO. 20-11104-WGY, 2021
WL 3185743 (D. Mass. July 28, 2021), order clarified, CIVIL
ACTION NO. 20-11104-WGY, 2021 WL 3516475 (D. Mass. Aug. 10,
2021), the first case out of a plethora of parallel litigation
to render a final judgment authoritative nationwide, see Brian
Bosworth, Lauren Bachtel & Christopher Cunio, How Court Ruling,
DOE Guidance Change DeVos' Title IX Rule, Law360 (Aug. 27, 2021,
5:44 PM), https://www.law360.com/articles/1416729/how-court-
ruling-doe-guidance-change-devos-title-ix-rule.

In the present case, speedy resolution was a compelling
necessity.  Sometimes, however, speed comes at the expense of
accuracy.  So here.  The text above explains **what** happened -- no
fraud, but unacceptable lacunae in the necessary preparation of
the factual record.

will not excuse or reward such lack of diligence, on the

totality of this record it is not an occasion for Rule 60(b)

relief.

Finally, the Coalition here elected to forgo pressing for

discovery NOT because it felt as though it had turned over every

evidentiary rock but because, given its erroneous view of the

law, it saw no need to overturn any more rocks than it already

had examined.  Tr. Case-Stated Hr'g 10:15-19, 21:4-22:3, ECF No.

---

**Why** did this happen?  Trial counsel were simply overwhelmed
by the magnitude of necessary trial preparation.  Why was that,
especially among trial counsel whose conduct in every other
respect -- save for that silly brief -- was exemplary?

The answer lies in the symbiosis between a flawed business
model and a complicit judiciary.  I have been at the bar now for
over half a century and in all that time judges have decried
delay with a fervor usually reserved for articles of faith.
Over that same period, trial counsel, from solo practitioners to
big firms, take every case they feel competent to handle (after
all, that's what pays the bills) and bet they can juggle their
trial calendars to try the ones they cannot settle.  At the same
time, trial judges (most of whom were trial lawyers or wish they
had been) recognize that trial counsel cannot be in two places
at once.  The result is that cases move through the courts at
roughly a pace convenient to the local bar.

For example, I am presently responsible for 143 civil cases
in Massachusetts.  During the past thirty days of September
2021, I received 26 motions for continuance and allowed 23 of
them.  During the same time period, while responsible for 201
civil cases in the District of Puerto Rico, I received 45
motions for continuance and allowed 41 of them.  And I am
considered "tough" on continuances.

Where, as here, the public necessity compels a much quicker
pace, trial counsel feel the strain as no firm can simply and
immediately "staff up" to meet a complex equity case.

101.  The Coalition had evidence that the Chairperson of the School Committee made racist remarks.  Joint Statement ¶¶ 48-68. The Coalition was already suspicious that Oliver-Davila and Rivera harbored animus toward Whites and Asians.  See Oct. 8 Tr. 184:17-185:3, 213:8-1; Oct. 21 Tr. 365:18-366:2, 368:5-14, 397:19-398:2, 399:5-8.  Nevertheless, the Coalition insisted that it need not prove animus because of the alternative theory it advanced, was adamant that it would prevail on the Joint Statement alone, and discouraged further development of the record.  See Tr. Case-Stated Hr'g 10:15-19, 15:24-16:3, 16:13-17, 21:4-22:3.[19]

### 1.   Rule 60(b)(2)

Against this backdrop, the Coalition fails to satisfy the second and fourth elements of Rule 60(b)(2).  See González-Piña, 407 F.3d at 433; Karak, 288 F.3d at 19-20.  Although these racist text messages are clearly new evidence, they are evidence that could have been discovered earlier by the Coalition had it not chosen to forgo discovery and followed to fruition its suspicions that Oliver-Davila and Rivera harbored racial animus.

As for the fourth prong, this evidence is not of such a nature that it would probably change the result were a new trial

---

[19] For the foregoing reasons, and the analysis developed further below, this Court would also deny relief under Rule 60(b)(6) if granted jurisdiction.

to be granted.  See González-Piña, 407 F.3d at 433; Karak, 288
F.3d at 19-20.  This Plan is not the celebrated result of
transcending racial classifications that this Court once found
it to be.  Three of the seven School Committee members harbored
some form of racial animus, and it is clear from the new record
that the race-neutral criteria were chosen precisely because of
their effect on racial demographics.  In other words, but for
the increase in Black and Latinx students at the Exam Schools,
the Plan's race-neutral criteria would not have been chosen.
While the increase of a zero-sum resource to one group
necessitates the reduction of that resource to others, the case
law is clear -- the concern is action taken because of animus
toward a group, not in spite of an action's necessary effect on
a group or groups.  See Personnel Adm'r of Mass. v. Feeney, 442
U.S. 256, 258 (1979).  The Plan's criteria are all facially race
neutral.  The precedent is clear that when the governmental
action is facially race neutral, "good faith [is] presumed in
the absence of a showing to the contrary," i.e., unless the
plaintiff proves disparate impact and discriminatory animus
under Arlington Heights.  See Bakke, 438 U.S. at 318-19; Village
of Arlington Heights, 429 U.S. at 266; Anderson, 375 F.3d at 83;
see also Parents Involved, 551 U.S. at 789 (Kennedy, J.)
(concurring in judgment and concurring in part); Lower Merion,

665 F.3d at 548; <u>Lewis</u>, 806 F.3d at 358; <u>Spurlock</u>, 716 F.3d at
394.

It ought be remembered that geographic and socioeconomic
diversity are appropriate, validated educational goals in their
own right, without any regard to racial demographics.  If the
only change possible is change free from any ignoble purpose, no
change is ever possible.

As this Court noted in its prior order, and as the First
Circuit noted in its denial for injunctive relief, the Coalition
failed to establish a disparate impact from the Plan.  <u>Boston
Parent II</u>, 996 F.3d at 46 (noting that the Coalition "for[went]
any serious engagement" with statistically analyzing the Plan's
alleged disparate impact); <u>id.</u> at 45-46; <u>Boston Parent I</u>, 2021
WL 1422827, at *14-15 (finding and ruling that the Coalition
failed to prove a disparate impact).

At trial, the Coalition relied on a projection -- not of
the Plan it challenged but a projection of a prior plan that was
amended by the Working Group into the present plan.  That
projection showed that White students would make up thirty-two
instead of thirty-nine percent of seats at the Exam Schools, and
that Asian students would make up sixteen instead of twenty-one

percent of seats at the Exam Schools.[20]  Recommendation 18.  As
this Court noted, White and Asian students combined comprise
twenty-three percent of school-age children in Boston but
represented fifty percent of incoming students at the Exam
Schools.  Id.  Thus, the Coalition's evidence of disparate
impact was a projection of a prior plan that showed White
students going from representing 243 percent of their share of
the school-age population in Boston to 200 percent, and Asian
students going from representing 300 percent of their share of
the school-age population in Boston to 228 percent.  Id.  Again,

---

[20] As both this Court and the First Circuit noted, even the
comparator used by the Coalition was specious.  The racial
demographics of the Exam Schools under the old plan were a
disjunctive consequence year to year; there was no guarantee
that any White or Asian student would even be admitted.  To use
a variable consequence as the baseline against which all future
must comport is erroneous.  White and Asian students are not
"losing" seats simply because last year different White and
Asian students were exceedingly privileged to win a high number
of seats without any evidence that this years' students would
have fared the same.  No such evidence was presented, and this
Court rejected the use of stereotypes to that effect.  See
Boston Parent II, 996 F.3d at 46 ("[A]s compared to a random
distribution of invitations, the Plan has no adverse disparate
impact on White and Asian students.  Rather, plaintiff is able
to generate a supposed adverse impact principally by comparing
the projected admissions under the Plan to prior admissions
under the predecessor plan.  Alternatively, plaintiff compares
projections under the Plan to projections of admissions based
only on GPA.  Either comparator does produce even higher
percentages of White and Asian students than does the Plan.  But
plaintiff offers no analysis or argument for why these
particular comparators, rather than a plan based on random
selection, are apt for purposes of determining adverse disparate
impact.").

this Court does not suggest that remaining overrepresented alone
precludes a disparate impact.  It simply notes that when a group
is as overrepresented as White and Asian students at the Exam
Schools, nearly any changes to the admissions process will
likely result in some reduction, if only from the law of
averages.  Absent any additional statistical analysis, such a
reduction is not a consequence that the caselaw considers a
disparate impact.  See Boston Parent II, 996 F.3d at 46
("[P]laintiff offers no evidence establishing that the numerical
decrease in the overrepresentation of Whites and Asians under
the Plan is statistically significant."); see generally, e.g.,
McCleskey v. Kemp, 481 U.S. 279 (1987); Washington v. Davis, 426
U.S. 229 (1976); Village of Arlington Heights, 429 U.S. at 266;
Yick Wo v. Hopkins, 118 U.S. 356 (1886); see also generally
Anderson, 375 F.3d at 87-90 (holding that the results were not
"stark" and did not qualify as a disparate impact under
Arlington Heights).

In the words of the First Circuit, "[a] party claiming a
disparate impact generally does not even get to first base
without such evidence."  Boston Parent II, 996 F.3d at 46.
Therefore, the new evidence is not of such a nature that it
would probably change the result were a new trial to be granted.
See González-Piña, 407 F.3d at 433; Karak, 288 F.3d at 19-20;
see also United States v. Armstrong, 517 U.S. 456, 465-69 (1996)

(requiring the plaintiff to prove both discriminatory purpose
and discriminatory effect).

### 2.    Rule 60(b)(3)

Similarly, the Coalition fails both prongs of Rule
60(b)(3).  See Anderson, 862 F.2d at 926.  First, the Coalition
fails to prove "misconduct by clear and convincing evidence."
See id.  As discussed above, the wrong established by the
Coalition is not the "misconduct" contemplated by Rule 60(b)(3)
because it occurred during an external state statutory process.
See Anderson, 862 F.2d at 924 (implying that "misconduct" under
Rule 60(b)(3) concerns misconduct between the parties during the
course of litigation).  To the extent that wrong misled this
Court, both parties are partially responsible for baking it into
the Joint Statement.  Moreover, the wrong did not substantially
interfere with the Coalition's "ability fully and fairly to
prepare for, and proceed at, trial."  See id. at 926.  As
discussed above, the Coalition elected to forgo a theory of
liability based upon racial animus.  In fact, the Coalition was
so confident that the Joint Statement would prove its
alternative theory of liability that it elected to forgo
discovery, despite evidence that the School Committee
Chairperson made racist statements and despite the Coalition's

suspicions that Oliver-Davila and Rivera had prejudices.[21]  See
Tr. Status Conference 23:2-5 ("We don't have to show racial
animus."); id. 15:24-16:3, 16:13-17, 21:4-22:3; Joint Statement
¶¶ 48-68; Transcription Oct. 21, 2020 Text Messages 1-2.  This
Court would have to blind itself to many of the Coalition's
tactical decisions and representations on the record to conclude
that the wrong "precluded inquiry into a plausible theory of
liability, denied it access to evidence that could well have
been probative on an important issue, or closed off a

---

[21] At trial, the Coalition demonstrated its suspicions
toward School Committee Member Rivera's statement at meetings,
such as the need to "be explicit about racial equity,"
"need[ing] to figure out again how we could increase those
admissions rates, especially for Latinx and [B]lack students,"
Oct. 8 Tr. 184:17-185:3, the Plan being a "step in the right
direction" for "addressing racial and ethnic disparities in
educational achievement and to advance ethnic studies and racial
equity in the school district," Oct. 21 Tr. 365:18-366:2, and
the Plan not going "far enough because [W]hite students continue
to benefit from thirty-two percent of the seats . . . ."  Id.
368:5-14.

    The Coalition demonstrated similar suspicions toward School
Committee Vice-Chairperson Oliver-Davila's statements, such as
"I want to see those schools reflect the District.  There's no
excuse, you know, for why they shouldn't reflect the District,
which has a larger Latino population and [B]lack African-
American population."  Oct. 8 Tr. 213:8-1.  "I mean, we know
that [B]lack and Latino youth are underrepresented, and they
have been locked out of this opportunity.  And for me, you know,
it's just criminal that the percentages have not increased."
Oct. 21 Tr. 397:19-398:2.  "I think that all of our schools
should reflect the student body that we have.  We should not --
it should not be acceptable to have schools that don't represent
that, just not acceptable."  Id. 399:5-8.

potentially fruitful avenue of direct or cross examination."
See Anderson, 862 F.2d at 924; Tr. Case-Stated Hr'g 10:15-19,
15:24-16:3, 16:13-17, 21:4-22:3.  Accordingly, it is not
appropriate to give the Coalition a second bite at the apple to
recast its theory of liability as one that the Coalition knew
existed but elected not to argue, and as to which there was some
evidence that the Coalition elected not to utilize.

**V.   CONCLUSION**

For the reasons discussed above, the motion under Rule
60(b) would be denied were this Court granted jurisdiction by
the First Circuit.[22]

This Court is well aware that this indicative ruling is
devoid of the valedictory tone of Boston Parent I, the withdrawn
opinion.  Indeed, it will doubtless complicate the work of
devoted public officials and public-spirited citizens involved
in crafting appropriate admissions procedures for the Exam
Schools in the 2022-2023 school year.  That can't be helped.
The first duty of a trial judge is to find the facts fairly and
accurately.[23]

---

[22] For the foregoing reasons, the motion would also be
denied as to count II, violation of Massachusetts General Law
chapter 76, section 5.

[23] A NOTE TO BOSTON SCHOOL STUDENTS: Are you following this case?
Not a very edifying spectacle, is it?  The Boston School
Committee is charged, under law, with providing each of you with

―――――――――――――

the finest education possible within the budget.  In voting on
your Exam School Admissions plan, the then chair mocked some of
you, your parents, or your friends.  Two of the then members
texted they "hated" you, your parents, or your friends.  The
Public Meeting Law requires disclosure of officials' discussions
of public matters.  Instead, the lawyers who are sworn to uphold
the law and who should have enforced this law simply deleted the
comments.  When found out, their trial lawyers first offered the
lamest of lame excuses.  As you well know, saying that you
"hate" a group of people is not the same as saying that you
"love Kit Kats."  When you agree that a document is "true and
accurate" you are necessarily agreeing that it is "complete."
And me?  The trial judge? -- I am revealed as a Pollyanna,
wanting to believe better of people than was in fact the case,
something you probably knew all along.

            You can do better than this.
            With love and respect, you will.
            We're counting on you.

_William G. Young_
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[24]

---

[24] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 43 years.